| | |
|---|---|
| In RE:<br>ROMAN CATHOLIC CHURCH OF THE<br>ARCHDIOCESE OF SANTA FE, A New Mexico<br>Corporation sole,<br>    Debtor. | CASE NO. 18-13027-T11 |

| | |
|---|---|
| THOMAS PAICKATTU,<br><br>    Plaintiff,<br><br>v.<br><br>ROMAN CATHOLIC CHURCH OF THE<br>ARCHDIOCESE OF SANTA FE, A New Mexico<br>Corporation sole,<br><br>    Defendant. | ADVERSARY PROCEEDING NO. |

## COMPLAINT FOR DENIAL OF DISCHARGE FOR DEBTOR MISCONDUCT

THOMAS PAICKATTU, through counsel Altura Law Firm (Andrew B. Indahl) asks the Court to deny Defendant's discharge of debt under 11 U.S.C. §§ 1141(d)(3)(C) and 727(a)(3), (2), (4)(C) and (4)(A) as follows:

### NATURE OF THE CASE

1. This is an adversary proceeding brought by a scheduled creditor to deny discharge to Debtor Archdiocese of Santa Fe ("ADSF") for debtor misconduct under 11 U.S.C. §§ 1141(d)(3)(C) and 727(a)(3), (2), (4)(C) and (4)(A).

2. Plaintiff is a priest who was appointed and supervised by Debtor ADSF to act as Parish Administrator for Holy Ghost Parish in Albuquerque from April to December 2017.

3. Plaintiff is also a scheduled creditor in this case, having filed a complaint alleging *civil racketeering* and *retaliatory discharge* against ADSF, Case Number D-202-CV-2018-

1

07481, filed October 12, 2018 (just under two months before this bankruptcy filing) in the Second Judicial District (Bernalillo County New Mexico).

4. Plaintiff's civil complaint alleged that Plaintiff observed *embezzlement* and *money laundering* at one of parishes under ADSF's authority and control, *reported it* to ADSF, and *requested that ADSF perform an audit* to inquire into these financial irregularities, but that instead of performing a proper audit, ADSF and its agents at the parish *destroyed all the relevant documents* and then *wrongfully terminated* and *libeled* Plaintiff to prevent him from disclosing what Plaintiff would later discovery was bankruptcy fraud.

5. Plaintiff now asks the Court to deny ADSF discharge based on the *bankruptcy fraud* his disclosure of which led to the wrongful termination that underlies his scheduled claim against ADSF.

## PARTIES, JURISDICTION AND VENUE

6. Plaintiff is a scheduled creditor in this matter, having filed suit against Defendant on October 12, 2018. [Doc 1] at p. 99.

7. Defendant is the Debtor in this matter, Case No. 18-13027-t11, a New Mexico corporation sole with its primary place of business in Albuquerque, New Mexico.

8. This is a core proceeding to the extent Plaintiff is seeking a determination of nondischargeability under 11 U.S.C. §§ 1141(d)(3)(C) and 727(a) of the United States Code (the "Bankruptcy Code").

9. The Bankruptcy Court has jurisdiction over the subject matter under 28 U.S.C §§ 1334(a) and (b), 157(b)(2)(J), Rules 4004 and 7001 of the Federal Rules of Bankruptcy Procedure, and § 727 of the Bankruptcy Code.

10. The proceeding is brought as an adversary proceeding under Rule 7001 of the Federal Rules of Bankruptcy Procedure.

11. Venue is proper in this Court because the case was filed in this District and pursuant to 28 U.S.C. § 1409.

## FACTUAL BACKGROUND

12. In April 2018, Debtor ADSF appointed Fr. Paickattu as parish administrator for Holy Ghost Parish, a parish under ADSF's authority and control.

13. Shortly after assuming his post as parish administrator, Fr. Paickattu uncovered severe financial improprieties at the church. As detailed below, these improprieties tended to show that the Archdiocese of Santa Fe (through its agents at Holy Ghost Parish) was engaged in a ***money laundering*** and ***embezzlement*** scheme which he would later discover was in fact ***bankruptcy fraud***.

14. Specifically: The Archdiocese of Santa Fe (through its agents at Holy Ghost) was ***concealing assets*** in anticipation of this bankruptcy by:

   a. Financially supporting Holy Ghost with ADSF funds in order to get those funds off its books; and

   b. Embezzling approximately $6,000 a week in cash donations from Holy Ghost Parish, and concealing those cash funds.

15. Upon information and belief Debtor ADSF is currently concealing the embezzled cash funds until after discharge, at which time it will reintroduce them unnoticed by adding them to weekly cash donations.

16. On October 2, 2017, based on his observations indicating rampant embezzlement in Holy Ghost Parish and as required by the Archdiocese's Fraud Policy and Fraud Response Plan [December 2005] Course of Action Section 1, Fr. Paickattu wrote Tony Salgado, Chief Financial Officer for the Archdiocese of Santa Fe, raising the improprieties and requesting an immediate audit. Vicar for Clergy Rev. John Daniel was copied on the letter.

17. At Mr. Salgado's direction, the next day, October 3, 2017, Plaintiff contacted Kim Montano, the Audit Director for the Archdiocese of Santa Fe, to schedule an audit.

18. When business manager Barbara Valdez learned of the impending audit, Plaintiff observed her walk out of her office and say "I wanna die, I wanna die, I wanna die."

19. The audit was scheduled to be completed on November 10, 2017.

20.     Instead of following proper procedures and placing Business Manager Barbara Valdez (who Plaintiff had identified as being engaged in financial improprieties) on administrative leave to prevent her from destroying the evidence, the ***Archdiocese's Director of Finance permitted Ms. Valdez continued unfettered access to the documents in question and then provided her with an extension of one month to make sure she had all the time she needed to destroy all evidence of embezzlement and money laundering.***

21.     Plaintiff then noticed a marked change in Barbara Valdez's work and behavior, including suspicious behavior such as checking cupboards and filing cabinets for records and working on weekends and at odd times when very few people were around.

22.     Ms. Valdez began working during weekends and at odd times to shred and alter incriminating financial documents without being noticed, at the direction of the Archdiocese of Santa Fe, in violation of 11 U.S.C. § 727(a)(3).

23.     In late October 2017, concerned that the financial improprieties were continuing and that evidence showing responsibility was being destroyed, Fr. Paickattu arranged for the donation bags to be counted at the Parish's bank instead of at the Parish.

24.     Immediately after the bank began counting receipts instead of Parish personnel, reported weekly receipts ***more than doubled***, increasing by approximately ***$6,000 per week***, reflecting the fact that approximately $6,000 per week was being embezzled before the policy change.

25.     Immediately after the parish discovered that weekly collections had increased as soon as the bank began counting the money, Parish Business Manager Barbara Valdez quit, threatening Plaintiff with legal action if her name were "slandered," i.e. if the truth about her embezzlement activities was made public.

26.     Four weeks after the Parish began having its bank count the collections, the bank notified the parish that the counting of money was too labor intensive and so it could no longer do it. At that time, the counting returned to the parish but was no longer performed by former

4

business manager Barbara Valdez, so the weekly receipts remained at the elevated level noticed by the bank.

27. After Barbara Valdez resigned, ADSF audit staff came to complete the audit. ***ADSF Audit Staff advised Plaintiff that nearly all of the relevant documents had been shredded by Ms. Valdez. In particular, all records of the number of bags of money at each service had been destroyed.***

28. ADSF audit staff then collected what few documents remained, and took them back to ADSF to be concealed or destroyed, and to prevent Fr. Paickattu from having access to them.

29. On December 15, 2018 ADSF staff completed the audit.

30. That same Friday, a Kenyan National employee of Holy Ghost, "Sister Josephine," was directed by ADSF Vicar General John C. Daniel to lodge false rape allegations against Fr. Paickattu by suggesting to her that she was in danger of being terminated, and suggested that bringing false allegations of rape against Fr. Paickattu would get her a "victim's visa," so she would not be returned to her home country of Kenya in the event of her termination.

31. "Sister Josephine" agreed, and (in order to avoid being deported) sent a text message to Fr. Paickattu threatening to "ruin his ministry in this country."

32. The following Monday, December 18, 2017 "Sister Josephine" made false allegations of rape against Plaintiff as suggested by ADSF Vicar General John C. Daniel.

33. ADSF then used these false rape allegations as a pretext to banish Fr. Paickattu from his workplace in order to prevent him from further exposing its bankruptcy fraud.

34. Specifically: ADSF Vicar General John C. Daniel banished Fr. Paickattu from his workplace and prohibited him from speaking with any parishioners.

35. ADSF then performed a sham "investigation" into the false rape allegations and determined that there was "not sufficient evidence" to determine "whether or not" they were true.

5

Case 18-13027-t11    Doc 106    Filed 02/26/19    Entered 02/26/19 08:58:08 Page 5 of 10

36. By means of this mealy-mouthed non-determination of the truth of the allegations, ADSF justified its continued ostracism of Plaintiff from the Parish and its continued coverup of the bankruptcy fraud Plaintiff had discovered.

37. Then, in order to keep Fr. Paickattu shut up and continue to cover up its ongoing bankruptcy fraud, ADSF claimed that "credible allegations of [unspecified] office misconduct" (including unspecified acts of sexual harassment) had been made which required his continued ostracism from the Parish.

38. Fr. Paickattu was never told with specificity what the allegations against him were and was never interviewed regarding these allegations before ADSF determined they were credible.

39. Fr. Paickattu subsequently met with Archbishop John Wester and Vicar John C. Daniel, and was advised by them that the "credible allegations" required his continued ostracism, but was never told what the "credible allegations" and was never given a chance to respond to them.

40. In a fit of stunning racism, during that meeting ADSF Archbishop John Wester and Vicar General John C. Daniel suggested that the alleged sexual harassment may have been normal and acceptable in Fr. Paickattu's native India.

41. In response, Fr. Paickattu advised ADSF Archbishop John Wester and Vicar General John C. Daniel that in his home culture, men do not even customarily shake the hands of women they are unmarried to.

42. During this meeting, **Fr. Paickattu advised ADSF Archbishop John Wester and Vicar General John C. Daniel in detail of the embezzlement and destruction of documents** he had observed.

43. ADSF Archbishop John Wester and Vicar General John C. Daniel expressed no interest in investigating the embezzlement and destruction of documents, because they were already fully aware of the ongoing bankruptcy fraud and were in the process of covering it up by destroying Fr. Paickattu's career.

44. ADSF Archbishop John Wester and Vicar General John C. Daniel promised to perform a canonical investigation into the allegations against Fr. Paickattu, but never did because they knew any objective investigation into the false allegations would reveal that they were false.

45. In March 2018, ADSF Archbishop John Wester and Vicar General John C. Daniel advised Fr. Paickattu that his green card process had been terminated and that he was required to remove his possessions from the Holy Ghost rectory.

46. In July 2018, Fr. Paickattu was cleared by the Bernalillo County District Attorney of the false rape allegations brought against him by "Sister Josephine."

47. The next day, while Fr. Paickattu was in Canada, ADSF Archbishop John Wester and Vicar General John C. Daniel terminated Fr. Paickattu's employment by phone.

48. This also terminated Fr. Paickattu's work visa, preventing him from returning to the country to expose ADSF's embezzlement, unlawful destruction of documents, and bankruptcy fraud.

49. As a result, Fr. Paickattu was forced to return to India and is currently unable to re-enter the United States and expose ADSF's bankruptcy fraud.

50. On October 12, 2018 Fr. Paickattu filed his complaint in the Second Judicial District for RETALIATORY DISCHARGE and CIVIL RACKETEERING, D-202-CV-2018-07481 (Second Judicial District, Bernalillo County), alleging the acts of embezzlement and money laundering described above. Ex 1.

51. Plaintiff's pending lawsuit is a scheduled debt in this bankruptcy.

52. ADSF Attorneys responded to the Complaint with a Motion to Dismiss incorrectly arguing that ADSF was immune from the suit on First Amendment Grounds.

53. On November 30, 2018, Fr. Paickattu filed his response to the Motion to Dismiss, demonstrating that ADSF is not immune from suit on First Amendment Grounds because the matters underlying this case (embezzlement and false allegations of sexual harassment) are purely secular.

7

54. The next day, December 1, 2018, counsel retained by ADSF to defend "Sister Josephine" proposed an order *sealing the record* in that case, in order to prevent *this Court* from discovering its allegations amounting to bankruptcy fraud.

55. The same proposed order also suggested a *restraining order* prohibiting Fr. Paickattu (who lived in India and was unable to return to the country) and his *counsel* from having any contact with "Sister Josephine," in an effort to prevent "Sister Josephine" from learning that she is just a pawn in ADSF's bankruptcy fraud scheme.

56. The next day, December 2, 2018, ADSF publicly announced its intent to file bankruptcy.

57. At that time, it became clear for the first time that the embezzlement, money laundering, and unlawful destruction of financial documents Fr. Paickattu had observed (as well as ADSF's draconian reaction to his exposing it) had in fact been bankruptcy fraud.

## COUNT I:  DENIAL OF DISCHARGE UNDER 11 U.S.C. §§ 1141(d)(3)(C) and 727(a)(3) FOR DESTRUCTION OF FINANCIAL DOCUMENTS

58. Fr. Paickattu incorporates the allegations contained in the preceding paragraphs.

59. The Court must deny bankruptcy to any debtor who would be denied under Section 727(a) if the case were a case under Chapter 7.  11 U.S.C. §§ 1141(d)(3)(C).

60. The Court must deny discharge if "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case."  11 U.S.C.A. § 727(a)(3).

61. Debtor ADSF "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained," when between October and December 2017, ADSF, through its agent Barbara Valdez, destroyed all financial

8

records at Holy Ghost Parish, an entity ADSF was using to launder money and conceal funds as part of its bankruptcy fraud.

62. The records that were destroyed established that ADSF was engaged in bankruptcy fraud through embezzlement and money laundering by a) supporting Holy Ghost financially to get funds off its books, b) embezzling cash donations from Holy Ghost parishioners, and c) concealing those cash donations until after discharge, at which time the cash donations will be reintroduced to ADSF's books through weekly donations.

**COUNT II: DENIAL OF DISCHARGE UNDER 11 U.S.C. §§ 1141(d)(3)(C) and 727(a)(2) FOR CONCEALING ASSETS**

63. Fr. Paickattu incorporates the allegations contained in the preceding paragraphs.

64. The Court must deny discharge to any debtor who would be denied under Section 727(a) if the case were a case under Chapter 7. 11 U.S.C. §§ 1141(d)(3)(C).

65. The Court must deny discharge to any debtor who conceals property of the debtor within one year before the date of the filing of the petition. 11 U.S.C. § 727(a)(2).

66. Upon information and belief After Fr. Paickattu was removed from his position as Parish Administrator in December 2017, ADSF resumed its money laundering activities, concealing its funds as cash by financially supporting Holy Ghost Parish and then embezzling Holy Ghost's cash donations and concealing them in order to reintroduce them to ADSF's accounts after discharge.

67. Upon information and belief, ADSF engaged in the same activity at other Parishes falling under its authority.

**COUNT III: DENIAL OF DISCHARGE UNDER 11 U.S.C. §§ 1141(d)(3)(C) and 727(a)(4)(C) FOR OFFERING AN ADVANTAGE FOR ACTING OR FORBEARING TO ACT**

68. Fr. Paickattu incorporates the allegations contained in the preceding paragraphs.

69. The Court must deny discharge to any debtor who would be denied under Section 727(a) if the case were a case under Chapter 7. 11 U.S.C. §§ 1141(d)(3)(C).

70.     The Court must deny discharge to any debtor who offers an advantage for acting or forbearing to act.  11 U.S.C. 727(A)(4)(C).

71.     Debtor ADSF offered "Sister Josephine" the advantage of continued employment, work visa, and life in the United States (rather than in her home country, Kenya) for acting to lodge false rape allegations against Fr. Paickattu in order to prevent him from exposing their bankruptcy fraud.

### COUNT IV:  DENIAL OF DISCHARGE UNDER 11 U.S.C. §§ 1141(d)(3)(C) and 727(a)(4)(A) FOR MAKING A FALSE ACCOUNT

72.     Fr. Paickattu incorporates the allegations contained in the preceding paragraphs.

73.     The Court must deny discharge to any debtor who would be denied under Section 727(a) if the case were a case under Chapter 7.  11 U.S.C. §§ 1141(d)(3)(C).

74.     The Court must deny discharge to any debtor who made a false account.  11 U.S.C. § 727 (a)(4)(A).

75.     Upon information and belief, Debtor ADSF has presented a false account of its assets because it has not included the cash assets embezzled from Holy Ghost Parish and other Parishes under its authority.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in his favor and deny ADSF discharge, as well as any other relief the Court deems necessary and appropriate.

Respectfully Submitted,

//s// Andrew Indahl//s//
Andrew Indahl
Altura Law Firm
500 Marquette Dr. NW
Suite 1200
Albuquerque NM 87102
andy@alturalawfirm.com