# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| In re:<br><br>ROMAN CATHOLIC CHURCH OF THE<br>ARCHDIOCESE OF SANTA FE, a New Mexico<br>corporation sole,<br><br>                    Debtor. | Chapter 11<br><br>Case No. 18-13027-t11 |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS: (I) FOR EXCLUSIVE AND IRREVOCABLE
AUTHORITY TO COMMENCE, PROSECUTE, AND SETTLE
ADVERSARY PROCEEDINGS ON BEHALF OF BANKRUPTCY
ESTATE AGAINST CERTAIN DIOCESE-RELATED ENTITIES; AND
(II) TO COMPEL THE DEBTOR TO PRODUCE INFORMATION
REVEALING THE TEN PARISHES WITH THE LARGEST
<u>PURPORTED INTERESTS IN THE DEPOSIT AND LOAN FUND</u>**

# TABLE OF CONTENTS

**Pages**

I.     INTRODUCTION ................................................................................................ 1

II.    FACTUAL BACKGROUND ............................................................................. 4

     A.    The Restructuring ................................................................................. 4

     B.    The RE Trust ........................................................................................ 5

     C.    The DLF Trust ..................................................................................... 7

     D.    Intentional Fraud ................................................................................. 9

     E.    Unrecorded Interests in Real Property ............................................. 12

     F.    The Bankruptcy .................................................................................. 13

     G.    ASF's Refusal to Pursue the Claims ................................................. 15

III.    JURISDICTION AND RELIEF REQUESTED ............................................. 15

IV.    STANDARDS FOR DERIVATIVE STANDING ......................................... 16

     A.    The Estate's Fraudulent Transfer Claims Are Timely. ...................... 18

           1.    The Fraudulent Transfer Claims Are Timely Under New Mexico's Uniform Voidable Transactions Act. ...................... 20

           2.    The Fraudulent Transfer Claims are Timely Under Applicable Federal Law Because the IRS Was a Creditor of the Estate on the Petition Date ....................................... 22

     B.    The Fraudulent Transfer Claims Are Colorable. ............................... 25

           1.    The Standard for Determining if Claims Are Colorable .......................... 25

           2.    ASF Transferred Property of the Estate to the RE Trust and the DLF Trust ................................................................. 27

           3.    The Estate Has Colorable Claims That ASF Transferred Property of the Estate With Actual Intent to Hinder, Delay, or Defraud Creditors .................................................................. 30

           4.    The Estate Has Colorable Claims That ASF Made Constructively Fraudulent Transfers to the RE Trust and the DLF Trust. ....................... 32

**C.**      The Estates' Claims to Avoid the Parishes Unrecorded Purported Beneficial Interests in ASF's Real Property Under Bankruptcy Code Section 544(a)(3) Are Colorable.................................................. 32

         **1.**      A BFP Would Have No Record Notice of the Parishes' Alleged Interests in the Disputed Real Property. .................................. 34

         **2.**      A BFP Would Have No Inquiry Notice of the Parishes' Alleged Interests in the Disputed Real Property. .................................. 34

**D.**      The Self-Settled Trust Claims Are Colorable........................................ 36

         **1.**      The Self-Settled Trust Claims Under Bankruptcy Code Section 548(e) Are Colorable. ................................................................. 36

         **2.**      The Self-Settled Trust Claims Under Bankruptcy Code Section 544 and New Mexico Trust Law Are Colorable........................... 38

**E.**      Prosecution of the Adversary Actions Will Benefit the Estate and the Debtor's Refusal to Prosecute Such Claims Is Unjustifiable.............................. 41

**V.**      **THE COURT SHOULD ORDER ASF TO PRODUCE INFORMATION TO THE COMMITTEE CONCERNING THE PARISHES' PURPORTED INTERESTS IN THE DLF TRUST** .............................................................. 42

**VI.**      **CONCLUSION** ........................................................................... 42

# TABLE OF AUTHORITIES

## CASES

*Adelphia Comm. Corp. v. Bank of America (In re Adelphia Comm. Corp.),*
    330 B.R. 364 (Bankr. S.D.N.Y. 2005) ................................................................. 17, 26

*AG N.M., FCS, ACA v. Borges* (*In re Borges*),
    510 B.R. 306 (10th Cir. B.A.P. 2014) ................................................................. 33, 34

*Akoury v. Roman Catholic Archbishop,*
    2004 Mass. Super. LEXIS 349 (Sept. 14, 2004) ....................................................... 28

*Albers v. Church of Nazarene,*
    698 F.2d 852 (7th Cir. 1983) ........................................................................... 28

*Alberts v. HCA Inc. (In re Greater Southeast Comty. Hosp. Corp. I),*
    365 B.R. 293 (Bankr. D.D.C. 2006) ............................................................... 24, 25

*Avalanche Maritime, Ltd. v. Parekh (In re Parmetex, Inc.),*
    199 F. 3d 1029 (9th Cir. 1999) ....................................................................... 16

*Bloom v. Fray (In re Leach),*
    380 B.R. 25 (Bankr. D.N.M. 2007) .................................................................. 20

*Bloom v. Reynolds* (*In re Wilson*),
    2009 Bankr. LEXIS 2823 (Bankr. D. N.M. Aug. 21, 2009) ......................................... 33

*Blue Canyon Well Ass'n v. Jevne,*
    2018-NMCA-004 (Ct. App. 2017) ................................................................... 29

*Brakhahn v. Nash* (*In re Brakhahn*),
    2019 Bankr. LEXIS 185 (Bankr. D. N.M. Jan. 24, 2019) ......................................... 33, 34

*Canadian Pac. Forest Prods. Ltd. v. J.D. Irving Ltd. (In re Gibson Group, Inc.),*
    66 F. 3d 1436 (6th Cir. 1995) ....................................................................... 16

*Citizens Bank v. Hodges,*
    107 N.M. 329 (1988) ................................................................................. 35

*City of Rio Rancho v. Amrep S.W. Inc.,*
    150 N.M. 428 (2011) ................................................................................. 35

*Committee of Tort Litigants v. Catholic Diocese of Spokane,*
    2006 U.S. Dist. LEXIS 6025 (E.D. Wash. Jan. 24, 2006) ............................................. 1

*Crowder v. Crowder (In re Crowder)*,
    225 B.R. 794 (Bankr. D. N.M. 1998) ................................................................ 33

*Dymarkowski v. Savage (In re Hadley)*,
    541 B.R. 829 (Bankr. N.D. Ohio 2015) ........................................................... 39

*E.E.O.C. v. St. Francis Xavier Parochial Sch.*,
    77 F. Supp. 2d 71 (D.D.C. 1999) .................................................................... 28

*Ebner v. Kaiser (In re Kaiser)*,
    525 B.R. 697 (Bankr. N.D. Ill. 2014) .......................................................... 23, 24

*Elstner-Bailey v. Fannie Mae (In re Elstner-Bailey)*,
    2011 Bankr. LEXIS 4802 (BAP 9th Cir. Oct. 4, 2011) ...................................... 26

*F.E.L. Publ'ns, Ltd. v. Catholic Bishop*,
    754 F.2d 216 (7th Cir. 1984) ......................................................................... 28

*Flanagan v. Benvie*,
    58 N.M. 525 (1954) ...................................................................................... 29

*Fogel v. Zell*,
    221 F. 3d 955 (7th Cir. 2000) ....................................................................... 16

*FTC v. Freecom Communications, Inc.*,
    401 F. 3d 1192 (10th Cir. 2005) .................................................................... 25

*Galich v. Catholic Bishop*,
    75 Ill. App. 3d 538 (1979) ............................................................................. 28

*G-I Holdings v. Those Parties (In re G-I Holdings)*,
    313 B.R. 612 (Bankr. D.N.J. 2004) ................................................................ 26

*Griffith v. Keystone Steel & Wire*,
    887 F. Supp. 1133 (C.D. Ill. 1995) ................................................................. 28

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
    530 U.S. 1 (2000) ......................................................................................... 17

*Hill v. Akamai Techs., Inc. (In re MS55)*,
    477 F. 3d 1131 (10th Cir. 2007) .................................................................... 17

*Hillen v. City of Many Trees, LLC (In re CVAH, Inc.)*,
    570 B.R. 816 (Bankr. D. Idaho 2017) ............................................................. 23

*In Racing Servs., Inc.*,
    540 F. 3d 892 (8th Cir. 2008) ................................................................... 18, 41

*In re Behrends v. Oletski-Behrends (In re Behrends),*
  2017 Bankr. LEXIS 3674 (Bankr. D. Colo. April 10, 2017)................................................... 24

*In re Dry Wall Supply, Inc.,*
  111 B.R. 933 (D. Colo. 1990) ...................................................................................... 21

*In re LTV Steel Co.,*
  333 B.R. 397 (Bankr. N.D. Ohio 2005) ...................................................................... 26

*In re Potter,*
  2008 Bankr. LEXIS 3351 (Bankr. D.N.M. July 29, 2008) ...................................... 37

*In re Rodriguez,*
  487 B.R. 275 (Bankr. D. N.M. 2013) ......................................................................... 17

*In re STN Enterprises,*
  779 F.2d 901 (2d Cir. 1985) ....................................................................................... 26

*Lawrence Nat'l Bank v. Edmonds (In re Edmonds),*
  924 F. 2d 176 (10th Cir. 1991) .................................................................................. 26

*Louisiana World Exposition v. Federal Ins. Co.,*
  858 F. 2d 233 (5th Cir. 1988) .................................................................................... 16

*Mazer v. Jones (In re Jones),*
  184 B.R. 377 (D.N.M. 1995) ...................................................................................... 30

*Mukamal v. Citibank N.A. (In re Kipnis),*
  555 B.R. 877 (Bankr. S.D. Fla. 2016) ................................................................. 23, 24

*Official Comm. of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc.*
  *(In re Catholic Diocese of Wilmington, Inc.),*
  432 B.R. 135 (Bankr. D. Del. 2010) .......................................................................... 27

*Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.),*
  330 F. 3d 548 (3d Cir. 2003) ................................................................................ 16, 18

*Official Comm. v. Hudson United Bank (In re America's Hobby Ctr.),*
  223 B.R. 275 (Bankr. S.D.N.Y. 1998)........................................................................ 26

*Oldham v. Oldham,*
  149 N.M. 215 (2011) .................................................................................................. 38

*Osherow v. Porras (In re Porras),*
  312 B.R. 81 (Bankr. W.D. Tex. 2004) ....................................................................... 24

*Pandy v. Indep. Bank,*
  2016 CO 49 (2016) ..................................................................................................... 38

*PW Enterprises, Inc. v. North Dakota Racing Comm. (In re Racing Servs., Inc.),*
540 F. 3d 892 (8th Cir. 2008) ....................................................................................... 16

*Ransel v. Libertyville Bank & Trust Co. (In re Holco Capital Group, Inc.),*
2013 Bankr. LEXIS 4086 (Bankr. N.D. Ind. Sep. 25, 2013) ..................................... 36

*Rindlesbach v. Jones,*
532 B.R. 850 (D. Utah 2015) ....................................................................................... 16

*Roeder v. Priscilla Avers Family Trust (In re Avers),*
2015 Bankr. LEXIS 1623 (Bankr. W.D. Pa. May 13, 2015) ..................................... 37

*Romero v. Sanchez,*
83 N.M. 358 (1971) ..................................................................................................... 21

*Safanda v. Castellano (In re Castellano),*
514 B.R. 555 (Bankr. N.D. Ill. 2014) ......................................................................... 36

*Schlaifer Nance & Co,*
194 F. 3d 323 (2d Cir. 1999) ....................................................................................... 25

*Sender v. Simon,*
84 F. 3d 1299 (10th Cir. 1996) .................................................................................... 19

*Shearer v. Tepsic (In re Emergency Monitoring Technologies, Inc.),*
347 B.R. 17 (Bankr. W.D. Pa. 2006) .......................................................................... 24

*Smart World Techs., LLC v. Juno Online Servs. Inc. (In re Smart World Techs., LLC),*
423 F.3d 166 (2d Cir. 2005) ........................................................................................ 16

*Springs East Land Co., LLC v. Goss (In re Ellicott Springs Res., LLC),*
485 B.R. 626 (Bankr. D. Colo. 2013) ............................................................. 16, 17, 41

*Starzynski v. Sequoia Forest Industries,*
72 F.3d 816 (10th Cir. 1995) ...................................................................................... 17

*Taylor v. Rupp (In re Taylor),*
133 F.3d 1336 (10th Cir. 1998) .................................................................................. 27

*Tort Claimants' Comm. v. Roman Catholic Archbishop*
*(In re Roman Catholic Archbishop of Portland in Oregon),*
335 B.R. 868 (Bankr. D. Or. 2005) ..................................................................... passim

*U.S. v. Summerlin,*
310 U.S. 414 (1940) ..................................................................................................... 23

*United Phosphorus, Ltd. v. Fox (In re Fox),*
305 B.R. 912 (10th Cir. B.A.P. 2004) .................................................................... 16, 17

*Vieira v. Gaither (In re Gaither),*
   595 B.R. 201 (Bankr. D. S.C. 2018) ............................................................... 23, 24

*Village of Overland Pointe, LLC v. Terra Bentley II, LLC (In re Bentley II, LLC),*
   2011 Bankr. LEXIS 806 (Bankr. D. Kan. Mar. 2, 2011) ..................................... 16, 18

*Wagner v. Eberhard (In re Vaughan Co.),*
   2014 Bankr. LEXIS 305 (Bankr. D. N.M. Jan. 23, 2014) ....................................... 39

*Wagner v. Pruett (In re Vaughan Co.),*
   477 B.R. 206 (Bankr. N.M. 2012) ...................................................................... 21, 23

*Wagner v. Ultima Homes, Inc. (In re Vaughan Co. Realtors),*
   498 B.R. 297 (Bankr. D. N.M. 2013) ......................................................................... 24

*Watkins v. Watkins,*
   922 F.2d 1513 (10th Cir. 1991) .................................................................................. 33

*Western Prod. Credit Ass'n v. Kear,*
   104 N.M. 494 (1986) ................................................................................................... 32

## STATUTES

11 U.S.C. § 101(54) ........................................................................................................ 30

11 U.S.C. § 506(c) .......................................................................................................... 17

11 U.S.C. § 544(b) ................................................................................................... passim

11 U.S.C. § 548 ......................................................................................................... 36, 37

26 U.S.C. § 6502 ............................................................................................................. 23

28 U.S.C. § 3304 ............................................................................................................. 22

28 U.S.C. § 3306(b) .................................................................................................. 22, 25

## OTHER AUTHORITIES

16 Am. Jur. 2d *Trusts* § 240 (2005) .............................................................................. 29

RESTATEMENT (SECOND) OF TRUSTS § 116 (1959) ......................................................... 29

RESTATEMENT (THIRD) OF TRUSTS § 43 (2003) .............................................................. 30

The Official Committee of Unsecured Creditors (the "Committee") of the Roman

Catholic Church of the Archdiocese of Santa Fe, a New Mexico non-profit corporation ("ASF"

or the "Debtor") moves: (i) for the exclusive and irrevocable authority to commence, prosecute,

and settle three complaints against two trusts created by the Debtor, against the the trustees, and

certain representative parishes (the "Parishes") as purported beneficiaries of the trusts; and (ii) to

compel ASF to produce information revealing the ten parishes with the largest purported

beneficial interests in the Deposit and Loan Fund. The complaints include claims for avoidance

of fraudulent transfers and interests under 11 U.S.C. sections 544 and 550 ("Fraudulent

Transfers"), claims to avoid alleged unrecorded interests in real property, as well as claims for

the avoidance of transfers to self-settled trusts under 11 U.S.C. section 548(e) and declaratory

relief that the assets held in the self-settled trusts constitute property of the estate pursuant to 11

U.S.C. section 541 (collectively, the "Self-Settled Trust Claims").[1] The Committee seeks

standing to file three complaints in substantially the forms attached to the Declaration of Kenneth

H. Brown ("Brown Decl.") as Exhibits A, B, and C.

## I.        INTRODUCTION

The lynchpin of ASF's reorganization is a determination of what constitutes property of

the estate. In the face of escalating claims by childhood sexual abuse survivors (the

"Survivors"), prior to filing bankruptcy, ASF engaged in a massive and fraudulent scheme to

---

[1] The Committee's proposed Adversary Actions include claims for declaratory relief that certain assets are property of the estate. While Court approval of derivative standing is required to pursue an action pursuant to Bankruptcy Code sections 544 and 548, permission is not required to determine property of the estate under section 541. *See, e.g., Committee of Tort Litigants v. Catholic Diocese of Spokane,* 2006 U.S. Dist. LEXIS 6025 at *5 (E.D. Wash. Jan. 24, 2006) (stating that committee did not have to receive "specific permission . . . to bring an adversary action to determine the assets of the estate), *rev'd in part on other grounds,* 364 B.R. 81 (E.D. Wash. 2006).

place its assets beyond the reach of its creditors, while ensuring the Archbishop remained in control of the assets. The scheme was intended to remove hundreds of millions of dollars of assets from ASF's balance sheet and into self-settled, revocable trusts controlled by ASF and the Archbishop. This was accomplished by a corporate restructuring (the "Restructuring") consisting of, among other things, the incorporation of previously unincorporated Parishes and the formation of two revocable self-settled trusts controlled by ASF—one for the receipt of ASF's real estate (the "RE Trust"), and one for the receipt of ASF's financial assets, otherwise known as funds from the Deposit and Loan Fund (the "DLF Trust"). Between 2013 and 2018, ASF's assets were transferred to these trusts without consideration. As of the Petition Date, the Parishes were separately incorporated, ASF's financial assets had been transferred to the DLF Trust, and most (but not all) of its real property had been transferred to the RE Trust.

ASF now disclaims any interest in hundreds million dollars' worth of real property and financial assets held in the RE Trust and the DLF Trust, as well as real properties that remain titled to ASF, asserting that these assets are held in an equitable trust for the benefit of the Parishes. The Committee seeks authority to avoid the fraudulent transfers to the RE Trust and the DLF Trust, obtain declaratory relief that the assets held by these trusts are subject to the claims of creditors and are property of the estate because the trusts are self-settled and revocable by ASF, and avoid the Parishes' purported unrecorded interests in the real estate that remains titled to ASF.

The Committee seeks authority to file, prosecute, and settle the claims set forth in three complaints ("Complaints") that seek to bring over $245,000,000 of value into the estate for the

benefit of creditors and to undo ASF's pre-bankruptcy asset protection scheme. The Complaints

are summarized as follows:

- **"RE Trust Complaint"**: A complaint against The Archdiocese of Santa Fe Real Estate Corporation, as the sole trustee of the RE Trust, ASF and ten representative parishes that are the purported beneficiaries of the RE Trust ("RE Trust Complaint") to (i) to avoid the fraudulent transfers to the RE Trust; (ii) obtain declaratory relief that the RE Trust is a self-settled trust and therefore its assets are subject to the claims of ASF's creditors and property of the estate; and (iii) injunctive relief compelling ASF to exercise its right to revoke the RE Trust. The ten representative parishes have been chosen based on the Committee's understanding of the substantial value of their purported beneficial interests in the trust. A copy of a draft of the RE Trust Complaint is attached to the Brown Decl. as Exhibit A.

- **"DLF Trust Complaint"**: A complaint against Rev. Msgr. Lambert J. Luna, Rev. John Cannon, Rev. Timothy A. Martinez, Rev. Clarence Maes, Rev. John Trambley, Very Rev. James Marshall, Rev. Msgr. Bennett J. Voorhies, Tony Salgado, Jennifer Cantrell, Bernard E. "Gig" Brummell, and Stan Sluder, solely in their capacity as trustees of The Archdiocese of Santa Fe Deposit and Loan Fund, ASF, and ten representative parishes on essentially the same grounds as the RE Trust Complaint with respect to investment assets ("DLF Trust Complaint"). The Committee intends to name the ten parishes with the largest alleged beneficial interests in the Deposit and Loan Fund and has twice requested this information from ASF. ASF has not provided it to the Committee. A copy of a draft of the DLF Trust Complaint is attached to the Brown Decl. as Exhibit B.

- **"Complaint to Avoid Unrecorded Interests"**: A complaint against ASF and ten representative parishes pursuant to 11 U.S.C. 544(a)(3) to avoid the alleged unrecorded interests of the parishes in real property titled to ASF and quiet title ("Complaint to Avoid Unrecorded Interests"). The ten representative parishes have been selected based on the Committee's understanding that they assert beneficial interests in property titled to ASF with substantial value. A copy of a draft of the Complaint to Avoid Unrecorded Interests is attached to the Brown Decl. as Exhibit C.

The Committee brings this Motion for standing to prosecute these claims because ASF

suffers from a profound and irreconcilable conflict as it is the architect of the fraudulent scheme

to put its assets beyond the reach of its creditors. It has no intention or interest in fulfilling its

fiduciary duties to the estate and its creditors. Its primary objective is to keep these assets out of the estate and out of the reach of its creditors rather than to maximize the assets of the estate. As set forth below, the estate has strong factual and legal grounds to pursue these claims and the prosecution of these claims will benefit the estate.

To date, the Committee and ASF have engaged in four days of in-person mediation and numerous additional calls with the mediators, and have been unable to reach an acceptable compromise. The Committee believes that litigation to determine the estate's interest in assets that are the subject of the foregoing Complaints is critical to advance settlement discussions toward a consensual plan of reorganization and, in the absence of a global settlement, to value the estate's assets and any contributions by non-debtor parties that seek releases in the event of a cram down plan.

## II.     FACTUAL BACKGROUND

### A.     The Restructuring

1.     In late 2007, ASF began to consider the Restructuring to insulate its assets from the claims of the Survivors. Brown Decl., Exh. G (Agenda re ASF Corporate Reorganization); Exh. H (Presbtyeral Meeting Minutes, p. 2: "protection of parish assets from settlements from litigation"). The Restructuring involved incorporation of approximately ninety-two parishes, the formation of the RE Trust and the DLF Trust, and transfer of ASF's real estate and financial assets to the two trusts, respectively, without consideration. Brown Decl., Exh. I (Parish Incorporation PowerPoint). Documents were executed to effectuate the Restructuring on January 1, 2013, although the actual transfer of ASF's assets took place over time.

**B.     The RE Trust**

2.      Effective January 1, 2013, ASF, as the sole settlor/grantor, created the RE Trust for the purpose of receiving transfers of ASF's real property and placing those assets out of the reach of its creditors.  A copy of the Indenture of Trust of the RE Trust ("RE Trust Indenture") is attached as Exhibit J to the Brown Decl.

3.      Shortly before the trust creation, in December 2012, ASF created the Archdiocese of Santa Fe Real Estate Corporation ("RE Corp."), a nonprofit corporation organized under the law of the State of New Mexico.  Brown Decl., Exh. K (RE Corp. Articles of Incorporation).  RE Corp. is the sole trustee of the RE Trust.  Brown Decl., Exh. J (RE Trust Indenture, ¶ 5).

4.      Pursuant to the Bylaws of RE Corp., the Archbishop is the sole member of RE Corp. and controls ASF.  The Archbishop appoints and removes RE Corp.'s directors and holds power over all actions of RE Corp. as trustee, including the purchase, sale, lease, or improvement of any real estate held or used by the RE Trust.  Brown Decl., Exh. L (RE Corp. Bylaws, Articles IV and V).

5.      ASF was the sole grantor/settlor of the RE Trust.  Brown Decl., Exh. J (RE Trust Indenture, ASF defined and referred to as "Grantor").

6.      Paragraph 2.d of the RE Trust Indenture expressly states that ASF is a beneficiary of the RE Trust. Brown Decl., Exh. J (RE Trust Indenture ¶ 2d: Beneficiaries defined).

7.      Paragraph 12 of the RE Trust Indenture expressly provides that the RE Trust is revocable by ASF.  Brown Decl., Exh. J (RE Trust Indenture, ¶ 12: "The Grantor may terminate the Trust by delivering written notice to the Trustee.").

8. The stated purpose of the RE Trust is to "support the religious, charitable and educational purposes" of ASF, the Parishes, and other affiliated entities. Brown Decl., Exh. J (RE Trust Indenture, ¶ 4).

9. Effective January 1, 2013, as part of the Restructuring, ASF, on the one hand, and RE Corp. as trustee for the RE Trust, on the other hand, entered into a *Real Estate Support Services Agreement* pursuant to which ASF maintains control of the real property transferred to the RE Trust under the guise of providing real estate, construction, and property management services. Brown Decl., Exh. M (RE Support Services Agreement). Accordingly, creation of the RE Trust served to divest ASF of legal title to real property, while it continues to exercise complete control over the use and disposition of all real property.

10. Based on the Committee's review and analysis of documents produced by ASF, the Committee believes that between January 1, 2013 and the Petition Date, ASF cumulatively transferred real properties (the "RE Trust Transfers") that ASF values in excess of $163 million to the RE Trust without consideration. Brown Decl., ¶ 18.

11. The RE Trust Transfers were typically made by Special Warranty Deed from ASF to RE Corp. for the benefit of a named parish, without consideration or reference to any consideration. An example of a transfer by Special Warranty Deed is attached to the Brown Decl. as Exhibit N.

12. The RE Trust Transfers have not been fully disclosed on ASF's Statement of Financial Affairs (as amended, "SOFA") and Schedules of Assets and Liabilities because many of the transfers took place more than two years prior to the Petition Date. ASF acknowledges

that during the two-year period prior to the Petition Date, it transferred real properties to the RE Trust valued at more than $34.2 million. Brown Decl., Exh. O (SOFA Exh. 4, Docket No. 95-4). As discussed below, ASF did not complete its anticipated transfers to the RE Trust prior to the Petition Date so additional real property remains legally titled with ASF, which ASF contends is equitably held in trust for the benefit of its parishes, notwithstanding the absence of any written trust agreements.

**C.     The DLF Trust**

13.     Effective January 1, 2013, ASF as the sole settlor/grantor, created the DLF Trust for the purpose of receiving its financial assets and placing them out of the reach of its creditors as part the Restructuring. A copy of the Indenture of Trust of the DLF Trust ("DLF Trust Indenture") is attached as Exhibit P to the Brown Decl.

14.     ASF was the sole grantor/settlor of the DLF Trust. Brown Decl., Exh. P (DLF Trust Indenture at p. 1; ASF defined and referred to as "Grantor").

15.     Paragraph 2(e) of the DLF Trust Indenture expressly states that ASF is a "Participant" of the DLF Trust. According to the recitals, the Trustees (defined below) hold legal title of the trust fund exclusively for the benefit of each respective Participant. Brown Decl., Exh. P (RE Trust Indenture, ¶ 2(e): Participants defined).

16.     Paragraph 14 of the DLF Trust Indenture expressly provides that the DLF Trust is revocable by ASF. Brown Decl., Exh. P (DLF Trust Indenture, ¶ 14: "The Grantor may terminate the Trust by delivering written notice to the Trustees.").

17.    Like the RE Trust, the stated purpose of the DLF Trust is to "support the religious, charitable and educational purposes" of ASF, the Parishes, and other affiliated entities. Brown Decl., Exh. P (DLF Trust Indenture, ¶ 4).

18.    Control of the DLF Trust rests exclusively with the named trustees ("Trustees"), who are appointed by and serve at the pleasure of the Archbishop of ASF.  Brown Decl., Exh. P (DLF Trust Indenture, ¶ 5).

19.    Pursuant to the Bylaws of the DLF Trust, the Archbishop appoints *ex-officio* Trustees who shall serve so long as they hold the specified office or position with ASF, subject to removal at any time by the Archbishop.  Accordingly, the Trustees hold the following positions within ASF: Vicar General, Chancellor, Members of the Executive Board of the Presbyteral Counsel of ASF, Executive Director of Finance, Chair of the Finance Council, Chair of the Investment Committee, and Chair of the Real Estate Committee.  Brown Decl., Exh. Q (DLF Trust Bylaws, ¶ 1).

20.    Effective January 1, 2013, ASF, on the one hand, and the Trustees of the DLF Trust, on the other hand, entered into an agreement entitled, "Transfer of Assets," pursuant to which ASF transferred to the DLF Trust, without consideration, all of ASF's interest in assets consisting of the "Deposit & Loan Fund" that was owned by ASF prior to the transfer (collectively, the "DLF Trust Transfers").  The transfer agreement does not specify the accounts or account balances transferred to the DLF Trust.  *See* Brown Decl., Exh. R (Transfer of Assets agreement).

21.     The Committee is informed and believes that the physical transfer of assets

constituting the DLF Trust Transfers took place in or about June 2013, notwithstanding the date

of the Transfer of Assets agreement.  Brown Decl., Exh. S (Finance Council Meeting Minutes,

p. 1).

22.     ASF's audited financial statements for the period ending June 2013 show that

ASF made DLF Trust Transfers of financial assets worth approximately $25.5 million, which

ASF reported on the financial statements as assets held for its Parishes and other church-related

organizations.  After ASF made the DLF Trust Transfers, various Parishes made additional

contributions of cash and assets that were directed to the DLF Trust, such that the trust held

approximately $36.7 million as of the Petition Date according to ASF's Statement of Financial

Affairs.  Brown Decl., Exh. T (SOFA, Item 21) and Exh. EE (2013 Financials, p. 20).

23.     Effective January 1, 2013, ASF, on the one hand, and the DLF Trust, on the other

hand, entered into a *D&L Fund Support Services Agreement* pursuant to which ASF maintains

control of assets held in the DLF Trust under the guise of providing accounting and management

services.  Brown Decl., Exh. U (DLF Support Services Agreement).

**D.      Intentional Fraud**

24.     The Restructuring was intended to place ASF's substantial assets beyond the

reach of its creditors, including the Survivors.  Both the planning process leading up to the

Restructuring, and the Restructuring itself, exhibited multiple and unmistakable badges of fraud

evidencing ASF's actual intent to hinder, delay or defraud its creditors, including the following:

(a)     The RE Trust Transfers and DLF Trust Transfers were made to an insider insofar as (i) the sole member of RE Corp., as trustee for the RE Trust, is the Archbishop who controls ASF, and (ii) the Trustees of the DLF Trust hold offices with ASF and are subject to control by the Archbishop.  Brown Decl., Exh. L (RE Corp. Bylaws at Art. IV) and Exh. Q (DLF Trust Bylaws, ¶¶ 1.1-1.2).

(b)     ASF retained control of the real properties under RE Corp.'s bylaws by virtue of the fact that the Archbishop continued to hold the exclusive power to purchase, sell, lease, or improve real estate, and ASF retained management control pursuant to the Real Estate Support Services Agreement.  Brown Decl., Exh. L (RE Corp. Bylaws at Art. V (e)), and Exh. M (RE Support Services Agreement, ¶ 1).

(c)     ASF retained control of the assets of the DLF Trust based on the required composition of the Trustees from specified ASF positions, the Archbishop's sole discretion to appoint or remove the Trustees, and pursuant to the D&L Fund Support Services Agreement. Brown Decl., Exh. Q (DLF Trust Bylaws, ¶¶ 1.1-1.2), and Exh. U (DLF Support Services Agreement, ¶ 1).

(d)     ASF was subject to pending and threatened litigation when it formulated the Restructuring and made the RE Trust Transfers.  *See, e.g.,* Brown Decl., Exhs. V and W (Doe 1 and Doe 70 complaints).

(e)     During a meeting of the Archdiocesan Consultors on September 5, 2007, the Archbishop reported on sexual abuse cases that "have had to be settled" and advised that it is important to know "that this is something that is *still being dealt with through attorneys,*

DOCS_SF:102938.5 05066/002

insurance companies, and the Archdiocesan Finance Council."  Brown Decl., Exh. X (Consultors Meeting Minutes at p. 4) (Emphasis added).

(f)     As early as December 2007, ASF expressed concerns about veil piercing and enterprise liability.  Brown Decl., Exh.  G (Agenda re ASF Corporate Reorganization, item 1).

(g)     On or about May 8, 2009, during a special meeting of the College of Consultors, the Finance Council, and the Presbyteral Council of ASF, a slideshow was presented stating that the purpose of the Restructuring was to "offer our parishes (and our Archdiocese) greater protection within the context of civil litigation."  Brown Decl., Exh. I (PowerPoint presentation, p. 4 re Advantages of Incorporation).

(h)     On August 9, 2013, during a meeting of the Archdiocesan Pastoral Council, the Archbishop reported the existence of seventeen accusations against a priest, allegedly having happened 30 years ago.  The Archbishop acknowledged, "*In effect, there is no statute of limitations.  This worrisome issue involves sadness . . . and also regarding the new financial concerns for the ASF*."  Brown Decl., Exh. Y (Pastoral Council Meeting Minutes at p. 5) (Emphasis added).

(i)     ASF's former property manager testified in a deposition that the Restructuring was meant to "protect the assets of the archdiocese so that they weren't all wide-open under the Archdiocese of Santa Fe . . . [T]he individual parishes could be responsible for their own assets and liabilities."  Brown Decl., Exh. Z (Deposition at pp. 31-32, line 18 through 10).

(j)     The Restructuring involved the transfer of most of ASF's financial and real estate assets.

(k)     The Restructuring was based on similar restructurings of other diocese within the United States, which were all done in in response to escalating sexual abuse claims and extended limitation periods for the Survivors to bring suit.

(l)     The Restructuring was initiated by ASF, alone, not the Parishes as alleged beneficiaries of the RE Trust.  On July 10, 2012, the Presbyteral Council discussed parish incorporation and reported, "At the convocation, every pastor will get the documents for their parish already signed by [the Archbishop]."  Brown Decl., Exh. AA (Presbyteral Council Meeting Minutes at p. 5).  In this manner, the Restructuring was presented to the Parishes as a *fait accompli* for ASF's benefit and for the purpose of shielding assets of ASF, while maintaining control of the transferred assets.

## E.     Unrecorded Interests in Real Property.

25.     ASF did not transfer all of its real property to the RE Trust.  ASF contends that it still holds legal title to real estate worth $57.4 million "in trust" for the Parishes (the "Disputed Real Property").  The Disputed Real Property that ASF allegedly holds in trust for the Parishes is listed on Exhibit 8 to ASF's SOFA.  *See* Brown Decl., Exh. T (SOFA at Item 21) and Exh. BB (SOFA Exhibit 8).

26.     The Committee understands that the Parishes are not reflected on deeds of the Disputed Real Property and that their purported beneficial interests in ASF's property are not recorded.

27.     ASF's articles of incorporation do not reflect any restriction on its ability to hold or convey real property.  Brown Decl., Exh. CC (ASF Articles of Incorporation, Art. II re purpose).

## F.     The Bankruptcy

28.     ASF filed its petition for chapter 11 bankruptcy on December 3, 2018 (the "Petition Date").  On the Petition Date, ASF filed its SOFA and Schedules of Assets and Liabilities, which were amended on February 15, 2019.  ASF continues to operate its business as a debtor in possession.

29.     As of the Petition Date, the following Survivors held allowable unsecured claims and had pending lawsuits against ASF:

a.      On December 19, 2016, a Survivor filed a lawsuit for damages, entitled *John Doe 1, et al. v. Roman Catholic Church of the Archdiocese of Santa Fe and Our Lady of Sorrows Church,* First Judicial Dist. of Santa Fe County, Case No. D-101-CV-2016-02908.  This action was pending on the Petition Date and stayed by ASF's bankruptcy.  The Doe plaintiffs each hold claims that are allowable unsecured claims under Bankruptcy Code section 502.  A copy of the Doe 1 Complaint is attached as Exhibit V to the Brown Decl.

b.      On November 27, 2017, a Survivor filed a lawsuit for damages and to avoid ASF's fraudulent transfers, entitled *John Doe "70" v. Archdiocese of Santa Fe,* Second Judicial Dist. of Bernalillo County, Case No. D-202-CV-2017-08542.  This action was pending on the Petition Date and stayed by ASF's bankruptcy.  John Doe 70 holds a claim that is an

allowable unsecured claim under Bankruptcy Code section 502.  A copy of the Doe 70

Complaint is attached as Exhibit W to the Brown Decl.

30.     As of the Petition Date, the IRS was a creditor of ASF based on unpaid payroll

taxes.  Brown Decl., Exh. DD.  The IRS held an allowable unsecured claim under Bankruptcy

Code section 502 until the claim was paid.

31.     Since the Petition Date, the Committee and ASF have engaged in informal

discovery.  In response to requests for documents, ASF made several informal productions of

documents to the Committee, which documents are identified and referred to herein.  Brown

Decl., ¶ 10.

32.     By letter dated February 24, 2020, and email dated March 10, 2020, the

Committee requested that ASF provide additional information regarding the DLF Trust.  In

particular, the Committee requested identification of ten Parishes holding the largest purported

beneficial interests in the DLF Trust and their account balances.  ASF has not responded or

provided the information.  Brown Decl., Exh. D (2/24/20 Letter at p. 7, item 7) and Exh. F

(3/10/20 Email).

33.     Since the Petition, the Committee and ASF (and its insurers) have engaged in four

days of in-person mediation, first before Hon. Leo S. Papas (Ret.) and then before Hon. Alan

Malott (Ret.), as well as numerous calls with each mediator.  ASF has not responded to the

Committee's last offer of compromise.  Brown Decl., ¶ 9.

**G.      ASF's Refusal to Pursue the Claims**

34.      By letter dated February 24, 2020, the Committee requested that ASF either bring the claims set forth in the Complaints and or stipulate to Committee standing to file and prosecute the Complaints on behalf of the Debtor's estate.  In its letter, the Committee provided a detailed explanation of the factual and legal basis of the Complaints and attached the draft Complaints to the letter.  By its response letter of March 5, 2020 ("ASF Letter"), ASF unequivocally refused to prosecute the Complaints or to stipulate to Committee's standing.  True copies of the Committee's demand letter and the ASF Letter are attached as Exhibits D and E, respectively to the Brown Decl.

## III.      JURISDICTION AND RELIEF REQUESTED

The Court has jurisdiction to pursuant to 28 U.S.C. sections 157 and 1334.  The Motion is a core proceeding pursuant to 28 U.S.C. section 157(b)(2).  The Court has authority to determine this motion by a final order.  The statutory predicates for the relief requested in this Motion include Bankruptcy Code sections 105, 544, 1103, and 1109.  Venue in this Court is proper pursuant to 28 U.S.C. sections 1408 and 1409.

By this Motion, the Committee requests an order granting the Committee authority to commence, prosecute, and settle (after Court approval) litigation against RE Corp. as trustee of the RE Trust, the Trustees of the DLF Trust, the representative Parishes, and ASF.  The Committee proposes to bring the complaints attached as Exhibits A, B and C to the Brown Decl., each of which will increase assets of the estate for the benefit of ASF's creditors.

## IV.  STANDARDS FOR DERIVATIVE STANDING

The Tenth Circuit has not directly addressed the standards for a committee's derivative standing to pursue avoidance actions.  However, decisions within the Tenth Circuit have consistently and recently stated that there is no reason to believe that the Tenth Circuit would diverge from the unanimous view of other circuits recognizing an implied right to bring avoidance actions on behalf of the estate where the debtor has unjustifiably refused to bring such claims.  *See Springs East Land Co., LLC v. Goss (In re Ellicott Springs Res., LLC),* 485 B.R. 626, 636 and n. 25-28 (Bankr. D. Colo. 2013) (motion for standing granted; citing precedent among circuits); *Rindlesbach v. Jones,* 532 B.R. 850, 858 (D. Utah 2015) (anticipating that Tenth Circuit will continue to allow committees to bring avoidance actions); *Village of Overland Pointe, LLC v. Terra Bentley II, LLC (In re Bentley II, LLC),* 2011 Bankr. LEXIS 806 at *11-15 (Bankr. D. Kan. Mar. 2, 2011) ("[T]he Court sees no reason to believe the Tenth Circuit would disagree with the unanimous view of the Circuits that have decided the question;" citing cases supporting derivative standing from the Second, Third, Fifth, Sixth, Seventh, Eighth, and Ninth Circuits).[2]

In the ASF Letter, ASF contends that derivative standing should be denied based on the Bankruptcy Appellate Panel's decision in *United Phosphorus, Ltd. v. Fox (In re Fox),* 305 B.R. 912 (10th Cir. B.A.P. 2004) and the language of section 544(b), which refer to the powers of "the

---

[2] The following Circuit Court decisions support derivative standing: *Smart World Techs., LLC v. Juno Online Servs. Inc. (In re Smart World Techs., LLC),* 423 F.3d 166, 176 (2d Cir. 2005); *Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.),* 330 F. 3d 548, 553 (3d Cir. 2003); *Louisiana World Exposition v. Federal Ins. Co.,* 858 F. 2d 233, 247-52 (5th Cir. 1988); *Canadian Pac. Forest Prods. Ltd. v. J.D. Irving Ltd. (In re Gibson Group, Inc.),* 66 F. 3d 1436, 1440-46 (6th Cir. 1995); *Fogel v. Zell,* 221 F. 3d 955, 965 (7th Cir. 2000); *PW Enterprises, Inc. v. North Dakota Racing Comm. (In re Racing Servs., Inc.),* 540 F. 3d 892, 898 (8th Cir. 2008); and *Avalanche Maritime, Ltd. v. Parekh (In re Parmetex, Inc.),* 199 F. 3d 1029, 1031 (9th Cir. 1999).

trustee" to avoid transfers as opposed to any interested party or committee. *Id.* at 914-17. In *Fox*, the court denied derivative standing to a creditor to avoid a transfer by the debtor to his wife, citing *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6-7 (2000).[3] However, as noted in *Adelphia Comm. Corp. v. Bank of America (In re Adelphia Comm. Corp.),* 330 B.R. 364, 373 n. 16 (Bankr. S.D.N.Y. 2005), the *Fox* decision is the only appellate decision that is contrary to the "longstanding, and nearly universally recognized" practice of authorizing the prosecution of actions on behalf of the estate by a committee. The *Fox* case is not binding on this Court.[4] Moreover, it remains an exception that has been disregarded in subsequent cases within the Tenth Circuit. In *Hill v. Akamai Techs., Inc. (In re MS55),* 477 F. 3d 1131 (10th Cir. 2007), the Tenth Circuit observed that since the Supreme Court decision in *Hartford,* courts have continued to grant derivative standing to committees to bring avoidance actions:

> We note the committee's right to bring an avoidance action is not without question. Although **we are among those courts to allow a committee to bring such an action**, *Starzynski v. Sequoia Forest Industries,* 72 F.3d 816, 821 (10th Cir. 1995), recent Supreme Court precedent may undermine this practice. …**Since** *Hartford,* **however, other circuits have continued to allow committees to bring avoidance actions**.

*Id.* at 1139 n. 9 (emphasis added; no reference to *Fox*). *See also In re Ellicott Springs Res. LLC, supra,* 485 B.R. at 635-40 (derivative standing granted based on unanimous view of circuits; no

---

[3] In *Hartford Underwriters Ins. Co.,* the Supreme Court affirmed the finding that an administrative claimant did not have an independent right to seek payment of its claim from a secured creditor under Bankruptcy Code section 506(c) because the statute refers only to the trustee. 530 U.S. at 13 ("It suffices that the natural reading of the text produces the result we announce.").

[4] *See In re Rodriguez,* 487 B.R. 275, 288 (Bankr. D. N.M. 2013) (10th Cir. BAP decisions persuasive, not binding authority).

reference to *Fox*). These decisions are not constrained by the Supreme Court's analysis of section 506(c), much less by the *Fox* case.

A court may grant derivative standing to a committee upon a showing that: (1) the committee made demand on the debtor to bring claims, and the demand was declined, (2) the claims are colorable, (3) the committee sought permission from the bankruptcy court to file an adversary proceeding, and (4) the debtor unjustifiably refused to pursue the claims. *In re Bentley II,* 2011 Bankr. LEXIS at *11 (citing *In Racing Servs., Inc.,* 540 F. 3d 892, 900 (8th Cir. 2008), noting that the first three elements are often mere formalities). Derivative standing is rooted in public policy to allow fraudulent transfer claims that will maximize the estate for the benefit of creditors where the debtor refuses to bring such claims. *See Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 330 F. 3d 548, 579 (3d Cir. 2003) (en banc) (extensive review of *Hartford* arguments and the benefits and drawbacks of derivative standing; "Because it helps to ensure that creditors' claims are not frustrated by fraudulent transfers, derivative standing seems clearly to 'give effect to the policy of the legislature.'").

In the present case, the Committee satisfies each of the elements for derivative standing and should be permitted to bring the Complaints on behalf of, and in the best interests of, the estate.

## A.   The Estate's Fraudulent Transfer Claims Are Timely.

Under section 544 of title 11 of the United States Code (the "Bankruptcy Code"), a debtor in possession or trustee has the power to avoid a transfer "that is voidable under applicable law by a creditor holding an unsecured claim." Bankr. Code § 544(b). This includes,

but is not limited to, state law fraudulent transfers.  The trustee succeeds to the rights of an actual unsecured creditor that exists on the petition date, and is said to "step into the shoes" of that creditor.  *See generally* Collier on Bankruptcy, ¶544.06.  The trustee must be capable of identifying the unsecured creditor and may assert the same rights as that creditor, subject to applicable defenses.  *Id.  See Sender v. Simon,* 84 F. 3d 1299, 1304 (10th Cir. 1996) (discussing application of 544(b)(1)).

In this case, there are hundreds of Survivors who hold allowable unsecured claims against ASF as of the Petition Date.  Few, if any, of the Survivors had knowledge of the RE Trust Transfers or the DLF Trust Transfers, let alone the fraudulent nature of such transfers, prior to the Petition Date, because there were no public announcements regarding the Restructuring and Survivors lacked access to ASF's books and records or other financial information.  However, at least one of the Survivors filed a state court action for damages in December 2016 that was pending on the Petition Date.  Brown Decl., Exh. V (Doe 1 complaint).  At least one other Survivor filed a state court action for damages, as well as claims for avoidance of transfers in connection with the Restructuring, which complaint was filed in November 2017 and was pending as of the Petition Date.  Brown Decl., Exh. W (Doe 70 complaint).  In addition, the Internal Revenue Service held an unsecured claim for outstanding payroll taxes on the Petition Date.  Brown Decl., Exh. DD (Redacted Exhibit re IRS claim).  Under section 544(b)(1), the Committee may succeed to the rights of any of these creditors and assert timely Avoidance Claims.

1. **The Fraudulent Transfer Claims Are Timely Under New Mexico's Uniform Voidable Transactions Act.**

New Mexico has adopted the Uniform Voidable Transactions Act (UVTA). Under the UVTA, the Committee may avoid fraudulent transfers by the debtor that were made within four years after the transfer was made, or not later than one year after it was or could reasonably have been discovered. N.M. Stat. §56-10-23.[5] *Bloom v. Fray (In re Leach),* 380 B.R. 25, 29-30 (Bankr. D.N.M. 2007) (applying New Mexico law under section 544(b) and UVTA). ASF's transfers to the RE Trust and DLF Trust occurred in and after 2013.

The Committee may step into the shoes of the Doe 1 and Doe 70 plaintiffs to assert avoidance claims they had standing to assert. Section 544(b)(1) permits the trustee to avoid ASF's fraudulent transfers that were avoidable by Doe 1 and Doe 70. Doe 1 filed his complaint for damages against ASF on December 19, 2016, well within four years of both the transfers to the DLF Trust and the RE Trust. Doe 70 filed his complaint for damages and to avoid fraudulent transfers on November 29, 2017. Both creditors had "an unsecured claim that is allowable under section 502" of the Bankruptcy Code as required by section 544(b)(1). At a minimum, section 544(b)(1) allows the estate to avoid the claims that Does 1 and 70 could avoid.

---

[5] N.M. Stat. §56-10-23 provides:

Extinguishment of cause of action. A cause of action with respect to a fraudulent transfer or obligation under the Uniform Voidable Transactions Act is extinguished unless action is brought:

A. under Paragraph (1) of Subsection A of Section 56-10-18 NMSA 1978 [intentionally fraudulent transfer], not later than four years after the transfer was made or the obligation was incurred or, if later, not later than one year after the transfer or obligation was or could reasonably have been discovered by the claimant;

B. under Paragraph (2) of Subsection A of Section 56-10-18 NMSA 1978 or Subsection A of Section 56-10-19 NMSA 1978 [constructively fraudulent transfer] not later than four years after the transfer was made or the obligation was incurred; . . .

The Committee may also step into the shoes of each Survivor who had no knowledge of the transfers until after the Petition Date, whether or not the Survivor filed a pre-petition action. Pursuant to N.M. Stat. section 56-10-23A, intentionally fraudulent transfers may be pursued within four years after the transfer or "not later than one year after the transfer or obligation was or could reasonably have been discovered by the claimant." The Committee seeks to avoid transfers in connection with the Restructuring that are timely under applicable state law because they are within one year of the claimants' discovery of the transfers. *See, e.g., Wagner v. Pruett (In re Vaughan Co.),* 477 B.R. 206, 214-15 (Bankr. N.M. 2012) (citing *In re Dry Wall Supply, Inc.,* 111 B.R. 933 (D. Colo. 1990), as long as cause of action is viable on the petition date, trustee may bring cause of action under 544(b)(1) provided he or she complies with 11 U.S.C. section 546(a) [within two years after appointment]).

The Survivors did not know and could not reasonably have discovered the RE Trust Transfers or the DLF Trust Transfers until after the Petition Date when the Restructuring was investigated by the Committee. The Supreme Court of New Mexico has held that public records relating to real property ownership impute notice only to those who are bound to search the records, such as those who have subsequent dealings with the property. *Romero v. Sanchez,* 83 N.M. 358, 361-62 (1971) ([W]e are convinced that our recording statutes ought to be held to have the same purpose and meaning as those of most other jurisdictions, viz: that they are intended to protect those having subsequent dealings with the property, and that the record imputes notice only to those who are bound to search for it;" summary judgment reversed).

The Survivors had no knowledge of , or reason to know, that in 2013 and 2014, ASF transferred its real and personal property assets to the RE Trust and DLF Trust in a massive asset protection scheme to put its assets out of their reach. The Restructuring was specifically designed to allow the Archbishop to continue to control the assets and not to impact the operations of ASF and the Parishes and other ASF affiliated entities. *See, e.g.,* Brown Decl., Exh. I (Parish Incorporation PowerPoint at p. 3: "How Will Civil Incorporation Affect Day-to-Day Operations?"). Under section 544(b)(1) and N.M. Stat. section 56-10-23A, the estate's intentionally fraudulent transfer claims are timely.

## 2. The Fraudulent Transfer Claims are Timely Under Applicable Federal Law Because the IRS Was a Creditor of the Estate on the Petition Date.

The estate's claims to avoid the Fraudulent Transfers are also timely because the IRS was an unsecured creditor on the Petition Date. The reach back period for the IRS is six years under the Federal Debt Collections Procedure Act (the "FDCPA") to avoid fraudulent transfers. *See* FDCPA at 28 U.S.C. § 3306(b) (remedies of the United States)[6] and § 3304 (transfer fraudulent as to a debt to the United States). The FDCPA fraudulent transfer provisions mirror most state court UFTA provisions, but give a federal creditor a longer limitation period within which to act. In addition, under the Internal Revenue Code, the IRS has ten years within which to bring a

---

[6] 28 U.S.C. § 3306(b) of the FDCPA provides in part:

Limitation – A claim for relief with respect to a fraudulent transfer or obligation under this subchapter is extinguished unless action is brought—

(1) under section 3304(b)(1)(A) [intentional fraud] **within 6 after the was made** or the obligation was incurred or, if later, within 2 after the or obligation was or could reasonably have been discovered by the claimant; [or]
(2) under subsection (a)(1) or (b)(1)(B) of section 3304 [constructive fraud] **within 6 after the was made** or the obligation was incurred; or … (emphasis added).

collection action for taxes.  *See* 26 U.S.C. § 6502 (collection after assessment).[7]  The Internal

Revenue Code allows a ten year limitation period for tax collection.  *U.S. v. Summerlin,* 310 U.S.

414, 417 (1940) (government not subject to state statute of limitations applicable to enforcement

of FHA claim).

     A majority of courts have held that the IRS can be a "triggering creditor" enabling a

bankruptcy trustee to use Bankruptcy Code section 544(b) to pursue fraudulent conveyances

within the 10-year reach back period applicable to the IRS.  Therefore, where the IRS is a

creditor of the debtor, a trustee can use the extended 10-year reach back period  because under

section 544(b), federal law is the "applicable law" under which the "triggering creditor" (the

IRS) could avoid the Fraudulent Transfers.  *See Hillen v. City of Many Trees, LLC (In re CVAH,*

*Inc.),* 570 B.R. 816, 824-44 (Bankr. D. Idaho 2017) (exhaustive analysis of federal statutes;

motion to dismiss denied as to fraudulent transfer claims made outside four-year reach back

period under state law, but within six and ten-year reach back periods of FDCPA and IRC,

respectively); *Vieira v. Gaither (In re Gaither)*, 595 B.R. 201, 206-14 (Bankr. D. S.C. 2018)

(trustee may assert rights of IRS under 544(b) and six-year reach back of FDCPA; rejects

*Vaughan*); *Mukamal v. Citibank N.A. (In re Kipnis)*, 555 B.R. 877, 881 (Bankr. S.D. Fla. 2016)

(trustee may step into shoes of IRS to use 10-year reach back period to pursue fraudulent

transfer); *Ebner v. Kaiser (In re Kaiser)*, 525 B.R. 697, 703-14 (Bankr. N.D. Ill. 2014) (same);

---

[7] 26 U.S.C. §6502(a) of the Internal Revenue Code provides in part:

    Length of Period − Where the assessment of any tax imposed by this title has been made within the period of
    limitation properly applicable thereto, such tax may be collected by levy or by a proceeding in court, but only if
    the levy is made or the proceeding begun—

        (1) **within 10 years after the assessment of the tax,** or … (emphasis added).

*Alberts v. HCA Inc. (In re Greater Southeast Comty. Hosp. Corp. I)*, 365 B.R. 293, 299-306

(Bankr. D.D.C. 2006) (same); *Shearer v. Tepsic (In re Emergency Monitoring Technologies,*

*Inc.)*, 347 B.R. 17, 19 (Bankr. W.D. Pa. 2006) (same); *Osherow v. Porras (In re Porras)*, 312

B.R. 81, 97 (Bankr. W.D. Tex. 2004) (same).  In each of these cases, the court typically relied on

the broad powers of a trustee under section 544(b)(1) and the plain language of section

544(b)(1), which does not limit the type of creditor or the applicable law authorizing the trustee

to avoid a transfer.

       *Wagner v. Ultima Homes, Inc. (In re Vaughan Co. Realtors)*, 498 B.R. 297 (Bankr. D.

N.M. 2013), is the lone case to the contrary.  *Vaughan* has never been followed and has been

widely criticized on the grounds that the plain language of section 544(b) does not impose

limitations on the type of creditor that serves as a trigger and does not impose limitations on the

law that serves as the basis for an extended limitation period.  *See, e.g., In re Gaither,* 595 B.R.

at 208-09 (rejecting *Vaughan* as contrary to the majority of courts and contrary to the plain

language of 544(b)(1)); *In re Kaiser,* 525 B.R. at 713 ("The view that the statute of limitations

available to the IRS may not be invoked by a bankruptcy trustee has no basis in the plain

language of section 544(b) . . .  When the law is clear, the court need not look to the underlying

policy."); *In re Kipnis,* 555 B.R. at 882 ("The fundamental problem with *Vaughan's* analysis is

its failure to start where courts must start in interpreting statutes and that is to look at the statute's

plain meaning.").  The holding in *Vaughan* has also been criticized by at least one bankruptcy

court within the 10th Circuit, *In re Behrends v. Oletski-Behrends (In re Behrends),* 2017 Bankr.

LEXIS 3674 at *24 (Bankr. D. Colo. April 10, 2017) ("While a thoughtful analysis, this court

does not agree that policy arguments should limit the scope of §544(b);" adopting majority position that trustee may invoke 10-year limitations applicable to IRS).

The IRS's status as a pre-petition unsecured for outstanding payroll taxes enables the estate to timely avoid the Fraudulent Transfers because the Petition Date is within ten years of when the Fraudulent Transfers were made. The estate's right to reach back ten year is preserved even of the IRS claim is subsequently satisfied. *Greater Southeast Cmty. Hosp. Corp.,* 365 B.R. at 301. The amount of the IRS claim and whether it was ultimately paid by ASF are not relevant. *Id.* Under section 544(b) and applicable federal law, including 28 U.S.C. §3306(b), the Committee may invoke the avoidance powers of the IRS, on behalf of the estate, to timely avoid the Fraudulent Transfers because the ten year reach back period on the earliest of the Fraudulent Transfers was made within in ten years of the Petition Date.

**B.      The Fraudulent Transfer Claims Are Colorable.**

      **1.      The Standard for Determining if Claims Are Colorable.**

The Committee is not required to prove that the estate will succeed in avoiding and recovering the Fraudulent Transfers to prevail on this Motion. Rather, the Committee merely needs to show the claims are "colorable." "[A] claim is colorable when it has some legal and factual support, considered in light of the reasonable beliefs of the [party] making the claim. The question is whether a . . . reasonable plaintiff . . . could have concluded that facts supporting the claim **might be established**, not whether such facts actually **had been established**." *FTC v. Freecom Communications, Inc.,* 401 F. 3d 1192, 1201 (10th Cir. 2005) (quoting *Schlaifer Nance & Co,* 194 F. 3d 323, 337 (2d Cir. 1999); emphasis and ellipses in original). A claim is colorable

if it reasonably might be successful. *Id. See also Lawrence Nat'l Bank v. Edmonds (In re Edmonds),* 924 F. 2d 176, 181 (10th Cir. 1991) (colorable claim for relief on the face of the complaint barred dismissal).

A colorable claim need only by "plausible." *See,* e.*g., In re LTV Steel Co.*, 333 B.R. 397, 406 (Bankr. N.D. Ohio 2005) ("A colorable claim is defined as one which is plausible or 'not without merit'"); *see also, e.g., Elstner-Bailey v. Fannie Mae (In re Elstner-Bailey)*, 2011 Bankr. LEXIS 4802, at *9-10 (BAP 9th Cir. Oct. 4, 2011) (in relief-from-stay context; quoting Cornell University Law School's Legal Information Institute's definition as: "A plausible legal claim. In other words, a claim strong enough to have a reasonable chance of being valid if the legal basis is generally correct and the facts can be proven in court. The claim need not actually result in a win.").

Thus, the standard to establish whether an underlying claim is colorable is not onerous; it merely requires, as with defeating a Rule 12(b)(6) motion to dismiss, assertion of claims "that on appropriate proof would support a recovery." *G-I Holdings v. Those Parties (In re G-I Holdings)*, 313 B.R. 612, 631 (Bankr. D.N.J. 2004); *see also In re STN Enterprises*, 779 F.2d 901, 905-06 (2d Cir. 1985) (court need not conduct a mini-trial to determine whether "colorable" claim has been presented); *Official Comm. v. Hudson United Bank (In re America's Hobby Ctr.)*, 223 B.R. 275, 288 (Bankr. S.D.N.Y. 1998) (observing that standing should be denied only if the claim is "facially defective"); *Adelphia Comm.*, 330 B.R. at (Bankr. S.D.N.Y. 2005) (claims are colorable where they are not a "hopeless fling.")*.

## 2.    ASF Transferred Property of the Estate to the RE Trust and the DLF Trust.

In the ASF Letter, ASF contends that the Fraudulent Transfers are not voidable because the transferred property was already held in an equitable trust by ASF for the benefit of the Parishes, so property of the estate was not transferred to the trusts.  However, property titled to ASF is presumed to be property of the estate, and ASF (or the Parishes) have the burden to prove the existence of a trust agreement by clear and convincing evidence.[8]  The issue of whether unwritten equitable trusts existed prior to the transfers can only be decided in the litigation after discovery.

Moreover, as a matter of law, the Parishes could not have been trust beneficiaries prior to being incorporated as part of the Restructuring, as they were not legal entities separate from ASF and did not have the capacity to hold legal or beneficial interests in property.  Rather, they were mere divisions of ASF with no separate legal existence from ASF and could not hold an interest in either real or personal property.  Bankruptcy Judge Perris's opinion in the Archdiocese of Portland Chapter 11 case leaves no room for legitimate dispute on this issue.  *Tort Claimants Committee v. Roman Catholic Archbishop* (*In re Roman Catholic Archbishop*), 335 B.R. 842, 866-67 (Bankr. D. Or. 2005)  (unincorporated parishes "are not separate from, but are merely a

---

[8] *Official Comm. of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc. (In re Catholic Diocese of Wilmington, Inc.)*, 432 B.R. 135, 161 n.93 (Bankr. D. Del. 2010) (property in the debtor's name "is presumptively property of the estate and it is the burden of any purported trust beneficiary to establish otherwise"); *Taylor v. Rupp* (*In re Taylor*), 133 F.3d 1336, 1341 (10th Cir. 1998) ("the proof required to impose a resulting trust must be strong, clear, and convincing, such as to leave no doubt of the existence of the trust.") (internal quotation omitted; applying Utah law).

part of [the Portland archdiocese]" and cannot be the beneficiaries of a trust).  In fact, ASF's own documents acknowledge as much. [9]

Therefore, ASF's contention that it held only bare legal title, but not the beneficial interests, in the property transferred to the trusts will fail.[10]  As unincorporated divisions, the Parishes lacked the capacity to be the beneficiaries of a trust prior to the Restructuring.[11]

In the ASF Letter, ASF contends that its Parishes could have been trust beneficiaries prior to their incorporation because they were unincorporated associations.  This is not true.  In New Mexico, unincorporated associations are governed by N.M. Stat. § 53-10-1 *et seq*.[12]  Section 53-10-1, authorizing the formation of unincorporated associations, states:

> Whenever two or more persons shall desire to form an association for the promotion of their mutual pleasure or recreation . . . or an association not for the individual profit of the members thereof, and without incorporating the same as a corporation, or

---

[9] ASF's May 2009 PowerPoint presentation included a slide entitled, "Advantages of Incorporation."  ASF described the Parishes as unincorporated associations, with no independent legal status, and no recognized identity under civil law.  Brown Decl., Exhibit I at p. 4 (Parish Incorporation PowerPoint).

[10] Courts have previously held that a Catholic diocese's unincorporated parishes are not legal entities separate from the diocese.  *See, e.g., F.E.L. Publ'ns, Ltd. v. Catholic Bishop*, 754 F.2d 216, 221 (7th Cir. 1984) ("[T]he parishes within the Archdiocese are not legal entities separate and independent from the Catholic Bishop, but are subsumed within the Catholic Bishop.") (citing *Galich v. Catholic Bishop*, 75 Ill. App. 3d 538, 546-47 (1979)); *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 77 F. Supp. 2d 71 (D.D.C. 1999); *Tort Claimants Committee v. Roman Catholic Archbishop* (*In re Roman Catholic Archbishop*), 335 B.R. 842, 866-67 (Bankr. D. Or. 2005)  ("*Portland*") (parishes "are not separate from, but are merely a part of [the Portland archdiocese]"); *Akoury v. Roman Catholic Archbishop*, 2004 Mass. Super. LEXIS 349, at *6-7 (Sept. 14, 2004) ("Saint Albert the Great's Church and Parish (including its real estate and its personalty) is an unincorporated subdivision of the Archdiocese of Boston.").

[11] As unincorporated divisions of ASF, the Parishes could not have held either a legal or beneficial interest in real or personal property.  *See, e.g., Albers v. Church of Nazarene*, 698 F.2d 852, 857 (7th Cir. 1983) ("An unincorporated division has no separate assets; all its assets are owned by the organization of which it is a part."); *Griffith v. Keystone Steel & Wire*, 887 F. Supp. 1133, 1138 (C.D. Ill. 1995) ("An unincorporated division of Keystone Steel & Wire Company is not suable in its own right because a division has no separate assets; all its assets are owned by the corporation of which it is a part."); *Portland*, 335 B.R. at 866 ("[U]nincorporated religious organizations are not legal persons that may take title to real property in their names.").

[12] ASF's contention in the ASF Letter that the statute does not apply to religious organizations is without authority and contrary to the terms of the statute which expressly states that it apples to "an association not for the individual profit of the member thereof . . . "

maintaining title of its property in trust . . .[, t]he said persons or members desiring to form such an association . . . may file in the office of the county clerk . . . a statement containing the name of such association, its objects and purposes, the names and residences of the persons forming such association, together with a copy of its articles of association and any rules and/or regulations governing the transactions of its objects and purposes and prescribing the terms by which its members may maintain or cease their membership therein.

N.M. Stat. Ann. § 53-10-1.

"[T]he filing of statutory documents is mandatory" to create an unincorporated association in New Mexico, *Blue Canyon Well Ass'n v. Jevne*, 2018-NMCA-004, at *10 (Ct. App. 2017). New Mexico does not recognize common law unincorporated associations; "**unincorporated associations, clubs and societies, unless recognized by statute, have no legal existence**." *Flanagan v. Benvie*, 58 N.M. 525, 529 (1954) (emphasis added); *see also Blue Canyon*, 2018-NMCA-004, at *15. Common law unincorporated associations, even if they had a legal existence under New Mexico law, cannot take and hold property, either real or personal. *Flanagan*, 58 N.M. at 529-30 (citing treatises).

ASF does not dispute that the required filings were not made by the Parishes. Therefore, the Parishes were not capable of holding property interests or being trust beneficiaries and ASF held both legal and beneficial interests in the real and personal property transferred to the trusts. "A person who has the capacity to take and hold legal title to property has the capacity to be the beneficiary of a trust of such property." *Portland*, 335 B.R. at 867 (quoting 16 Am. Jur. 2d *Trusts* § 240 (2005)); *see also* RESTATEMENT (SECOND) OF TRUSTS § 116 (1959). As a corollary, an entity cannot be a beneficiary of a trust if it lacks the capacity to take and hold legal title to

such property.  *See, e.g.,* RESTATEMENT (THIRD) OF TRUSTS § 43 (2003) ("ordinarily, a person

who lacks capacity to hold legal title to property may not be a trust beneficiary").

To the extent that incorporation of the Parishes enabled them to receive and hold a

beneficial interest in ASF's property, the incorporation itself was a fraudulent transfer.

Bankruptcy Code section 101(54) defines "transfer to include "each mode, direct or indirect,

absolute or conditional, voluntary or involuntary, of disposing of or parting with . . . an interest

in property."

### 3. The Estate Has Colorable Claims That ASF Transferred Property of the Estate With Actual Intent to Hinder, Delay, or Defraud Creditors.

The Committee, on behalf of the estate, seeks to avoid intentionally fraudulent transfers

under the UVTA, N.M. Stat. §56-10-18A(1).  The Committee has demonstrated the existence of

a colorable claim that ASF made the transfers of its property to the RE Trust and the DLF Trust

"with actual intent to hinder, delay or defraud" creditors of ASF.  *See* Factual Background and

supporting documents, *supra* at ¶¶ 24 (a)-(l).

ASF's transfers to the RE Trust and the DLF Trust exhibit multiple badges of fraud.

N.M. Stat. §56-10-18B.  *See, e.g., Mazer v. Jones (In re Jones),* 184 B.R. 377, 386 (D.N.M.

1995) ("requisite intent may be demonstrated by proof of the existence of any one or more of the

factors enumerated in subsection B [N.M. Stat. §56-10-18]."  These badges of fraud are:

> (1) the transfer or obligation was to an insider;
>
> (2) the debtor retained possession or control of the property
> transferred after the transfer;
>
> (3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor has been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

N.M. Stat. § 56-10-18(B).

The following badges of fraud are present here: (i) ASF made the transfers without consideration; (ii) the Archbishop retained control of the transferred property along with the ability to revoke the trusts or cause the trusts to be revoked; (iii) there was a close relationship between ASF and its Parishes-they share the same mission and have an identity of interest according to ASF; and (iv) the transfers were made in the face a ASF's massive exposure to the Survivors' claims.[13]  Colorable intentional fraud claims clearly exist.

---

[13] *See* Factual Background, ¶¶ 24 (a)-(l); Brown Decl., Exh. J (RE Trust Indenture at ¶ 5: "The powers of control and management of the Trust shall rest exclusively in the Trustee"); Exh. P (DLF Trust Indenture at ¶ 5: "The powers of control and management of the Trust shall rest exclusively in the Trustees . . . each of whom shall be appointed by and serve at the pleasure of the Archbishop."); Brown Decl., Exh. R (Transfer of Assets to DLF Trust without consideration); Exh. N (RE Trust Transfer by Special Warranty Deed without consideration).

4.      **The Estate Has Colorable Claims That ASF Made Constructively Fraudulent Transfers to the RE Trust and the DLF Trust.**

The transfers to the RE Trust and DLE Trust are also avoidable as constructively fraudulent transfers under the UVTA, N.M. Stat. §56-10-18A(2).  *See also Western Prod. Credit Ass'n v. Kear,* 104 N.M. 494, 495 (1986) ("[A] conveyance is fraudulent without regard to actual intent, if the conveyance is made without fair consideration, and insolvency exists or results therefrom.").

The Committee believes it is undisputed that ASF made transfers without receiving ***any*** consideration. In light of its massive exposure to the Survivors, it is beyond legitimate dispute that a colorable claim exists that ASF was insolvent, or made insolvent, by the transfers.  ASF transferred real property worth more than $163 million dollars, to the RE Trust and over $25 million to the DLF Trust from accounts titled to ASF for no consideration when ASF was facing substantial exposure to the Survivors' claims and was insolvent or made insolvent by the transfers.[14]

C.      **The Estates' Claims to Avoid the Parishes Unrecorded Purported Beneficial Interests in ASF's Real Property Under Bankruptcy Code Section 544(A)(3) Are Colorable.**

By its Complaint to Avoid Unrecorded Interests (Brown Decl., Exhibit C), the Committee seeks to avoid the Parishes' alleged unrecorded beneficial interests in ASF's real property that was not transferred to the RE Trust (the Disputed Real Property) pursuant to Bankruptcy Code section 544(a)(3)—i.e., real property valued at approximately $57.4 million

---

[14] *See* Brown Decl., Exh. R (Transfer of Assets to DLF Trust without consideration); Exh. N (RE Trust Transfer by Special Warranty Deed without consideration); Exhs. V and W (Doe 1 and Doe 70 complaints); *see also* Docket No. 1 (SOFA, 20 Largest Unsecured Claims and Item 7, legal actions within one year of Petition Date).

titled in the name of ASF and purportedly "held in trust" for the Parishes. ASF identifies the

Disputed Real Property on Exhibit 8 to the SOFA, entitled "Property Held in Trust for Parishes."

The $57.4 million aggregate value of the Disputed Real Property provided by ASF is based on

2018 assessments. Brown Decl., Exh. BB (SOFA Exhibit 8).

Section 544(a)(3) gives the estate the rights of a hypothetical bona fide purchaser

("BFP") and allows it to avoid any interests in property that could be avoided by a BFP. 11

U.S.C. § 544 (a)(3); *see also Brakhahn v. Nash* (*In re Brakhahn*), 2019 Bankr. LEXIS 185, at *8

(Bankr. D. N.M. Jan. 24, 2019) (quoting *Watkins v. Watkins*, 922 F.2d 1513, 1514 (10th Cir.

1991)) (Thuma, J.). This includes any unrecorded equitable interests that the Parishes may

allege they hold with respect to the Disputed Real Property. *See, e.g., Bloom v. Reynolds* (*In re

Wilson*), 2009 Bankr. LEXIS 2823, at *16-17 (Bankr. D. N.M. Aug. 21, 2009); *see also Tort

Claimants' Comm. v. Roman Catholic Archbishop* (*In re Roman Catholic Archbishop of

Portland in Oregon*), 335 B.R. 868 (Bankr. D. Or. 2005) ("*Portland*").

Whether a trustee's federally-defined status as a BFP defeats the rights of one claiming

an equitable interest in a debtor's real property is determined by a state law. *Brakhahn*, 2019

Bankr. LEXIS 185, at *8 ("What constitutes a 'bona fide purchaser' is determined by state

law."); *see also AG N.M., FCS, ACA v. Borges* (*In re Borges*), 510 B.R. 306, 323 (10th Cir.

B.A.P. 2014). In New Mexico, a BFP is one without actual or constructive notice of an adverse

claim. N.M. Stat. §14-9-3; *see also Brakhahn*, 2019 Bankr. LEXIS 185, at *8.

Section 544(a)(3) of the Bankruptcy Code makes actual notice of an unrecorded interest

irrelevant. *Crowder v. Crowder* (*In re Crowder*), 225 B.R. 794, 796 (Bankr. D. N.M. 1998); *see

*also Portland*, 335 B.R. at 878.  Accordingly, the inquiry is whether a BFP would be on constructive notice of the interests asserted by the Parishes in this case.  *Brakhahn*, 2019 Bankr. LEXIS 185, at *9 (citing cases).  In New Mexico, constructive notice arises in two circumstances: "record notice, such as that provided by the recording acts, and inquiry notice, arising from facts as ought to put a prudent person upon inquiry as to the title."  *Borges*, 510 B.R. at 323.  Neither arises here.

### 1.     A BFP Would Have No Record Notice of the Parishes' Alleged Interests in the Disputed Real Property.

Under New Mexico law, recordation of a deed provides constructive notice to subsequent purchasers.  N.M. Stat. §14-9-2.  There is no record notice of the Parishes' equitable interest in the Disputed Real Property because ASF holds fee simple title to all of the Disputed Real Property.  The Parishes purported interests are not of record.

### 2.     A BFP Would Have No Inquiry Notice of the Parishes' Alleged Interests in the Disputed Real Property.

A hypothetical BFP would not have had constructive notice of an interest other than ASF in the Disputed Real Property.  *See Portland*, 335 B.R. at 888 ("I conclude that there is no genuine issue of material fact that the TCC is entitled under § 544(a)(3) to avoid any unrecorded interests in the test properties.").

First, the Parishes' "occupancy" of the Disputed Real Property would not have given rise to a duty to inquire.  The legal standard for determining whether occupancy gives rise to a duty of inquiry is well established in New Mexico: "**open, notorious and exclusive** possession of real estate under claim of ownership, is constructive notice to the world of whatever claim the

possessor asserts, whether such claim is legal or equitable in its nature." *Citizens Bank v. Hodges*, 107 N.M. 329, 332 (1988) (emphasis added). "However, open possession of property creates no duty to investigate where all signs of possession can be attributed to and are consistent with ownership by the owner of record." *City of Rio Rancho v. Amrep S.W. Inc.*, 150 N.M. 428, 437 (2011). "Where open possession can be attributed to the owner of record, an investigator may certainly rely upon the truth of the recitals of a record, where they are specific." *Id.* (cleaned up). A purchaser viewing the Disputed Real Property would see nothing inconsistent with ASF's exclusive ownership by virtue of the operation of its parish at the property where the parish was not a legal entity and in fact was merely a part of ASF.

Second, ASF's articles of incorporation and existence as a non-profit entity would not have given rise to a duty of inquiry. In *Portland,* court rejected this argument as meritless. *Portland,* 335 B.R. at 883-84 (debtor argued that it was organized as a corporation sole, "an ecclesiastical entity" under canon law, with limited authority over real property held for parishes; "Nothing in the Oregon nonprofit corporation statutes or debtor's articles of incorporation would excite inquiry into whether debtor was holding title to real property in trust for some other beneficial interests."). There is nothing in ASF's status as a non-profit nor its articles of incorporation that "would cause a reasonable purchaser to inquire into whether anyone other than debtor had an unrecorded interest in the property." *Portland*, 335 B.R. at 885.[15]

---

[15] *See* Brown Decl., Exh. CC (ASF Articles of Incorporation).

**D.    The Self-Settled Trust Claims Are Colorable.**

The RE Trust Complaint and the DLF Trust Complaint seek declaratory and injunctive relief[16] that the assets in the trusts are subject to the claims of creditors and/or are property of the estate under Bankruptcy Code section 544(a)(1) and New Mexico state law because the trusts are self-settled by ASF and revocable and to avoid the transfers to the trusts pursuant to section 548(e) of the Bankruptcy Code.

**1.    The Self-Settled Trust Claims Under Bankruptcy Code Section 548(e) Are Colorable.**

Section 548 of the Bankruptcy Code "restored[17] the common-law rule allowing creditors to avoid pre-bankruptcy spendthrift trusts designed to shield assets from creditors of an insolvent debtor." *Safanda v. Castellano* (*In re Castellano*), 514 B.R. 555, 560 (Bankr. N.D. Ill. 2014). Section 548(e)(1) provides:

> In addition to any transfer that the trustee may otherwise avoid, the trustee may avoid any transfer of an interest of the debtor in property that was made on or within 10 years before the date of the filing of the petition, if—
>
> (A) such transfer was made to a self-settled trust or similar device;
>
> (B) such transfer was by the debtor;
>
> (C) the debtor is a beneficiary of such trust or similar device; and

---

[16] The Committee does not require court approved derivative standing to bring the declaratory/injunctive relief claims related to self-settled trusts (i.e., Tenth through Twelfth Claims for Relief). *See* fn. 1, *supra*.

[17] Section 548(e) was added to the Bankruptcy Code in 2005 to address the "self-settled trusts loophole" that existed due to certain states—such as Alaska and Delaware—permitting a debtor to shield assets from its creditors through a self-settled spendthrift trust. *Ransel v. Libertyville Bank & Trust Co.* (*In re Holco Capital Group, Inc.*), 2013 Bankr. LEXIS 4086, at *63 (Bankr. N.D. Ind. Sep. 25, 2013).

> (D) the debtor made such transfer with actual intent to hinder,
> delay, or defraud any entity to which the debtor was or became,
> on or after the date that such transfer was made, indebted.

Bankruptcy Code § 548(e)(1).

Whether a transfer was made to a self-settled trust "or similar device" under section 548(e) is interpreted broadly. *See, e.g., Roeder v. Priscilla Avers Family Trust (In re Avers),* 2015 Bankr. LEXIS 1623 at *7 (Bankr. W.D. Pa. May 13, 2015) (section 548(e)(1) "is intended to broadly address any perceived abuse whereby a debtor seeks to put his assets out of reach of creditors by transferring them to a trust which he himself has had a hand in creating, and of which he is a beneficiary, regardless whether it fits within the precise definition of a self-settled trust").

For the reasons set forth above, the colorable claims exist that ASF made transfers to the RE Trust and DLF Trust with actual intent to hinder, delay, and defraud the Survivors. ASF was the grantor/settlor of both trusts and caused the transfers of its assets to the trusts to occur. Brown Decl., Exh. J (RE Trust Indenture, at p. 1 recitals re Grantor); and Exh. P (DLF Trust Indenture, at p. 1 recitals re Grantor). In each trust, ASF is also explicitly named as a beneficiary. Brown Decl., Exh. J (RE Trust Indenture, ¶2(d) defining "Beneficiaries"); and Exh. P (DLF Trust Indenture, ¶2(e) defining "Participants").

Under 548(e)(1), the debtor need only be a beneficiary, not necessarily the sole beneficiary of a self-settled trust. *See In re Potter,* 2008 Bankr. LEXIS 3351 at *38 (Bankr. D.N.M. July 29, 2008) ("Under 11 U.S.C. §548, the debtor need only be 'a' beneficiary, not the sole beneficiary; the transfer must be to a self-settled trust 'or other similar device,' and the transfers must be made by the debtor;" summary judgment granted based on establishment of

statutory elements where trust was funded by two LLCs owned by the debtor). Accordingly, the Committee's claims for avoidance and recovery of transfers to a self-settled trust or similar device are colorable and support an order granting the Committee derivative standing. *See* Exhibit A, ¶¶ 80-87 (Seventh Claim for Relief); Exhibit B ¶¶ 84-90 (same).

### 2. The Self-Settled Trust Claims Under Bankruptcy Code Section 544 and New Mexico Trust Law Are Colorable.

The Self-Settled Trust Claims also include claims for turnover of estate assets held in the RE Trust and the DLF Trust pursuant to Bankruptcy Code section 544(a)(1) and New Mexico law, whether the trusts are revocable or irrevocable. RE Trust Complaint, Exhibit A (Eighth and Ninth Claims for Relief); DLF Trust Complaint, Exhibit B (same).

Under New Mexico law, a creditor can reach all assets of a revocable self-settled trust. New Mexico Statute section 46A-5-505, entitled "Creditor's claim against settlor," provides:

> A. Whether or not the terms of a trust contain a spendthrift provision, the following rules apply: . . .
>
> (1) during the lifetime of the settlor, the property of a revocable trust is subject to claims of the settlor's creditors.

N.M. Stat. §46A-5-505(A)(1); *accord Pandy v. Indep. Bank*, 2016 CO 49, *18-32 (2016) (collecting cases; assets of co-settlor of revocable trust subject to judgment collection). In New Mexico, a trust is considered revocable if it is "revocable by the settlor without the consent of the trustee or a person holding an adverse interest." N.M. Stat. §46A-1-103(N). "The terms of the trust instrument determine whether a trust is revocable." *Oldham v. Oldham,* 149 N.M. 215, 220 (2011) (citing N.M. Stat. §46A-6-602 governing revocation of revocable trust).

Notwithstanding recitals in both the RE Trust Indenture and the DLF Trust Indenture stating the desire to establish an irrevocable charitable trust, both Indentures provide that <u>ASF alone may terminate the Trusts</u>. Neither instrument requires consent by another party to termination. Brown Decl., Exh. J (RE Trust Indenture, at ¶ 12); Brown Decl., Exh. P (DLF Trust Indenture, at ¶ 14). Therefore, under New Mexico law and the plain language of Indentures, the trusts are revocable and their assets reachable by ASF's creditors as property of the bankruptcy estate.

New Mexico Statute section 46A-6-603 (Settlor's powers; powers of withdrawal) provides at subsection (B): "While a trust is revocable and the settlor has capacity to revoke the trust, rights of the beneficiaries are subject to the control of, and the duties of the trustee are owed exclusively to, the settlor." *See Wagner v. Eberhard* (*In re Vaughan Co.*), 2014 Bankr. LEXIS 305, at *9 (Bankr. D. N.M. Jan. 23, 2014) ("The assets of [self-settled revocable] trusts are owned by the debtor, and thereby become property the bankruptcy estate, for purposes of 11 U.S.C. § 541(a)"); *Dymarkowski v. Savage* (*In re Hadley*), 541 B.R. 829, 835 (Bankr. N.D. Ohio 2015) ("property in a self-settled revocable trust is property of the estate"). Accordingly, the Committee has colorable Self-Settled Trust Claims under Bankruptcy Code section, 541(a)(1), 544(a)(1) and N.M. Statute section 46A-5-505(A)(1) for turnover of assets from a revocable trust.

Under New Mexico law, a creditor can reach assets in an irrevocable self-settled trust to the extent the settlor is a beneficiary of such trust. New Mexico Statute section 46A-5-505(A) provides:

(2) [W]ith respect to an irrevocable trust, a creditor or assignee of the settlor may reach the maximum amount that can be distributed to or for the settlor's benefit. If a trust has more than one settlor, the amount the creditor or assignee of a particular settlor may reach may not exceed the settlor's interest in the portion of the trust attributable to that settlor's contribution.

N.M. Stat. § 46A-5-505(A)(2). The statute incorporates Uniform Trust Code ("UTC")

§ 505(a)(2) into New Mexico law verbatim. The Official Comments to the UTC state:

Subsection (a)(2), which is based on Restatement (Third) of Trusts Section 58(2) and cmt. e (Tentative Draft No. 2, approved 1999), and Restatement (Second) of Trusts Section 156 (1959), **follows traditional doctrine in providing that a settlor who is also a beneficiary may not use the trust as a shield against the settlor's creditors**. . . . Under the Code, whether the trust contains a spendthrift provision or not, **a creditor of the settlor may reach the maximum amount that the trustee could have paid to the settlor-beneficiary**.

UTC § 505 cmt. (emphasis added).

ASF is explicitly named as a beneficiary of both Trusts. Brown Decl., Ex. J (RE Trust Indenture, ¶ 2(d); Brown Decl., Ex. P (DLF Trust Indenture, ¶ 2(e)). The Parishes and "certain other Archdiocesan Organizations" are also named as beneficiaries. Therefore, even if the Trusts are irrevocable (they are not for the reasons discussed above), creditors of ASF can still reach the "maximum amount" of the Trusts' assets "that can be distributed to or for [ASF's] benefit." N.M. Stat. §46A-5-505(A)(2). The extent to which those assets can be reached—i.e., the amount distributable to ASF—is a question of fact. As a matter of law, however, the estate has colorable Self-Settled Trust Claims under Bankruptcy Code sections 541(a)(1), 544(a)(1) and N.M. Statute section 46A-5-505(A)(2) for turnover of assets from an irrevocable trust.

E.    **Prosecution of the Adversary Actions Will Benefit the Estate and the Debtor's Refusal to Prosecute Such Claims Is Unjustifiable.**

Derivative standing is conditioned, in part, on a finding that the debtor unjustifiably refused to pursue the claims. *In re Racing Servs.,* 540 F.3d at 900-901 (cited with approval by *In re Ellicott Springs Res., LLC,* 485 B.R. at 636). Whether a refusal to pursue litigation is "unjustifiable" depends on the facts and circumstances of each case, and more specifically whether there is likely to be a real benefit to the estate. *Id.* at 900 ("At one end of the spectrum, a trustee almost certainly abuses his discretion by refusing to bring a creditor's claim that, if successful, would **clearly** benefit the estate. At the other end, a trustee certainly does not abuse his discretion by refusing to bring a claim that would yield insignificant benefits to the estate;" emphasis in original).

Here, tens, if not hundreds, of millions of dollars of value are at issue (the Committee believes that that more than $246 million of asset transfers are at stake based on ASF's valuations and contention that such assets are equitably or legally "held in trust"). The Complaints could *quintuple* the estate's assets. In light of the strength of the claims and the amount at issue, ASF's refusal to prosecute the Complaints is unjustified and is based on ASF's profound conflict of interest. Rather than fulfilling its fiduciary duty to maximize the assets of the estate for the benefit of creditors, ASF's primary goal is to protect the asset protection scheme that it designed and implemented to put its assets out of the reach of the Survivors. The potential non-debtor defendants—Parishes, the RE Trust, and the DLF Trust—are related parties that benefited from the asset protection scheme at the expense of the Survivors. To allow ASF to

control the claims set forth in the Complaints is to permit the proverbial fox to guard the henhouse.

## V. THE COURT SHOULD ORDER ASF TO PRODUCE INFORMATION TO THE COMMITTEE CONCERNING THE PARISHES' PURPORTED INTERESTS IN THE DLF TRUST

The Committee lacks information regarding the composition of the DLF Trust on the date that the financial investments were transferred (Brown Decl., Exh. R, Transfer of Assets) or on the Petition Date (Brown Decl., Exh. T, SOFA at Item 21). On the Petition Date, the DLF Trust assets were worth a total of $36.7 million, but the parish beneficiaries/Participants and their account balances were not disclosed. *Id.* By letter dated February 24, 2020, the Committee requested that ASF identify the Participants and their account balances in the DLF Trust. Brown Decl., Exh. D (2/24/20 Letter at p. 7, item 7). In a follow-up email dated March 10, 2020, counsel for the Committee explained that in order to limit the number of Parishes sued under the DLF Trust Complaint, the Committee needed the names of the ten largest beneficiaries and their account balances. ASF has not responded or produced documents. Brown Decl., ¶ 8 and Exh. F (3/10/20 Email).

By this Motion, the Committee requests that the Court order ASF to produce information revealing the ten Parishes holding the largest purported interests in the DLF Trust.

## VI. CONCLUSION

ASF refuses to pursue the Complaints because of its profound conflict and in violation of its duty to maximize the value of the estate for the benefit of its creditors. The huge dollar value of the transferred assets, coupled with the strength of the claims shows they are well worth

pursuing, notwithstanding the inevitable cost. The Complaints state colorable claims that would not be subject to motions to dismiss have the potential to bring tens if not hundreds of millions of dollars value to the estate.

For the foregoing reasons, the Committee requests an order: (i) granting it exclusive authority to commence, prosecute, and settle the Complaints; and (ii) compelling ASF to provide information to the Committee revealing the identity of the ten parishes with the largest alleged beneficial interest in the DLF Trust.

Dated: May 29, 2020

Respectfully submitted,

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James I. Stang*

James I. Stang
Kenneth H. Brown
Gail S. Greenwood
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: 310-277-6910
Fax: 310-201-0760
jstang@pszjlaw.com
kbrown@pszjlaw.com
ggreenwood@pszjlaw.com

Counsel for the Official Committee of
Unsecured Creditors

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

10100 Santa Monica Blvd, 13th Floor, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled (*specify*):

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS: (I) FOR EXCLUSIVE AND IRREVOCABLE AUTHORITY TO COMMENCE, PROSECUTE, AND SETTLE ADVERSARY PROCEEDINGS ON BEHALF OF BANKRUPTCY ESTATEAGAINST CERTAIN DIOCESE-RELATED ENTITIES; AND (II) TO COMPEL THE DEBTOR TO PRODUCE INFORMATION REVEALING THE TEN PARISHES WITH THE LARGEST PURPORTED INTERESTS IN THE DEPOSIT AND LOAN FUND**

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **May 29, 200**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) **_____**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 29, 2020 | Sophia L. Lee | */s/Sophia L. Lee* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

1. **Served by Court Electronic Filing (ECF)**

- Jonathan B. Alter    jalter@travelers.com
- Bruce Anderson    baafiling@eaidaho.com, brucea@eaidaho.com
- Dennis A Banning    nmfl@nmfinanciallaw.com,
  banninglaw@yahoo.com;dab@nmfinanciallaw.com;banningdr54167@notify.bestcase.com;dfh@nmfinanciallaw.com
- Jamison Barkley    jamison@jamisonbarkley.com
- Merit Bennett    administrator@thebennettlawgroup.com,
  mb@thebennettlawgroup.com;tk@thebennettlawgroup.com;ag@thebennettlawgroup.com;dv@thebennettlawgroup.com
- Joseph A. Blumel    joseph@blumellaw.com
- Martha G Brown    mgb@modrall.com, sandih@modrall.com
- Laura R Callanan    laura@curtislawfirm.org,
  lisa@curtislawfirm.org;amalia@curtislawfirm.org;filing@curtislawfirm.org
- Robert M. Charles    RCharles@LRRC.com, BankruptcyNotices@LRRC.com,robert-charles-1072@ecf.pacerpro.com
- Annie Coogan    annie@cooganlawnm.com
- Lisa K. Curtis    lisa@curtislawfirm.org,
  steven@curtislawfirm.org;pauline@curtislawfirm.org;filing@curtislawfirm.org
- Everett J. Cygal    ecygal@schiffhardin.com
- Ford Elsaesser    ford@eaidaho.com
- Daymon Brandeis Ely    daymon@daymonely.com, darlene@daymonely.com
- Sam L. Fadduol    sfadduol@fchclaw.com
- Daniel Fasy    dan@fasylaw.com
- Paul M Fish    pfish@modrall.com, nikkim@modrall.com;nikkim@ecf.courtdrive.com
- Joseph Mark Fisher    mfisher@schiffhardin.com
- Juan L Flores    jflores@stelznerlaw.com, jgarcia@stelznerlaw.com
- Charles S Glidewell    charles.glidewell@usdoj.gov
- Don F Harris    nmfl@nmfinanciallaw.com,
  briefwriter@comcast.net;donharrislawfirm@gmail.com;nmflcmecf@gmail.com;r54167@notify.bestcase.com;dab@nmfinanciallaw.com
- Paul Russell Harris    pharris@ulmer.com
- Manuel Hernandez    mhernandez@fchclaw.com
- Andrew Berne Indahl    andy@alturalawfirm.com
- James C Jacobsen    jjacobsen@nmag.gov, jotero@nmag.gov
- Pierre Levy    pierre@ofrielandlevy.com
- Paul M Linnenburger    plinnenburger@rothsteinlaw.com,
  melopez@rothsteinlaw.com;psanchez@rothsteinlaw.com;nrivera@rothsteinlaw.com;dchdalan@rothsteinlaw.com;ldelgado@rothsteinlaw.com;bjtrujillo@rothsteinlaw.com
- Alicia C. Lopez    alopez@rothsteinlaw.com,
  melopez@rothsteinlaw.com;psanchez@rothsteinlaw.com;nrivera@rothsteinlaw.com;dchdalan@rothsteinlaw.com;ldelgado@rothsteinlaw.com;bjtrujillo@rothsteinlaw.com
- Caroline Manierre    cmanierre@rothsteinlaw.com,
  melopez@rothsteinlaw.com;psanchez@rothsteinlaw.com;nrivera@rothsteinlaw.com;dchdalan@rothsteinlaw.com;ldelgado@rothsteinlaw.com;bjtrujillo@rothsteinlaw.com

- Leslie D. Maxwell     lmaxwell@maxwelllawpc.com,
  9786701420@filings.docketbird.com;aburnside@maxwelllawpc.com;
- John F. McIntyre     jmcintyre@montand.com
- Levi A Monagle     levi@hallmonagle.com
- Carolyn M Nichols     cmnichols@rothsteinlaw.com,
  melopez@rothsteinlaw.com;psanchez@rothsteinlaw.com;nrivera@rothsteinlaw.com;dch
  alan@rothsteinlaw.com;ldelgado@rothsteinlaw.com;bjtrujillo@rothsteinlaw.com
- Alice Nystel Page     Alice.N.Page@usdoj.gov
- Christopher Pattock     Christopher.J.Pattock@usdoj.gov
- Chris W Pierce     cpierce@walkerlawpc.com,
  piercelawfirm@gmail.com;WalkerLawPC14@gmail.com;cramirez@walkerlawpc.com
- Samuel I. Roybal     sroybal@walkerlawpc.com,
  WalkerLawPC14@gmail.com,mlara@walkerlawpc.com
- Stephanie L Schaeffer     bknotice@mccarthyholthus.com,
  sschaeffer@mccarthyholthus.com;sschaeffer@ecf.courtdrive.com
- Daniel J. Schufreider     dschufreider@schiffhardin.com
- Carlos Sedillo     csedillo@fchclaw.com
- Sharon T. Shaheen     sshaheen@montand.com, ltalley@montand.com
- John D. Sloan     pfoster@sloanfirm.com
- Bryan G. Smith     bsmith@tamakilaw.com
- David M. Spector     dspector@schiffhardin.com
- James I. Stang     jstang@pszjlaw.com
- United States Trustee     ustpregion20.aq.ecf@usdoj.gov
- Douglas R Vadnais     drv@modrall.com,
  doloress@modrall.com,doloress@ecf.courtdrive.com
- Thomas D Walker     twalker@walkerlawpc.com,
  mlara@walkerlawpc.com;sroybal@walkerlawpc.com;WalkerLawPC14@gmail.com;spat
  teson@walkerlawpc.com;mdevine@walkerlawpc.com
- Christopher P. Winters     cwinters@fchclaw.com
- Vito Ray de la Cruz     vito@tamakilaw.com