# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEW MEXICO

| | |
|---|---|
| In re:<br><br>ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF SANTA FE, a New Mexico corporation sole,<br><br>                Debtor. | Chapter 11<br><br>Case No.  18-13027-t11 |

**OPPOSITION TO MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS: (I) FOR EXCLUSIVE AND IRREVOCABLE AUTHORITY TO COMMENCE, PROSECUTE, AND SETTLE ADVERSARY PROCEEDINGS ON BEHALF OF BANKRUPTCY ESTATE AGAINST CERTAIN DIOCESE-RELATED ENTITIES; AND (II) TO COMPEL THE DEBTOR TO PRODUCE INFORMATION REVEALING THE TEN PARISHES WITH THE LARGEST PURPORTED <u>INTERESTS IN THE DEPOSIT AND LOAN FUND</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... III

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

ARGUMENT ........................................................................................................................... 4

1.  THE UCC'S COMPLAINTS ARE UNLIKELY TO SURVIVE A MOTION TO
    DISMISS AND ARE THEREFORE NOT COLORABLE ................................................ 4

2.  THE UCC'S PREMISE THAT ALL PARISH ASSETS WERE ARCHDIOCESE
    ASSETS IS FALSE .......................................................................................................... 6

    2.1.  The Parishes Have Existed For Centuries ............................................................. 6

    2.2.  The Parishes Have Always Operated Separately Under Archdiocese
          Supervision ........................................................................................................... 7

    2.3.  The Parishes Are Properly Separate Juridic Persons Under Canon Law ............. 7

    2.4.  Canon Law Prefers Separate Corporations Over Corporation Sole, Although
          Both Are Permissible ............................................................................................ 8

    2.5.  Assets Not Titled In A Parish Corporation, The Real Estate Corporation, Or
          The DLF Trust Were And Are Held In Trust For The Parishes ............................ 8

          2.5.1.  Bankruptcy law excludes beneficial interests held in trust from
                  property of the estate .............................................................................. 9

          2.5.2.  New Mexico would recognize the trust relationship ................................ 9

    2.6.  Prior To Parish Incorporation The Best Analogy Is An Unincorporated
          Association ........................................................................................................... 13

    2.7.  Avoidance Of Transfers Would Require Determination Of Donor
          Restrictions ......................................................................................................... 15

3.  THE RELIGIOUS FREEDOM RESTORATION ACT BARS THE UCC AND THE
    COURT FROM REQUIRING INCLUSION OF PARISH PROPERTY IN THE
    BANKRUPTCY ESTATE .............................................................................................. 16

    3.1.  RFRA Applies To The UCC's Proposed Adversary Actions Because The
          UCC Is Seeking Permission To Proceed As A State Actor, With The
          Intention Of Exercising State Action And Authority. ........................................ 18

    3.2.  The UCC's Avoidance Actions And Pursuit Of Parish Assets Burden The
          Free Exercise Of Religion .................................................................................. 19

i

3.3.     Maximizing The Recovery Of The UCC Creditors—At The Expense Of The Parish Creditors—Is Not A Compelling Interest Under RFRA............................21

4.     THE UCC'S PREMISE THAT THE ARCHBISHOP'S CONTROL OVER THE RE TRUST RENDERS ITS ASSETS ESTATE PROPERTY IS FALSE .............................23

5.     THE UCC'S PREMISE THAT THE ARCHBISHOP'S CONTROL OVER THE DLF TRUST RENDERS ITS ASSETS ESTATE PROPERTY IS FALSE.....................24

6.     NEITHER THE RE TRUST NOR THE DLF TRUST IS SELF SETTLED ...................25

7.     THE UCC'S PREMISE THAT THE INTERESTS OF PARISHES IN REAL ESTATE TITLED IN THE CORPORATION SOLE WOULD NOT CONSTITUTE NOTICE IS FALSE ........................................................................................................26

8.     THE UCC'S DEMAND FOR IDENTIFICATION OF THE DLF TRUST BALANCES IS UNDULY INTRUSIVE............................................................................29

CONCLUSION.........................................................................................................................30

GLOSSARY .............................................................................................................................31

DECLARATIONS ....................................................................................................................32

EXHIBITS ...............................................................................................................................33

CERTIFICATE OF SERVICE ................................................................................................34

# TABLE OF AUTHORITIES

## Cases

*Aragon v. Rio Costilla Co-Op. Livestock Ass'n*,
112 N.M. 152, 812 P.2d 1300 (1991) ..................................................................... 9, 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................. 4, 5

*Bassett v. Bassett*,
110 N.M. 559, 798 P.2d 160 (1990) ......................................................................... 10

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................. 4, 5

*Blue Canyon Well Assoc. v. Jevne*,
410 P.3d 251 (N.M. Ct. App. 2017) ............................................................. 13, 14, 15

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ................................................................................................. 21

*Citizens Bank of Clovis v. Hodges*,
107 N.M. 329, 757 P.2d 799 (Ct. App. 1988) .................................................. 27, 28

*City of Rio Rancho v. Amrep S.W. Inc.*,
150 N.M. 428 (2011) ...................................................................................... 27, 28, 29

*Comm. Of Tort Litigants v. Catholic Diocese of Spokane*,
364 B.R. 81 (E.D. Wash. 2006) ............................................................................. 13

*Cordova v. Cline*,
308 P.3d 975 (N.M. Ct. App. 2013) ......................................................................... 14

*E.E.O.C. v. Catholic University of America*,
83 F.3d 455 (D.C. Cir. 1996) .................................................................................. 17

*Employment Div., Dep't of Human Res. of Oregon v. Smith*,
494 U.S. 872 (1990) ................................................................................................. 21

*Gonzales v. Franco*,
2015 WL 13651172 (D.N.M. Dec. 10, 2015) ........................................................... 5

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006) ................................................................................................. 16

*Hankins v. Lyght*,
441 F.3d 96 (2d Cir. 2006) ....................................................................................... 17

*Hobby Lobby Stores, Inc. v. Sebelius*,
 723 F.3d 1114 (10th Cir. 2013) ......................................................................... 19

*In re Amdura Corp.*,
 75 F.3d 1447 (10th Cir. 1996) ........................................................................... 11

*In re Cedar Funding, Inc.*,
 398 B.R. 346 (Bankr. N.D. Cal. 2008) ................................................................ 9

*In re Crowder*,
 225 B.R. 794 (Bankr. D.N.M. 1998) ....................................................... 26, 27, 28

*In re Cyr*,
 602 B.R. 315 (Bankr. W.D. Tex. 2019) ............................................................. 25

*In re Ellicott Springs Res., LLC*,
 485 B.R. 626 (Bankr. D. Colo. 2013) ................................................................ 18

*In re Garcia*,
 367 B.R. 778 (Bankr. D.N.M. 2007) ........................................................ 9, 11, 27

*In re Harman*,
 512 B.R. 321 (Bankr. N.D. Ga. 2014) ............................................................... 25

*In re Hodge*,
 200 B.R. 884 (Bankr. D. Idaho 1996) ............................................................... 22

*In re Jones*,
 184 B.R. 377 (Bankr. D.N.M. 1995) ................................................................. 11

*In re Keenan*,
 364 B.R. 786 (Bankr D.N.M. 2007) ................................................................. 27

*In re K-Ram, Inc.*,
 451 B.R. 154 (Bankr. D.N.M. 2011) ................................................................. 10

*In re Mastro*,
 585 B.R. 587 (B.A.P. 9th Cir. 2018) ................................................................. 30

*In re McGough*,
 737 F.3d 1268 (10th Cir. 2013) ........................................................................ 17

*In re Palmer*,
 72 N.M. 305, 383 P.2d 264 (1963) .................................................................... 11

*In re Parsons*,
 280 F.3d 1185 (8th Cir. 2002) ............................................................................ 9

iv

*In re Racing Servs., Inc.*,
540 F.3d 892 (8th Cir. 2008) .......................................................................................... 18

*In re Rafter Seven Ranches L.P.*,
414 B.R. 722 (B.A.P. 10th Cir. 2009) ............................................................................... 9

*In re Roman Catholic Archbishop of Portland in Oregon*,
335 B.R. 842 (Bankr. D. Or. 2005) ................................................................................. 22

*In re Roman Catholic Bishop of Great Falls, Montana*,
584 B.R. 335 (D. Mont. 2018) ......................................................................................... 13

*In re Seneca Oil Co.*,
906 F.2d 1445 (10th Cir. 1990) ......................................................................................... 9

*In re Strecker*,
251 B.R. 878 (Bankr. D. Colo. 2000) .............................................................................. 30

*In re Tessier*,
190 B.R. 396 (Bankr. D. Mont. 1995) ............................................................................. 22

*In re Vaughan Co., Realtors*,
481 B.R. 752 (Bankr. D.N.M. 2012) ................................................................................. 5

*In re Vaughan Co., Realtors*,
2014 WL 231971 (Bankr. D.N.M. Jan. 22, 2014) ............................................................ 6

*In re Vaughn Co., Realtors*,
477 B.R. 206 (Bankr. D.N.M. 2012) ................................................................................. 6

*In re Wreyford*,
505 B.R. 47 (Bankr. D.N.M. 2014) ................................................................................... 6

*In re Young*,
141 F.3d 854 (8th Cir. 1998) ........................................................................................... 17

*In re Young*,
82 F.3d 1407 (8th Cir. 1996) ..................................................................................... 17, 22

*Kennann v. Ottinger*,
1999 WL 35809724 (D.N.M. Mar. 8 1999) ...................................................................... 9

*Listecki v. Official Comm. of Unsecured Creditors*,
780 F.3d 731 (7th Cir. 2015) ........................................................................................... 17

*Martinez-Sandoval v. Kirsch*,
118 N.M. 616, 884 P.2d 507 (App. 1994) ......................................................................... 7

v

*Matter of Wilcher*,
   46 B.R. 428 (Bankr. N.D. Ill. 1985)................................................................. 30

*Montoya v. O'Friel*,
   2017 WL 5891757 (D.N.M. Nov. 27, 2017)........................................................ 5

*Philadelphia Indem. Ins. Co. v. Episcopal Diocese of Ft. Worth*,
   2011 WL 3510848 (N.D. Tex. Aug. 10, 2011) ................................................. 13

*United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*,
   878 F.3d 1224 (10th Cir. 2017)......................................................................... 29

*Wagner v. Galbreth*,
   500 B.R. 42 (D.N.M. 2013)................................................................................. 5

*Wagner v. Levann*,
   2013 WL 12335305 (D.N.M. Mar. 29, 2013) ..................................................... 5

*Watkins v. Watkins*,
   922 F.2d 1513 (10th Cir. 1991).......................................................................... 26

*Watson Truck & Supple Co. v. Males*,
   111 N.M. 57, 801 P.2d 639 (1990).................................................................... 10

*White v. Mayo*,
   299 P. 1068 (N.M. 1931)................................................................................... 11

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972)........................................................................................... 21

## Statutes

11 U.S.C. § 544......................................................................................................... 29

11 U.S.C. § 544(a) ................................................................................................... 19

11 U.S.C. § 544(a)(3)........................................................................................ 26, 27

11 U.S.C. § 544(b) ................................................................................................... 19

11 U.S.C. § 548(a) ..................................................................................................... 6

11 U.S.C. § 548(a)(1)(A) ........................................................................................... 5

11 U.S.C. § 548(a)(2)............................................................................................... 17

11 U.S.C. § 548(e) ............................................................................................. 19, 25

vi

11 U.S.C. § 1102(a) ........................................................................................................ 18

11 U.S.C. § 1103(a) ........................................................................................................ 18

28 U.S.C. § 581 .............................................................................................................. 18

42 U.S.C. § 2000bb-1(a) ................................................................................................ 16

42 U.S.C. § 2000bb-1(c) ................................................................................................ 16

NM ST § 12-2A-1 ........................................................................................................... 15

NM ST § 12-2A-4 ........................................................................................................... 15

NM ST § 12-2A-18 ......................................................................................................... 15

NM ST § 14-9-2 .............................................................................................................. 26

NM ST § 14-9-3 .............................................................................................................. 27

NM ST § 46A-10-1013 ................................................................................................... 26

NM ST § 53-10-1 ................................................................................................. 13, 14, 15

NM ST § 56-10-18 ............................................................................................................ 6

NM ST § 56-10-18(C) ....................................................................................................... 6

NM ST § 57-22-1 ............................................................................................................ 14

NM ST § 57-22-4(A) ...................................................................................................... 14

## Rules

Bankr. R. 2004 ................................................................................................................ 29

Fed. R. Civ. P. 9(b) ........................................................................................................... 6

Rule 1-009(B) NMRA ....................................................................................................... 6

## Other Authorities

5 Scott & Fratcher, *The Law of Trusts* § 462 (4th ed. 1989) ........................................ 10

Restatement (First) of Property § 437 (1944) ................................................................. 16

Restatement (Second) of Trusts § 44 (1957) ............................................................. 10, 11

Restatement (Second) of Trusts § 404 (1957) ............................................................... 9

Restatement (Second) of Trusts § 406 (1957) ........................................................... 10

viii

# Introduction[1]

This Opposition is filed by the Parish Steering Committee of the Roman Catholic Church of the Archdiocese of Santa Fe; the Archdiocese of Santa Fe Real Estate Corporation, trustee of the Archdiocese of Santa Fe Real Estate Trust; and the Archdiocese of Santa Fe Deposit and Loan Fund.[2]

Every parish in the Archdiocese Santa Fe was formed by people who came together to create a place for worship and ministry, some over a century ago, under a bishop's or archbishop's supervision. Every parish acquired land, built a church and other ministry buildings. Every parish houses a pastor, maintains its properties, pays bills and salaries, borrows and repays loans, and supports ministries, all from its own funds obtained inside or outside the parish. This separate relationship between a parish and the diocese or archdiocese is a fundamental piece of Catholic Canon Law, and has been so longer than anyone reading this paper has been alive.

The Official Committee of Unsecured Creditors ("UCC") would file three lawsuits that together ask a federal court to find that there is no such thing as a parish, that no parish owns a legally recognizable interest in any real or personal property, and that every dollar held by a parish, including next week's offertory, is a dollar that the Archdiocese should pay to claimants of the Archdiocese. Separately and collectively, these lawsuits are the furthest thing from colorable.

The Parishes are committed to a just, fair and healing reorganization, including for abuse victims. To date, every successful reorganization of a diocese or archdiocese has involved significant parish contributions in consideration of a channeling injunction obtained with the

---

[1] Terms used in this Opposition are defined in the Glossary.
[2] For purposes of convenience, this opposition expresses the views of all objectors, but refers simply to the Parish Steering Committee.

1

consent of victims after difficult negotiations. This case should be no different and the Parishes of the Archdiocese are committed to the settlement process. Spending hundreds of thousands of dollars (or more) in legal fees of the Archdiocese, the UCC, the Parishes, and others, on the proposed litigation is the definition of waste. Demanding permission to inflict that expense on the Parishes and the Archdiocese is a negotiating tactic that can be considered in due course if circumstances in the settlement process warrant it. The Parish Steering Committee opposes the UCC motion.

This Opposition is supported by the Court's record, by the oppositions filed by the Archdiocese, and by the declarations and exhibits submitted with this Opposition under separate cover.

## Background[3]

There are 94 Parishes listed in the Archdiocese directory.[4] The Archdiocese was formally recognized by Pope Pius XI as an Archdiocese in 1875 after different states of existence in the prior centuries.[5] Cathedral Basilica of St. Francis of Assisi was established in 1610, long before the United States of America,[6] and the current cathedral was built between 1869 and 1886. A diocese or an archdiocese is established by geography, and over time, dioceses have been carved out of the Archdiocese, including the Dioceses of Las Cruces and Gallup, and parishes within the new dioceses. Archbishop John C. Wester became the 12th archbishop of Archdiocese in 2015.

---

[3] We submit under separate cover eight declarations from Parish Pastors that confirm Parish formation, funding and operation without pin point citing every declaration to every sentence of these factual statements.

[4] Each a "Parish" and together the "Parishes".

[5] https://archdiosf.org/asf-history (visited 6/8/2020).

[6] https://www.cbsfa.org/parish-life/about (visited 6/8/2020); Archdiocese Parish Directory (4/2020).

Each Parish operates under the supervision of a Pastor appointed by the Archbishop. The Parish obtains its funds from parishioners' and others' donations, hires and pays employees, provides (through joint Archdiocese programs) employee benefits and worker compensation insurance to its employees, insures (through joint Archdiocese policies) and maintains its properties, pays its own bills, and maintains a separate tax identification number (which it has had for decades). Each Parish contributes to the Archdiocese via a share of parish collections, while the Annual Catholic Appeal receives parishioner donations for benefit of and restricted for certain programs of the Archdiocese. Each Parish does and has for decades maintained separate accounts in financial institutions and with the Archdiocese Deposit and Loan Fund ("DLF"), but since 2013 with the DLF Trust, which may include savings and restricted accounts.

The UCC Motion implicates all real and personal property of all of the Parishes, however acquired and however titled. If, as discussed below, donative intent is relevant, then the circumstances of acquisition of each disputed property must be determined,[7] but the Motion seeks to prematurely initiate litigation that implicates all real and personal property of all Parishes. The draft complaints do not identify specific properties. Instead, Exhibit A challenges all real estate held by ten named Parishes, identifying only one deed transferring 8 properties to one Parish. Exhibit B, the challenge to the DLF Trust, identifies no Parish, no account and no specific transfer. Exhibit C identifies ten Parishes, but alleges that all parish property still held on the petition date by the Archdiocese as corporation sole is property that may be recovered for the benefit of the estate, without identifying any specific property.

---

[7] Simply as examples, the Estate of Helena K. White deeded a parcel to the RE Trust for the benefit of San Clemente Parish, earlier this month (see Exhibit 1 attached under separate cover); George Roybal donated over $100,000 to St. Anthony of Padua parish for a specific purpose (Roybal declaration); and Laura Lee Halbleib donated land to Holy Child Church for the school ministry (Halbleib declaration).

3

The proposed complaints will require discovery into the real estate and personal property records of every Parish to determine how each church or other site was acquired, how each church, mission or school was built, how each was maintained, refurbished, and by whom. Every donation of real or personal property to every Parish must be examined to determine donative intent, and then the use of each property analyzed to determine if the donor's intent was honored.

The UCC has and may suggest it is willing to leave undisturbed property that is necessary for the mission of the Church (Parishes, Archdiocese). The offer, while sincere, and based on reasonable sentiment, highlights the First Amendment and RFRA concerns with federal courts deciding what property a religious entity needs to operate.

It is impossible to imagine a benefit to the initiation of these lawsuits at this time other than enrichment of lawyers and legal service providers, impoverishment of the Archdiocese, Parishes and donors, and continued delay and frustration for victims.

## Argument

This Opposition focuses on the element that the party seeking derivative standing demonstrate that the proposed claims are "colorable" and to highlight the burdens that the proposed litigation will impose on the Court and parties.

## 1. THE UCC'S COMPLAINTS ARE UNLIKELY TO SURVIVE A MOTION TO DISMISS AND ARE THEREFORE NOT COLORABLE

It is unlikely that the bulk of the claims to be asserted by the UCC would survive a motion to dismiss under the *Bell Atlantic Corp. v. Twombly*,[8] and *Ashcroft v. Iqbal*[9] standards.

---

[8] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)
[9] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

4

*Twombly* and *Iqbal* set forth strict pleading requirements for fraudulent transfer claims. It has never been sufficient for a plaintiff to merely track statutory language without specifying particular facts to support the plaintiff's allegations.[10]

The district court in *Wagner v. Galbraith* explained that a fraudulent transfer complaint must

> set forth facts sufficient to apprise the defendant "of the nature of his alleged participation in the fraud". . . and at least connect the defendant's actions to the debtor's alleged scheme to defraud.[11]

The *Twombly* and *Iqbal* decisions further make clear that:

> Although a court must accept as true all of the allegations in a complaint, deference is 'inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'"[12]

The fraudulent transfer claims to be asserted by the UCC must be analyzed under these pleading standards. Most of the boilerplate claims in the draft complaints are unlikely survive a motion to dismiss. It is simply not sufficient for the UCC to rely on generalized allegations as to insolvency and vague descriptions of indeterminate properties.

The elements of a fraudulent transfer claim under Section 548(a)(1)(A) are: "(1) a transfer of an interest of the debtor in property; (2) made within two years before the debtor filed for bankruptcy; and (3) done with actual intent to hinder, delay, or defraud the debtor or any

---

[10] *See, e.g.*, *Montoya v. O'Friel*, 2017 WL 5891757, at *7 (D.N.M. Nov. 27, 2017) (explaining that a proposed amended complaint would be subject to dismissal because the plaintiff alleged no facts and merely "repeat[ed] and expand[ed] quotations of the statutory language"); *Wagner v. Levann*, 2013 WL 12335305, at *1 (D.N.M. Mar. 29, 2013) (dismissing a claim for fraudulent transfer where the complaint failed to include any specific allegations).

[11] *Wagner v. Galbreth*, 500 B.R. 42, 54 (D.N.M. 2013) (internal citations omitted); *see In re Vaughan Co., Realtors*, 481 B.R. 752, 759 (Bankr. D.N.M. 2012) (explaining that "when pleading an actual fraudulent transfer the plaintiff must set forth facts sufficient to apprise the defendant 'of the nature of his alleged participation in the fraud,' and at least connect the defendant's actions to the debtor's alleged scheme to defraud.") (internal citation omitted)

[12] *Gonzales v. Franco*, 2015 WL 13651172, at *2 (D.N.M. Dec. 10, 2015) (*quoting Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 570)).

5

entity the debtor would become after the transfer."[13] The elements are similar for a fraudulent

transfer claim under New Mexico law.[14]

The plaintiff bears the burden of proving the elements of this claim by a preponderance

of the evidence.[15] A claim for fraudulent transfer is subject to the heightened pleading standard

for fraud as outlined by Fed. R. Civ. P. 9(b) or Rule 1-009(B) NMRA.[16]

Allegations that are not sufficient to withstand a motion to dismiss should not form the

basis for an order granting derivative standing. Such claims cannot be treated as colorable.

Moreover, as explained in detail below, the vast majority of alleged transfers would not be

recoverable even if the UCC's complaints were replete with detail.

## 2. THE UCC'S PREMISE THAT ALL PARISH ASSETS WERE ARCHDIOCESE ASSETS IS FALSE

The mere incorporation of an entity, or other alteration of its legal status does not qualify

as a transfer under Section 548(a). Similarly, the act of forming a limited liability entity does not

constitute a transfer. Instead, as the term implies, the transfer occurs when property is

transferred from one entity to another.[17]

There was no "transfer" by the Archdiocese in 2013 or thereafter with respect to Parish

property.

### 2.1. The Parishes Have Existed For Centuries

Before what is now New Mexico was acquired by treaty, there were parishes that were

supervised by an archbishop. For example, the Cathedral Basilica of St. Francis of Assisi

("Basilica") has been a parish since 1610 and the cathedral dates to 1869.[18] The San Felipe de

---

[13] *In re Vaughan Co., Realtors*, 2014 WL 231971, at *3 (Bankr. D.N.M. Jan. 22, 2014).
[14] NM ST § 56-10-18.
[15] NM ST § 56-10-18(C).
[16] *In re Vaughn Co., Realtors*, 477 B.R. 206, 216 (Bankr. D.N.M. 2012).
[17] *In re Wreyford*, 505 B.R. 47, 60 (Bankr. D.N.M. 2014).
[18] Declaration of Fr. Timothy A. Martinez ¶¶ 7-8.

6

Neri Church has been a parish since 1706 and the current church has elements that date back to 1796.[19]  Our Lady of Sorrows Parish in Las Vegas, NM dates back to 1852; while Our Lady of Sorrows parish to 1836, and its church building is 150 years old.[20]  Parishes and churches have regularly appeared as litigants before the New Mexico courts.[21]

**2.2.     The Parishes Have Always Operated Separately Under Archdiocese Supervision**

For the Canon Law reasons explained in the next section, the Parishes have operated separately for all the years that anyone living can remember.  As the declarations of the Archdiocese's Tony Salgado and eight pastors confirm, for decades each Parish has maintained separate books and records, its own tax ID number, paid its own employees and bills, and maintained its own bank and Deposit and Loan accounts.  This is confirmed by numerous pastors.[22]  As required by Canon Law, the Archbishop appoints the pastor or administrator of the Parish, who operates under Archdiocese spiritual and financial review, for the benefit of the Parish, not the Archdiocese.[23]  None of the UCC complaints suggest the Archdiocese ignored Parish separateness.

**2.3.     The Parishes Are Properly Separate Juridic Persons Under Canon Law**

Fr. Joseph E. Fox, a Canon Law expert, explains in his declaration that the Roman Catholic Church is governed by Canon Law, which he identifies and explains.[24]  Under the Code of Canon Law, a parish is a separate entity from the archdiocese.  A parish is, under Canon Law,

---

[19] Declaration of Fr. Andrew J. Pavlak ¶¶ 3-4.
[20] Declaration of Fr. Rob Yasksich ¶¶ 3, 8, 10.
[21] *See, e.g.*, *Martinez-Sandoval v. Kirsch*, 118 N.M. 616, 884 P.2d 507 (App. 1994) (St. Thomas Apostle Church in Abiquiu, New Mexico).
[22] Rev. Andrew J. Pavlak decl. ¶¶ 14-17; Very Rev. Oscar W. Coelho decl. ¶¶ 18-23; Very Rev. Stephen Carl Schultz decl. ¶¶ 21-24, 29; Very Rev. George Robert Yaksich decl. ¶¶ 19-22; Rev. Timothy Martinez decl. ¶¶ 26-28; Very Rev. John D. Cannon decl. ¶¶ 18-21; Very Rev. James Marshall decl. ¶¶ 19-21; Rev. Msgr. Lambert Joseph Luna decl. ¶¶ 19-23.
[23] Msgr.  Luna decl. ¶¶ 28, 30-31.
[24] Declaration of Fr. Joseph E. Fox ¶¶ 5-8.

7

its own public juridic person. CIC, canon 515, § 3.[25]  Parish property is obtained from the parish

and administered by the pastor of a parish for the parish.[26]  The archbishop may not and does not

administer parish property.[27]  Just as archdiocese property is not liable for parish debts,[28] parish

property is not liable for archdiocese obligations.[29]  Parish property titled in the archdiocese

corporation sole is held for the benefit of the parish.[30]

    In its filings on the Motion, the Archdiocese demonstrates what the Pastor declarations

confirm – in the Archdiocese the separateness of Parishes is honored and Parish assets strictly

and separately accounted for.

### 2.4.    Canon Law Prefers Separate Corporations Over Corporation Sole, Although Both Are Permissible

    At least since 1911, American dioceses have known that Canon Law recognizes the

church's ownership of temporal property in the corporation sole, but the parish corporation

structure is preferable.[31]  Parishes in this Archdiocese did not meet this expectation until 2013.

### 2.5.    Assets Not Titled In A Parish Corporation, The Real Estate Corporation, Or The DLF Trust Were And Are Held In Trust For The Parishes

    Assuming for purposes of discussion that no Parish was separately incorporated until

2013, then until that point in time, the UCC argues all Parish property was owned by the

Archdiocese, despite the dictates of Canon Law.  That argument is the point of the request to

avoid conveyance of Parish real property to the RE Trust for the benefit of the Parish, and to

avoid the titling of Parish funds in the DLF Trust.  The Archdiocese and Parishes agree that

---

[25] Fr. Fox Decl. ¶ 17.
[26] Fr. Fox Decl. ¶¶ 20-22.
[27] Id., ¶¶ 22, 25.
[28] Id., ¶ 27.
[29] Id., ¶ 28.
[30] Fr. Fox Decl. ¶¶ 33-37.
[31] Fr. Fox Decl. ¶ 30.

under New Mexico law, Parish property nominally titled in the Archdiocese corporation sole was held as trustee for the Parishes.

### 2.5.1.  Bankruptcy law excludes beneficial interests held in trust from property of the estate

This Court is well aware that Section 541(d) excludes from property of the estate legal title held by a debtor subject to another's beneficial or equitable interest.  Courts acknowledge that that property in which the debtor holds only legal title and not an equitable interest is not property of the bankruptcy estate.[32]  In determining whether Section 541(d) prevents an equitable interest from becoming property of the bankruptcy estate, courts must look to the intent of the parties and the totality of the circumstances surrounding the transaction.[33]  Whether assets in question belong in the bankruptcy estate is a mixed question of fact and law.[34]

### 2.5.2.  New Mexico would recognize the trust relationship

To the extent that legal title to Parish asset is in the Archdiocese, the Parishes are beneficiaries of trusts to which the Archdiocese is the trustee.  Bankruptcy court decisions regarding resulting trusts are to be guided by state law.[35]  In New Mexico, a resulting trust "arises when a person makes a disposition of property under circumstances which raise an inference that such person does not intend that the person taking or holding the property should also have the beneficial interest therein, and where the inference is not rebutted and the beneficial interest is not otherwise disposed of."[36]  For property held in a resulting trust, because the person holding title to the property is not entitled to the beneficial interest, the property

---

[32] *In re Seneca Oil Co.*, 906 F.2d 1445, 1453 (10th Cir. 1990).
[33] *In re Cedar Funding, Inc.*, 398 B.R. 346, 352 (Bankr. N.D. Cal. 2008).
[34]  *In re Rafter Seven Ranches L.P.*, 414 B.R. 722, 731 (B.A.P. 10th Cir. 2009) (*citing In re Parsons*, 280 F.3d 1185, 1188 (8th Cir. 2002)); *Kennann v. Ottinger*, 1999 WL 35809724, at *3 (D.N.M. Mar. 8 1999) (describing the "extent and nature" of an interest as an issue of fact).
[35] *In re Garcia*, 367 B.R. 778, 781 (Bankr. D.N.M. 2007).
[36] *Aragon v. Rio Costilla Co-Op. Livestock Ass'n*, 112 N.M. 152, 155, 812 P.2d 1300, 1303 (1991) (*citing* Restatement (Second) of Trusts § 404 (1957)) ("Restatement").

9

"'springs back or results,' to the person who made the original disposition."[37]  Establishing a resulting trust requires proof that the person who made the original disposition did not intend that the transferee hold the beneficial interest.[38]  By contrast, a writing is not required to form a resulting trust.[39]

Resulting trusts arise in three circumstances: "(1) where an express trust fails in whole or in part; (2) where an express trust is fully performed without exhausting the trust estate; [or] (3) where property is purchased and the purchase price is paid by one person and at his direction the vendor conveys the property to another person."[40]  Under the third set of circumstances, the presumption is that the person who paid the purchase price intended to keep a beneficial interest therein.[41]

Alternatively, New Mexico law would recognize a constructive trust here.  "A constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it."[42]  Contrary to a resulting trust, which is imposed to carry out the parties' intent, a constructive trust is imposed to prevent the unjust enrichment of the person holding title to the property.[43]  The existence of a fiduciary or confidential relationship may be sufficient to establish a constructive trust.[44]  Confidential relationships are not only those for which a

---

[37] *Id.* (*citing Watson Truck & Supple Co. v. Males*, 111 N.M. 57, 59, 801 P.2d 639, 641 (1990)).
[38] *Id.*
[39] Restatement § 406.
[40] *Bassett v. Bassett*, 110 N.M. 559, 566, 798 P.2d 160, 167 (1990) (*citing* 5 Scott & Fratcher, *The Law of Trusts* § 404.1 (4th ed. 1989)).
[41] *Aragon*, 112 N.M. at 155, 812 P.2d at 641; *see also Boegert-Trusts & Trustees* (Third Ed. 2005) § 455 ("The first fact which the claimant seeking to establish a resulting trust in his favor must prove is that he paid the purchase price of the property conveyed to the [trustee].").
[42] *Bassett*, 110 N.M. at 566, 798 P.2d at 167. (*quoting* 5 Scott & Fratcher, *The Law of Trusts* § 462 (4th ed. 1989)).
[43] *Aragon*, 112 N.M. at 156, 812 P.2d at 1304.
[44] *In re K-Ram, Inc.*, 451 B.R. 154, 172 (Bankr. D.N.M. 2011); *see also* Restatement § 44 cmt.c ("Where the owner of land transfers it inter vivos to another in trust for the transferor, but no

10

fiduciary relationship also exists, such as between an attorney and client or trustee and beneficiary, but also where, because of the nature of the relationship, "the transferor is in fact accustomed to be guided by the judgment of the transferee or is justified in placing confidence in the belief that the transferee will act in the best interest of the transferor."[45]  Where a confidential relationship exists, the court looks for unjust enrichment or "other abuse of the relationship" to determine whether a constructive trust should be imposed.[46]

It appears that the existence of either a resulting or constructive trust must be established by clear and convincing evidence.[47] Doing so does not require proving that the parties intended to form such a trust, but rather, that the parties did not intend that the transferee would hold a beneficial interest in the property.[48] Similarly, a writing is not necessary to establish a resulting or constructive trust by clear and convincing evidence.[49] Instead, for a resulting trust, the parties must prove that the transferor "paid all, or some definite proportion, of the purchase price of a definite tract of land, the title of which was taken in another."[50] Evidence such as "plain and consistent" statements showing the parties' intent, especially where "corroborated by evidence. . . [such as] proof that the purchase money was paid by such other, or by proof of a prior agreement to so purchase" is sufficient to establish a resulting trust.[51] To establish a constructive trust, the parties may provide clear and convincing evidence of either the abuse of a confidential relationship or of unjust enrichment.[52]

---

memorandum properly evidencing the intention to create a trust is signed, the transferee will be compelled to hold the land upon a constructive trust for the transferor, if the transferee at the time of the transfer was in a confidential relation to the transferor.").

[45] Restatement § 44 cmt. c.
[46] *In re Amdura Corp.*, 75 F.3d 1447, 1451-52 (10th Cir. 1996).
[47] *In re Palmer*, 72 N.M. 305, 307-08, 383 P.2d 264, 266 (1963).
[48] *In re Jones*, 184 B.R. 377, 382 (Bankr. D.N.M. 1995).
[49] *Id.*
[50] *White v. Mayo*, 299 P. 1068, 1071 (N.M. 1931) (citation and internal quotations omitted).
[51] *Id.*
[52] *In re Garcia*, 367 B.R. 778, 782 (Bankr. D.N.M. 2007).

11

In 2013 then under either theory, any Parish property held in the name of the Archdiocese was held in trust for the Parishes' benefit. The resulting trusts are within the third set of general circumstances through which a resulting trust may arise. The Parishes either directly, through Parish funds, or indirectly by donors to the Parish, provided the resources for the acquisition of the real properties, including those donated to the Parishes, and the churches and schools built upon the properties were paid for by the individual Parish. The Parishes similarly assumed all responsibility for the maintenance and operation of each Parish property, including all expenses thereof and receipt of any revenue therefrom. The resulting trusts arise when title to the Parish property is taken in the name of the Archdiocese, but the purchase and improvement costs were all furnished by the individual Parish. They would equally arise if the Archdiocese initially paid for the Parish property but then transferred the debt to the individual Parish as a loan. The individual Parishes raise their funds through regular contributions from their individual members, and these funds are retained in separate bank accounts in the particular Parish's name. Each Parish maintains and solely controls its own separate bank account. Conversely, there is no evidence that the Archdiocese paid for Parish properties with the exception of isolated instances where the Archdiocese may have gifted properties to a poor parish, nor that anyone intended that the Archdiocese retain the beneficial interest of said property.

It is clear that the Parishes were meant to retain a beneficial interest in the Parish property, and that this can be accomplished through a resulting trust.

The same is true if the court concludes, in the alternative, that the Parish property is held in a constructive trust. The Parishes are separately authorized to exist by the Archdiocese.[53] The Archdiocese has a confidential relationship with each individual Parish. The existence of this special relationship is sufficient to establish a constructive trust. However, the rationale for

---

[53] Fr. Fox Decl. ¶ 17.

establishing a constructive trust is strengthened by the fact that, as already explained, Parish property was paid for by Parish funds, not by the Archdiocese, or donated to the Parish. All Parish property is similarly insured, maintained and operated by the Parish, not the Archdiocese. Accordingly, to now treat this Parish property as belonging to the Archdiocese would result in the unjust enrichment of the Archdiocese to the Parishes' detriment. This unfair result is avoided by finding that the Parishes are beneficiaries of a constructive trust.

### 2.6. Prior To Parish Incorporation The Best Analogy Is An Unincorporated Association

Many jurisdictions treat parishes as unincorporated associations.[54]

The New Mexico unincorporated association statute, NM ST § 53-10-1, states:

> Whenever two or more persons shall desire to form an association for the promotion of their mutual pleasure or recreation of any hunting, fishing, camping, golf, country club, or association for a similar purpose, or an association not for the profit of the members thereof, and without incorporating the same as a corporation, or maintaining the title of its property in trust for the interest of its several members as they may exist from time to time, the said persons or members desiring to form such an association or club may file in the office of the county of the clerk of the county in which it may maintain its headquarters and pursue its objects and purposes. . .

This statute has been construed as requiring qualifying organizations to make a filing with the county clerk.[55]

The statute does not apply to Parishes. The Parishes do not exist "for the promotion of their mutual pleasure or recreation of any hunting, fishing, camping, golf, country club, or association for a similar purpose."[56] A parish is a "definite community of the Christian faithful

---

[54] *See, e.g.*, *Comm. Of Tort Litigants v. Catholic Diocese of Spokane*, 364 B.R. 81, 91 (E.D. Wash. 2006); *In re Roman Catholic Bishop of Great Falls, Montana*, 584 B.R. 335, 339 n.6 (D. Mont. 2018); *Philadelphia Indem. Ins. Co. v. Episcopal Diocese of Ft. Worth*, 2011 WL 3510848, at *2 (N.D. Tex. Aug. 10, 2011).

[55] *Blue Canyon Well Assoc. v. Jevne*, 410 P.3d 251, 254 (N.M. Ct. App. 2017). The Parishes agree with the Archdiocese that this case was simply wrongly decided.

[56] NM ST § 53-10-1.

13

established on a stable basis within a particular Church," in which the pastoral care "is entrusted to a pastor as its own shepherd under the authority of the diocesan bishop."[57]  An alternative definition of a parish is "[a] specific community of the Christian faithful within a diocese, having its own church building, under the authority of a pastor who is responsible for providing ministerial service.  Most parishes are formed on a geographic basis, but they may be formed along national or ethnic lines."[58]

The inapplicability of NM ST § 53-10-1 to the Parishes is exemplified in the types of organizations that have been treated as unincorporated associations under the statute.  There are few cases in New Mexico qualifying organizations as unincorporated associations.  Qualifying organizations include a water-well association,[59] and an organization formed to initiate a recall of a school board election.[60]  The absence of more examples from which the Parishes can illustrate a distinction does not mean that the difference between a Parish and the organizations meant to be subject to the unincorporated associations statute are any less clear.

Similarly, New Mexico law recognizes that parishes and other religious organizations warrant distinct treatment, due to their unique stature and the role that they play in the lives of their members.  Specifically, the New Mexico Charitable Solicitations Act[61] explicitly "shall not apply to a religious organization, even if it were a charitable organization."[62]  If a religious organization is distinct from a charitable one, it surely is different than those contemplated under the unincorporated associations statute.

---

[57] Fr. Fox Decl. ¶ 17.
[58] *Glossary of Catholic Terms*, United States Conference of Catholic Bishops, http://www.usccb.org/about/public-affairs/glossary/index.cfm.
[59] *Blue Canyon,* 410 P.3d 251.
[60] *Cordova v. Cline*, 308 P.3d 975 (N.M. Ct. App. 2013).
[61] NM ST § 57-22-1 *et seq.*
[62] NM ST § 57-22-4(A).

14

However, if the Parishes are deemed unincorporated associations under the statute, the plain language of NM ST § 53-10-1 provides for a permissive, rather than mandatory, filing requirement. This is based on the explicit language that the "association or club *may* file in the office. . . ," not "must" or "shall." New Mexico has adopted the Uniform Statute and Rule Construction Act, which provides clear statutory interpretation guidance.[63] In particular, the Act defines "may" as "confer[ring] a power, authority, privilege or right," compared with "shall" or "must," which "express a duty, obligation, requirement or condition precedent."[64] In spite of these instructions, the New Mexico Court of Appeals decided that the New Mexico unincorporated associations statute imposes a mandatory filing requirement.[65]

The Parishes believe that this was an incorrect decision. The role of the court is to give effect to the clear and unambiguous meaning of statutory language.[66] Not only is "may" commonly understood in general statutory drafting to be permissive, rather than mandatory, but New Mexico has codified this understanding. Accordingly, the Parishes see no reason to stray from this clear rule and construe the New Mexico unincorporated associations statute in a way contrary to the Uniform Act.

### 2.7. Avoidance Of Transfers Would Require Determination Of Donor Restrictions

To the extent that the UCC seeks to avoid transfer of parish real estate to the RE Trust, funds to the DLF Trust, or title in the corporation sole, the Court must then determine if the affected properties were donated to the Parishes, or to the Archdiocese for the benefit of Parishes. Another piece of Canon Law concerns donations to the parishes. Under Canon 1267 § 3 "offerings given by the faithful for a certain purpose can be applied only for that same

---

[63] NM ST § 12-2A-1 *et seq.*
[64] NM ST § 12-2A-4.
[65] *Blue Canyon Well Assoc. v. Jevne*, 410 P.3d 251, 254 (N.M. Ct. App. 2017).
[66] NM ST § 12-2A-18.

15

purpose."[67] The Canon Law and individual donor restrictions would be recognized by New Mexico law and this Court should enforce the donor's restriction adverse to the Archdiocese's putative claim.[68] Restraints placed on donations are valid unless they are contrary to the general welfare or violate a rule of law.[69]

### 3. THE RELIGIOUS FREEDOM RESTORATION ACT BARS THE UCC AND THE COURT FROM REQUIRING INCLUSION OF PARISH PROPERTY IN THE BANKRUPTCY ESTATE.

The Religious Freedom Restoration Act ("RFRA") was enacted by Congress in 1993 to enhance religious freedom by restoring strict scrutiny analysis when substantial burdens are placed on religious exercise by or through government action. Under RFRA, "the federal government may not, as a statutory matter, substantially burden a person's exercise of religion, 'even if the burden results from a rule of general applicability.'"[70] "A person whose religious practices are burdened in violation of RFRA 'may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief.'"[71]

In its Motion, the UCC does not address RFRA, or engage in any analysis of the burden on the free exercise of religion or the government's interest here. While the Tenth Circuit has not

---

[67] Fr. Fox Decl. ¶ 20.

[68] Restatement (First) of Property § 437 (1944) ("An otherwise effective condition precedent, special limitation, condition subsequent or executory limitation. . . which is designed to prevent the acquisition or retention of an interest in land or in things other than land in the event of any failure to comply with the terms and conditions expressed therein is valid unless the terms and conditions involve a violation of some rule of law or contravene public policy, in which event the restraint is invalid.").

[69] *Id.* § 437 cmt. a.

[70] *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006) (quoting 42 U.S.C. § 2000bb-1(a)).

[71] *Id.* (quoting 42 U.S.C. § 2000bb-1(c)).

16

addressed RFRA in the context of avoidance actions in bankruptcy proceedings,[72] other Circuit

Courts have examined RFRA in this context.

For example, the Eight Circuit has concluded that RFRA is directly applicable to

bankruptcy proceedings that may place a burden on the free exercise of religion.[73]  In *In re*

*Young*, the Circuit Court addressed the applicability of RFRA to the Chapter 7 trustees' actions

to avoid certain transfers under Section 548.  The Court concluded that RFRA "has effectively

amended the Bankruptcy Code, and has engrafted the additional clause to § 548(a)(2)(A) that a

recovery that places a substantial burden on a debtor's exercise of religion will not be allowed

unless it is the least restrictive means to satisfy a compelling governmental interest."[74]"

Moreover, the Court concluded that the interests advanced by the bankruptcy system are not

sufficiently compelling to overcome RFRA's strict scrutiny test.[75]

---

[72] The Tenth Circuit expressly declined to address RFRA as applied in the bankruptcy context and to the Bankruptcy Code's avoidance provisions. *See In re McGough*, 737 F.3d 1268, 1277 n.8 (10th Cir. 2013) (a tithing case implicating 11 U.S.C. 548(a)(2)).

[73] *In re Young*, 82 F.3d 1407, 1420 (8th Cir. 1996), *vacated*, 521 U.S. 1114 (1997), *reinstated by* 141 F.3d 854 (8th Cir. 1998).

[74] *In re Young*, 141 F.3d 854, 861 (8th Cir. 1998).

[75] *In re Young*, 82 F.3d at 1420.  One circuit court has concluded that RFRA was not applicable to acts by an unsecured creditors committee. *See, e.g., Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 741 (7th Cir. 2015) (holding that RFRA's protections are limited to litigation with the government, and holding that a statutorily appointed officer fulfilling a federal-law duty to pursue claims on behalf of a bankruptcy estate is not acting "under color of law."). However, in addition to the Eight Circuit decision in *In re Young*, the Second and District of Columbia Circuits have applied RFRA whenever a person's religious exercise is burdened by the application of federal law. *See Hankins v. Lyght*, 441 F.3d 96, 104 (2d Cir. 2006) ("RFRA allows parties who claim that a federal statute "substantially burdens the exercise of their religion to assert the RFRA as a defense to any action asserting a claim based on [that statute]."); *E.E.O.C. v. Catholic University of America*, 83 F.3d 455, 470 (D.C. Cir. 1996) (RFRA barred both the EEOC's and a private plaintiff's gender discrimination claims against a religious employer, explaining that, through RFRA, Congress had "create[d] a compelling interest defense for the benefit of those whose free exercise rights would be burdened by a neutral federal law of general application.").

### 3.1. RFRA Applies To The UCC's Proposed Adversary Actions Because The UCC Is Seeking Permission To Proceed As A State Actor, With The Intention Of Exercising State Action And Authority.

RFRA applies to the UCC's proposed avoidance actions because the UCC's pursuit of turnover and avoidance actions against the Archdiocese and the parishes are quintessentially state actions.

First, the UCC is a creature of federal law, composed and supervised by a federal officer, and charged with carrying out a congressionally charted role in the bankruptcy process. Specifically, a creditors' committee is appointed by the U.S. Trustee, an official of the Department of Justice.[76] The committee performs a specific role in the bankruptcy process, exercising powers enumerated in the Code,[77] and employing attorneys and other professionals with court approval.[78] And, in keeping with the committee's status as an "officer" of the bankruptcy process, those professionals are compensated from the debtor's estate.[79]

Second, despite its attempt to focus on the Archdiocese's refusal to pursue these avoidance claims against separate Parishes (and other non-debtor entities), for purposes of prosecuting these avoidance actions, the UCC seeks to stand in the shoes of a trustee. In fact, the cases cited by the UCC in support of its derivative standing argument make clear that derivative standing is directly tied to claims that otherwise belong exclusively to the trustee.[80] Moreover, the same case law emphasizes that the creditor requesting derivative standing must demonstrate that "the creditor has the consent of the trustee" to proceed.[81] Put simply, the UCC cannot dodge RFRA's protections under the guise that it is simply a private actor or working for the benefit of

---

[76] *See* 11 U.S.C. § 1102(a); 28 U.S.C. § 581.

[77] *See id.* at § 1103(c)

[78] 11 U.S.C. § 1103(a).

[79] *Id.* at § 503(b)(3).

[80] *See In re Ellicott Springs Res., LLC*, 485 B.R. 626, 636 (Bankr. D. Colo. 2013); Brief at 16-17.

[81] *Id.* (citing *In re Racing Servs., Inc.*, 540 F.3d 892, 898 (8th Cir. 2008)).

18

private creditors, when the UCC is seeking the power and authority vested in the trustee under federal law.[82]

If permitted to proceed with its three avoidance actions, the UCC must be considered a state actor taking state action, and the protections of RFRA must be applied.

### 3.2. The UCC's Avoidance Actions And Pursuit Of Parish Assets Burden The Free Exercise Of Religion.

A government act imposes a substantial burden on religious exercise if it, among other things, "prevents participation in conduct motivated by a sincerely held religious belief."[83]  Here, the burden the UCC seeks to impose on the exercise of the Roman Catholic faith in New Mexico is clear, and not merely substantial, but monumental.

The Motion explains that UCC seeks to grab over $246 million in assets through its three adversary actions—assets that underpin and sustain the local ministry of more than 94 parishes, including:

- The real estate comprising each and every parish (and physical church) in the Archdiocese, with the stated intent of liquidating those assets for the benefit the UCC creditors.

- All funds in held in the DLF Trust, including the savings deposited by Parishes throughout the Archdiocese.  These savings are made up of parishioner contributions, including restricted contributions and funds earmarked for maintenance and repair of parishes, capital projects, schools, insurance, and specific ministries.[84]

Inclusion of these parish assets (and assets held in trust for the benefit of each parish) in the bankruptcy estate would greatly constrain the parishioners' ability to practice and study religion.  The parishes include the churches and schools throughout the Archdiocese. Churches

---

[82] *See* 11 U.S.C. § 544(a) ("The trustee shall have . . ."); § 544(b) ("the trustee may avoid . . . "); § 548(e) ("In addition to any transfer that the trustee may otherwise avoid, the trustee may avoid any transfer of an interest . . . "); and § 550(a) ("to the extent that a transfer is avoided . . .  the trustee may recover").

[83] *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1138 (10th Cir. 2013) (*en banc*) (quotations omitted).

[84] *See* Msgr. Luna decl. ¶¶ 22, 23.

19

are the primary places of worship for Roman Catholics, where parishioners engage in the sacraments like the Sacrament of Reconciliation (known colloquially as "confession") and gather for important religious occasions such as baptisms and marriage. Parish schools also serve as the primary places where religion is fostered and inculcated for all Catholics—from the very young to the oldest members of our community. On a macro level, it cannot be disputed that the loss of these places of worship and schools would burden the free exercise of religion. Indeed, hundreds of thousands of Roman Catholics could lose their church or school if the UCC were to successfully prosecute its adversary actions, and leave them without any viable alternative.

Critically, the UCC's Motion seeks unabated and unlimited authority to pull these assets into the bankruptcy estate, which the UCC claims it needs to satisfy the claims of sexual abuse survivors. That is, there are no proposed limits on specific properties; no limits on the cost or time to prosecute these actions; no correlation to the alleged value of the UCC's purported claims; and no limits on how far the UCC may go to simply wipe out every Catholic parish in northern New Mexico. Although the draft complaints identify certain parishes, the scope of the Motion is much broader. But even if the just the parishes identified in the Exhibit A draft complaint lost their properties, it would directly burden the free exercise of religion for at least 15,312 Parish families that make up those Parishes.[85]

Finally, the analysis here cannot focus exclusively on the burden imposed on the free exercise of religion when spread across the entire Archdiocese. That is, substantially burdening (or eliminating) an individual parish community cannot be justified because there remain other Catholic parishes for parishioners to practice their faith. Instead, the burden must also be examined at the individual parish level—for each parish, however constituted—where the loss of

---

[85] T. Salgado Decl. ¶ 41.

20

its church, school, and funds held in the DLF Trust could effectively eliminate an entire faith community.

As noted in the Declaration of Most Rev. Joseph E. Fox, despite their common Catholicity, no matter how they are structured under civil law, parishes are separate legal entities under church law and exist as separate faith communities within the larger hierarchy of the Catholic church. More specifically, under Roman Catholic Canon law, parishes are recognized as separate and distinct juridic persons from the Archdiocese. The burden analysis under RFRA cannot ignore the separateness established under this legal structure. Considering all the Parishes as part of a singular Catholic enterprise would violate RFRA and incorrectly diminish the burden that the UCC's proposed adversary actions may have on the free exercise of religion within the individual parish communities throughout the Archdiocese.

### 3.3. Maximizing The Recovery Of The UCC Creditors—At The Expense Of The Parish Creditors—Is Not A Compelling Interest Under RFRA.

When it comes to examining whether there is a compelling government interest, only interests of "the highest order and ... not otherwise served can overbalance legitimate claims to the free exercise of religion" and justify a substantial burden on religious observance.[86] Courts must not interpret "compelling government interest" so as to "water [the standard] down," but so as to ensure it "really means what it says."[87]

At its core, the Bankruptcy Code's protections for creditors further private interests, not government interests. That includes the avoidance provisions at issue here and the UCC's stated intent to maximize recovery for sexual abuse victims. While the Code certainly imposes a public order to ensure that all creditors are treated fairly, its ultimate purpose is to equitably maximize

---

[86] *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972).
[87] *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (*quoting Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 888 (1990) (striking down a non-neutral statute targeting a religious practice)).

21

creditors' recovery on their private claims to the debtor's property. Given this core purpose and the UCC's stated intent, it is difficult to see any government interest at issue, let alone a compelling one.

But putting this private/government distinction aside, the interests advanced through the Code and avoidance actions still do not rise to a compelling interest. As noted above, the Eight Circuit in *In re Young* concluded that interests advanced by the bankruptcy system are not compelling under the RFRA.[88] Specifically, the court explained that unlike the collection of revenue through tax code or the integrity of the social security system, allowing debtors to get a fresh start or protecting the interests of creditors is not a comparable or compelling government interest.[89] The court further explained that recognizing a free exercise exception would not hinder the bankruptcy system as whole:

> [W]e cannot see how the recognition of what is in effect a free exercise exception to the avoidance of fraudulent transfers can undermine the integrity of the bankruptcy system as a whole; its effect will necessarily be limited to the debtor's creditors, who will as a result have fewer assets available to apply to the outstanding liabilities, and not all creditors or even all debtors.[90]

Again, here, nothing in the UCC's motion indicates a compelling government interest that should take precedent over the free exercise of religion under RFRA.

---

[88] *In re Young*, 82 F.3d at 1420.

[89] *Id.*

[90] *Id.; see also In re Roman Catholic Archbishop of Portland in Oregon*, 335 B.R. 842, 864 (Bankr. D. Or. 2005) (did not find a burden on the free exercise of religion, but agreed with the Eighth Circuit's view that "the interests advanced by the bankruptcy system are not compelling under the RFRA."); *In re Hodge*, 200 B.R. 884, 898 (Bankr. D. Idaho 1996) ("interests advanced by the bankruptcy system are not compelling as that term has been developed under First Amendment and RFRA jurisprudence"); *In re Tessier*, 190 B.R. 396, 406 (Bankr. D. Mont. 1995).

4. **THE UCC'S PREMISE THAT THE ARCHBISHOP'S CONTROL OVER THE RE TRUST RENDERS ITS ASSETS ESTATE PROPERTY IS FALSE**

The RE Trust was established by the Indenture of Trust effective as of January 1, 2013.[91] The RE Corp. is trustee of the "irrevocable charitable trust" for the benefit of the "Beneficiaries." The Parishes and other Archdiocesan Organizations are the "Beneficiaries." Each Parish "is a separate legal entity under civil law and, as such, is the beneficial owner of its real property held by the [RE] Trust."

The UCC argues that under the Bylaws of the RE Corp.[92] the Archbishop may appoint and remove the directors of the RE Corp. The UCC argues this gives the Archbishop unfettered control over Parish assets in the RE Trust.

Yet, under the Indenture of Trust, "All acts of administration of Trust Property" … "shall be done in a manner which is consistent with Canon Law and which recognizes the juridic status of the Archdiocese of Santa Fe, each Parish and certain of the Archdiocesan Organizations in Canon Law and their property rights under Canon Law." The Bylaws direct the RE Corp. officers to "always [take] into account the prescriptions of Canon Law and of the policies and procedures of the Archdiocese…." Thus, all actions in the Trustee's discretion with respect to a Parish real property must be undertaken for the Parish as beneficiary.

The UCC argues that the Archdiocese, in providing services to the RE Trust, maintains sufficient control as to be deemed the owner of trust properties. The RE Support Agreement[93] provides that the Archdiocese provides support services to the RE Trust. The RE Support Agreement explicitly requires that "the then current *Code of Canon Law* and of the particular law of the Archdiocese of Santa Fe" must be taken into account in providing services. Nothing in the

---

[91] Brown decl. Ex. J.
[92] Brown decl. Ex. L.
[93] Brown decl. Ex. M.

23

RE Support Agreement even hints that the Archdiocese may convert Parish property from the RE Trust to itself or its creditors.

The UCC suggests that the Archdiocese or the Archbishop has the power to remove Parish property from trust, and infers that the property may be conveyed to the Archdiocese or its creditors. Since any such act would plainly contravene Canon Law, only the UCC's imagination can support the argument. There is no such power in the RE Corp. as trustee.[94]

5. **THE UCC'S PREMISE THAT THE ARCHBISHOP'S CONTROL OVER THE DLF TRUST RENDERS ITS ASSETS ESTATE PROPERTY IS FALSE**

Prior to 2013, the Archdiocese was administrator of the Deposit and Loan Fund. Parish funds in the DLF were separately maintained and accounted for.

The DLF Trust was established by Bylaws effective January 1, 2013,[95] as was the Indenture of Trust of the DLF Trust.[96] Under a Transfer of Assets effective January 1, 2013,[97] the Archdiocese transferred the funds from the DLF to the DLF Trust. The Assets "shall be used solely for the exclusive benefit of each respective Parish Corporation … and subject to the norms of the Roman Catholic *Code of Canon Law"* and the Archdiocese Rules and Regulations.

As a result, and under the Indenture, the Trustees of the DLF Trust hold "legal title of the trust fund exclusively for the benefit of each respective Participant." Each Parish is a Participant and "is the beneficial owner of its portion or share of the trust fund, in the civil law sense, and such portion belongs, in the Canon Law sense, to the respective Participant (or that Participant's canonical administrator in the case of a Participant that is not a Parish or other juridic person under Canon Law…)." Funds are deposited, invested, and returned to the respective Participants, i.e. Parishes. Absent violation of Canon Law, the Trustees may not convert a

---

[94] Msgr. Luna decl. ¶¶ 25-27.
[95] Brown decl. Ex. Q.
[96] Brown decl. Ex. P.
[97] Brown decl. Ex. R.

Participant's deposits for another Participant's benefit, or for the Archdiocese's benefit. Upon termination of the Trust, the Participants recover their deposits pro rata. Under the Trust's anti-alienation provision, no creditor of the Archdiocese or any Parish may obtain an interest in any Trust Property. Although the UCC complains about the Archdiocese's control over the trustees under the DLF Trust Bylaws, Canon Law controls over the provisions of the DLF Trust's Trust Indenture and the Bylaws.[98]

The UCC complains that the Archdiocese again provides services under the DLF Service Agreement.[99] Rather than convey the ability to convert funds to the Archdiocese or its creditors, however, the DLF Service Agreement requires the Archdiocese, "taking into account the prescriptions of the then current *Code of Canon Law"* and of the Archdiocese law, provide only accounting and management services.

6.    **NEITHER THE RE TRUST NOR THE DLF TRUST IS SELF SETTLED**

The UCC claims the RE Trust and the DLF Trust may be avoided as self-settled trusts under § 548(e) of the Bankruptcy Code and New Mexico law. A self-settled trust is one where the grantor places its own assets in trust.[100] Where, as here, the trust is formed by a trustee that causes the transfer of trust assets, not its own, into the trust, there is no self-settled trust.[101]

The UCC also argues that the Archdiocese has an interest in the RE Trust and the DLF Trust. The Parishes understand, via the Archdiocese's accounting, that no Archdiocese real estate is held in the RE Trust, and no Archdiocese funds are in the DLF Trust.

---

[98] Msgr. Luna decl. ¶¶ 25-27.
[99] Brown decl. Ex. U.
[100] *Self-Settled Trust*, Black's Law Dictionary (11th ed. 2019).
[101] *Id.*; *see In re Cyr*, 602 B.R. 315, 334 (Bankr. W.D. Tex. 2019) (defining a self-settled trust as "[a] trust in which the settlor is also the person who is to receive the benefits from the trust."); *In re Harman*, 512 B.R. 321, 343 (Bankr. N.D. Ga. 2014) (same).

25

7.    **THE UCC'S PREMISE THAT THE INTERESTS OF PARISHES IN REAL ESTATE TITLED IN THE CORPORATION SOLE WOULD NOT CONSTITUTE NOTICE IS FALSE**

The UCC argues that a bona fide purchaser of Parish real estate titled in the Archdiocese as corporation sole would take free under New Mexico law of the interests of the Parish, or that a hypothetical judgment creditor would extinguish the Parish's interest at an execution sale.  The UCC is incorrect.  Section 544(a)(3) provides that a trustee may avoid certain transfers of real property, as the trustee assumes the position of a hypothetical bona fide purchaser ("BFP").[102] The statute enables the trustee to void any transfer of the debtor's property that a BFP of real property may void, under "applicable state law."[103]  "Applicable state law" refers to the law of the state governing the transfer or transaction, which includes the state's laws on constructive notice.[104]

New Mexico recognizes recording as constructive notice.[105]  In 2014, the Archdiocese caused to be recorded a Certification of Trust in every New Mexico county.  An example, recorded in Bernalillo County on April 29, 2014, is attached under separate cover as Exhibit 2. The Certification provides record notice of the beneficial interest of the Parishes in all property titled in the Archdiocese under New Mexico.[106]

In addition, New Mexico common law widely recognizes other forms of constructive notice.[107]  Under New Mexico law, "[a] party in possession of the property who is not the record

---

[102] *In re Crowder*, 225 B.R. 794, 796 (Bankr. D.N.M. 1998) (*citing Watkins v. Watkins*, 922 F.2d 1513, 1514 (10th Cir. 1991)).
[103] 11 U.S.C. § 544(a)(3).
[104] *In re Crowder*, 225 B.R. at 796.
[105] NM ST § 14-9-2 (the recording of an instrument that affects the title to real estate "shall be notice to all the world of the existence and contents of the instruments so recorded from the time of recording.")
[106] NM ST § 46A-10-1013 (outlining the requirements for a certification of trust); NM ST § 14-9-2.
[107] *In re Crowder*, 225 B.R. at 797 (citations omitted).

26

title holder of the property gives rise to a duty of inquiry on the part of a subsequent purchaser, mortgagee, or lienholder."[108] Accordingly, when property is possessed by a party other than that in which it is titled, such as Parish property, any purchaser would have a duty to inquire as to the Parishes' rights in said property.[109] Section 544(a)(3) therefore cannot be used to void the interest of the party that is in actual possession of the property.[110]

Each Parish is and was on the petition date in possession of its property. Exhibit 3 is a non-exclusive set of examples of signage on Parish properties identifying the interest of the Parish.[111] As to all Parish properties other than perhaps raw land or lots without any indication of ownership, the UCC's complaint to avoid the Parishes' interest in their properties is unfounded.

The UCC argues that there are circumstances in which open possession *does not* impose a duty of inquiry or constructive notice on a potential purchaser.[112] In fact, open, notorious, and exclusive possession of real property should always be treated as providing a potential purchaser with constructive notice and impose a duty of inquiry. Second, even if this Court believes that there are circumstances in which this is not true, the current situation is materially different from *City of Rio Rancho*, cited by the UCC, such that even if the exception was applicable in that case, it is wholly inapplicable to Parish property.

---

[108] *Id.* (In this decision, the court notably held that the exception to constructive notice set forth in NM ST § 14-9-3 only applies to unrecorded executory real estate contracts, not all forms of unrecorded instruments. *Id.* at 800.).

[109] *Id.* at 800 (*citing Citizens Bank of Clovis v. Hodges*, 107 N.M. 329, 331-32, 757 P.2d 799, 801-02 (Ct. App. 1988)).

[110] *In re Garcia*, 367 B.R. 778, 785 (Bankr. D.N.M. 2007); *In re Keenan*, 364 B.R. 786, 796-97 (Bankr D.N.M. 2007); *In re Crowder*, 225 B.R. at 796-97.

[111] *See also* Msgr. Luna decl. ¶ 32.

[112] *City of Rio Rancho v. Amrep S.W. Inc.*, 150 N.M. 428, 423 (2011).

We demonstrate above that constructive notice is a well-established principle in New Mexico common law.[113]  There is no reason to create an exception to the recognized rule that open, notorious, exclusive possession of real property provides constructive notice to the world of its interest.[114]  To impose a carve-out for instances in which open possession does not provide such notice, those in which "all signs of possession can be attributed to and are consistent with ownership by the owner of record" will unnecessarily create factual questions and complications.[115]  Whether the Parishes' conduct and possession is "consistent" with the Archdiocese's ownership in trust is certainly not an easily answered question, and the costs (both financial and of time spent) determining this should not be expended.  There is a clear rule in New Mexico, and that should be uniformly enforced.

Even if this Court finds that there may be appropriate situations in which the *City of Rio Rancho* rule ought to be enforced, this is not one of them.  In *City of Rio Rancho*, the dispute centered around an alleged open space easement.[116]  The plaintiff in that case, the City, had a recorded drainage easement over property purchased by the defendant, and claimed that with that easement also came an unrecorded permanent open space easement.[117]  Accordingly, the City argued that because the defendant had knowledge of the drainage easement, it should have investigated the reasoning behind the easement, which would have revealed that the property was meant to be permanently open space.[118]  Faced with this argument, the court began by recognizing that constructive notice is widely recognized in New Mexico, but that whether it exists is a fact-based inquiry specific to a particular set of circumstances.[119]  In this instance,

---

[113] *In re Crowder*, 225 B.R. 794, 797 (Bankr. D.N.M. 1998).
[114] Mot. at 33-34 (*quoting Citizens Bank v. Hodges*, 107 N.M. 329, 332 (1998)).
[115] *City of Rio Rancho*, 260 P.3d at 423.
[116] *Id.* at 422.
[117] *Id.*
[118] *Id.*
[119] *Id.*

28

however, the fact that the property was undeveloped, while surrounded by developed land, was not inconsistent with ownership by the property's seller, and would not lead a reasonable person to believe that the reason for this lack of development was anything other than the seller's decision to keep the property as open space.[120]

These facts bear no relationship to Parish property. A drainage easement can hardly be analogized to open, notorious and exclusive possession, as a means of providing constructive notice. The fact that a third-party holds an easement over property does not raise the same questions of the scope of that third-party's interest as does open, notorious and exclusive possession. Because of this, the exception to constructive notice does not apply here.

Accordingly, a hypothetical BFP of real estate or judgment or execution creditor could not avoid the Parishes' interest in their property under New Mexico law, and the proposed complaint under § 544 is futile.[121]

## 8. THE UCC'S DEMAND FOR IDENTIFICATION OF THE DLF TRUST BALANCES IS UNDULY INTRUSIVE

The UCC has been provided with an accounting of funds on deposit in and loans from the DLF Trust. The beneficiaries of the DLF Trust, predominantly Parishes, are identified by code in that accounting. The UCC now wants to know the top-10 depositors, which likely is a prelude to discovery of all depositors.

Such information should be available, if at all, only under Bankr. R. 2004. Where the Archdiocese, the debtor, does not own the funds, the information sought is both private information of the Parishes, and seemingly sought for the purpose of demanding settlement tribute from the disclosed Parishes. The Steering Committee respectfully suggests that the

---

[120] *Id.* at 423-24.
[121] *See United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 878 F.3d 1224, 1229-30 (10th Cir. 2017) ("A proposed amendment is futile if the complaint, as amended, would be subject to dismissal.") (internal quotations and citations omitted).

29

interests of the Parishes in their confidential financial information outweighs the interests of the UCC counsel in seeking to put leverage on specific Parishes.[122]

## Conclusion

The UCC Motion should be denied, or any hearing continued for investigation of the factual disputes raised in this brief, as to which an evidentiary hearing is required.

DATED: June 26, 2020            LEWIS ROCA ROTHGERBER CHRISTIE LLP

By: s/ Robert M. Charles, Jr.
     Robert M. Charles, Jr.
*Attorneys for Parish Steering Committee of the Roman Catholic Church of the Archdiocese of Santa Fe*
One South Church Avenue, Suite 2000
Tucson, AZ 85701-1611
Tel: 520.629.4427
Fax: 520.622.3088
E-mail: rcharles@lrrc.com

---

[122] *Matter of Wilcher*, 46 B.R. 428, 434 (Bankr. N.D. Ill. 1985) ("This, although Rule 2004 permits examinations of third parties the language of the rule makes it evident that an examination may be had only of those persons possessing knowledge of the debtor's acts, conduct or financial affairs as this relates to a debtor's proceeding in bankruptcy. . . It is clear that Rule 2004 may not be used as a device to launch into a wholesale investigation of a non-debtor's private business affairs.") (internal quotations and citations omitted); *see also In re Mastro*, 585 B.R. 587, 597 (B.A.P. 9th Cir. 2018) (recognizing that a Rule 2004 examination is not "without limits" and should not "stray into matters which are not relevant to the basic inquiry.") (internal quotations and citations omitted); *In re Strecker*, 251 B.R. 878, 882-83 (Bankr. D. Colo. 2000) (same).

30

# GLOSSARY

"Basilica" means Cathedral Basilica of St. Francis of Assisi

Deposit and Loan Fund means the Parish unincorporated savings and lending fund prior to 2013

"DLF Service Agreement" means D&L Fund Support Services Agreement

"DLF Trust" means Archdiocese of Santa Fe Deposit and Loan Fund

Parish Steering Committee means Parish Steering Committee of the Roman Catholic Church of the Archdiocese of Santa Fe

"RE Corp." means Archdiocese of Santa Fe Real Estate Corporation

"RE Support Agreement" means Real Estate Support Services Agreement effective January 1, 2013

"RE Trust" means Archdiocese of Santa Fe Real Estate Trust

"Restatement" means Restatement (Second) of Trusts (1957)

"RFRA" means the Religious Freedom Restoration Act

"UCC" means Official Committee of Unsecured Creditors

31

## DECLARATIONS

1.      Very Reverend John D. Cannon

2.      Very Reverend Oscar W. Coelho

3.      Joseph E. Fox, O.P.

4.      Rev. Msgr. Lambert Joseph Luna

5.      Very Reverend James Marshall

6.      Reverend Timothy Martinez

7.      Reverend Andrew J. Pavlak

8.      Very Reverend Stephen Carl Schultz

9.      Very Reverend George Robert Yaksich

10.     Laura Lee Halbleib, Trustee of the Laura Lea Halbleib Revocable Living Trust

11.     George Roybal

## EXHIBITS

1.     Personal Representative's Deed, recorded June 18, 2010 at Instrument 202006365, Valencia County, New Mexico

2.     Certification of Trust recorded April 29, 2014 in Official Records, Bernalillo County, New Mexico at Doc. #2014033622.

3.     Examples of Parish signage

## **CERTIFICATE OF SERVICE**

I hereby certify that, on June 26, 2020, in accordance with NM LBR 9036-1 and Fed. R.

Civ. P. 5(b)(3), a true copy of the foregoing was served via the Court's CM/ECF notification

facilities to those parties who are registered CM/ECF participants in this case.

s/ filed electronically
Renee L. Creswell