# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

| | |
|---|---|
| In re: | Chapter 11 |
| ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF SANTA FE, a New Mexico corporation sole, | Case No. 18-13027-t11 |
| Debtor. | |

## DEBTOR'S OBJECTION TO MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS: (I) FOR EXCLUSIVE AND IRREVOCABLE AUTHORITY TO COMMENCE, PROSECUTE, AND SETTLE ADVERSARY PROCEEDINGS ON BEHALF OF BANKRUPTCY ESTATE AGAINST CERTAIN DIOCESE-RELATED ENTITIES; AND (II) TO COMPEL THE DEBTOR TO PRODUCE INFORMATION REVEALING THE TEN PARISHES WITH THE LARGEST PURPORTED INTERESTS IN THE DEPOSIT AND LOAN FUND

The Roman Catholic Church of the Archdiocese of Santa Fe ("Debtor" or "Archdiocese" and sometimes referred to by the Committee as "ASF") in the above-captioned case (the "Reorganization Case"), by and through its undersigned counsel, hereby responds and objects to the "*Motion (I) for Exclusive and Irrevocable Authority to Commence, Prosecute, and Settle Adversary Proceedings on Behalf of Bankruptcy Estate Against Certain Diocese-Related Entities; and (II) to Compel the Debtor to Produce Information Revealing the Ten Parishes With the Largest Purported Interests in the Deposit and Loan Fund*" (Doc. No. 383) (the "Motion") filed by The Official Committee of Unsecured Creditors (the "Committee" or the "Movant") filed on May 29, 2020 (Doc. No. 383). In support of this Objection, the Debtor relies upon the contemporaneously filed Declarations of the Most Reverend John C. Wester, Archbishop of the Roman Catholic Church of the Archdiocese of Santa Fe, Tony Salgado, Chief Financial Officer for the Roman Catholic Church of the Archdiocese of Santa Fe, and Fr. Joseph E. Fox, O.P.

## I. DEBTOR'S INTRODUCTION AND RESPONSE TO COMMITTEE'S INTRODUCTION

The Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on December 3, 2018 ("Petition Date"). Since the Petition Date, the Debtor has been operating as a Debtor-in-Possession pursuant to 11 U.S.C. §§ 1107 and 1108. In the Motion, the Committee recites a voluminous catalogue of unfounded accusations, unsupported facts, speculative and baseless theories, and self-serving, inflammatory statements, while failing to satisfactorily address the standing issue, which is the Motion's fundamental and fatal flaw. The Court should disregard the Committee's unsupported allegations in their entirety. The relief requested in the Motion is unauthorized and unwarranted.

The Committee's Introduction is replete with misstatements, false allegations and unfounded claims. The Archdiocese affirmatively states that no assets of the Archdiocese were transferred to the Parishes, to the RE Trust or to the DLF Trust. The Parishes were and are independent juridic persons under the Canon Law of the Roman Catholic Church ( "Canon Law"). Each juridic person under Canon Law has its own property and operates as a separate entity. Under Canon Law, the Archbishop of the Archdiocese, under the "corporation sole" structure, holds title to the juridic person's property as a steward for each juridic person. Holding property in stewardship is legally equivalent to holding property in trust. As such, all property of each Parish was held in trust by the Archdiocese for each separate Parish.

The Archdiocese kept meticulous records, including audited financials, with regard to all separate Parish deposit and loan accounts. All Parish properties (real estate and financial assets) were always treated as separate from Archdiocese property. Parish properties were never listed on the balance sheet of the Archdiocese as an asset. The Deposit and Loan Fund was listed as an asset in the balance sheet but a corresponding liability to each Parish as a depositor was also listed, and

-2-

therefore no Parish properties held in the Deposit and Loan Fund were ever accounted for as a net asset of the Archdiocese. Again, no Parish property such as Parish real estate or Deposit and Loan Funds was ever owned by the Archdiocese or the Archbishop. Declaration of Tony Salgado, Paragraphs 23 and 24; Exhibit 7 to Declaration of Tony Salgado (Note 6 to Consolidated Financial Statements, June 30, 2012 and 2011).

The "Unrecorded Interests" are now and have always been Parish property, held in trust for the Parishes by the Archbishop under the "corporation" sole structure. These assets are not, and never have been, Archdiocese property.

The incorporations of the Parishes and creation of the RE Trust and DLF Trust did not result from "escalating claims by childhood sexual abuse survivors." To the contrary, during the relevant time period (2008 to 2013), the number of abuse lawsuits had diminished significantly since the 1990s, and there were very few lawsuits filed or pending at that time. Declaration of Tony Salgado, Paragraph 6. The Parishes were incorporated and the RE Trust and DLF Trust were created as part of a decades-long continual process to improve the structure of the Archdiocese and the Parishes.

Archdiocese properties were not "transferred" in the formation of the RE Trust and the DLF Trust. There was never any "scheme" to insulate Archdiocese properties from the abuse claimants, from other creditors, or from anyone else. The Parish real property and financial assets are and have always been separate from Archdiocese property; the incorporations of the Parishes and creation of the RE Trust and DLF Trust did not change that. Parish assets are not property of the bankruptcy estate and are not available to pay creditors' claims in the bankruptcy case.

The Committee's proposed action for declaratory relief to determine property of the estate is unfounded and impermissible. The Committee asserts, in footnote 1 of the Introduction (p. 9 of

54[1]), that it does not need Court approval to sue for declaratory relief to determine property of the estate. That is not correct. The Committee cites in support of its proposed action *Committee of Tort Litigants v. Catholic Diocese of Spokane,* 2006 WL 211792, 2006 U.S. Dist. LEXIS 6025, *5 (E.D.Wash. 2006). A close reading of this case reveals that the Court's statements concerning this issue were only advisory, based on the stage of the case when the *Spokane* Committee filed its adversary proceeding. The Court merely refused to dismiss the adversary complaint as a result of the Committee's failure to obtain Court permission, without endorsing the action; the Court clearly would have preferred for the *Spokane* Committee to have sought prior leave of the Court. *Id*. The Archdiocese states that any such cause of action is, itself, property of the estate, and that Court permission is required for the Committee in this case to assert such claims. The Archdiocese opposes the Committee's request for such permission.

The Archdiocese disputes the Committee's claim that the Archdiocese has an "irreconcilable conflict." As the undisputed facts clearly show, there was no fraudulent scheme; there were no transfers of Archdiocese assets; and, creditors of the Archdiocese never had any right to reach the separate property of the Parishes. Therefore, there simply is no conflict. Further, the Archdiocese is focused on pursuing mediation and a fair, compassionate, and generous resolution of claims rather than embarking on pointless scorched-earth litigation with the Parishes, when the Archdiocese is fully aware that no colorable claims exist to recover any Parish property for the estate. Such litigation would be extremely expensive and time-consuming and damaging to mediation efforts, as any assets which the Parishes might willingly contribute to a settlement would instead be spent on attorneys and litigation costs, thereby making a settlement less likely and further polarizing the parties.

---

[1] References to page numbers in the Committee's Motion are to the Court-stamped page numbers, e.g., "9 of 54."

## II.     RESPONSE TO FACTUAL BACKGROUND

The Archdiocese objects to subheading titles A. ("The Restructuring"), D. ("Intentional Fraud"), and G. ("ASF's Refusal to Pursue the Claims") on the basis that they are misleading and not based on the facts. The Archdiocese responds to each allegation in the "Factual Background" as follows:

1.      The Archdiocese denies the allegations in Paragraph 1. No assets of the Archdiocese were insulated. No consideration was necessary because there was no transfer of ownership of any Archdiocese assets. The structure of the Archdiocese has nothing to do with the claims of the Survivors. The dates of execution and recording of deeds, leases, Certifications of Trust and other documents speak for themselves. Declaration of Tony Salgado, ¶¶ 6, 34-40.

2.      In response to the allegations contained in Paragraph 2 of the Motion, the Archdiocese admits that "Effective January 1, 2013, ASF, as the sole settlor/grantor, created the RE Trust" and denies the remaining allegations in Paragraph 2.

3.      The Archdiocese admits the allegations contained in Paragraph 3 of the Motion.

4.      In response to the allegations contained in Paragraph 4 of the Motion, the Archdiocese admits that "Pursuant to the Bylaws of RE Corp., the Archbishop is the sole member of RE Corp." and denies the remaining allegations in Paragraph 4. The Archdiocese specifically denies that "pursuant to the Bylaws of RE Corp.", the Archbishop "controls" ASF, as this description is incomplete, insufficient, immaterial, and meaningless. The Archdiocese affirmatively states further that Archbishop's relationship with the RE Corp., and its relationship, in turn, with the RE Trust is in the capacity of custodian and trustee for the benefit of the Parishes. Declaration of Tony Salgado, ¶¶ 14-29.

5.      The Archdiocese admits the allegations contained in Paragraph 5 of the Motion and affirmatively states further than the establishment of the RE Trust did not change the custodial and trust relationship that existed at all times with respect to Parish property.

6.      In response to the allegations contained in Paragraphs 6 and 7 of the Motion, the Archdiocese states that the documents speak for themselves. In further response, the Archdiocese denies the allegations in Paragraph 7. The Archdiocese further states that the RE Trust Indenture expressly states that it is an "irrevocable charitable trust" and that the Indenture of Trust is irrevocable. Committee Ex. J, p.1, and ¶¶ 1 and 13. There is no provision in the RE Trust Indenture of Trust providing that the RE Trust is "revocable."

7.      In response to the allegations contained in Paragraph 8 of the Motion, the Archdiocese states that the documents speak for themselves.

8.      The Archdiocese denies the allegations in Paragraph 9 of the Motion as being false, misleading, incomplete, insufficient and meaningless. The Archdiocese states affirmatively that the RE Trust, the DLF Trust, and the Real Estate Support Services Agreement were created for valid legal purposes while maintaining the Parishes' separate, beneficial ownership of Parish property. Declaration of Tony Salgado, ¶¶ 4-40.

9.      The Archdiocese denies the allegations contained in Paragraph 10 of the Motion, and states that the Committee's analysis is biased and wrong. There were no transfers of beneficial interests in Parish property, which remained in place, and unchanged, for the benefit of the Parishes and were at no time for the benefit of the Archdiocese. As such, there was no requirement for consideration. The Committee's self-serving and unsupported statement of Parish properties' value is false, immaterial, and meaningless The Archdiocese further states that no undisclosed transfers of Archdiocese property took place between January 1, 2013 and the Petition Date.

Declaration of Tony Salgado, ¶¶ 4-40.

10.     In response to the allegations contained in Paragraph 11 of the Motion, the Archdiocese states that the documents speak for themselves. The Archdiocese further incorporates its response to Paragraph 10, and states further that no undisclosed transfers of Archdiocese property took place between January 1, 2013 and the Petition Date; that no Parish property was ever transferred out of trust, and that no consideration was required. Declaration of Tony Salgado, ¶¶ 4-40.

11.     The Archdiocese denies the allegations contained in Paragraph 12 of the Motion. Paragraph 12 of the Motion appears to allege that the Statements and Schedules filed in this case are not accurate, and that certain transfers are not "fully disclosed," because they allegedly took place more than two years before the Petition Date. The SOFA does not require disclosure of transfers which took place more than two years before the Petition Date, despite the insinuation in Paragraph 12 to the contrary. The Archdiocese states that its Statements and Schedules are accurate, and states affirmatively that no undisclosed transfers of Archdiocese property took place between January 1, 2013 and the Petition Date, and that no Archdiocese property was transferred to the Parishes, to the RE Trust or to the DLF Trust. Declaration of Tony Salgado, ¶¶ 4-40.

12.     In response to the allegations contained in Paragraphs 13 and 14 of the Motion, the Archdiocese denies that any of its financial assets were transferred to anyone as a result of establishing the DLF Trust. The Archdiocese admits that the DLF Trust was created effective January 1, 2013, and that the Archdiocese was the Grantor as set forth in the Indenture of Trust and states that at all times the funds at issue were Parish funds. The Archdiocese further states that the Indenture of Trust speaks for itself, and denies the remaining allegations in Paragraph 13 and 14.

13.     In response to the allegations contained in Paragraphs 15, 16, 17 and 18 of the Motion, the Archdiocese states that the DLF Indenture of Trust speaks for itself, and any allegations inconsistent with the DLF Indenture of Trust are denied. The allegations in Paragraph 16 are false and are denied. The Indenture of Trust expressly states that it is an "irrevocable charitable trust" and that the Indenture of Trust is irrevocable. Committee Ex. P, p.1, and ¶¶ 1 and 15. There is no provision in the Indenture of Trust providing that the DLF Trust is "revocable." The Archdiocese states that the RE Trust, the DLF Trust and the Real Estate Support Services Agreement were created for valid legal purposes while maintaining the Parishes' separate ownership of Parish property. Declaration of Tony Salgado, ¶¶ 4-40.

14.     In response to the allegations contained in Paragraph 19 of the Motion, the Archdiocese states that the Bylaws speak for themselves, and denies all allegations in Paragraph 19 inconsistent with the Bylaws.

15.     The Archdiocese denies the allegations in Paragraph 20 of the Motion. The document titled "Transfer of Assets" speaks for itself, and demonstrates how misleading the Committee's allegations are. The document states, expressly, that the Archdiocese was acting in its capacity as "custodian for the deposit and loan funds of certain Parishes and other affiliated organizations" and that it transferred the funds to the trustees of the DLF Trust, "[p]rovided that such Assets shall be used solely for the exclusive benefit of each respective Parish Corporation or affiliated organization currently a beneficiary of such Fund" all subject to the Canon Law. There was a transfer of the custodial responsibilities, not of any beneficially interest, which clearly and expressly remained with Parishes. Therefore, the Archdiocese denies all allegations in Paragraph 20 of the Motion that are inconsistent with the referenced document. As such, "consideration" is not necessary or material. The Archdiocese states affirmatively that Paragraph 20 completely

mischaracterizes the nature of the DLF Trust, the Transfer of Assets and the Archdiocese's trust relationship with the Parishes. Declaration of Tony Salgado, ¶¶ 4-40.

16.     The Archdiocese denies the allegations contained in Paragraphs 21 and 22 of the Motion and states affirmatively that no transfers of Archdiocese property took place.

17.     In response to the allegations contained in Paragraph 23 of the Motion, the Archdiocese admits that there is a *D&L Fund Support Services Agreement* effective January 1, 2013, but denies all other allegations in Paragraph 23 and states that the D&L Fund Support Services Agreement speaks for itself. The Archdiocese denies the remaining allegations contained in Paragraph 23 of the Motion.

18.     The Archdiocese denies all of the allegations contained in Paragraph 24 of the Motion and states affirmatively that the Parishes were incorporated, and that the RE Trust, the DLF Trust and the Real Estate Support Services Agreement were created, for valid legal purposes while maintaining the Parishes' separate ownership of Parish property. Declaration of Tony Salgado, ¶¶ 4-40. The Archdiocese states that no Archdiocese were ever transferred as alleged in the Motion, and therefore the Committee's attempt to identify "badges of fraud" is pointless. The Archdiocese denies that it took any actions with the actual intent to "hinder, delay or defraud" its creditors. The Archdiocese responds to the allegations in each subpart of Paragraph 24 of the Motion as follows:

     a.     In response to the allegations contained in Paragraph 24(a) of the Motion, the Archdiocese denies that transfers of Archdiocese property took place, and denies that the Archbishop "controls" the Archdiocese in the manner alleged in the Motion. All property held for the benefit of each respective Parish continues to be held for the benefit of each respective Parish, whether or not deeded into the RE Trust or deposited in the DLF Trust.

b. In response to the allegations contained in Paragraph 24(b) of the Motion, the Archdiocese denies that the Archbishop "controls" the Archdiocese in the manner alleged in the Motion. The powers, duties and authority of the Archbishop are defined, governed and limited by Canon Law and *inter alia* by the control mechanisms of the RE Trust, the DLF Trust, the RE Corporation, the Real Estate Support Services Agreement, the D&L Fund Support Services Agreement. Any replacement of Trustees would be subject to these control mechanisms. Declaration of Archbishop John C. Wester, Paragraphs 7-9.

c. In response to the allegations contained in Paragraph 24(c) of the Motion, the Archdiocese denies that the Archbishop "controls" the Archdiocese in the manner alleged in the Motion. The powers, duties and authority of the Archbishop are defined, governed and limited by the control mechanisms of the RE Trust, the DLF Trust, the RE Corporation, the Real Estate Support Services Agreement, the D&L Fund Support Services Agreement, the Canon Law and many other documents, agreements and laws, and any replacement of Trustees would be subject to these control mechanisms. Declaration of Archbishop John C. Wester, Paragraphs 7-11.

d. The allegation that the Parishes were incorporated and the trusts were formed in an environment of "escalating abuse claims" is false. In response to the allegations contained in Paragraph 24(d) of the Motion, the Archdiocese states that in the period from 2008 to 2013, when the study of incorporations occurred and eventually the Corporation paperwork was filed for the Parishes, the number of abuse lawsuits had diminished significantly since the 1990s, and there were minimal claims asserted or pending at that time. During the period of July 16, 2008 to May 16, 2013, there were seven abuse claims or lawsuits pending against the Archdiocese; six of these were settled by October 5, 2012. As a result, from October 5, 2012 through May 16, 2013, there was one (1) pending abuse claim against the Archdiocese at the time that the incorporations

of the Parishes were finalized and the RE Trust and DLF Trust were created. Declaration of Tony Salgado, Paragraph 11.

e.       In response to the allegations contained in Paragraph 24(e) of the Motion, the Archdiocese states that the Minutes speak for themselves and that the Committee's reinterpretation is unnecessary and inaccurate. The Archdiocese acknowledges that it has been involved with abuse claims for a number of years; that attorneys have been involved, and that the Archdiocese has at all times responded compassionately and in good faith and has settled all the claims generously.

f.       In response to the allegations contained in Paragraph 24(f) of the Motion, the Archdiocese states that the Agenda speaks for itself and that the Committee's reinterpretation is unnecessary and inaccurate. The Archdiocese acknowledges that the Parishes were incorporated, and that the RE Trust, the DLF Trust and the Real Estate Support Services Agreement were created, for valid legal purposes while maintaining the Parishes' separate ownership of Parish property.

g.       In response to the allegations contained in Paragraph 24(g) of the Motion, the Archdiocese states that the PowerPoint presentation speaks for itself, and states affirmatively that the Parishes were incorporated, and that the RE Trust, the DLF Trust and the Real Estate Support Services Agreement were created, for valid legal purposes while maintaining the Parishes' separate ownership of Parish property.

h.       In response to the allegations contained in Paragraph 24(h) of the Motion, the Archdiocese states that the Minutes speak for themselves, and states affirmatively that the Parishes were incorporated, and that the RE Trust, the DLF Trust and the Real Estate Support Services Agreement were created, for valid legal purposes while maintaining the Parishes' separate

-11-

ownership of Parish property.

  i. In response to the allegations contained in Paragraph 24(i) of the Motion, the Archdiocese states that the deposition transcript speaks for itself, and states affirmatively that the Parishes were incorporated, and that the RE Trust, the DLF Trust and the Real Estate Support Services Agreement were created, for valid legal purposes while maintaining the Parishes' separate ownership of Parish property.

  j. The Archdiocese denies the allegations contained in Paragraph 24(j) of the Motion.

  k. In response to the allegations contained in Paragraph 24(k) of the Motion, the Archdiocese admits that it reviewed information from the Dioceses in the Las Cruces, Tucson, St. Paul/Minneapolis and St. Louis while considering separate corporations for the Parishes. Declaration of Tony Salgado, Paragraph 8. The Archdiocese states affirmatively that the Parishes were incorporated, and that the RE Trust, the DLF Trust and the Real Estate Support Services Agreement were created, for valid legal purposes while maintaining the Parishes' separate ownership of Parish property.

  l. The Archdiocese denies the allegations contained in Paragraph 24(l) of the Motion and states affirmatively that the Parishes were involved in planning and discussions at all material times, as demonstrated by the Committee's own Exhibits. The Archdiocese states affirmatively that the Parishes were incorporated, and that the RE Trust, the DLF Trust and the Real Estate Support Services Agreement were created, for valid legal purposes while maintaining the Parishes' separate ownership of Parish property, all with the input and consent of the Parishes.

  19. In response to the allegations contained in Paragraph 25 of the Motion, the Archdiocese states affirmatively that no transfers of Archdiocese property took place. All property

held for the benefit of each respective Parish continues to be held for the benefit of each respective Parish, whether or not deeded into the RE Trust.

20.     In response to the allegations contained in Paragraph 26 of the Motion, the Archdiocese states that it is without knowledge or information sufficient to form a belief as to what the Committee understands, and states affirmatively that title to the real property belonging to each Parish is validly held in trust for each respective Parish, and that no recording is required. Further, the Certification of Trust recorded in each county makes clear and gives notice to the world of the trust relationship between the Archdiocese, as administrator of church property in accordance with the Canon Law, and the Parishes as beneficiaries.

21.     In response to the allegations contained in Paragraph 27 of the Motion, the Archdiocese states that the ASF Articles of Incorporation speak for themselves and, further, that the relationship between the Archdiocese and the Parishes and the Parishes' beneficial ownership of the Parish property is established under the Canon Law.

22.     The Archdiocese admits the allegations contained in Paragraph 28 of the Motion.

23.     In response to the allegations contained in Paragraph 29 of the Motion, the Archdiocese states that the complaints speak for themselves, and the Archdiocese reserves all rights, claims and defenses under Federal, State, Bankruptcy and other applicable law, whether common law, statutory law, legal or equitable, of any kind whatsoever, with regard to any claims in this matter.

24.     In response to the allegations contained in Paragraph 30 of the Motion, the Archdiocese states that payroll taxes incurred in the ordinary course in the one week (Nov. 24 – Dec. 2) prior to the petition date were owed on the petition date along with prepetition wages and were paid in full, pursuant to Court order entered on December 4, 2018 (Doc. No. 28). Therefore,

the Committee's allegations about *de minimis* payroll taxes are misleading and immaterial and have no applicability, in part because the Committee's claim that it can use the IRS's ten-year reach back is unsupported legally. There is no "derivative standing" available to the Committee to do anything and, if there were, the IRS's ten-year look back period is available only to the IRS and not otherwise. *In re Vaughan Co. (Wagner v. Ultima Homes, Inc.),* 498 B.R. 297, 305 (Bankr. D.N.M. 2013).

25.     In response to the allegations contained in paragraph 31 of the Motion, the Archdiocese states it has responded to several informal discovery requests, some of which are identified in the Brown Declaration (Doc. No. 384).

26.     In response to the allegations contained in paragraph 32 of the Motion, it is correct that the Committee requested, in an email dated March 10, 2020, identification of ten Parishes holding the largest purported beneficial interests in the DLF Trust and their account balance, and by letter dated February 24, 2020, the identity of the purported interest of each Parish and participant in the DLF Trust (not limited to ten) as of the Petition Date. The Archdiocese denies that it has not responded to the request. In response to informal discovery in 2019, ASF has provided redacted information showing the accounts and balances of the Deposit and Loan Fund, as well as a schedule of loans, with percentage rate, monthly payments and balances due. Information as to particular Parishes or participants was redacted. For further information, the Committee was referred to Rob Charles, attorney for the Deposit and Loan Fund Trust.

27.     In response to the allegations contained in Paragraph 33 of the Motion, the Archdiocese states that several days and many hours of mediation have occurred in-person and by telephone with various parties, including the Committee, the insurance carriers, third parties and others, both directly and with the assistance of Court-appointed mediators and otherwise denies

the allegations in the paragraph. The Archdiocese expressly denies the allegation that it has not "responded to the Committee's last offer of compromise." The Archdiocese asserts the application of the mediation privilege and of mediation confidentiality.

28.    The Archdiocese admits the allegations contained in Paragraph 34 of the Motion, and states that the Committee does not have standing to pursue any of the claims identified in the Complaints, the letter dated February 24, 2020, the Motion, or elsewhere, and states affirmatively that no grounds exist to pursue any such claims, as no transfers of Archdiocese property ever took place.

29.    The Archdiocese denies any allegations in the Motion not expressly admitted herein.

## III.    THE ARCHDIOCESE'S RESPONSE TO JURISDICTION AND RELIEF REQUESTED

The Archdiocese states that jurisdiction and venue are proper in this Court. The Archdiocese denies that the Committee is entitled to the relief requested in the Motion, for the reasons stated herein.

## IV.    THE COMMITTEE CANNOT BE GRANTED DERIVATIVE STANDING

A.    <u>There is No Derivative Standing Available to the Committee Under Applicable Law.</u> The controlling law does not grant the Committee standing to pursue the causes of action described in the Motion. Further, even under the incorrectly decided cases in other circuits that permit derivative standing, the Committee's request fails to satisfy any of the material elements. The Court must deny the Committee's request.

The causes of action sought to be pursued by the Committee are property of the bankruptcy estate. *See* 11 U.S.C. §541(a). Under the plain language of the Bankruptcy Code, and the interpretation of the Bankruptcy Code by the Supreme Court of the United States, only the Debtor

-15-

in Possession has standing to pursue the causes of action. As a threshold issue, the Committee does not have standing to pursue the causes of action, and cannot be granted derivative standing by this Court or any other Court. As a result, the Motion should be denied without consideration of any of the other issues or requests for relief contained in the Motion.

Under the Bankruptcy Code, only the trustee or, in Chapter 11, the debtor in possession, may bring actions to avoid fraudulent transfers. 11 U.S.C. § 548, entitled "Fraudulent transfers and obligations," states:

> (a)(1) The **trustee** may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition…

11 U.S.C. § 548(a). (Emphasis added).

11 U.S.C. §1107 expressly grants to the Debtor in possession, *and only the debtor in possession,* the rights and powers of a trustee under Chapter 11.[2] Under the plain language of the Bankruptcy Code, therefore, only the Debtor-in-Possession in Chapter 11 has standing to bring avoidance actions under 11 U.S. Code § 548.

B.      The Tenth Circuit Rejects Derivative Standing for Creditors.

In *United Phosphorus v. Fox (In re Fox)*,  305 B.R. 912, 914-916 (10th Cir. BAP 2004), the Tenth Circuit Bankruptcy Appellate Panel determined that, based on the clear and unambiguous language of 11 U.S.C. § 548 and the Supreme Court's decision in *Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A. (In re Hen House Interstate, Inc.)*, 530

---

[2] 11 U.S.C. §1107(a) states: "Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter." The exceptions to grant of authority to the debtor in possession are immaterial to the issue before the Court.

-16-

U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000), creditors and committees cannot bring derivative suits to collect assets for the bankruptcy estate when, for whatever reason, the trustee or debtor in possession does not bring the action. The Tenth Circuit BAP expressly declined to follow the Third Circuit Court of Appeal's reasoning in *Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548, 553 (3d Cir. 2003) (*en banc*), in which the Third Circuit held that derivative standing is available to creditors' committee when debtor-in-possession'' refusal to pursue avoidance action was unreasonable.

In *Fox*, the Tenth Circuit BAP faced exactly the same legal issue presented here. In *Fox*, a creditor filed a derivative action to avoid under Code §548 the debtor's transfer of property to his wife after the debtor refused to do so. *In re Fox*, 305 B.R. at 913-914. In a clear and well-reasoned decision, the BAP held that the Bankruptcy Code does not allow creditors to bring derivative suits on behalf of the bankruptcy estate. *In re Fox*, 305 B.R. at 914. Here, the Committee presses this Court to adopt the twisted leaps and jumps of logic presented by *Cybergenics* to get around the "explicit, unambiguous, and absolute" language of the statute. *In re Fox*, 305 B.R. at 914. In response, the Archdiocese requests that this Court follow the clear, unambiguous language of the Bankruptcy Code along with the mandate of the Supreme Court in *Hartford.*

There is no reasonable debate regarding the Committee's lack of standing. The Committee filed its Motion knowing that it was asking this Court to ignore the unanimous *Hartford* decision in which the Supreme Court was "construing virtually identical language of another section of the Bankruptcy Code" and holding that "when a statute is plain and unambiguous the courts are to apply it according to its own language and not embellish what Congress has said." *In re Fox,* 305 B.R. at 914.

Rulings of the Tenth Circuit Bankruptcy Appellate Panel are not binding on the Bankruptcy

Court. Still, bankruptcy courts will generally treat published Tenth Circuit BAP opinions as persuasive authority. *See In re Rodriguez*, 487 B.R. 275, 288 (Bankr. D.N.M. 2013), citing *In re Wenzel*, 415 B.R. 510, 516–17 (Bankr.D.Kan.2009) (acknowledging that the bankruptcy court might not be bound to follow a BAP decision, but that the "Court's practice is to give appropriate deference to published BAP decisions and treat them as persuasive authority, absent a compelling reason to depart.") Here, there is no reason to depart from the well-reasoned authority of the *Fox* decision, particularly since it is founded upon binding and well-reasoned Supreme Court precedent.

C.     Hartford is Controlling Law.

In *Hartford*, in a unanimous decision authored by Justice Scalia, the Supreme Court reiterated, in construing virtually identical language of another section of the Bankruptcy Code [Section 506(c) of the Bankruptcy Code, which says "[t]he trustee may recover ..." 11 U.S.C. § 506(c)], that when a statute is plain and unambiguous the courts are to apply it according to its own language and not embellish what Congress has said. It quotes *Sutherland on Statutory Construction* in saying that "'[w]here a statute ... names the parties granted [the] right to invoke its provisions, ... such parties only may act.' " *Hartford*, 530 U.S. at 6–7, 120 S.Ct. 1947.

In *Hartford,* insurance provider Hartford Underwriters provided post-petition workers' compensation insurance to the Debtor, Hen House Interstate, Inc. in a Chapter 11 proceeding. The Debtor failed to pay the insurance premiums post-petition, resulting in more than $50,000.00 in unpaid premiums. The case then converted to Chapter 7, and there were insufficient funds to pay the administrative claim for the $50,000.00 in unpaid premiums. Hartford Underwriters filed an application to surcharge the secured creditor for the premiums pursuant to 11 U.S.C. §506(c) on the basis that the secured creditor benefited from Hartford Underwriters' provision of insurance.

-18-

11 U.S.C. §506(c), provides as follows: "The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim."

Hartford Underwriters argued that, although 11 U.S.C. §506(c) states that "The trustee may recover…", any creditor would be entitled to recover under 11 U.S.C. §506(c) because no express prohibition is contained in the statute. The Supreme Court disagreed, stating:

> In answering this question, we begin with the understanding that Congress "says in a statute what it means and means in a statute what it says there," *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). As we have previously noted in construing another provision of § 506, when "the statute's language is plain, 'the sole function of the courts' "—at least where the disposition required by the text is not absurd— " 'is to enforce it according to its terms.' " *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)). Here, the statute appears quite plain in specifying who may use § 506(c)—"[t]he trustee." It is true, however, as petitioner notes, that all this actually "says" is that the trustee may seek recovery under the section, not that others may not. **The question thus becomes whether it is a proper inference that the trustee is the only party empowered to invoke the provision. We have little difficulty answering yes**…

> Because we believe that by far the most natural reading of § 506(c) is that it extends only to the trustee, petitioner's burden of persuading us that the section must be read to allow its use by other parties is "'exceptionally heavy.'"

*Hartford*, 530 U.S. at 6–9 120 S.Ct. 1947-1948 (emphasis added).In *Hartford*, the Supreme Court reasoned that by identifying the "trustee" and only the trustee in Code § 506(c), Congress intended "exclusivity." However, the Supreme Court does not limit its analysis to that Code section. Its states, "First, a situation in which a statute authorizes specific action and designates a particular party empowered to take it is surely among the least appropriate in which to presume nonexclusivity." *Hartford*, 120 S.Ct. at 1947. "Second, the fact that the sole party named—the trustee—has a unique role in bankruptcy proceedings makes it entirely plausible that Congress would provide a power to him and not to others." *Id.*

-19-

After *Hartford,* any analysis which awards derivative standing to a creditors committee is simply wrong. *Hartford* overruled any decision which awards derivative standing to any party other than a trustee or debtor-in-possession. *Hartford* stands for the proposition that "[W]here a statute ... names the parties granted [the] right to invoke its provisions, ... <u>such parties only may act</u>." *Hartford*, 530 U.S. at 6–7, 120 S.Ct. at 1947 (emphasis added).

It follows that a court violates the clear Supreme Court precedent set in *Hartford* if it awards derivative standing to a creditors committee under 11 U.S.C. §544(a), which provides that "[t]he **<u>trustee</u>** shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers…"; or 11 U.S.C. §547(b), which states that "the **<u>trustee</u>** may…avoid any transfer of an interest of the debtor in property…); or 11 U.S.C. §548(a)(1), which provides that "The **<u>trustee</u>** may avoid any transfer…"

D. <u>The Tenth Circuit Would Likely Continue to Follow Hartford.</u>

The Tenth Circuit Court of Appeals has cited *Hartford* for this "plain language" doctrine in at least 14 reported cases, although not in the bankruptcy context. "When the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *United States v. Anderson*, 679 Fed.Appx. 711, 712 (10th Cir. 2017) (quoting *Hartford Co.*, 530 U.S. at 6); *United States v. Collins*, 859 F.3d 1207, 1213 (10th Cir. 2017) (same); *In re Wood*, 743 F.3d 689, 694 (10th Cir. 2016) (same); *United States v. Ortiz*, 427 F.3d 1278, 1282 (10th Cir. 2005) (same).

E. <u>Other Circuit Cases and Lower Court Cases are Either Inapplicable or Not Persuasive.</u>

The Motion identifies other circuits' decisions which have recognized grants of derivative standing under certain circumstances, and cites lower court decisions within the Tenth Circuit which suggest that there is no reason to believe that the Tenth Circuit Court of Appeals would

-20-

diverge from the "unanimous view of other circuits" recognizing an implied right for committees to bring derivative suits to collect assets for the bankruptcy estate under certain circumstances. *See* Motion, p. 24. First, there is substantial reason to believe that the Tenth Circuit would continue to follow the Supreme Court's unanimous *Hartford* decision. Second, "other circuits" are far from "unanimous" on this issue. Third, the cases within the Tenth Circuit which are cited for this proposition are distinguishable and inapplicable, and finally, such lower court decisions are not binding on the Court, are not well-reasoned, and are not persuasive.

In its Motion, the Committee cites cases from the Second, Third, Fifth, Sixth, Seventh, Eighth and Ninth Circuit Courts of Appeal in support of its blanket statement that "[t]he following Circuit Court decisions support derivative standing." Motion, p. 24. These decisions from other circuits either fail to address the Supreme Court's unanimous *Hartford* decision, or are inapplicable or distinguishable for other reasons (or just plain wrong).

*Second Circuit.* Despite the UCC's citation to the Second Circuit's decision in *Smart World Techs., LLC v. Juno Online Servs. Inc. (In re Smart World Techs., LLC)*, 423 F.3d 166 (2d Cir. 2005), the case offers no support to the UCC's position in this case. In *Smart World,* a buyer of the debtor's assets negotiated a settlement with the debtor's main creditor, which the debtor opposed. *Id.* at 171. The buyer and creditors moved for derivative standing to approve the settlement pursuant to Rule 9019 without debtor's participation and over its objection. *Id.* at 172. The Second Circuit denied derivative standing, reversing the bankruptcy court and district court. *Id.* at 173-174. In dicta, the court mused that there might be "certain limited circumstances" where parties other than the debtor-in-possession" may have standing to pursue a Rule 9019 motion. *Id.* Contrary to the express language of Rule 9019 ("On motion by the trustee . . . .") and the directive of *Hartford,* the court based its dicta on an "implied qualified right to bring suit on behalf of the

estate." *Id.* at 176.[3] This is precisely what the Supreme Court rejected in *Hartford. Smart World* says nothing material about derivative standing to bring avoidance actions, and is inapplicable to this matter.

More recently in the Second Circuit, the court has recognized *Hartford's* clear language doctrine: "When a statute's language is clear, our only role is to enforce that language 'according to its terms.'" *Arciniaga v. General Motors Corp., 460 F.3d 231, 326 (2nd Cir. 2006) (*quoting *Hartford* 530 U.S. at 6 (2000)) (responding to one of the party's arguments that legislative history could circumvent the plain language of a statute).

*Third Circuit. Cybergenics* appears to be the touchstone for those, like the UCC, who want courts to rewrite the Code to suit their own needs. *Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 330 F. 3d 548 (3d Cir. 2003). In *Cybergenics,* the creditors' committee moved for derivative standing to bring an action to avoid alleged fraudulent transfers in connection with a sale of the debtor's assets. *Id. a*t 554. The bankruptcy court  permitted derivative standing. *Id.* The district court reversed, relying on *Hartford.* The Third Circuit, in a five to four decision, and in an egregious example of judicial activism, ignored the absolute, clear, and unambiguous language of the Code and the mandate of *Hartford* and cobbled together parts of Code §§ 503, 1103, and 1109 to fabricate Congressional approval of derivative avoidance actions by creditors' committees. *Id.*

The majority opinion in *Cybergenics* is unpersuasive and highly criticized. (*See Cybergenics*, (Fuentes, J., joined by Sloviter, C.J., Alito, J., and Smith, J. dissenting); and, Keith Sharfman, *Derivative Suits in Bankruptcy*, 10 STAN. J.L. BUS. & FIN. 1 (2004); *In re Fox*, 305 B.R.

---

[3] Despite this dicta, the *Smart World* court rejected the argument that Code § 1109(b) could be construed liberally based on the Supreme Court's decision in *Hartford*. *Id.* at 181. The court explained "we read *Hartford Underwriters* to stand for the proposition that § 1109(b) does not entitle parties in interest . . . to usurp the debtor-in-possession's role as legal representative of the estate." Id. at 182.

912 (10th Cir. BAP 2004). First, to get around *Hartford's* established precedent and the clear unambiguous language of the Bankruptcy Code, the court relies on *Hartford's* footnote declining specifically to address the issue of derivative standing. *In re Cybergenics Corp.*, 330 F. 3d 548, 558. Second, instead of addressing whether a creditors' committee has the right to derivative standing under Section 544, the majority frames the central issue as an exploration of "bankruptcy courts equitable power to craft a remedy when the Code's envisioned scheme breaks down." *Id.* at 559. Ironically, the majority acknowledges that (1) "Congress says in a statute what it means, and means in a statute what is says[,]" (2) "[w]hen 'the statutes language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms[,]'" and (3) "[u]ndoubtedly, there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Id.*

Despite the clear and unambiguous language of Code § 544[4] and the Supreme Court's previous interpretation of the phrase "a trustee may," the majority reaches the conclusion that Congress implicitly intended to give creditors' committees derivative standing. *Id.* at 553. This implication overrides the clear language of the Code and the Supreme Court's rejection in *Hartford* of courts rewriting statutes based on "pre-Code practice," *Id.* at 586,[5] and perceived "public policy interests." *Id.* at 573.[6]

The dissent in *Cybergenics* is well-reasoned and persuasive. In the dissent, among other convincing arguments, Judge Fuentes raises the point that bankruptcy courts are required to look

---

[4] "The trustee . . . may avoid any transfer of property of the debtor . . . that is voidable." 11 U.S.C. §544(a).

[5] In *Hartford*, the Supreme Court expressly rejected arguments based on pre-Code practice. "Pre–Code practice cannot transform § 506(c)'s reference to "the trustee" to "the trustee and other parties in interest." 120 S.Ct. at 1950.

[6] The Supreme Court rejected judicial rewriting of the Code based on a court's view of public policy. "In any event, we do not sit to assess the relative merits of different approaches to various bankruptcy problems. It suffices that the natural reading of the text produces the result we announce. Achieving a better policy outcome—if what petitioner urges is that—is a task for Congress, not the courts." Hartford, 120 S.Ct. at 1951. This is another way that *Cybergenics* is wrongly decided.

to state law for substantive law concerning derivative actions, stating:

> "[F]ollowing the Supreme Court's decision in *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), this Court was the first to hold that, for purposes of derivative actions, state substantive law squarely controlled the definition of an eligible plaintiff. …for purposes of shareholder derivative actions, federal courts were no longer permitted to broaden the concept of a "shareholder" on the grounds of equity or otherwise."

> *Id*. at 586 (internal citation omitted) (emphasis added).

Under New Mexico law, creditors do not have standing to bring derivative actions on behalf of corporations; only shareholders have such standing. "For a shareholder to bring an action 'in the right of a domestic or foreign corporation' he or she must be, 'a shareholder of record or the beneficial owner of shares held by a nominee or the holder of voting trust certificates at the time of the transaction of which he complains...' NMSA 1978, Section 53–11–47(A) (Repl.Pamp.1993)." *White v. Banes Co*., 116 N.M. 611, 866 P.2d 339 (1993).

"It is a fundamental tenet of corporation law that creditors, unlike shareholders, may not bring derivative suits on a firm's behalf—even if the firm is, or is nearly, insolvent." Keith Sharfman, *Derivative Suits in Bankruptcy*, 10 Stan. J.L. Bus. & Fin. 1 (2004). In footnotes 1 through 7 of the *Sharfman* article and the accompanying text, Mr. Sharfman argues persuasively that state law simply does not authorize creditors to bring derivative suits, and that bankruptcy courts should be bound by state law, although many bankruptcy courts disregard this analysis.

Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive state law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code. *See Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) ("Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving a windfall merely by reason of the happenstance of bankruptcy"); *Vanston*

*Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161–162, 67 S.Ct. 237, 91 L.Ed. 162 (1946) (recognizing that creditors' rights must be determined under state law). The "basic federal rule" in bankruptcy is that state law governs the substance of claims, *Butner*, supra, at 57, 99 S.Ct. 914. Congress has "generally left the determination of property rights in the assets of a bankrupt's estate to state law." 440 U.S., at 54, 99 S.Ct. 914 (footnote omitted). New Mexico state law does not authorize creditors to bring derivative suits, and therefore the relief requested by the Committee cannot be granted.

Finally, the majority in *Cybergenics* based much of its analysis on the Court's powers under Section 105 of the Bankruptcy Code. See, e.g., *Cybergenics* at 572. The Supreme Court's subsequent decision in *Law v. Siegel*, 134 S.Ct. 1188, 1194 (2014) eviscerates that argument. Section 105(a) "does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code." Sections 544, 547 and 548 limit avoidance actions to the Trustee, and under *Law v. Siegel*, Section 105(a) cannot be used to expand this "explicit mandate." The Court should follow *Fox* and *Hartford,* disregard the flawed analysis by the majority in *Cybergenics,* and deny the Motion.

*Fourth Circuit*. The Fourth Circuit has declined to authorize derivative standing. In *Baltimore Emergency Services II, Corp. v. PAPPG (In re Baltimore Emergency Services II, Corp.)*, 432 F.3d 557, 558 (4th Cir. 2005), the Fourth Circuit Court of Appeals reversed the bankruptcy and district courts and denied the creditors' request for derivative standing to pursue a preliminary injunction against a former insider at the debtor's corporations. *Id*. The court declined to decide if the Bankruptcy Code permitted derivative standing, in part because neither party addressed the question, but did discuss policy considerations regarding derivative standing. *Id.* at 560-61. The court explained that as "we have recognized in an analogous Chapter 7 context, '[c]ourts

consistently have noted a public policy interest in reducing the number of ancillary suits that can be brought in the bankruptcy context so as to advance the swift and efficient administration of the bankruptcy's estate. This goal is achieved primarily by narrowly defining who has standing in a bankruptcy proceeding.'" *Id.* (emphasis added).

*Fifth Circuit.* The Committee cites *Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d 233, (5th Cir. 1988), but it does not support the UCC's argument. It is a pre-*Hartford* case that did not involve avoidance actions at all, did not interpret any part of the Bankruptcy Code or any statute, and in which the "plain language" doctrine was not addressed. It offers nothing to this analysis.

In *Louisiana World Exposition*, the creditors' committee sought derivative standing to pursue an action against LWE's "officers and directors for gross negligence, mismanagement and breach of fiduciary duty." 858 F.2d at 235-236. The bankruptcy court allowed the action, but the district court dismissed the suit. *Id.* at 256. The issue before the Fifth Circuit arose under Louisiana state law: "[W]hether the Committee – suing on behalf and in the name of LWE – can maintain an action against the appellees, absent allegations of fraud, for gross negligence, mismanagement and breach of fiduciary duty." *Id.* at 236. The court held the committee could pursue the action on behalf of LWE. *Id.* at 254.

The court's ruling was based primarily on a cause of action arising under Louisiana state law and <u>not</u> under the Bankruptcy Code. The court did not analyze or discuss Code § 544 or any avoidance action. Unlike Louisiana, New Mexico does not grant such a cause of action to creditors.

Furthermore, *Louisiana World Exposition* contains only one reference to derivative standing for avoidance actions – a parenthetical following a citation to *In re MortgageAmerica*, 831 F.2d 97,98 (5th Cir. 1985). *Id.* at 247, in which the court states: "[C]reditors' committee, may,

in some circumstances, have the right to initiate an avoidance action." *Id*. The reference includes no analysis whatsoever and no connection to any of the issues before this Court. *Louisiana World Exposition* should be disregarded.

*Sixth Circuit*. The Committee cites *Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.),* 66 F.3d 1436 (6th Cir.1995), which is another pre-*Hartford* case and should be disregarded on that basis alone. In *Gibson Group,* the circuit court approved of a single creditor's preference and fraudulent transfer avoidance action. With minimal analysis, the court held that the "statutory language does not prohibit creditor standing, and that such standing furthers Congress's purpose in balancing the interests between the debtor and its creditors . . . where the debtor-in-possession abuses its discretion" by not bringing the action. 66 F.3d at 1441. The Court noted that 11 U.S.C. §§547 and 548, respectively, provide that "the trustee may avoid" preferential transfers and fraudulent transfers, and stated "[a] debtor in possession has all the powers of a trustee. 11 U.S.C. § 1107(a)." *Id*. at 1440-1441. The Sixth Circuit essentially ignored the plain language of the statute, something that *Hartford* forbids.

*Seventh Circuit.* *Fogel v. Zell,* 221 F.3d 955, 965 (7th Cir. 2000) is not applicable to the present case. It did not involve a request by a committee or other third party for derivative standing and it did not involve avoidance actions. The Seventh Circuit reversed the lower court's approval of a Chapter 7 Trustee's settlement of claims, which included an injunction against certain non-debtor entities. In dicta, while analyzing certain "property of the estate" issues, the Court in *Fogel v. Zell* stated: "If a trustee unjustifiably refuses a demand to bring an action to enforce a colorable claim of a creditor, the creditor may obtain the permission of the bankruptcy court to bring the action in place of, and in the name of, the trustee." *Fogel* at 965. *Fogel* was decided shortly after *Hartford,* and contains no analysis of the *Hartford* reasoning.

*Fogel* fails to mention another Seventh Circuit case, *In re Xonics Photochemical, Inc.*, 841 F.2d. 198 (7th Cir. 1988), in which the Court stated:

> The right to invoke these provisions [11 U.S.C. §§544(b) or 548(a)] belongs not to a particular unsecured creditor such as such Mitsui <u>but to the trustee</u> (or debtor in possession) as the representative of all the unsecured creditors; and in this case the debtor in possession has not invoked either provision. It is not as if Mitsui itself had been a creditor harmed by the allegedly fraudulent conveyances; they preceded the payments in issue. Mitsui is seeking to stand in the shoes of creditors who may have been harmed, but only the trustee or debtor in possession can do that.

> *Id.* at 202 (emphasis added).

<u>*Eighth Circuit*</u>. *In re Racing Servs, Inc.,* 540 F.3d 892, 898 (8th Cir.2008) is a Chapter 7 case in which the circuit court upheld an unsecured creditor's derivative standing to bring avoidance actions against state tax authorities after the trustee declined to do so. The Eighth Circuit held that "derivative standing is available to a creditor to pursue avoidance actions when it shows that a Chapter 7 trustee (or debtor-in-possession in the case of Chapter 11) is "unable or unwilling" to do so." *Id.,* 540 F.3d at 898. The trustee did not oppose the creditor pursuing the avoidance action. The Eighth Circuit includes a cursory analysis of *Hartford*. However, its reasoning is limited to adopting the Third Circuit's ruling in *Cybergenics*, stating that *Hartford* "did not answer the question" with regard to derivative standing for parties other than the Trustee, therefore courts are free to recognize such derivative standing. 540 F.3d at 898, footnote 7.

<u>*Ninth Circuit*</u>. The Ninth Circuit's decision in *Avalanche Mar., Ltd. v. Parekh (In re Parmetex, Inc.)*, 199 F.3d 1029, 1031 (9th Cir.1999) is pre-*Hartford* and should be disregarded on that basis alone. The holding in *Parmetex* is limited: "[U]nder these particular circumstances—where the trustee stipulated that the Creditors could sue on his behalf and the bankruptcy court approved that stipulation—the Creditors had standing to bring the suit." As in *Racing Servs, Inc., Parmetex* is a Chapter 7 case and, again, the trustee consented to the action.

-28-

*First Circuit and Eleventh Circuit*. Neither the First Circuit nor the Eleventh Circuit have ruled on the derivative standing issue. Many lower courts in both circuits have ruled on the issue, with mixed results, some acknowledging the *Hartford* ruling and some adopting the *Cybergenics* ruling.

F.  The UCC's Lower Court Cases from the 10th Circuit are distinguishable and inapplicable.

*Springs East Land Co., LLC v. Goss (In re Ellicott Springs Resources, LLC),* 485 B.R. 626 (Bankr. D. Colo. 2013) is completely inapplicable to this case, as no creditor or committee sought derivative standing to pursue avoidance actions based on a refusal by a Trustee to pursue such actions. The *Ellicott Springs Resources* case was a chapter 7 case (not a Chapter 11) in which the Chapter 7 Trustee (not a debtor in possession), in exchange for an agreement by the Springs Land Company to abandon its $2.3 million claim against the estate and to pay the estate $50,000.00 if certain assets were preserved by its actions, voluntarily (not forcibly) assigned to Springs Land Company the right to seek injunctive relief in an effort to protect dissipation of an estate asset and diminution of the value of that asset by non-debtor, non-creditor, third-parties. *Id.*, 485 B.R. at 631-634. The Court recognized that other courts had approved "derivative standing under certain circumstances. *Id.*, 485 B.R. at 636-639. The Court did not specifically address *Hartford's* ruling on the virtually identical language of Section 506(c). Here, the Debtor has not and will not stipulate to such standing, and *Ellicott Springs Resources* does not apply.

*Rindlesbach v. Jones*, 532 B.R. 850 (D. Utah 2015) is not applicable to the present case. It is a Chapter 7 case in which the trustee voluntarily agreed, over the debtor's objection, to transfer certain state court fraudulent transfer actions to creditors as part of a bankruptcy settlement. *Rindlesbach* does not mention any bankruptcy avoidance power or statute, and does not analyze the Code language granting to the Trustee the exclusive right to pursue fraudulent transfer actions.

-29-

The court mentions *Hartford*, but does not address *Hartford's* "plain meaning" rule, nor does it even mention *Fox*. In dicta, the court quotes *Overland Pointe's* false statement about the "unanimous view" of the circuits to allow committees to bring avoidance actions. 532 B.R. at 858. Lacking any analysis whatsoever, *Rindlesbach* is of no value here.

In *Village of Overland Pointe, LLC v. Terra Bentley II, LLC (In re Bentley II, LLC)*, 2011 WL 808190 (Bankr. D. Kan. Mar. 2, 2011), the court granted the debtor's objection to what the court characterized as a creditor's motion to be granted "derivative standing" to pursue a state court avoidance action on behalf of the bankruptcy estate. *Id*. at *1. The creditor sought to pursue an action to avoid an alleged fraudulent granting of a mortgage pursuant to the Kansas Uniform Fraudulent Transfer Act. *Id*. The Court recognized the possibility for creditors to bring avoidance actions and stated that it "sees no reason to believe the Tenth Circuit would disagree with the unanimous view of the Circuits that have decided the question." *Id*. at *4. The court reviewed *Racing Services,* 540 F.3d 892 (8th Cir.2008) and *Gibson Group,* 6 F.3d 1436 (6th Cir.1995) but does not mention any of the bankruptcy avoidance powers. Further, it does not consider the language of Code § 548 granting the exclusive right to pursue fraudulent transfers under the Bankruptcy Code to the Trustee and it ignores *Fox* (2004) and *Hartford* (2000), the two precedential cases. It is simply inapplicable to the present case and does not support the Committee's request for derivative standing.

Neither the express language of the Bankruptcy Code, nor New Mexico state law, nor the binding precedent of the United States Supreme Court grant the UCC standing to pursue the causes of action contemplated in the Motion. The cases cited by the UCC in support of its argument to the contrary are non-binding, badly reasoned, or completely inapplicable. The Motion should therefore be denied.

## V. THE ESTATE HAS NO "TRANSFER CLAIMS" AGAINST THE PARISHES OR THE TRUSTS

A. <u>The Committee's Claims are Time-Barred.</u>

<u>The IRS 10-year reachback is not available to anyone other than the IRS</u>. The Committee argues that the claims it wishes to pursue are timely despite the "transfers" having allegedly occurred more than four years ago. Motion, Section IV.A.1 and 2, pp. 18-25. The Committee argues that it should be permitted to file avoidance actions because the "transfers" occurred within ten years and that the Committee should be allowed to use the government's ten-year reach back period.

First, there were no transfers, fraudulent or otherwise, from the Archdiocese to the Parishes or to the RE Trust or to the DLF Trust, at any time. The Archdiocese cannot transfer a beneficial interest in property to someone who already owns it. Second, if there were transfers, which there were not, they were not made within any lawfully recognized reach-back period. Under 11 U.S.C. § 548, only transfers made within 2 years before the date of the filing of the petition are avoidable. The Committee mentions also the four-year reach back period under the Uniform Voidable Transfers Act, N.M. Stat. §56-10-23. However, since neither of those legitimate reach back periods (available exclusively to a trustee or debtor in possession) serve the Committee's needs, the Committee wishes to stand in the shoes of the IRS and use its 6-year or 10-year reach back periods, which are clearly reserved for the IRS and the IRS alone.

There were no avoidable transfers. But if there were, the extended reachback period available to the IRS is not available to a bankruptcy trustee or debtor in possession, or to a creditors' committee if it were granted the permission the Committee seeks. For this reason alone, the Committee's Motion is futile and must be denied. The New Mexico bankruptcy court has ruled against permitting parties other than the IRS to use provisions of the Internal Revenue Code to

extend the "reachback period" to ten years under 26 U.S.C. §6502. In *Wagner v. Ultima Homes, Inc. (In re Vaughan Co. Realtors),* 498 B.R. 297 (Bankr. D. N.M. 2013), the bankruptcy court denied the Chapter 11 trustee's motion to amend an adversary complaint to attempt to recover certain transfers. *Id*. at 307. The alleged transfers occurred more than four years prior to the petition date, and the court found that avoidance of the transfers was barred, rendering the proposed amendment futile. *Id*.

      The court rejected the trustee's argument that she was immune from the four-year statute of limitations that ordinarily applies to state law fraudulent transfer claims because Section 544(b) permits her to use the ten-year look back period available to the IRS, reasoning that although the trustee may stand in the shoes of any unsecured creditor to set aside transfers to third parties, Congress did not intend to vest the sovereign powers of the United States "in a bankruptcy trustee and thereby immunize her from the strictures of state law in pursuit of her private interests." *Id.* at 304, 307. The court stated that not even the sovereign is immune from state statutes of limitation when an action, although brought in the name of the United States, involves no public rights or interests, and even the IRS could only use the ten-year look back period in order to perform a government function. *Id.* at 305. Finally, the Court reasoned that, as the IRS holds an unsecured claim in a substantial portion of bankruptcy cases, allowing trustees or debtors-in-possession to use the IRS ten-year look back period would "eviscerate" the Uniform Fraudulent Transfer Act's four year look back period in most bankruptcy cases. *Id.* at 305. The Committee argues that *Vaughan* "has never been followed and has been widely criticized" (Motion, p. 32). However, the Committee cannot and does not dispute Judge Jacobvitz's reasoning and cites no controlling Tenth Circuit authority to the contrary. In any event, the Committee has no standing to pursue avoidance actions, and therefore timeliness of such actions is irrelevant.

B.     The Alleged Fraudulent Transfer Claims of the Estate are not Colorable and Debtor's Refusal to Pursue or Consent is not Justified

    1.   Standard for Determining if Claims are Colorable.

The Committee has no standing to pursue avoidance actions, and no avoidable transfers took place. Therefore, any analysis of the "standard for determining if claims are colorable" in the derivative standing context is irrelevant and immaterial.

    2.   The Archdiocese Did Not Transfer Archdiocese Property to the RE Trust or to the DLF Trust.

Parish property is and always has belonged to the Parishes, regardless of how it was titled. Property held *in trust for the Parishes* by the Archdiocese is not "presumed to be property of the estate." *See* Declarations of Tony Salgado and Fr. Joseph Fox, and Exhibits thereto. The New Mexico Unincorporated Associations Act clearly does not apply to religious or charitable organizations. Prior to incorporation, the Parishes were entitled to take and hold property under Canon law, or as beneficiaries of a resulting trust. The Parishes are protected from the Committee's suggested course of action by the First Amendment to the United States Constitution.

    3.   Civil Courts are Required to Respect the Parishes' Property Rights; Failure to do so Would Violate the First Amendment.

In the Motion, the UCC argues that because certain civil courts have held that under state law, individual Parishes are not separate legal entities capable of being sued by third parties,[7] the Parishes could not have owned or held a beneficial interest in their own real and personal property. Motion, p. 28. This argument is without merit.

---

[7] See, e.g. *F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago*, 754 F.2d 216, 221 (7th Cir. 1985) (holding that a plaintiff must sue the archdiocese because the Parishes had no individual capacity to sue or be sued)

-33-

Under Canon Law, the Parishes have always been distinct juridic persons. Declaration of Fr. Fox, ¶ 17. Each Parish has always held a beneficial interest in its own real and personal property, including all of the real property in the Real Estate Trust and all funds in the Deposit and Loan Fund. *Id*, ¶¶ 20-25. Under the religious autonomy doctrine, these beneficial interests cannot be disturbed or disregarded by civil courts. The claims that the UCC proposes to bring against the Parishes, the Real Estate Trust, and the Deposit and Loan Fund require the Bankruptcy Court to interfere with and disregard completely Canon Law and the Debtor's internal structure and governance in violation of the First Amendment to the United States Constitution, which protects the rights of religious organizations to adhere to their own ecclesiastical governments.

a. The First Amendment and religious autonomy doctrine protect internal religious structures from judicial interference.

The First Amendment, which provides in pertinent part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[,]" is premised on the notion that "both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere[.]" U.S. Const. Amend. I; *Aguilar v. Felton*, 473 U.S. 402, 410 (1985) (quoting *McCollum v. Bd. of Educ.*, 333 U.S. 203, 212 (1948)). Over the span of 150 years, the Supreme Court has consistently applied the doctrine of religious autonomy to disputes involving church property. The religious autonomy doctrine, sometimes referred to as the "church autonomy" or "ecclesiastical abstention" doctrine, originated in *Watson v. Jones*, 80 U.S. 679 (1871). In *Watson*, the Court held "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." *Id.* at 727. The *Watson* court made

clear that there can be no such secular adjudication over such "strictly and purely ecclesiastical" disputes, explaining:

> [I]t is easy to see that if the civil courts are to inquire into all these matters, the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental organization of every religious denomination may, and must, be examined into with minuteness and care, for they would become, in almost every case, the criteria by which the validity of the ecclesiastical decree would be determined in the civil court. This principle would deprive these bodies of the right of construing their own church laws, would open the way to all the evils which we have depicted as attendant upon the doctrine of Lord Eldon, and would, in effect, transfer to the civil courts where property rights were concerned the decision of all ecclesiastical questions.

*Id.* at 733-34.

To avoid those "evils," and to secure a "full, entire, and practical freedom for all forms of religious belief and practice which lies at the foundation of our political principles,"—the *Watson* court established the religious autonomy doctrine. *Id.* at 728.

The United States Supreme Court reaffirmed the religious autonomy doctrine articulated by *Watson* in *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94 (1952). *Kedroff* confirmed that the First Amendment grants to "religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff,* 344 U.S. at 116. The underlying dispute in *Kedroff* concerned the contested right to the use and occupancy of a church in New York City after the head of the American churches, religiously affiliated with the Russian Orthodox Church, sought to take possession of the church, which was occupied by appointees of the Supreme Church of the Russian Orthodox Church in Moscow. *Id.* at 95-96. The Court of Appeals of New York determined that under New York state law regarding the incorporation of religious organizations, the prelate appointed by the Moscow ecclesiastical authorities was not entitled to occupancy of the church and directed entry

-35-

of a judgment that the American entities be re-vested with the possession and administration of the Cathedral.  *Id.* at 97.

The United States Supreme Court reversed, holding that to the extent New York law purported "by its terms to transfer the control of the New York churches of the Russian Orthodox religion from the central governing hierarchy of the Russian Orthodox Church, the Patriarch of Moscow and the Holy Synod, to the governing authorities of the Russian Church in America," that law violated the First Amendment by "directly prohibit[ing] the free exercise of an ecclesiastical right, the Church's choice of its hierarchy."  *Id.* at 107, 119.  The *Kedroff* Court explained that neither legislators nor civil courts may displace one church administrator with another, pass the control of matters strictly ecclesiastical from one church authority to another, or otherwise intrude for the benefit of one segment of a church "the power of the state into the forbidden area of religious freedom contrary to the principles of the First Amendment."  *Id.* at 119.

On remand, the New York courts continued to try to circumvent the church's authority— this time through judicial means—and the Supreme Court had to intervene once more.  *Kreshik v. St. Nicholas Cathedral*, 363 U.S. 190, 190-91 (1960) (*per curiam*).  The Court found it "not of moment that the State has here acted solely through its judicial branch, for whether legislative or judicial, it is still the application of state power which we are asked to scrutinize.'"  *Id.* at 191 (quoting *NAACP v. Patterson*, 357 U.S. 449, 463 (1958)).  *Kreshik* thus leaves no doubt that no state authority—whether judicial, legislative, or otherwise—has the power to impair matters of ecclesiastical government.

The Supreme Court reinforced the principles set forth in *Kedroff* and *Kreshik* in *U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440 (1969).  *Presbyterian Church* involved a dispute over church property which arose when two local churches withdrew

from a hierarchical general church organization. *Id.* at 441. Under the applicable state law, the right to the property previously used by the local churches was determined by a civil court jury decision as to whether the general church abandoned or departed from the tenets of faith and practice it held at the time the local churches affiliated with it. *Id.* After the question was submitted to the jury and the verdict affirmed through the Georgia state courts, the Supreme Court unanimously reversed.

The Supreme Court held that while civil courts may have a legitimate interest in resolving property disputes, "[s]pecial problems arise…when these disputes implicate controversies over church doctrine and practice." *Id.* at 445. The *Presbyterian Church* Court explained that when such disputes implicate church doctrine and practice, "it was wholly inconsistent with the American concept of the relationship between church and state to permit civil courts to determine ecclesiastical questions." *Id.* at 445-46. The Court further held that *Watson* "leaves the civil courts no role in determining ecclesiastical questions in the process of resolving property disputes." *Id.* at 447, citing *Watson v. Jones*, 80 U.S. 679 (1871). As the Court explained, "First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice" and "[i]f civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern." *Id.* at 449.

The Tenth Circuit has recognized that the religious autonomy doctrine applies to claims of third parties unaffiliated with the religious organization when those claims threaten the religious autonomy of the religious organization. In *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 653 (10th Cir. 2002), a former youth minister (Bryce) at St. Aiden's Episcopal

Church and her partner (Smith) brought sexual harassment and civil rights claims against St. Aiden's. Smith argued her individual claims were not subject to the religious autonomy doctrine because she did not have a prior affiliation with the church. *Id.* at 658. The court held the religious autonomy doctrine applied to Smith's claims, stating that "[t]he applicability of the doctrine does not focus upon the relationship between the church and [the claimant]." *Id.* at 658. Instead, the religious autonomy doctrine focuses on "the right of the church to engage freely" in conduct protected by the First Amendment. *Id.* at 658-9.

As 150 years of the Supreme Court's jurisprudence confirms, deference to religious authorities on matters of organization and doctrine is essential both to prevent Establishment Clause concerns with excessive entanglement and to promote the free exercise of religion. "If civil courts undertake to resolve such controversies . . ., the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern." *Presbyterian Church*, 393 U.S. at 449.

b. <u>Canon Law is a Form of Ecclesiastical Government and is Outside the Court's Jurisdiction.</u>

(1) <u>Canon Law Creates and Governs the Legal Relationship Between Juridic Persons.</u>
The Roman Catholic Church has a unique hierarchical structure established by Canon Law. Declaration of Fr. Fox, ¶¶ 5-12; Canon Law is the internal legal system of the Roman Catholic Church. Declaration of Fr. Joseph Fox, ¶ 5. It is very old, and has been collected and codified in various forms through the centuries. *Id.* Most recently, it was revised and codified in 1983. *Id.* The 1983 Code of Canon Law is the universal law for the entire western or Latin Church, and is currently in force in the United States of America. Id., at ¶ 9. The structure of the Archdiocese arises out of Canon Law. Declaration of Archbishop Wester, ¶¶ 13, 17. Imposing upon the Church the structure described by the Committee would be incorrect, in contradiction with Canon Law,

and "a complete distortion of the Roman Catholic Church' s doctrine, polity, and governance." Declaration of Fr. Joseph Fox, at ¶ 16.

Under Canon Law, a parish is a separate legal entity from the archdiocese. *Id*., at ¶ 17. It is, under Canon Law, its own public juridic person. *Id*., at ¶ 17. Each juridic person is its "own legal person, existing independently of other persons, endowed with its own rights and duties, and owning its own property, apart from the property of other juridic persons." *Id*., at ¶ 19. Parish property is, almost entirely, the result of the offerings of the faithful to the parish for the use of the parish. Declaration of Archbishop Wester, ¶¶ 6-8. Under Canon Law, gifts made for a particular purpose must be used only for that purpose. Declaration of Fr. Joseph Fox, at ¶ 20.

Under Canon Law, property given to the pastor of a parish is presumed to be property given to the parish itself; the pastor of a parish, and not the archbishop, is the administrator of parish property; the archbishop is neither the owner nor the administrator of parish property; all juridic persons are capable of acquiring, retaining, administering and alienating property; and, the property of a parish is not the property of the archdiocese nor of the archbishop. *Id*., at ¶ 21-25. Making the goods of one public juridic person (e.g. the parish) available for the debts of another (e.g. the archdiocese) is a violation of Canon Law because it destroys the legal autonomy of these public juridic persons one from another. Declaration of Fr. Joseph Fox, at ¶ 28; Declaration of Archbishop Wester, ¶ 17. When an archbishop takes legal title to parish property in the name of the corporation sole, it must be presumed that he is doing so in conformity with the Canon Law. For that reason, the archbishop as corporation sole can only hold bare legal title to parish property. Under Canon Law, the beneficial interest is with and remains in the public juridic person of the parish. Declaration of Fr. Joseph Fox, at ¶ 33.

When the idea of a Corporation Sole and the Canon Law of the Roman Catholic Church are read together, in complimentary and not contradictory fashion, as they must be, it is clear that the archbishop as corporation sole is not the owner of parish property, but rather that he holds bare legal title to such property in trust for the public juridic persons of the parishes. Declaration of Fr. Joseph Fox, at ¶ 35. As a matter of Canon Law, the Archdiocese and the Parishes are not one monolithic entity, but each entity has its own legal personhood. If the Court were to take Parish property away from the Parishes, as the Committee demands, and give it to the Archdiocese or to its creditors not only would it be civil conversion it would interfere with decades, even centuries, of Church structure and impose upon the Church a civil construct contrary to Canon Law, in violation of the First Amendment.

    (2) <u>Under Canon Law, the property in the Real Estate Trust and the Deposit and Loan Fund always belonged to the individual Parishes, not the Archdiocese of Santa Fe.</u>

Under Canon Law, each Parish has always had its own distinct juridic identity. Declaration of Fr. Fox, ¶ 17. The Archdiocese and the Parishes have always acted consistently with Canon Law. Declaration of Archbishop Wester, ¶ 5. The Parishes within the Archdiocese have always been organized from the Parishioners "upward." *Id*., at ¶ 8. Catholic individuals purchased and built the Parish properties with their own funds, materials, and labor. *Id*. The separate property of each Parish has always belonged to and been maintained by each Parish. Id., at ¶ 7-8; Declaration of Tony Salgado, ¶ 27-29.

    (3) <u>The Parish real properties have always been held separate from each other and from the Archdiocese</u>.

Ownership of the Parish real properties has always been separate from ownership of Archdiocese real property. Declaration of Tony Salgado, ¶ 16. Each parcel of real estate for each separate Parish was acquired by funds of the Parish, or of the Parishioners, or of funds donated to the Parish. *Id*. Title to the real estate of each separate Parish was held in trust for such Parish by

the Archdiocese. *Id.* Parish properties have never been listed as assets of the Archdiocese on the Archdiocese's balance sheet. *Id.* The Archdiocese has always treated the Parishes' real properties as belonging to the Parishes, subject to the stewardship of the Archdiocese. *Id.* In 2014, the Archdiocese recorded a Certification of Trust in each county in which a Parish held property, providing public notice that the trustee or custodian of the properties holding legal title would no longer be the Archbishop or Archdiocese, but instead would be the Real Estate Trust. *Id.*, at ¶ 18. The Real Estate Trust was formed not to change or create any beneficial interest in any property, but rather to reflect under civil law the trust relationships between the Archdiocese and the beneficiary Parishes that had always existed under Canon Law. Id., at ¶ 21. There were no "transfers of property." *Id.* All separate property of the Parishes belonged at all times to the Parishes, whether held in trust by the Archdiocese prior to 2013, or held in trust by the Real Estate Trust after its establishment in 2013. *Id.*

 (4) <u>The Parishes have always held their own bank accounts, separate from each other and the Archdiocese.</u>

 Each Parish keeps its own separate books and records and has its own separate federal and state tax ID number and bank accounts, and has done so since at least 1984. Declaration of Tony Salgado, ¶ 30. Prior to 2013, all funds of each individual Parish were maintained in separate bank accounts by the Archdiocese in trust for each Parish, and meticulous separate records were kept for each Parish. *Id.*, at ¶ 22. In 2013, the Archdiocese established the Deposit and Loan Fund. The Deposit and Loan Fund was issued a separate federal tax ID number and new bank accounts were set up for the Deposit and Loan Fund. *Id.*, at ¶ 23. The Deposit and Loan fund was listed as an asset in the Archdiocese balance sheet but a corresponding liability for each Parish's deposits was also listed, and therefore no Deposit and Loan Fund was ever accounted for as a net asset of the

Archdiocese. *Id.*, at ¶ 24. The Parishes' deposits in the Deposit and Loan Fund were never treated as property of the Archdiocese or of the Archbishop. *Id.*

The claims that the UCC requests authority to bring would require the courts to disregard and dismantle the internal church structures, hierarchy, and property ownership, all of which are dictated by Canon Law, and all of which have been in place for decades or even centuries. This interference with Catholic Canon Law is forbidden by the First Amendment and the religious autonomy doctrine, which would apply to all of the claims made by the UCC.

4. The New Mexico Unincorporated Associations Act clearly does not apply to religious or charitable organizations.

Section 53-10-1 *et seq.*, NMSA 1978 states:

> Whenever two or more persons shall desire to form an association *for the promotion of their mutual pleasure or recreation of any hunting, fishing, camping, golf, country club, or association for a similar purpose, or an association not for the individual profit of the members thereof,* and without incorporating the same as a corporation, or maintaining the title of its property in trust for the interest of its several members as they may exist from time to time. The [sic] said persons or members desiring to form such an association or club *may* file in the office of the county clerk of the county in which it may maintain its headquarters and pursue its objects and purposes, a statement containing the name of such association, its objects and purposes, the names and residences of the persons forming such association, together with a copy of its articles of association and any rules and/or regulations governing the transactions of its objects and purposes and prescribing the terms by which its members may maintain or cease their membership therein.

NMSA 1978 § 53-10-1(Emphasis added).

This statute is clearly inapplicable. The Parishes were not formed "for the promotion of their mutual pleasure or recreation of any hunting, fishing, camping, golf, country club, or association for a similar purpose, or an association not for the individual profit of the members thereof." To the extent that the Committee argues that, pre-incorporation, the Parishes constituted associations "not for the individual profit of the members thereof," such an argument is nonsensical. Prior to their incorporation, the Parishes did not have "members." The Parishioners

-42-

are not "members" of the Parish in any traditional corporate sense. They hold no shares, and have no ownership interest. They are not "officers" or "directors." They simply attend services and make donations to their Parish. *See* Declarations filed contemporaneously herewith. Post-incorporation, the "member" of each Parish non-profit corporation became the Archbishop, in his capacity as the head of the Archdiocese, which is a corporation sole. It would be impossible for the "members" of the Parish to file documents under the Unincorporated Associations Act, because the Parish had no members. The Parishioners could have created an Unincorporated Association by filing papers as required by the Unincorporated Associations Act, but the resulting entity would **not** be the Parish; it would be a new entity created for some separate purpose.

A Roman Catholic Parish, by contrast, is a juridic person under Canon law, and is a separate legal entity. (See Declaration of Fr. Fox, ¶¶ 17-19.) It cannot be transformed into a statutory Unincorporated Association by its Parishioners.

The Parishes within the Archdiocese have been in existence for years, some of them for hundreds of years. Their existence, and the trust relationship among the Parishes and the Archdiocese under Canon Law, significantly predate the existence of the New Mexico corporate statutes. Indeed, the relationships among the Parishes and the Archdiocese predate New Mexico statehood in many cases. It is absurd to suggest that the passage of an inapplicable and clumsily-worded Unincorporated Associations Act, *ex post facto*, can somehow transform the Parishes into non-existence as legal entities.

The Parishes are "religious organizations" which are entirely different and distinct from the recreational and social clubs addressed by the Unincorporated Associations Act, Section 53-10-1 *et seq.*, NMSA 1978.

-43-

*See, e.g.*, NMSA 1978 § 57-22-3 of the New Mexico Charitable Solicitations Act, "Definitions:"[8]

> G. "religious organization" means a church, organization or group organized for the purpose of divine worship or religious teaching or other specific religious activity or any other organization that is formed in association with or to primarily encourage, support or promote the work, worship, fellowship or teaching of the church, organization or group;…

The Unincorporated Associations Act is not applicable to religious or charitable organizations. The Committee's attempts to apply the Unincorporated Associations Act and the case law interpreting that act to the Archdiocese and the Parishes should be disregarded.

In support of its attempt to erroneously apply the Unincorporated Associations Act to the Parishes, the Committee cites *Blue Canyon Well Ass'n v. Jevne*, 2018-NMCA-004 (Ct. App. 2017) and *Flanagan v. Benvie*, 58 N.M. 525, 273 P.2d 381 (1954), which involved an unincorporated well association and a rifle and pistol club, respectively. These cases did not address religious or charitable organizations, and are not applicable in this matter. To the extent that the Court does consider these cases, *Blue Canyon Well Ass'n v. Jevne*, 2018-NMCA-004, at *10 (Ct. App. 2017), excepts "other legally viable entit[ies]" from any obligation to file documents under the Unincorporated Associations Act. The Parishes are "legally viable entities;" they never "wished to form an association for the limited purposes described" in the Unincorporated Associations Act, and *Blue Canyon Well Ass'n* should otherwise be disregarded as irrelevant.

An unincorporated association which has not complied with statutory requirements under Section 53-10-1 *et seq.*, NMSA 1978 can still be the beneficiary of a trust. Here, under basic trust law, prior to incorporation, the Parishes were capable of being beneficiaries of a trust. Section

---

[8] While the legislature defined religious organizations in the New Mexico Charitable Solicitations Act, it simultaneously exempted them from the provisions of the Act. N.M.S.A. § 57-22-4.A. ("Application of Act. A. The Charitable Solicitations Act [this article] shall not apply to a religious organization, even if it is a charitable organization.")

§46A-1-103(C) NMSA defines a beneficiary as "a person that: (1) has a present or future beneficial interest in a trust, vested or contingent; or (2) in a capacity other than that of trustee, holds a power of appointment over trust party." "Person" is defined as "an individual, corporation, business trust, estate, partnership, limited liability company, association, joint venture, government, governmental subdivision, agency or instrumentality, public corporation or any other legal or commercial entity." Section §46A-1-103(J) NMSA. Under Canon law, and under statutory and common law, the Parishes constituted, at a minimum, "any other legal or commercial entity."

Unincorporated associations can be beneficiaries of a trust. In *Leslie v. Midgate Center, Inc.*, 436 P.2d 201 (1967), the Washington Supreme Court stated:

> …[T]he joint venture was to hold the equitable interest in the real property until the corporation was formed, at which time the equitable interest immediately passed to the corporation. As to the capacity of a joint venture or unincorporated association to be a beneficiary, there was formerly a difference of opinion arising from the common law rule that such an association was not a legal entity and from the operation of the rule against perpetuities. <u>The general rule now, however, seems to be that an unincorporated association has such capacity</u>.

*Leslie v. Midgate Center, Inc.*, 436 P.2d at 205 (Emphasis added.)

The Restatement (Second) of Trusts 2d s 119 (1959), comment (a) provides:

> A statement of the law governing the capacity of an unincorporated association to take or hold the legal title to property is not within the scope of the Restatement of this Subject. Whether or not it has capacity to take or hold the legal title to property, <u>it has capacity to be the beneficiary of a trust</u>.

(Emphasis added.)

Similarly, Bogert, The Law of Trusts and Trustees, s 167 (2d ed. 1965), states:

> However, the modern attitude is generally that the <u>unincorporated association is capable of being a beneficiary of a private trust</u>, either because it is considered a de facto legal entity, or on the theory that the gift is to the association until incorporation and then to the corporation or to a corporation to be formed * * *

-45-

(Emphasis added.)

When incorporated, the Parishes remained the beneficiaries of the property held in trust.

*See* 2 Scott, The Law of Trusts s 119 (2d ed. 1956); 6 Am.Jur.2d Associations and Clubs s 23

(1963); 54 Am.Jur.Trusts s 137 (1945):

> As to a corporation's capacity to be the beneficiary of a trust, even though not in existence when the trust agreement was executed or when the trust property was acquired, 2 Scott, supra, s 112.2 states: 'Just as a trust may be created in favor of an unborn child, so also it can be created in favor of a corporation not yet organized.' See also Bogert, supra, s 163; 41 Wash.L.Rev. 583 (1966). Accord, Senfour Inv. Co. v. King County, 66 Wash.2d 67, 401 P.2d 319 (1965).

In *Committee of Tort Litigants v. Catholic Diocese of Spokane* (*In re Catholic Bishop of*

*Spokane*), 364 B.R. 81 (E.D.Wash.2006), the district court overturned the bankruptcy court's

ruling that parish property was property of the diocese's bankruptcy estate, and stated:

> Treatise trust law is also clear that an <u>unincorporated association is capable of being a beneficiary of a trust</u>. *See Bogert–Trusts & Trustees (Second Ed. Rev. 1979)* § 167, page 171 ". . . the modern attitude is generally that the unincorporated association is capable of being a beneficiary of a private trust, either because it is considered a *de facto* legal entity ..."; *Scott on Trusts, Volume II*, § 119- "Property may be held in trust for a non-charitable unincorporated association." § 119, page 896 –"If the unincorporated association is one whose purposes are charitable, there is no doubt as to the validity of the trust."; *Restatement of the Law of Trusts (Second Edition)* § 119, Comment a – "An unincorporated association has capacity to be the beneficiary of a trust," and *Restatement of the Law of Trusts (Third Edition*) § 43 Comment (d) as to unincorporated associations: "Whether or not it has capacity to take or hold legal title to property, an unincorporated association has capacity to be the beneficiary of a trust, the disability being a technical and historical one rather than one based on current substantive policy."

> The Parishes claim that, at a minimum they are the beneficiaries of a resulting trust, in earlier times, the *cestui que trust*- he for who title is held. The Parishes, while contending that as a factual matter they are the true owners of the property, argue that each of the Parish properties is the *res* or property of a resulting trust, that being [sic] that even though title to the 22 properties denominated by the Tort Litigants Committee is in the formal records in the name of the Catholic Bishop of Spokane, <u>the individual Parish furnished all of the consideration for the purchase and improvement of the real properties with the additions of churches and schools and thus the holders of the beneficial interest in the properties</u>. *Id*. at 91-92.

364 B.R. at 93-94 (Emphasis Added.)

5. Under New Mexico law, Canon Law is sufficient to create an express trust; alternatively, the Parishes were beneficiaries under a resulting trust.

As set forth in the Declarations of Archbishop Wester (¶¶ 9-13, 16-17), Father Fox (¶¶ 38-39, 41-45, 47-49 ) and Tony Salgado (¶¶ 8-10, 13-14, 16, 21 and 31), the stewardship/trust relationship among the Archdiocese and the Parishes is subject to the extensive written Canon Law as well as hundreds of years of history and tradition; is documented in the various recorded Certifications of Trust, deeds, leases, accountings, audited financials, and other documents evidencing the trust, and is verified and confirmed by the consistent conduct of the parties. As a result, the Archdiocese and the Parishes have established an express trust for all Parish property managed by the Archdiocese. The Committee's arguments that such property is actually Archdiocese property is wrong. In *Aragon v. Rio Costilla Coop. Livestock Ass'n,* 112 N.M. 152, 156, 812 P.2d 1300, 1304 (1991), the New Mexico Supreme Court reviewed New Mexico law on trust principles:

> *Express trusts.* The *Restatement (Second) of Trusts* defines an express trust as a fiduciary relationship with respect to property, subjecting the person holding title to the property to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it. *Restatement (Second) of Trusts* § 2 (1957) [hereinafter *Restatement*]. For our purposes, the significance of the general definition lies in the requirement of a manifestation of an intention to create the trust. In this regard, either written or spoken words, or conduct, will suffice, and no particular form of words or conduct is necessary. *Id.* at § 24; *accord Ward v. Buchanan,* 22 N.M. 267, 270, 160 P. 356, 357 (1916). "Express trusts are those which are created by the direct and positive acts of the parties, by some writing, or deed, or will, or by words, either expressly or impliedly evincing a desire to create a trust."

> Significantly, the declaration and creation of a trust in land falls under the English statute of frauds, *see* An Act for Prevention of Frauds and Perjuries, 1677, 29 Car. 2, ch. 3, § 7 (Am.Jur.2d Desk Book, Doc. No. 116 (1962)), which is part of our common law. *Alvarez v. Alvarez,* 72 N.M. 336, 341, 383 P.2d 581, 584 (1963). Thus, while an express trust in real estate need not be *created* in writing, some

-47-

memorandum manifesting and proving the trust must exist. *See, e.g., Eagle Mining & Imp. Co. v. Hamilton,* 14 N.M. 271, 91 P. 718 (1907) (express trust proved by recognition of trust in correspondence between parties). The failure of an oral trust in land by virtue of the effect of the statute of frauds may result in the imposition of a constructive trust under certain circumstances, *see Restatement* §§ 44, 45, or may result in the duty to reconvey title to the settlor under NMSA 1978, Section 46–2–13 (Repl.Pamp.1989).

*Id.*at 1304.

In this matter, the evidence is absolutely unequivocal that an "express trust was created by the direct and positive acts of the parties, by some writing, or deed, or will, or by words, either expressly or impliedly evincing a desire to create a trust."  Under well-established, and very old, Canon Law, the relationship between the Archdiocese and the Parishes is one of trustee and beneficiary. Prior to creation of the RE Trust, the Archdiocese, through the Archbishop as corporation sole, held bare legal title to the parish property, "in trust for the public juridic persons of the parishes."  Fox Declaration, ¶ 35. The formality of that continuous relationship cannot be reasonably questioned.

Even if Canon Law is not held to be sufficient to create an express trust, the Parishes were beneficiaries of resulting trusts under New Mexico law. The opinion of the Supreme Court of the State of New Mexico in 1990 *Browne v. Sieg,* 55 N.M. 447, 234 P.2d 1045 (1951) recognized resulting trusts:

> We may, therefore, lay down the general rule, as defined by 3 *Story on Equity Jurisprudence*, (14th Ed.), Sections 1590 et seq. and 3 *Pomeroy on Equity Jurisprudence*, (4th Ed.) Section 1031, that a resulting trust is a trust by implication or construction of law and presumed to exist from the supposed intention of the parties and the nature of the transaction as shown by all the facts and circumstances of the case.

*Id*. at 457.

In *Bassett v. Bassett,* 798 P.2d 160, 110 N.M. 559 (1990) the Supreme Court recognized resulting trusts where title to property is taken in the name of a party other than the actual

-48-

purchaser:

> [A] resulting trust arises from a transfer of property under circumstances showing that the transferee was not intended to take the beneficial interest * * *. It has been termed an "intention-enforcing" trust, to distinguish it from the other type of implied trust, the *constructive* or "fraud-rectifying" trust. The resulting trust carries out the inferred intent of the parties; the constructive trust defeats or prevents the wrongful act of one of them.

*Id*. at 167 (citation omitted).

Basic trust law also recognizes resulting trusts. An inference of a trust arises where the property is paid for by one party, but title is taken in the name of another. *See Bogert–Trusts & Trustees (Third Ed. 2005*) § 454, page 316:

> The inference of an intent to have a trust which the court draws from the acts of the payor in paying the price and taking title in another, is not a conclusive inference. It is an inference or presumption of fact and not of law. Once the inference is established, the burden shifts to the contestant to rebut and overcome the inference.

At § 454 of *Bogert*, page 325, it is stated:

> The conduct of the parties with relation to the possession of the reality and the benefits and burdens thereof, after delivery of the deed, is important as corroborating or contradicting the presumption of a trust.

6. <u>The Parish properties were paid for and built by the Parishioners of each Parish; any interest of the Archdiocese is subject to the beneficial interests of the Parishes.</u>

In this case, the unchallenged evidence is that the individual Parishes, with rare exceptions, provided the property, labor, and funds for the purchase of the real properties and construction of the churches and schools on those properties. The Parishes are responsible for the maintenance and operation of each Parish property including all expenses thereof and receipt of any revenue therefrom. (Salgado Declaration, ¶ 20). Therefore, even if the Court finds that Canon Law and the well documented relationships between the Archdiocese and the Parishes were not sufficient to create an express trust, the Parishes are entitled to a resulting trust with regard to all Parish

property, as title to Parish property was taken in the name of a party (the Archdiocese) other than the actual purchaser (the Parishes).

When the Certifications of Trust were recorded in 2014, in each county in which deeds into the RE Trust were later recorded (Declaration of Tony Salgado, Paragraphs 18 and 19, and Exhibits 3 and 4), the intent of the Parishes and the Archdiocese was made clear and unequivocal: the property is held in trust for each respective Parish by the RE Trust.

The general rule to be applied in construing a deed is that the intention of the parties is to be ascertained from the language employed, viewed in light of the surrounding circumstances. *Camino Sin Pasada Neighborhood Ass'n v. Rockstroh*, 119 N.M. 212, 889 P.2d 247 (Ct. App. 1994), citing *Hyder v. Brenton,* 93 N.M. 378, 381, 600 P.2d 830, 833 (Ct.App.1979); *see also Northrip v. Conner,* 107 N.M. 139, 141–42, 754 P.2d 516, 518–19 (1988). The deeds into the RE Trust clearly indicate the intent of the parties and further verify the existence of the trust relationship.

As demonstrated by the Declaration of Tony Salgado, paragraphs 27-29, and the Declarations of Fr. Coelho, Rev. Pavlak, Rev. Msgr. Luna, Rev. Martinez, Very Rev. Cannon, Very Rev. Yaksich, Very Rev. Marshall, and Very Rev. Schultz, the uncontroverted evidence before the Court is that the Parishes within the Archdiocese have always been formed and funded by their respective Parishioners. Catholic individuals purchased and built the Parish properties with their own funds, materials, and labor. The separate property of each Parish has always belonged to and been maintained by each Parish. The Parishes have maintained separate EIN numbers for decades.

The Archdiocese does not donate property to Parishes, with few exceptions, and does not participate in Parish fundraising activities. Salgado Declaration, ¶ 28. The exceptions are quite

rare, such as the situation described in Fr. Coelho's declaration where the Archdiocese sold property and donated the proceeds for use by Santuario San Martin de Porres in about 2005. Proceeds from that sale assisted in purchasing property on which a new church was built. Parish funds were used to pay all other costs of building the church.

Each Parish takes up its own collections at Masses, receives donations by mail or online giving, and collects fees for services. Salgado Declaration, ¶ 29. Examples of fees for services are for religious education classes, confirmation fees, funerals, weddings, and baptisms. Salgado Declaration, ¶ 29. The Parish collections and fees are used to pay the operational expenses of that Parish. Salgado Declaration, ¶ 29. Parishes pay for everything including maintenance, utilities, payroll, health insurance, property insurance, payroll taxes, office supplies, property taxes for any nonexempt property, computers, furniture, equipment, liturgical supplies, buildings, improvements, and other standard and ordinary expenses. Salgado Declaration, ¶ 29. All these costs are budgeted for on an annual basis and budgets are prepared within each Parish by the Pastor and his finance counsel without Archdiocese involvement. Declaration of Tony Salgado, ¶ 38.

All evidence before the Court establishes beyond any doubt that, prior to Parish incorporation, all Parish property in the name of the Archdiocese was held in trust for the Parishes. Post-incorporation, there is absolutely no doubt about the existence of the trust relationship. The Motion is based on false assumptions and should be denied.

7. <u>The RE Trust and the DLF Trust are not revocable and contain spendthrift provisions; none of the assets in the trust are subject to avoidance or attachment.</u>

The Archdiocese has not transferred property to the Parishes. The Parishes have always been and remain the beneficial owners of all Parish property. Even if, *arguendo*, transfers were somehow found to have occurred, the Parish property managed by the Archdiocese is now held in trust in the RE Trust or the DLF Trust, and is protected from avoidance by spendthrift provisions.

-51-

Further, contrary to the Committee's erroneous allegations, the trusts are irrevocable trusts, subject to termination but not revocation.

The RE Trust Indenture (Exhibit J) states, at Paragraphs 12-14:

12. Termination.

The Grantor may terminate the Trust by delivering written notice to the Trustee. Upon receipt of such notice of termination, the Trustee shall dispose of and apply the Trust Property in accordance with the religious, educational and charitable purposes of the Trust, Canon Law and the statutes and norms of the Archdiocese of Santa Fe.

13. Amendment.

This Indenture of Trust is irrevocable and may not be amended or modified except that Grantor may amend this Indenture of Trust (i) if for any reason the Trust does not comply with the Canon Law or the Statutes of the Archdiocese of Santa Fe, by making such changes as are necessary to so comply, (ii) if for any reason whatsoever the Trust fails to qualify as a tax exempt charitable trust, by making such changes as are necessary for the Trust to so qualify, and (iii) as the Grantor may determine is necessary for the administration of the Trust within the purposes of the Trust.

14. Claims of Creditors; Spendthrift Provisions.

The Trust Property shall not be subject to seizure, levy, attachment, garnishment or sequestration by any creditor of Grantor or of any Beneficiary under any writ or proceeding at law or in equity. No assignment of any part of the income or principal of this Trust shall be valid, nor shall be accepted by Trustee, but all payments, whether of income or principal, shall be made by the Trustee as provided herein. The interest of any beneficiary shall not be subject to claims of any creditor or other person, nor to legal process through attachment, garnishment, execution, or other legal or equitable charge or lien brought by or in favor of any creditor, and may not be otherwise voluntarily or involuntarily encumbered.

The DLF Trust Indenture (Exhibit P) states, at Paragraphs 14 and 15:

14. Termination.

The Grantor may terminate the Trust by delivering written notice to the Trustees.

-52-

Upon receipt of such notice of termination, the Trustees shall dispose of and apply the Trust Fund in accordance with the religious, charitable and educational purposes of the Trust. The Trustees shall reserve such sums of money as they deem necessary to pay expenses, charges or liabilities for which the Trust may be liable. The Trustees shall pay such expenses, charges or liabilities promptly. Any balance remaining after the payment of such charges, fees and expenses shall be distributed pro rata to the Participants in proportion to the amounts of the deposits of each Participant, plus accrued interest, less any loan balance outstanding and interest accrued thereon, if any, provided that each Participant to whom a distribution is to be made is an organization which at the time qualifies as exempt under Section 501501(c)(3) of the Code, with any residuary amount being distributed to the Grantor, provided that, if Grantor does not qualify as exempt under Section 501(c)(3) of the Code, the residue shall be distributed to one or more exempt organizations designated by the Archbishop.

15.    Amendment.

This Indenture of Trust is irrevocable and may not be amended or modified except that (i) if for any reason the Trust does not comply with the Canon Law, such changes as are necessary to so comply may be made by the Archbishop, (ii) if for any reason whatsoever the Trust fails to qualify as a tax exempt charitable trust, such changes as are necessary for the Trust to so qualify may be made by the Trustees, (iii) the Trustees may make changes which do not materially adversely affect the deposits of any Participants who have deposits with the Trust. Any amendment to the Trust by the Trustees shall require the approval of the Archbishop.

When considering the validity of a spendthrift trust provision, bankruptcy courts look to applicable state law. *In re Brown,* 303 F.3d 1261, 1265 (11th Cir.2002) (stating that "spendthrift and support trusts are excluded from a debtor's bankruptcy estate to the extent they are protected from creditors under applicable state law.") (citation omitted).

NMSA 1978 § 46A-5-502 provides as follows:

A. A spendthrift provision is valid only if it restrains both voluntary and involuntary transfer of a beneficiary's interest.

B. A term of a trust providing that the interest of a beneficiary is held subject to a "spendthrift trust" or words of similar import is sufficient to restrain both voluntary and in involuntary transfer of the beneficiary's interest.

-53-

C. A beneficiary may not transfer an interest in a trust in violation of a valid spendthrift provision and except as otherwise provided in this article, a creditor or assignee of the beneficiary may not reach the interest or a distribution by the trustee before its receipt by the beneficiary.

NMSA 1978 § 46A-5-502(A)-(C).

The spendthrift provisions are enforceable. None of exceptions to the enforceability of a spendthrift trust under New Mexico law are present here. *See* NMSA 1978 § 46A-5-503(B).

8. <u>The Archdiocese Did Not Transfer Archdiocese Property; Intent is not an Issue.</u>

The Committee has no standing to pursue avoidance actions, and no avoidable transfers took place. The Committee has presented no evidence and has not made a plausible argument that transfers of Archdiocese property occurred at all, much less with any ill intent. The funds in the Deposit and Loan Fund have always been Parish property, donated by and raised by the Parishioners of each Parish. The Parish real estate was acquired by each Parish from funds raised and donated by Parishioners. There is no evidence to the contrary. Therefore, any discussion of alleged transfers of Archdiocese property with actual intent to hinder, delay or defraud creditors the "standard for determining if claims are colorable" in the derivative standing context is irrelevant and immaterial.

9. <u>The Estate Does Not have Colorable Claims that ASF Made Constructively Fraudulent Transfers to the RE Trust and the DLF Trust.</u>

The Committee lacks standing to pursue avoidance actions, and the undisputed facts demonstrate that there were no avoidable transfers of Archdiocese property. Under the Uniform Voidable Transfers Act ("UVTA"), NMSA 1978 §56-10-14 *et seq*., the first requirement of an avoidable transfer is that a "transfer" took place. Archdiocese did not transfer property to the Parishes, the RE Trust or the DLF Trust, and therefore, the UVTA is not applicable.

Further, as shown by the undisputed facts, there is no evidence of an "actual intent to hinder, delay or defraud" creditors of the Archdiocese, either through reference to "badges of

-54-

fraud" or otherwise. No transfers occurred; no consideration was required or even possible; the Trusts are not revocable; and there was no "massive exposure to the "Survivors' claims" at the time of the incorporation of the Parishes or at the time of the creation of the RE Trust, the RE Corporation, and the DLF Trust. There are no "colorable claims" for anyone to pursue, and the Committee is precluded from pursuing any such claims.

The Committee argues repeatedly and without basis that the RE Trust and the DLF Trust are "revocable," despite the fact that the RE Trust Indenture and the DLF Trust Indenture plainly state that they are "irrevocable" (Brown Declaration, Exhibit J, Paragraphs 1 and 13; Exhibit P, Paragraphs 1 and 15). Neither the RE Trust Indenture nor the DLF Trust Indenture reserves a power of revocation. A completely executed voluntary trust will be enforced, and it is irrevocable unless a power of revocation is reserved. *Krause v. Jeannette Inv. Co.,* 333 Mo. 509, 62 S.W.2d 890, 895 (1933). If no power of revocation is reserved, the trust can be revoked only with the consent of all beneficiaries. Where the settlor makes no reservation in the language to revoke a trust, he or she may not unilaterally revoke the trust. *In re Guardianship of Lombardo*, 86 Ohio St. 3d 600, 716 N.E.2d 189 (1999). *See also* Restatement (Second) of Trusts § 330 cmt. j (1959); Scott, *The Law of Trusts* § 330.8 (4th ed.1989); Bogert, *Trusts and Trustees* § 1001 (2d ed.1983); 76 Am.Jur.2d *Trusts* § 97 (1992); 90 C.J.S. *Trusts* § 115 (2002).

The Court must keep in mind a few critical facts that the Committee chooses to ignore:  (a) the formation of the trusts merely changed the trustee; (b) no property changed hands or was transferred from the Archdiocese to any Parish; (c) Parish property before the trusts were formed remained Parish property after the trusts were formed; and (d) no property was transferred as result of incorporation of the Parishes. Revocation, while not permitted under the trust indentures, is

irrelevant here. If the trusts were revoked, it would not change the beneficial ownership of the real property or the Parish funds in the Deposit and Loan Fund.

The RE Trust contains one provision stating that "The Grantor may terminate the Trust by delivering written notice to the Trustee." (Exhibit J, Paragraph 14). "Termination" is not "revocation." See 76 Am. Jur. 2d Trusts § 83: "A trust can terminate under several circumstances, including, for instance, **revocation** or modification by the settlor, the expiration of the period for which the trust was created, or a conveyance by the trustee to or at the direction of a beneficiary or by other terms of the instrument, when no purpose of the trust remains to be achieved, or the purposes of the trust have become unlawful, contrary to public policy, or impossible to achieve." (Emphasis added; footnotes omitted).

Upon termination by the Grantor, the RE Trust would continue with a different Trustee or in some other Trust format consistent with Canon Law. The Trust property would remain the Parishes' property. As a result, the Committee's arguments and citations to authority concerning revocable trusts are irrelevant and should be disregarded.

10. No Grounds Exist to Avoid the Parishes' Unrecorded Beneficial Interests in  Real Property Under Bankruptcy Code Section 544(a)(3).

As set forth herein, the UCC has no standing, there were no transfers of Archdiocese property, and if there had been transfers, the statute of limitations to avoid such transfers has long expired because the IRS reachback period does not apply to the Committee. Therefore, any discussion of avoidance under 11 U.S.C. §544(a)(3) is irrelevant and immaterial.  However, even if the Committee could somehow overcome the threshold issues of standing and statute of limitations, the avoidance actions described in the Motion would be patently unsuccessful under 11 U.S.C. § 544(a)(3).

Although Section 544(a)(3) of the Bankruptcy Code gives the Debtor (not the Committee)

the rights of a hypothetical bona fide purchaser and allows the Debtor to avoid any interests in property that could be avoided by a bona fide purchaser, under no circumstances could the Debtor "avoid" the Parishes' beneficial ownership of Parish real property.

"Under New Mexico law a bona fide purchaser takes for value free of defects that are unknown to the purchaser and not discoverable in the exercise of ordinary care." *In re Comm. Invests., Ltd.*, 99 B.R. 455 (Bankr. D.N.M. 1989) (internal citation omitted). Similarly, a bona fide purchaser does not take property subject to an easement unless they had actual or constructive notice of the easement. *Otero v. Pacheco*, 94 N.M. 524, 526, 612 P.2d 1335, 1337 (App. 1980).

With regard to *both* the recorded deeds and the "unrecorded" deeds, therefore, the recording of the Certifications of Trust in each New Mexico County was more than sufficient to put a hypothetical bona fide purchaser on record notice of the Parishes' beneficial ownership of Parish real property, and no avoidance is possible, or "colorable." As stated in the Declaration of Tony Salgado at Paragraph 18, in 2014, the Archdiocese recorded a separate Certification of Trust in each New Mexico County in which a Parish held property, providing public notice that the trustee or custodian of the properties holding legal title would no longer be the Archbishop or Archdiocese, but instead would be the Real Estate Corporation. *See* Recorded Certifications of Trust, Exhibit 3 to Declaration of Tony Salgado.

In addition, the recording of deeds is definitive with regard to record notice, and no avoidance under Section 544(a)(3) is possible. Declaration of Tony Salgado, ¶ 19; *and* s*ee, e.g.*, Exhibit 4 to Declaration of Tony Salgado, Deed--Nativity of the Blessed Virgin Mary.

With regard to the "unrecorded deeds," in addition to the recording of the Certifications of Trust, the Parishes' "open, notorious and exclusive possession of real estate under claim of ownership" would be sufficient to create a duty to investigate, and would put a prospective

-57-

purchaser upon inquiry notice as to such rights. "It is a general rule that open, notorious and exclusive possession of real estate under claim of ownership, is constructive notice to the world of whatever claim the possessor asserts, whether such claim is legal or equitable in its nature. . . Possession does not amount to constructive notice of the nature and extent of the rights of the person in possession, but i[t] puts the purchaser upon inquiry as to such rights." *Nelms v. Miller*, 56 N.M. 135, 156-57, 241 P.2d 333, 349 (1952). "A party in possession of the property who is not the record title holder of the property gives rise to a duty of inquiry on the part of a subsequent purchaser, mortgagee, or lienholder." *In re Crowder*, 225 B.R. 794, 797 (Bankr. D.N.M. 1998).

New Mexico statutes do not support the Committee's 544(a)(3) arguments. NMSA §14-9-3 (1978) ("Unrecorded Instruments; Effects) states:

> No deed, mortgage or other instrument in writing not recorded in accordance with Section 14-9-1 shall affect the title or rights to, in any real estate, of any purchaser, mortgagee in good faith or judgment lien creditor, without knowledge of the existence of such unrecorded instruments. Possession alone <u>based on an unrecorded executory real estate contract</u> shall not be construed against any subsequent purchaser, mortgagee in good faith or judgment lien creditor either to impute knowledge of or to impose the duty to inquire about the possession or the provisions of the instruments."

(Emphasis added.)

The statute was construed literally and narrowly in *In re Crowder*, 225 B.R. 794 (Bankr. D.N.M. 1998). Specifically, the court interpreted the statute as applying only to unrecorded real estate contracts, not warranty deeds. 225 B.R. at 798. Further, the warranty deed at issue in *Crowder* was not recorded until after the bankruptcy was filed, and the Court held that a reasonable

inquiry would have revealed the interest of the party in possession of the real property.[9] 225 B.R. at 797-798.

Here, the Parishes do not claim beneficial ownership based on an "unrecorded executory real estate contract," nor do they *possess* real estate based on such a contract. The Parishes are in "open, notorious and exclusive possession of real estate under claim of ownership," and a hypothetical bona fide purchaser would be on notice of their ownership claim. Further, since 2014, each counties' real property records have put any such purchaser on notice of the RE Trust's and the Parishes' interest in the properties.

In *In re Commercial Investments, Ltd.*, 99 B.R. 455 (Bankr. D.N.M. 1989), the Court stated:

> The true rule ... is that absent actual notice, **where the facts brought to the knowledge of the intending purchaser are such that in the exercise of ordinary care he ought to inquire, but does not, and his failure so to amounts to gross or culpable negligence, he will be charged with a knowledge of all the facts which the inquiry, pursued with reasonable diligence, would have revealed.** Want of ordinary care alone will not charge him. The circumstances must be such that the failure to make the inquiry suggested by ordinary care will convict the intending purchaser of gross or culpable negligence if he is to be visited with all the consequences of having made the purchase with actual knowledge of the facts.
>
> *Id*. at 462 (*quoting Sawyer v. Barton,* 55 N.M. 479, 485–86, 236 P.2d 77 (1951)) (emphasis added).

The Committee argues that "[a] purchaser viewing the Disputed Real Property would see nothing inconsistent with ASF's exclusive ownership by virtue of the operation of its parish at the property where the parish was not a legal entity and in fact was merely a part of ASF" (*Motion*, p.

---

[9] "Constructive notice is firmly embedded in New Mexico common law." *Crowder*, 225 B.R. at 797, *citing Nelms v. Miller*, 56 N.M. 132 (1952), etc. "Under constructive notice principles, once a duty of inquiry arises, subsequent purchasers are held to have notice of all documents a reasonable inquiry would uncover, even if those documents are not recorded." (Citations omitted.) "A party in possession of the property who is not the record title holder of the property gives rise to a duty of inquiry on the part of a subsequent purchaser, mortgagee, or lienholder." *Crowder*, 225 B.R. at 797, citing *Nelms*, 56 N.M. at 156–157.

43 of 54). This argument is absurd and stretches credulity. Despite the Committee's arguments to the contrary, a prospective purchaser of, for instance, real property on which a Catholic church had been constructed, and which was occupied by a Parish, would immediately be put upon inquiry notice as to the ownership rights of the Parish. The Parish itself would be identified as the entity in possession of the Parish property, by name, by signage, by correspondence, by identification on donation envelopes, and otherwise, all in an "open, notorious and exclusive" manner—there would likely be no reference to the Archdiocese of Santa Fe anywhere on the property. It would be "gross or culpable negligence" for such a prospective purchaser to fail to inquire about the ownership claims of the Parish under these circumstances.

11.    There are no Colorable Self-Settled Trust Avoidance Claims.

The Committee cites *In re Potter,* 2008 WL 5157877 (Bankr. D.N.M. July 29, 2008)[10] for the proposition that "the debtor need only be a beneficiary, not necessarily the sole beneficiary of a self-settled trust" in order to permit avoidance under 11 U.S.C. § 548. This is not precisely the holding in *In re Potter.* The Court found that "the existence of additional settlors and additional beneficiaries of the California Trust does not serve to validate the spendthrift provision *as to Mr. Potter*, who is both settlor and beneficiary." In *Potter*, all of the property transferred to the trust in question was transferred by the Debtor. *Id*. at *7. Here, none of the property transferred to the Trusts was property of the Debtor; it was all Parish property, and therefore could not be subject to avoidance. See *Matter of Shurley,* 115 F.3d 333, 338 (5th Cir.1997) (creditors were only entitled to reach the self-settled portion of a spend-thrift trust). Here, the Archdiocese transferred no Archdiocese property into the Trusts, and therefore the spendthrift provisions remain enforceable.

---

[10] Cited as 2008 Bankr. LEXIS 3351 at *38 in the Motion, p. 45 of 54.

Further, the Committee must acknowledge that, in order to be avoidable under 11 U.S.C. § 548(e) "the transfers must be made by the debtor." *Id*. The Archdiocese transferred no assets into the RE Trust or the DLF Trust; all assets subject to the RE Trust and the DLF Trust were Parish assets, as shown by the undisputed facts. There were no "transfers" by the Debtor.

12.     Prosecution of the Adversary Actions Will Irreparably Damage the Estate and the Debtor, Is Highly Unlikely to Succeed and Will Adversely Affect Mediation

The Committee's claims are groundless. The Archdiocese is focused on pursuing mediation and a fair, compassionate, and generous resolution of claims. Avoidance litigation with the Parishes would be unimaginably complicated, expensive and time-consuming, and would expend millions of dollars otherwise available for claimants and severely damage mediation efforts. Most importantly, it would be futile, because none of the claims the Committee seeks to bring are colorable.

## VI.     THE COURT SHOULD DENY THE COMMITTEE'S REQUEST THAT THE COURT ORDER THE ARCHDIOCESE TO PRODUCE INFORMATION TO THE COMMITTEE CONCERNINGTHE PARISHES' INTERESTS IN THE DLF TRUST

The Committee's request for additional documents regarding the Parishes' interest in the DLF Trust should be denied as pointless and unnecessary.

## VII.     CONCLUSION

For the foregoing reasons, the Debtor respectfully requests that the Court deny the Motion and grant Debtor all other just and proper relief.

Respectfully submitted,

*/s/ Bruce A. Anderson*
Ford Elsaesser
Bruce A. Anderson
ELSAESSER ANDERSON, CHTD.
320 East Neider Avenue, Suite 102
Coeur d'Alene, ID  83815
(208) 667-2900
Fax: (208) 667-2150
ford@eaidaho.com
brucea@eaidaho.com

-and-

*/s/ Thomas D. Walker*
Thomas D. Walker
WALKER & ASSOCIATES, P.C.
500 Marquette N.W., Suite 650
Albuquerque, New Mexico 87102
(505) 766-9272
Fax: (505) 722-9287
twalker@walkerlawpc.com
Counsel for Debtor

Pursuant to F.R.C.P. 5(b)(3), F.R.B.P. 9036 and NM LBR 9036-1(b), I hereby certify that service of the foregoing was made on June 26, 2020 via the notice transmission facilities of the Bankruptcy Court's case management and electronic filing system.

*/s/ Thomas D. Walker*
Thomas D. Walker