# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| In re:<br><br>ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF SANTA FE, a New Mexico corporation sole,<br><br><div align="center">Debtor.</div> | Chapter 11<br><br>Case No. 18-13027-t11 |

**CONSOLIDATED REPLY TO OPPOSITIONS FILED BY THE DEBTOR, PARISHES, RE TRUST, AND DLF TRUST TO MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS: (I) FOR EXCLUSIVE AND IRREVOCABLE AUTHORITY TO COMMENCE, PROSECUTE, AND SETTLE ADVERSARY PROCEEDINGS ON BEHALF OF BANKRUPTCY ESTATE AGAINST CERTAIN DIOCESE-RELATED ENTITIES; AND (II) TO COMPEL THE DEBTOR TO PRODUCE INFORMATION REVEALING THE TEN PARISHES WITH THE LARGEST <u>PURPORTED INTERESTS IN THE DEPOSIT AND LOAN FUND</u>**

DOCS_SF:103803.8 05066/001

# TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................................................. 1

ARGUMENT ........................................................................................................................ 6

I.     THE COURT CAN AND SHOULD GRANT DERIVATIVE
    STANDING TO THE COMMITTEE. ......................................................... 6

    A.     *Hartford Underwriters* Addresses the Standing of an
    Administrative Creditor Under Section 506(c) and Expressly
    Leaves Intact Authority That Permits Granting Derivative Standing
    to a Creditors' Committee.......................................................................... 7

    B.     The *Fox* Decision Is Not Controlling and Is Not Followed By
    Courts Within the Tenth Circuit. ............................................................... 9

    C.     ASF's Criticism of Other Circuits and Lower Court Cases That
    Unanimously Recognize the Practice of Granting Standing to a
    Creditors' Committee Is Misplaced. ....................................................... 14

II.     THE RELIGIOUS FREEDOM RESTORATION ACT IS NOT A
    DEFENSE TO THE ESTATE'S CLAIMS. .................................................. 17

    A.     RFRA Does Not Create a Cause of Action or Defense Against
    Non-Government Actors............................................................................ 18

        1.     The plain language of RFRA only permits a defense against
        "a government." ........................................................................ 18

        2.     The Committee is not a government actor subject to a claim
        or defense under RFRA. ........................................................... 22

        3.     The RFRA defense against the Committee fails as a matter
        of law. ...................................................................................... 23

        4.     The Committee, as a private party, is not a government
        actor because it is neither acting "under color of law" nor
        "willfully participating in joint action with government
        officials.".................................................................................. 24

    B.     RFRA May Not Be Applied to Modify or Preempt State Law............... 29

    C.     The Parishes Reliance on *In re Young* is Misplaced.............................. 32

    D.     The Bankruptcy Code Serves a Compelling Government Interest. ......... 34

    E.     Even if RFRA Is Applicable to the Committee, Whether the
    Adversary Proceedings Impose a Substantial Burden, Is a Factual
    Issue That Can Only Be Resolved in Litigation After Discovery. .......... 35

DOCS_SF:103803.8 05066/001

III.  THE ADVERSARY PROCEEDINGS ARE NOT BARRED BY THE
      FIRST AMENDMENT FREE EXERCISE CLAUSE. ................................. 36

      A.    The Religious Autonomy Doctrine Does Not Apply to Secular
            Disputes........................................................................................ 36

IV.   PRIOR TO THE RESTRUCTURING, THE PARISHES COULD
      NOT BE TRUST BENEFICIARIES BECAUSE THEY HAD NO
      SEPARATE LEGAL EXISTENCE. ............................................... 42

      A.    New Mexico's Statutory Filing Requirement for Unincorporated
            Associations Is Mandatory...................................................... 43

            1.    New Mexico Statute Sections 53-10-1 et seq., Apply to the
                  Parishes. ........................................................................ 44

            2.    The Filing Requirement of NMSA Section 53-10-1 et seq.
                  Is Mandatory. ................................................................ 46

            3.    The Parishes Were Capable of Filing as Unincorporated
                  Associations and Failed to Do So. ................................ 48

      B.    New Mexico's Statutory Filing Requirement Governed the
            Parishes' Capacity to Hold Real Property and Supplanted Contrary
            Common Law, If Any. .............................................................. 49

V.    WHETHER ASF'S PROPERTY WAS HELD IN TRUST FOR ITS
      UNINCORPORATED PARISHES PRIOR TO TRANSFERS TO
      THE TRUSTS IS A QUESTION OF FACT THAT MUST BE
      RESOLVED IN THE LITIGATION AFTER DISCOVERY. ...................... 51

CONCLUSION ....................................................................................... 53

DOCS_SF:103803.8 05066/001

# TABLE OF AUTHORITIES

<div align="right">

**Page(s)**

</div>

## CASES

*Adams v. Marwil (In re Bayou Group, LLC)*,
    564 F.3d 541 (2d Cir. 2009) ................................................................................. 28

*Adelphia Comm. Corp. v. Bank of America (In re Adelphia Comm. Corp.)*,
    330 B.R. 364 (Bankr. S.D.N.Y. 2005) ............................................................. 9, 17

*Ades v. Supreme Lodge Order of Ahepa*,
    51 N.M. 164, P.2d 161 (1947) ............................................................................ 52

*Akoury v. Roman Catholic Archbishop*,
    2004 Mass. Super. LEXIS 349 (Mass. Super. Sept. 14, 2004) ............................. 42

*Alexander v. Sandoval*,
    532 U.S. 275, 121 S. Ct. 1511 (2001) ................................................................. 24

*Allen ex rel. Martin v. LaSalle Bank, N.A.*,
    629 F.3d 364 (3d Cir. 2011) ................................................................................ 18

*Aragon v. Rio Costilla Coop. Livestock Ass'n*,
    112 N.M. 152, 812 P.2d 1300 (1991) ................................................................. 51

*Bassett v. Bassett*,
    110 N.M. 559, 798 P. 2d 160 (1990) .................................................................. 53

*Blue Canyon Well Ass'n v. Jevne*,
    2018-NMCA-004, 410 P. 3d 251 (Ct. App. 2017) ......................................... 45- 48

*Brownson v. Bogenschultz*,
    966 F. Supp. 795, 797 (E.D. Wis. 1997) ............................................................ 25

*Bryce v. Episcopal Church in the Diocese of Colorado*,
    289 F.3d 648 (10th Cir. 2002) ........................................................................ 38- 40

*Butner v. United States*,
    440 U.S. 48, 99 S. Ct. 914 (1979) ...................................................................... 30

*Caminetti v. U.S.*,
    242 U.S. 470, 37 S. Ct. 192 (1917) ..................................................................... 23

*Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.)*,
    66 F. 3d 1436 (6th Cir. 1995) ........................................................................... 7-8

*Cantwell v. Conn*,
    310 U.S. 296, 60 S. Ct. 900, (1940) ..................................................................... 4

*Christians v. Crystal Evangelical Free Church (In re Young)*,
    141 F.3d 854 (8th Cir. 1998), *cert denied*, 525 U.S. 811 (1998) ................... 32- 33

DOCS_SF:103803.8 05066/001

*City of Boerne v. Flores*,
   521 U.S. 507, 117 S. Ct. 2157 (1997) ................................................................. 29- 32

*Comm. of Tort Litigants v. Catholic Diocese of Spokane*
*(In re Catholic Bishop of Spokane)*,
   329 B.R. 304 (Bankr. E.D. Wash. 2005),
   *rev'd in part*, 364 B.R. 81 (E.D. Wash. 2006) ........................................... 32, 41, 51

*Comm. of Tort Litigants v. Catholic Diocese of Spokane (In re Catholic Bishop of Spokane)*,
   364 B.R. 81 (E.D. Wash. 2006) ................................................................................ 41

*Cummings v. X-Ray Assocs. of New Mexico*,
   121 N.M. 821, 918 P. 2d 1321 (1996) ..................................................................... 45

*E.E.O.C. v. St. Francis Xavier Parochial Sch.*,
   77 F. Supp. 2d 71 (D.D.C. 1999) .............................................................................. 41

*F.E.L. Publications, Ltd. v. Catholic Bishop*,
   754 F.2d 216 (7th Cir. 1984) ..................................................................................... 41

*Flanagan v. Benvie*,
   58 N.M. 525, 273 P. 2d 381 (1954) ................................................................ 47, 49-50

*Fuel Oil Supply and Terminaling v. Gulf Oil Corp.*,
   762 F.2d 1283 (5th Cir.1985) .................................................................................... 29

*Gallagher v. Neil Young Freedom Concert*,
   49 F.3d 1442 (10th Cir. 1995) ................................................................................... 26

*Gen. Conference Corp. of Seventh-Day Adventists v. McGill*,
   617 F.3d 402 (6th Cir. 2010) ........................................................................... 3, 19- 20

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
   546 U.S. 418, 126 S. Ct. 1211 (2006) ...................................................................... 35

*Gonzalez v. Roman Catholic Archbishop*,
   280 U.S. 1, 50 S. Ct. 5 (1929) .................................................................................... 4

*Hankins v. Lyght*,
   441 F.3d 96 (2d Cir. 2006) .................................................................................. 20-21

*Hartford Underwriters Ins., Co. v. Union Planters Bank, N.A.*,
   530 U.S. 1, 120 S. Ct. 1942 (2000) .................................................................. *passim*

*Hill v. Akamai Techs., Inc. (In re MS55, Inc.)*,
   477 F. 3d 1131 (10th Cir. 2007) ........................................................................ 10, 13

*In re Dow Corning Corp.*,
   255 B.R. 445 (E.D. Mich. 2000) ............................................................................... 28

*In re iPCS, Inc.*,
   297 B.R. 283 (Bankr. N.D. Ga. 2003) ..................................................................... 17

*In re Lobera*,
   454 B.R. 824 (Bankr. D.N.M. 2011) ........................................................................ 18

DOCS_SF:103803.8 05066/001

*In re Meyer*,
   467 B.R. 451 (Bankr. E.D. Wis. 2012) ................................................................... 35

*In re Navarro*,
   83 B.R. 348 (Bankr. E.D. Pa. 1988) ....................................................................... 35

*In re Turner*,
   193 B.R. 548 (Bankr. N.D. Cal. 1996) ................................................................... 35

*In re Xonics Photochemical, Inc.*,
   841 F.2d 198 (7th Cir. 1988) ................................................................................... 7

*Int'l Union of Operating Eng'rs, Local 150 v. Ward*,
   563 F.3d 276 (7th Cir. 2009) ................................................................................. 24

*Jackson v. Metro Edison Co*.,
   419 U.S. 345, 95 S. Ct. 449 (1974) ........................................................................ 27

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church*,
   344 U.S. 94, 73 S. Ct. 143 (1952) .......................................................................... 37

*Kikumura v. Hurley*,
   242 F.3d 950 (10th Cir. 2001) ............................................................................... 35

*Kreshik v. Saint Nicholas Cathedral of Russian Orthodox Church*,
   363 U.S. 190, 80 S. Ct. 1037 (1960) ...................................................................... 37

*Lamie v. U.S. Trustee*,
   540 U.S. 526, 124 S. Ct. 1023 (2004) .................................................................... 23

*Leslie v. Midgate Center, Inc.*,
   72 Wash. 2d 977, 436 P. 2d 201 (1967) ................................................................ 51

*Listecki v. Official Comm. of Unsecured Creditors (In re Archdiocese of Milwaukee)*,
   485 B.R. 385 (Bankr. E.D. Wis. 2013) ............................................................ 24- 25

*Listecki v. Official Comm. of Unsecured Creditors*,
   780 F.3d 731 (7th Cir. 2015) ......................................................................... *passim*

*Loyd v. Loyd*,
   731 F.2d 393 (7th Cir. 1984) ................................................................................. 27

*Lugar v. Edmondson Oil Co*.,
   457 U.S. 922, 102 S. Ct. 2744 (1982) .................................................................... 26

*McDaniel v. Paty*,
   435 U.S. 618, 98 S. Ct. 1322 (1978) ........................................................................ 4

*Moffatt Tunnel League v. U.S.*,
   289 U.S. 113, 53 S. Ct. 543 (1933) ........................................................................ 47

*Morris v. Midway So. Baptist Church (In re Newman)*,
   183 B.R. 239 (Bankr. D. Kan. 1995) ................................................................. 34- 35

*Morris v. Midway S. Baptist Church (In re Newman)*,
   203 B.R. 468 (D. Kan. 1996) ................................................................................. 33

v

*Official Comm. of Equity Security Holders v. Official Comm. of Unsecured Creditors*
   *(In re Adelphia Comm. Corp.),*
   544 F. 3d 420 (2d Cir. 2008) ................................................................ 17

*Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.),*
   330 F. 3d 548 (3d Cir. 2003) ........................................................... *passim*

*Official Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.),*
   984 F.2d 1305 (1st Cir. 1993) .............................................................. 28

*Pino v. Higgs,*
   75 F.3d 1461 (10th Cir.1996) ............................................................... 26

*Presbyterian Church in United States v.*
   *Mary Elizabeth Blue Hull Mem'l Presbyterian Church,*
   393 U.S. 440, 89 S. Ct. 601 (1969) ....................................................... 37

*PW Enterprises, Inc. v. No. Dakota Racing Comm. (In re Racing Servs., Inc.),*
   540 F. 3d 892 (8th Cir. 2008) ...................................................... 12-13, 17

*Rindelsbach v. Jones,*
   532 B.R. 850 (D. Utah 2015) ............................................................... 13

*Rodriguez v. Plymouth Ambulance Serv.,*
   577 F.3d 816 (7th Cir. 2009) ............................................................... 26

*Rweyemamu v. Cote,*
   520 F.3d 198 (2d Cir. 2008) ........................................................... 20- 21

*Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC),*
   423 F.3d 166 (2d Cir. 2005) ............................................................... 28

*Springs East Land Co., LLC v. Goss (In re Ellicott Springs Res., LLC),*
   485 B.R. 626 (Bankr. D. Colo. 2013) .............................................. 12-13

*Starzynski v. Sequoia Forest Indus.,*
   72 F. 3d 816 (10th Cir. 1995) .............................................................. 11

*Sutton v. Providence St. Joseph Med. Ctr.,*
   192 F.3d 826 (9th Cir. 1999) ..................................................... 3, 19, 25

*Tartaglia v. Hodges,*
   129 N.M. 497, 10 P.3d 176 (Ct. App. 2000) ......................................... 51

*Tort Claimants Comm. v. Roman Catholic Archbishop (In re Roman Catholic Archbishop of*
   *Portland in Oregon),*
   335 B.R. 842 (Bankr. D. Or. 2005) ................................................. *passim*

*Touche Ross & Co. v. Redington,*
   442 U.S. 560, 99 S. Ct. 2479 (1979) ..................................................... 23

*United Phosphorous, Ltd. v. Fox (In re Fox),*
   305 B.R. 912 (10th Cir. BAP 2004) .................................................... 9- 10

*U.S. Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.),*
   33 F.3d 294 (3d Cir. 1994) ................................................................. 28

DOCS_SF:103803.8 05066/001

*Village of Overland Pointe, LLC v. Terra Bentley II, LLC (In re Bentley II, LLC),*
    2011 Bankr. LEXIS 806 (Bankr. D. Kan. Mar. 2, 2011) ...................................................... 12- 13

*Wadsworth v. Word of Life Christian Ctr. (In re McGough),*
    737 F.3d 1268 (10th Cir. 2013) ...................................................................... 34

*Watson v. Jones,*
    80 U.S. 679 20 L. Ed. 666 (1872) ...................................................................... 37

*Weinman v. Word of Life Christian Center (In re Bloch),*
    207 B.R. 944 (D. Colo. 1997) ...................................................................... 33

*White et al. v. Lord Abbett & Co. et al. (In re Lord Abbett Mut. Funds Fee Litig.),*
    553 F.3d 248 (3d Cir. 2009) ...................................................................... 20

## STATUTES

11 U.S.C. § 101 ...................................................................... 22

11 U.S.C. § 503 ...................................................................... 10, 15

11 U.S.C. § 506 ...................................................................... 8

11 U.S.C. § 541 ...................................................................... 30, 31

11 U.S.C. § 544 ...................................................................... 31, 33

11 U.S.C. § 548 ...................................................................... 33

11 U.S.C. § 1102 ...................................................................... 27

11 U.S.C. § 1103 ...................................................................... *passim*

11 U.S.C. § 1109 ...................................................................... 10, 15-16

28 U.S.C. § 586 ...................................................................... 27

42 U.S.C. § 1983 ...................................................................... 25

42 U.S.C. § 2000bb ...................................................................... *passim*

NMSA § 46A-1-103(C) and (J) ...................................................................... 50

NMSA § 46A-5-505 ...................................................................... 30

NMSA § 46A-6-603 ...................................................................... 30

NMSA § 53-10-1 ...................................................................... *passim*

NMSA § 53-10-2 ...................................................................... 47, 49

NMSA § 57-22-1 ...................................................................... 45

# OTHER AUTHORITIES

7 Collier on Bankruptcy ¶ 1109.05 (16th ed. 2020) ...................................................... 15

Alan R. Lepene & Sean A. Gordon, *The Case for Derivative Standing in Chapter 11: "It's the Plain Meaning, Stupid,"* 11 Am. Bankr. Inst. L. Rev. 313 (2003)........................................... 17

RLCDPA, Pub. L. No. 105-183 §§ 2, 3(a), June 19, 1998, 112 Stat. 517.................................... 33

DOCS_SF:103803.8 05066/001

**INTRODUCTION**

The fox is guarding the hen house.

Prior to filing bankruptcy, ASF engaged in a massive and fraudulent scheme to place its assets beyond the reach of its creditors while enabling the Archbishop to continue to control the assets. The scheme involved the transfer of hundreds of millions of dollars of real estate and financial assets that were legally titled to ASF, without consideration, to self-settled revocable trusts controlled by ASF and the Archbishop. This "Restructuring"[1] involved, among other things, the incorporation of previously unincorporated Parishes and the formation of two revocable self-settled trusts controlled by ASF—one for the receipt of ASF's real estate (the "RE Trust"), and one for the receipt of ASF's financial assets, otherwise known as funds from the Deposit and Loan Fund (the "DLF Trust"). Between 2013 and 2018, ASF's assets were transferred to these trusts without consideration. As of the Petition Date, the Parishes had been separately incorporated, ASF's financial assets had been transferred to the DLF Trust, and most (but not all) of its real property had been transferred to the RE Trust.

By its *Motion for Exclusive and Irrevocable Authority to Commence, Prosecute, and Settle Adversary Proceedings on Behalf of the Bankruptcy Estate Against Certain Diocese Related Entities* ("Motion"), the Committee contends, among other things, that the transfers to the trusts are both actually and constructively fraudulent under the Bankruptcy Code and New Mexico law, that the RE Trust and the DLF Trust are voidable self-settled trusts in which the ASF is a beneficiary, and that the assets transferred into the trusts are property of ASF's estate.

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

DOCS_SF:103803.8 05066/001

The Committee also contends that any unrecorded interests in real property that remain titled to ASF are unenforceable pursuant to 11 U.S.C. § 544(a)(3).

In their oppositions to the Motion, ASF, the Parish Steering Committee ("Parishes") and the RE Trust and DLF Trust (the "Trusts," together with ASF and the Parishes, the "Objectors")[2] raise numerous factual issues that are not a basis to deny the Motion; rather they are quintessential matters for discovery after the Committee has been granted standing to initiate the litigation.[3] The Objectors also raise three legal arguments (gating issues) that are properly addressed in ruling on the Motion, as well as a fourth legal issue, that can, but need not be decided at this juncture because it is not a gating issue. First, the Objectors argue that the Court does not have authority to grant the Committee derivative standing because "the Tenth Circuit rejects derivative standing for creditors." Second, the Objectors argue the Religious Freedom Restoration Act of 1993 (42 U.S.C. § 2000bb, *et seq*.) ("RFRA") precludes the Committee from seeking to avoid the transfers to the Trusts pursuant to New Mexico fraudulent transfer law or provisions of the Bankruptcy Code, and otherwise seeking to determine the estate's interests in property, because these actions would substantially burden the Objectors' free exercise of

---

[2] The ASF Opposition ("ASF Opp.") is Dkt. No. 418. The Opposition by the Parishes and Trusts ("Parish Opp") is Dkt. No. 416.

[3] The factual issues that will potentially be at issue in the litigation if standing is granted to the Committee include: (i) if the unincorporated Parishes had legal capacity to hold equitable interests in real or personal property, whether property ASF transferred to the Trusts was in fact the subject of pre-existing trusts in favor of the unincorporated Parishes prior to the transfers. The existence of an express or resulting trust is a matter of intent which is a fact intensive determination; (ii) whether funds contributed to purchase/improve parish properties were gifts. If so, no trust can result because gifts cannot give rise to a retained beneficial interest because no legally enforceable right in the property remains in the person making a gift; (iii) whether any of the purported gifts of labor or money were subject to enforceable restrictions such that the donations/gifts could only be used for a particular purpose; (iv) whether ASF or the Archbishop exercise control over the Trusts; (v) whether ASF is a beneficiary of the Trusts; (vi) when a triggering creditor knew or should have known of the fraudulent nature of the challenged transfers for statute of limitations purposes; and (vi) whether facts exist that would put a hypothetical bona fide purchaser on inquiry notice of the purported unrecorded interests of the Parishes.

DOCS_SF:103803.8 05066/001

religion.  Third, they contend that under the free exercise clause of the First Amendment to the United States' Constitution (the "<u>First Amendment</u>"), this court must apply ecclesiastical (canon) law rather than civil law in determining whether ASF's assets were held in preexisting trusts before they were transferred to the Trusts.  The issues of standing and immunity under RFRA and the First Amendment are the three gating issues.  As a matter of law, these arguments cannot constitute viable defenses to the estate's claims or grounds to deny the Motion for at least three reasons.

**First,** ASF has misinformed the Court that the Tenth Circuit has rejected derivative standing for committees.  In fact, it has stated its approval and the courts within the Tenth Circuit agree with every other circuit that has considered the issue that derivative standing is appropriate under prescribed circumstances that exist here.

**Second**, RFRA provides a cause of action or defense only against "a government" and is inapplicable to suits to which the government is not a party.  Three United States Courts of Appeals have concluded that the statutory language makes clear that Congress intended RFRA to apply only in cases where the "government" is a party.  *Listecki v. Official Comm. of Unsecured Creditors,* 780 F.3d 731, 737 (7th Cir. 2015); *Gen. Conference Corp. of Seventh-Day Adventists v. McGill,* 617 F.3d 402, 411-12 (6th Cir. 2010); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834 (9th Cir. 1999).

The Committee is a private non-government actor that would stand in the shoes of the Debtor's estate, which is also a non-government actor.  *Listecki* 780 F.3d at 737-741.  Therefore, RFRA cannot provide a defense to the claims the Committee seeks standing to bring.  Nor may

RFRA be applied to state law, such as the New Mexico fraudulent transfer, corporate, and trust laws that govern the outcome of the litigation.

**Third**, ASF's claim that the religious autonomy doctrine requires this Court to ignore civil law and apply canon law to determine that the unincorporated Parishes were separate legal entities has been easily rejected by every court that has considered the argument. The Supreme Court has repeatedly held in a long line of cases that the religious autonomy doctrine only applies to internal church disputes and cannot be applied to resolve disputes with the secular world. ASF's suggestion that the Court is prohibited by the First Amendment from applying the neutral, generally applicable provisions of the Bankruptcy Code and New Mexico law is without merit as a matter of law. The Supreme Court has rejected the idea that fraudulent or improper actions can ever be excused in the name of religion: ***"Nothing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public. . . . Even the exercise of religion may be at some slight inconvenience in order that the State may protect its citizens from injury."*** *Cantwell v. Conn*, 310 U.S. 296, 306 60 S. Ct. 900 (1940); *see also McDaniel v. Paty,* 435 U.S. 618, 643 n.*, 98 S. Ct. 1322 (1978) (Stewart, J., concurring) ("[A]cts harmful to society should not be immune from proscription simply because the actor claims to be religiously inspired."); *Gonzalez v. Roman Catholic Archbishop,* 280 U.S. 1, 16, 50 S. Ct. 5, 7-8 (1929) (noting fraud exception to intrachurch religious autonomy doctrine). As the Seventh Circuit observed in *Listecki*, "[w]e do not believe that there is, nor can there be, a religious exception that would allow a fraudulent conveyance in the name of free exercise."

4

**Fourth,** the Objectors' argument that under civil law the unincorporated Parishes were beneficiaries of preexisting trusts, and therefore ASF did not transfer property of the estate to the Trusts, is a factual issue that cannot be resolved without discovery. Therefore, this is not a gating issue. However, the legal issue of whether unincorporated Parishes have the legal capacity under New Mexico law to be trust beneficiaries can be decided now. If the Court finds that the unincorporated Parishes could not have been trust beneficiaries, the Objectors' argument that the assets transferred were held in preexisting trusts for the benefit of the Parishes will be extinguished. On the other hand, if the Court finds that the unincorporated Parishes did have the legal capacity to be trust beneficiaries, the existence of the purported pre-transfer equitable trusts will be a factual issue subject to discovery. However, such a ruling would not be a basis to deny the Motion.

Rather than fulfilling its duty to the estate and its creditors to maximize estate assets, ASF has elected to devote the estate's resources to advancing a frivolous and misguided freedom of religion theory to keep its assets out of the estate and out of the reach of its creditors. ASF's position, if accepted by this Court, would preclude this Court from applying neutral and general provisions of New Mexico law and the Bankruptcy Code in order to challenge the fraudulent transfer of hundreds of millions of dollars of assets out of the estate. Denial of the Motion based on the Objectors' arguments would sanction ASF's attempt to "cherry pick" the Code by taking full advantage of the automatic stay, discharge, and other provisions of the Code that enable it to escape responsibility for aiding and abetting childhood sex abuse of children by its clergy, while waiving the Constitution and purported religious freedom rights to obtain complete insulation

5

from the provisions of the Code and New Mexico law that protect creditor interests. This seems like the least appropriate response from an organization that purports to seek justice for its victims. It also proves beyond doubt that ASF is incapable of overcoming its profound conflict of interest and of objectively evaluating the estate's claims against the Trusts and the Parishes.[4]

## **ARGUMENT**

## I.     **THE COURT CAN AND SHOULD GRANT DERIVATIVE STANDING TO THE COMMITTEE.**

ASF makes the unsupportable argument that this Court lacks authority to grant derivative standing to the Committee irrespective of the circumstances. Applicable law allows the Court to grant derivative standing to the Committee to pursue avoidance actions that ASF refuses to pursue and that will benefit the estate. Every circuit that has taken a position on derivative standing has embraced the concept under circumstances that are present here. The Supreme Court's decision in *Hartford Underwriters*, discussed below, expressly exempts committee derivative standing to bring avoidance actions and does not foreclose the relief requested. ASF's frivolous arguments seeking to discredit this overwhelming consensus underscore its profound conflict of interest and that, left to its own devices, ASF will elevate its interest in protecting the assets of the Parishes at the expense of the estate and its creditors.

---

[4] As a debtor-in-possession, ASF owes a fiduciary duty to its creditors. Although canon law may require ASF and the Archbishop to protect the interests of the parishes, ASF has elected to submit itself to the bankruptcy process which clearly requires ASF to subordinate those interests to those of its creditors.

**A.** *Hartford Underwriters* **Addresses the Standing of an Administrative Creditor Under Section 506(c) and Expressly Leaves Intact Authority That Permits Granting Derivative Standing to a Creditors' Committee.**

ASF mischaracterizes *Hartford Underwriters Ins., Co. v. Union Planters Bank, N.A.,* 530 U.S. 1 (2000) as controlling law on the issue of derivative standing. ASF Opp. at 18. In fact, the Supreme Court explicitly stated that it was *not* deciding the issue of a creditor or creditors' committee derivative right to bring avoidance actions:

> **We do not address whether a bankruptcy court can allow other interested parties to act in the trustee's stead in pursuing recovery under § 506(c).** *Amici* American Insurance Association and National Union Fire Insurance Co. draw our attention to **the practice of some courts of allowing creditors or creditors' committees a derivative right to bring avoidance actions when the trustee refuses to do so, even though the applicable Code provisions,** *see* **11 U.S.C. §§ 544, 545, 547(b), 548(a), 549(a), mention only the trustee.** *See, e.g., In re Gibson Group, Inc.,* 66 F. 3d 1436, 1438 (6th Cir. 1995). **Whatever the validity of that practice, it has no analogous application here, since petitioner did not ask the trustee to pursue payment under § 506(c) and did not seek permission from the Bankruptcy Court to take such action in the trustee's stead.** Petitioner asserted an independent right to use § 506(c), which is what we reject today. *Cf. In re Xonics Photochemical, Inc.,* 841 F.2d 198, 202-203 (7th Cir. 1988) (holding that creditor had no right to bring avoidance action independently, but noting that it might have been able to seek to bring derivative suit).

*Id.* at 13 n. 5 (emphasis added). Clearly, the Supreme Court did not decide whether a bankruptcy court can grant derivative standing to an interested party upon request where the trustee or debtor has refused to act. The Supreme Court did not decide who may act in place of "the trustee"

7

under 506(c), much less under sections 544, 547, 548, and 549. Moreover, the cases favorably cited by the Supreme Court recognize derivative standing.[5]

In *Hartford,* the Supreme Court affirmed denial of a surcharge sought by an administrative claimant/insurer under section 506(c) of the Bankruptcy Code. Reviewing the plain language of the statute, which states that "the trustee may recover from property securing an allowed secured claim the reasonable costs . . . ," the court held that an administrative claimant has no independent right under 506(c) to seek payment of its claim. *Id.* at 14. ASF simply misrepresents the Supreme Court's holding when it states: "*Hartford* overruled any decision which awards derivative standing to any party other than a trustee or debtor-in-possession." ASF Opp. at 20. First, as set forth above, the Supreme Court expressly cautioned it was not ruling on derivative standing by a Committee. *Id.* ("We do not address whether a bankruptcy court can allow other interested parties to act in the trustee's stead."). *Hartford* merely held that an administrative claimant could not independently seek recovery under 506(c). *Id.* at 14. ("We conclude that 11 U.S.C. § 506(c) does not provide an administrative clamant an independent right to use the section to seek payment of its claim." Second, *Hartford* made clear that its focus was on recognition of a statutory right, as opposed to a derivative right upon request to the bankruptcy court. *Id.* ("Indeed, if administrative claimants were free to seek recovery on their own, they could proceed even where the trustee himself planned to do so.").

---

[5] ASF criticizes numerous cases as "pre-*Hartford*" from the majority of circuits that have embraced derivative standing granted to a creditor or creditors' committee upon motion, including *In re Gibson Group, Inc.*, 66 F. 3d 1436 (6th Cir. 1995) (derivative standing furthers congressional purpose of avoidance actions; reversing dismissal of adversary proceeding). ASF Opp. at 27. However, the Supreme Court itself did not criticize, much less overturn, the case.

*Hartford* does not constrain this Court from exercising its equitable power consistent with the Bankruptcy Code.

**B.     The *Fox* Decision Is Not Controlling and Is Not Followed By Courts Within the Tenth Circuit.**

ASF relies on *United Phosphorous, Ltd. v. Fox (In re Fox),* 305 B.R. 912 (10th Cir. BAP 2004) to misinform the Court that the Tenth Circuit has held that bankruptcy courts lack authority to grant derivative standing to a creditors' committee. ASF Opp. at 16. In *Fox,* the Bankruptcy Appellate Panel affirmed a bankruptcy court's denial of derivative standing to a creditor seeking to avoid an alleged fraudulent transfer by the debtor to his wife. The court denied derivative standing sought by the creditor based on a strict statutory construction of section 548 of the Bankruptcy Code, which states that "the trustee may avoid . . . ," and the court's reading of the *Hartford* case as only allowing trustees to assert statutory remedies based on the plain terms of the statute. *In re Fox,* 305 B.R. at 914-15.

*Fox* is not binding on this Court. The decision has not been followed by subsequent decisions within or outside of the Tenth Circuit and therefore has no persuasive weight. The *Fox* case is the only appellate decision contrary to the "longstanding, and nearly universally recognized" practice of authorizing the prosecution of actions on behalf of the estate by a committee upon a showing that the action is in the interests of the estate. *Adelphia Comm. Corp. v. Bank of America (In re Adelphia Comm. Corp.),* 330 B.R. 364, 373 n. 16 (Bankr. S.D.N.Y. 2005) (collecting cases and granting derivative standing to creditors' committee; observing that *Fox* is the only outlier). *Fox* fails to recognize the bankruptcy court's equitable powers that are entirely consistent with the Bankruptcy Code, read as a whole, and public policies that are the

9

foundation of the Code.  In particular, sections 1103(c)(5), 1109(b), and 503(b)(3)(B) of the

Bankruptcy Code each support granting derivative standing to a committee as an equitable

remedy where the trustee or debtor unreasonably refuses to bring an avoidance claim.[6]  *See*

*Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.),* 330 F. 3d 548,

560-66 (3d Cir. 2003).  These provisions are part of the broader framework of the Code and

demonstrate congressional intent to give committees a greater role in the reorganization process

where necessary and appropriate.  *Id.* at 560.  *Fox* even agreed that there are good policy reasons

for granting derivative standing to a committee, but refused to acknowledge the court's authority

to do so.  *In re Fox,* 305 B.R. at 916.  *Fox* is not persuasive and its rationale for denying all

derivative standing, whether by court order or by stipulation, is not supported by Supreme Court

precedent or the Bankruptcy Code.  If ASF's argument is accepted by this Court, the bankruptcy

estate's ability to recover fraudulent or preferential transfers made by debtors that are religious

organization to insiders, where the debtor refuses to initiate such suits, could be crippled because

of the First Amendment issues implicated by the appointment of a trustee.

      The Tenth Circuit and courts within it have consistently agreed with the majority of

circuits that recognize an implied right of a creditors' committee to bring avoidance actions on

behalf of the estate where the debtor in possession has unjustifiably failed to bring such an action

and court approval is sought.  Seven years after *Hartford* was decided, in *Hill v. Akamai Techs.,*

*Inc. (In re MS55, Inc.),* 477 F. 3d 1131, 1139 (10th Cir. 2007), addressing a financing order and

---

[6] *See* Bankruptcy Code § 1103(c)(5) (committee powers to perform such other services as are in the interest of those
represented), § 1109(b) (committee right to be heard on any issue), and § 503(b)(3)(B) (expenses to creditor that
recovers, after court approval and for the benefit of the estate, property transferred or concealed by the debtor).

the rights of a chapter 7 trustee after conversion, the Tenth Circuit cited *Cybergenics* with

approval:

> **As a matter of law, a creditors' committee does not have its own right to bring avoidance actions.** *See, e.g. Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery,* 330 F.3d 548, 563 (3d Cir.2003) (stating that "§ 1103(c)(5) does not confer the sort of blanket authority necessary for the Committee independently to initiate an adversarial proceeding, including one under § 544(b)"). **But courts have "permitted creditors' committees to bring actions in the name of the debtor," usually only "in connection with actions against insiders or other persons that the debtor in possession has refused or is reluctant to sue."** Collier on Bankruptcy ¶ 1103.05[6][a] (emphasis added). Thus, as the trustee noted, any rights the creditors' committee has to an avoidance action are derivative of the debtor and the estate's claims.

*Id.* (emphasis added). The Tenth Circuit characterized itself as "among those courts to allow a

committee to bring such an action." *Id.* at 1139 n. 9 ("We note the committee's right to bring an

avoidance action is not without question. Although we are among those courts to allow a

committee to bring such an action, *see Starzynski v. Sequoia Forest Indus.,* 72 F. 3d 816, 821

(10th Cir. 1995),[7] recent Supreme Court precedent may undermine the practice . . . Since

*Hartford,* however, other circuits have continued to allow committees to bring avoidance actions.

[Citations].").

Courts within the Tenth Circuit uniformly acknowledge their authority to grant derivative

standing under prescribed circumstances and consistent with other circuits. In *Springs East Land*

---

[7] The Tenth Circuit approved derivative standing of a creditors' committee in dicta. *Starzynski v. Sequoia Forest Indus.,* 72 F. 3d at 821 (adversary proceeding brought by liquidating agent barred by section 546; "[A] creditors' committee or even an individual creditor may, with leave of the bankruptcy court, initiate avoidance and other actions when the debtor-in-possession has failed to do so.").

*Co., LLC v. Goss (In re Ellicott Springs Res., LLC)*, 485 B.R. 626 (Bankr. D. Colo. 2013), the

court stated:

> Several circuit level courts have "found an implied but qualified
> right under certain circumstances for creditors, through 'derivative
> standing,' to pursue . . . claims that otherwise belong exclusively to
> the trustee. . . . " Although the Tenth Circuit has yet to weigh in on
> this precise issue, the court in *Terra Bentley* cited above [2011
> Bankr. LEXIS 806 (Bankr. D. Kan. Mar. 2, 2011)] saw **no reason
> to believe the Tenth Circuit would disagree with the
> unanimous view of the Circuits that have decided the question**"
> that creditors have the ability to request derivative standing to
> prosecute estate causes of action.
>
> Furthermore, the Tenth Circuit in prior opinions has suggested in
> dicta that such standing should be available: "[A] creditors'
> committee or even an individual creditor may, with leave of the
> bankruptcy court, initiate avoidance or other actions when the
> debtor-in-possession has failed to do so." More recently, the Tenth
> Circuit commented that it is "among those courts to allow a
> committee to bring" an action, and that "other circuits have
> continued to allow committees to bring avoidance actions."

*Id.* at 636 (emphasis added; collecting cases from the Eighth, Second, Third, Fifth, Sixth,

Seventh, and Ninth Circuits both pre- and post-*Hartford*) (granting creditor's motion for standing

to prosecute adversary proceeding in chapter 7 with trustee's consent). While not addressing

*Hartford* directly, the *Ellicott Springs* court adopted the reasoning of the Eighth Circuit in *In re

Racing Servs., Inc.,* 540 F. 3d 892 (8th Cir. 2008), which specifically held that *Hartford* does not

foreclose derivative standing and set forth the elements required to establish a right to derivative

standing. *In re Ellicott Springs,* 485 B.R. at 637.

In *Village of Overland Pointe, LLC v. Terra Bentley II, LLC (In re Bentley II, LLC)*, 2011

Bankr. LEXIS 806 at *10-15 (Bankr. D. Kan. Mar. 2, 2011), the bankruptcy court addressed

derivative standing of a chapter 11 creditor that filed an adversary proceeding to avoid a

mortgage. The court embraced the standards for derivative standing followed by the Eighth and

Sixth Circuit after acknowledging that the Tenth Circuit has not specifically ruled on the

question. The *Bentley II* court reasoned:

> Village correctly points out that in bankruptcy cases, many courts
> have found an implied but qualified right under certain
> circumstances for creditors, through "derivative standing," to
> pursue avoidance clams that otherwise belong exclusively to the
> trustee or the debtor-in-possession. [Citations] . . . The Tenth
> Circuit has apparently not yet ruled on the question. **No Circuit
> court appears to have concluded derivative standing for
> creditors is never permissible, [] and the Court sees no reason
> to believe the Tenth Circuit would disagree** with the unanimous
> view of the Circuits that have decided the question.

*Id.* at *10-11 (emphasis added; collecting cases and citing *In re Racing Servs. Inc.,* as joining the

Third Circuit and others in recognizing derivative standing upon a showing of specified

elements). The *Bentley II* court concluded that the creditor failed to demonstrate that derivative

standing was appropriate because the creditor was not acting on behalf of the estate, the creditor

made no demand on the debtor to pursue the avoidance claim, and the creditor could not

demonstrate that the debtor's refusal to pursue such claim was unjustified. *Id.* at *16-19. *See

also Rindelsbach v. Jones,* 532 B.R. 850, 858 (D. Utah 2015) (citing *Hartford, In re MS55, In re

Ellicott Springs,* and *In re Bentley II, supra,* and agreeing with the conclusion of the Bankruptcy

Court for the District of Kansas that "there is 'no reason to believe the Tenth Circuit would

disagree with the unanimous view of the Circuits that have decided the question.'").

    ASF makes preposterous attempts to distinguish or discredit each of these cases as

"completely inapplicable" or "badly reasoned." ASF Opp. at 30. ASF complains, for example,

that in *Ellicott Springs,* the trustee stipulated to a creditor's derivative standing on behalf of the estate—which ASF emphasizes it will not do.  However, if the Court followed *Fox,* derivative standing would be equally unavailable by stipulation because the strict language of section 544 would limit any statutory right of action to the trustee alone.  The factual variations in these cases do not alter the clear and uniform recognition by the Tenth Circuit and courts within the circuit that derivative standing remains viable twenty years after *Hartford* (and sixteen years after *Fox*).  These cases favorably cite the analysis of derivative standing employed by the Third Circuit in *Cybergenics*, rejecting an overly narrow construction of the Bankruptcy Code and recognizing the bankruptcy court's authority to grant derivative standing to non-trustees to pursue avoidance actions.

C.  **ASF's Criticism of Other Circuits and Lower Court Cases That Unanimously Recognize the Practice of Granting Standing to a Creditors' Committee Is Misplaced.**

ASF makes a futile attempt to distinguish or discredit the circuit authority that uniformly recognizes a bankruptcy court's authority to grant derivative standing to a creditors' committee.  ASF Opp. at 21 ("These decisions from other circuits either fail to address the Supreme Court's unanimous *Hartford* decision, or are inapplicable or distinguishable for other reasons (or just plain wrong)."); and ASF Opp. at 21-29 (describing cases).  Notably, ASF does not, and cannot, identify a single circuit, before or since *Hartford,* that has rejected the practice of granting derivative standing to pursue avoidance actions under prescribed circumstances.

Collier on Bankruptcy explains the current status of derivative standing as follows:

> Before the Supreme Court's decision in *Hartford Underwriters,* numerous courts recognized the bankruptcy courts' authority to

14

permit a party in interest to commence litigation on behalf of the estate in the trustee's stead if certain conditions are satisfied. **Following *Hartford Underwriters*, courts have continued to recognize this authority. The leading case is the Third Circuit's *en banc Cybergenics* decision.**

\* \* \*

In affirming the doctrine of derivative standing, the Court of Appeals for the Third Circuit [*Cybergenics*] has ensured that bankruptcy courts have an important tool to effectuate the fair and efficient administration of bankruptcy cases. Other courts have embraced the Third Circuit's approach.

7 Collier on Bankruptcy ¶ 1109.05 (16th ed. 2020) (The Right to Initiate Litigation on Behalf of the Estate; emphasis added).

In *Cybergenics,* 330 F. 3d 548, the Third Circuit painstakingly examined the bankruptcy court's authority to allow a creditors' committee to bring fraudulent transfer claims on behalf of the estate in connection with a leveraged buyout where the debtor refused to bring the claims. The Third Circuit began its analysis by looking at the effect of *Hartford* and whether the Supreme Court's decision precluded derivative standing of the committee. ***It does not.*** *Id.* at 558-59. The Third Circuit proceeded by examining the plain text of the Bankruptcy Code based on individual provisions and as a whole. Section 544(b) does not preclude the bankruptcy court from authorizing derivative standing so the question was whether its use as an equitable remedy is consistent with the Bankruptcy Code's statutory scheme. *Id.* at 559. As discussed above, sections 1109(b), 1103(c)(5), and 503(b)(3)(B) support the participation of interested parties and the practice of granting derivative standing to committees under the court's guidance. *Id.* at 560-66 ("For all of the foregoing reasons, we are satisfied that the most natural reading of the Code is that Congress recognized and approved of derivative standing for creditors' committees.

15

Sections 1109(b) and 1103(c)(5), taken together, evince a Congressional intent for committees to play a robust and flexible role in representing the bankruptcy estate, even in adversarial proceedings.").

The Third Circuit did not stop there. It analyzed the bankruptcy court's authority as a court of equity. *Id.* at 568 (policy concern of 544(b) is that trustee acts as "gatekeeper" for avoidance actions; court may use its equitable power to substitute a committee to pursue an avoidance action for the estate's benefit when the trustee is delinquent). Eventually, the Third Circuit considered whether derivative standing advanced Congressional goals under the Code. It does. *Id.* at 572-79. Finally, the *Cybergenics* court reviewed the potential benefits, drawbacks, and potential substitutes for derivative standing and concluded that the practice is a valuable tool to ensure that creditors' claims are not frustrated by fraudulent transfers. *Id.* at 579. In particular, the court noted that chapter 11 cases often give rise to "the proverbial problem of the fox guarding the henhouse" where the debtor remains in possession and its management "bears a fiduciary duty to avoid fraudulent transfers that it itself made." *Id.* at 573. Under these circumstances, conflicts of interest arise and "the real losers are the unsecured creditors whose interests avoidance actions are designed to protect." *Id.*

As Collier observes, the Third Circuit's decision in *Cybergenics* is the leading case that is followed by other courts and it ensures fair and efficient administration of bankruptcy cases. The "high criticism" of *Cybergenics* to which ASF refers (ASF Opp. at 22-23) appears to be limited to the dissenting opinion in *Cybergenics*, a journal review, and the *Fox* decision. However, the rationale of *Cybergenics* supporting derivative standing has been adopted by innumerable courts.

16

*See, e.g., In re Racing Servs. Inc.,* 540 F. 3d 892, 898 and n. 7 (8th Cir. 2008) (reviewing *Hartford Underwriters* and *Cybergenics*; holding that derivative standing to pursue avoidance actions is available to creditor when debtor is unable or unwilling to do so); *Official Comm. of Equity Security Holders v. Official Comm. of Unsecured Creditors (In re Adelphia Comm. Corp.),* 544 F. 3d 420, 425 (2d Cir. 2008) (bankruptcy court has authority both to confer derivative standing and to withdraw derivative standing from the equity committee based on interests of the estate); *In re Adelphia Comm. Corp.,* 330 B.R. at 373-74 (following *Cybergenics* and collecting cases; "The Second Circuit has held that provisions of the Bankruptcy Code imply a qualified right for creditors' committees to sue on behalf of an estate with bankruptcy court approval."); *In re iPCS, Inc.,* 297 B.R. 283, 288-90 (Bankr. N.D. Ga. 2003) (reviewing *Hartford Underwriters* and *Cybergenics*: "The Court is persuaded by the reasoning employed by the majority of the Third Circuit Court of Appeals in the *Cybergenics* decision;" granting committee standing). The Third Circuit's position in favor of derivative standing under specified circumstances is also the view expressed by Colliers and supported by other leading commentators.[8]

## II.     THE RELIGIOUS FREEDOM RESTORATION ACT IS NOT A DEFENSE TO THE ESTATE'S CLAIMS.

The RFRA defense advanced by the Parishes and the Trusts (Parish Opp. At 16-22) fails as a matter of law for two reasons. First, RFRA does not create a cause of action against private

---

[8] *See, e.g.,* Alan R. Lepene & Sean A. Gordon, *The Case for Derivative Standing in Chapter 11: "It's the Plain Meaning, Stupid,"* 11 Am. Bankr. Inst. L. Rev. 313 (2003) (supporting derivative standing).

17

DOCS_SF:103803.8 05066/001

non-government actors.  Second, RFRA may not be applied to modify, preempt or trump state law.

**A.**     **RFRA Does Not Create a Cause of Action or Defense Against Non-Government Actors.**

The Parishes and the Trusts contend that the Motion must be denied because RFRA is an absolute defense to the claims the Committee seeks standing to pursue.  This argument is meritless; RFRA only creates a cause of action or defense against "a government," and the Committee is a private party.

**1.**     **The plain language of RFRA only permits a defense against "a government."**

The interpretation of any statute begins with the text.  *Allen ex rel. Martin v. LaSalle Bank, N.A.*, 629 F.3d 364, 367 (3d Cir. 2011); *In re Lobera*, 454 B.R. 824, 836-37 (Bankr. D.N.M. 2011).  RFRA provides:

> (a)     In General.  ***Government*** shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

> (b)     Exception.  ***Government*** may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

> (c)     Judicial relief.  A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief ***against a government***.  Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

18

42 U.S.C. § 2000bb-1 (emphasis supplied).

RFRA defines "government" to include "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States." 42 U.S.C. § 2000bb-2(1). RFRA "applies to all Federal law, and the implementation of that law." 42 U.S.C. § 2000bb-3. RFRA's "Judicial relief" section provides that "[a] person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000cc-2.

Three United States Courts of Appeals have concluded that this language makes clear that Congress intended RFRA to apply only in cases where the "government" is a party. *Listecki*, 780 F.3d at 737 (7th Cir. 2015); *McGill,* 617 F.3d at 411-12 (6th Cir. 2010); *Sutton,* 192 F.3d at 834 (9th Cir. 1999) . These decisions emphasize that the statute prohibits the *"Government"* from substantially burdening the free exercise of religion except when that burden is justified by a "compelling governmental interest." 42 U.S.C. § 2000bb-1 (emphasis added); *McGill*, 617 F.3d at 411. The statute provides relief *"against a government"* to parties asserting RFRA as a claim or defense. 42 U.S.C. § 2000cc-2 (emphasis added); *Listecki,* 780 F.3d 737 ("If the government is not a party, no one can provide the appropriate relief."). In addition, Congress emphasized the importance of the government's presence in the findings and purposes section of RFRA. Specifically, Congress found that "governments should not substantially burden religious exercise without compelling justification" and the statute provides that one of its purposes is to "provide a claim or defense to persons whose religious exercise is

19

substantially burdened by government."  42 U.S.C. § 2000bb (emphasis added); *McGill,* 617

F.3d at 411.

Furthermore, the burden-shifting framework set forth in RFRA requires ***"the***

***Government"*** to "demonstrate[]" that its actions constitute the least restrictive means of pursuing

a compelling governmental interest.  42 U.S.C. § 2000bb-1 (emphasis added).  RFRA defines

"demonstrates" as "meet[ing] the burdens of going forward with the evidence and of

persuasion."  42 U.S.C. § 2000bb-2(3).  "It is self-evident that the government cannot meet its

burden" under this framework "if it is not a party to the suit."  *Listecki,* 780 F.3d at 736.  "A

private party cannot step into the shoes of the 'government' and demonstrate a compelling

governmental interest and that it is the least restrictive means of furthering that compelling

governmental interest because the statute explicitly says that the 'government' must make this

showing."  *Id*; *see also Rweyemamu v. Cote*, 520 F.3d 198, 203 n.2 (2d Cir. 2008) ("Where, as

here, the government is not a party, it cannot 'go[] forward' with any evidence." (quoting

*Hankins v. Lyght,* 441 F.3d 96, 114-14 (2d Cir. 2006) (Sotomayor, J. dissenting)).

If the statutory test was not clear and persuasive enough, its legislative history confirms

that the government must be a party in order for the statute to apply.  *See In re Lord Abbett Mut.*

*Funds Fee Litig.*, 553 F.3d 248, 254 (3d Cir. 2009) ("Where the statutory language does not

express Congress's intent unequivocally, a court traditionally refers to the legislative history . . .

in an attempt to determine the congressional purpose.").  The Senate Committee on the Judiciary

issued a report on RFRA that "began by stating that the nation was founded by those with a

conviction that they should be free to practice their religion 'free from Government interference'

20

and 'Government actions . . . ' In describing RFRA's purpose, the report refers to 'government actions,' 'only governmental actions,' and 'every government action.'" *Listecki,* 780 F.3d at 737 (quoting S. Rep. No. 103-111, at 4, 8-9 (1993), reprinted by 1993 U.S.C.C.A.N. 1892, 1894).

The reliance on the Second Circuit's interpretation of RFRA in *Hankins,* 441 F.3d at 103-04 is misplaced.[9] *Hankins* involved a suit brought under the Age Discrimination in Employment Act (ADEA). The Second Circuit permitted a private defendant to assert a RFRA defense because, hypothetically, the government, through the EEOC, could have been a party to the action. *Id.* at 103. The logic of *Hankins* is suspect. *Hankins* relies on the assumption that "the substance of" federal statutory discrimination "prohibitions cannot change depending on whether it is enforced by the EEOC or an aggrieved private party." *Id.* at 103. There is no authority for such an assumption. Indeed, as then-Judge Sotomayor explained in her dissent, "[i]f RFRA amends all federal statutes as they apply to suits in which the government is a party, then the substance of [a statute's] prohibitions most certainly *can* change depending on who enforces it." *Id.* at 115 (Sotomayor, J., dissenting) (emphasis in original). Moreover, another panel of the Second Circuit has since retreated from the holding in *Hankins* because it could "not understand how" RFRA "can apply to a suit between private parties, regardless of whether the government is capable of enforcing the statute at issue." *Rweyemamu*, 520 F.3d at 203 n.2.

---

[9] Parish Opp. at 17, n.75. *EEOC v. Catholic Univ. of Am.,* 317 U.S. App. D.C. 343, 83 F.3d 455 (1996), is also inapposite as the government was a party and the decision does not even consider the issue of whether RFRA only applies to the government.

DOCS_SF:103803.8 05066/001

## 2. The Committee is not a government actor subject to a claim or defense under RFRA.

A creditors' committee in a bankruptcy proceeding is not included in the definition of "government" under RFRA. *Id*. § 2000bb-2(1) ("The term 'government' includes a branch, department, agency, instrumentality and official (or other person acting under color of law) of the United States, or of a covered entity."). The Committee is not a branch, department, agency or instrumentality of the United States. Nor is it an official (or other person acting under color of law) of any of the foregoing. There are no cases holding that a creditors' committee is "a government" under RFRA.

The Bankruptcy Code also treats creditors' committees as private, non-governmental actors. For example, a creditors' committee is not included in the Bankruptcy Code's definition of "governmental unit," which provides:

> The term "governmental unit" means United States; State;
> Commonwealth; District; Territory; municipality; foreign state;
> department, agency, or instrumentality of the United States (but not a
> United States trustee while serving as a trustee in a case under this title), a
> State, a Commonwealth, a District, a Territory, a municipality, or a foreign
> state; or other foreign or domestic government.

11 U.S.C. § 101(27).[10]

The Parishes and Trusts acknowledge that the Bankruptcy Code, at its core, furthers creditors' private interests and not those of the government, and that the Committee seeks to maximize a recovery for its private constituents. Parish Opp. at 21-22. Nevertheless, the

---

[10] The Bankruptcy Code's treatment of a creditors' committee as a nongovernmental entity is underscored by the fact that only "persons" are eligible to serve on a creditors' committee and the Bankruptcy Code's definition of "person" specifically excludes "governmental units," with a narrow exception that permits only certain government creditors to serve on committees. *See* 11 U.S.C. § 101(45). No governmental units are members of the Committee. [*See Notice of Appointment of Committee of Unsecured Creditors* [Bankruptcy Case Docket No. 53].

Parishes and Trusts argue that "putting this private/government distinction aside" (Parish Opp. at 22), the Court should deny the Committee standing under RFRA based on an analysis of compelling interests. The Court should reject this.

### 3. The RFRA defense against the Committee fails as a matter of law.

As the plain language of RFRA creates a cause of action or defense only against "a government" and a creditors' committee is a private party, the RFRA defense must fail as a matter of law. The plain language of a statute controls its interpretation, and federal courts must first look to the language of a statute to determine its meaning. *See e.g., Caminetti v. U.S.*, 242 U.S. 470, 485 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed . . . "); *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (holding that when the language of a statute is clear, courts should enforce it pursuant to its literal meaning).

"[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank,* 530 U.S. at 6; *Touche Ross & Co. v. Redington*, 442 U.S. 560, 571 (1979) (noting that where plain language of the statute did not provide for a cause of action, courts must assume Congress did not intend to create one).

The fundament principle of separation of powers is violated if courts ignore the plain language of the statute and create a right of action or defense where it is not provided for in the statute. This is an impermissible judicial rewrite of the statute. *See id.* at 568 ("The question of the existence of a statutory cause of action is, of course, one of statutory construction. . . . And

23

as with any case involving the interpretation of a statute, our analysis must begin with the language of the statute itself."); *Int'l Union of Operating Eng'rs, Local 150 v. Ward*, 563 F.3d 276, 282 (7th Cir. 2009) ("Whether express or implied, however, we remain mindful that it is Congress, not this or any other court, that creates private causes of action to enforce federal law."), *cert. denied*, 558 U.S. 947 (2009); *Alexander v. Sandoval*, 532 U.S. 275, 285-86 (2001) (Without plain congressional intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.").

Permitting the Parishes and Trusts to assert RFRA as a defense to claims by a private party would require this Court to create a defense in violation of the plain meaning of the statute and the constitutionally mandated separation of powers. The Objectors have cited no case in which the Tenth Circuit Court of Appeals, or any court within the Tenth Circuit has applied RFRA to allow a claim or defense against a non-government actor and the Committee has been unable to locate one.

4. **The Committee, as a private party, is not a government actor because it is neither acting "under color of law" nor "willfully participating in joint action with government officials."**

The next question is whether the Committee is the "government" under RFRA. The Seventh Circuit's decision in *Listecki* is the only circuit decision to consider whether the Committee is the "government" for RFRA purposes. *Listecki* held unequivocally that it is not.[11]

---

[11] The issue was first considered by the bankruptcy court, which held the creditors' committee was not the government and was not acting under color of law as the phrase is used in RFRA. *Listecki v. Official Comm. of Unsecured Creditors (In re Archdiocese of Milwaukee)*, 485 B.R. 385 (Bankr. E.D. Wis. 2013). The district court reversed concluding the committee was the "government" for RFRA purposes because it acted under color of law pursuant to authority granted to it by the bankruptcy court. *Listecki v. Official Comm. of Unsecured Creditors (In re*

RFRA defines "government" to include "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States . . . " 42 U.S.C. § 2000bb-2(1). The Parishes and Trusts appear to argue generally that a creditors' committee, including this Committee, acts "under color of law" and therefore is "government" because: (i) it is created pursuant to the Bankruptcy Code and exercises its powers under the Code; (ii) it is appointed by the United States Trustee, an official of the Justice Department; (iii) it can only employ professionals with court approval; (iv) it is compensated by the debtor's estate; and (iv) the Committee is the same as a trustee and the trustee is a government actor.[12] These arguments are unsupportable and were considered and rejected in *Listicki*.

The phrase "color of law" in RFRA mirrors that found in 42 U.S.C. § 1983, which applies to those acting "under color of" any statute, ordinance, regulation, etc. Both the Seventh and Ninth Circuits have found that this word choice is not coincidental and held that Congress intended for RFRA's "color of law" analysis to overlap with Section 1983 analysis. *Sutton*, 192 F.3d at 834-35*; Listecki,* 780 F.3d at 738 (both interpreting RFRA "under color of law" in the same way as Section 1983 because "[w]hen a legislature borrows an already judicially interpreted phrase from an old statute to use it in a new statute, it is presumed that the legislature intends to adopt not merely the old phrase but the judicial construction of the phrase" (internal citation omitted); *see also Brownson v. Bogenschultz,* 966 F. Supp. 795, 797 (E.D. Wis. 1997) (interpreting "color of law" under RFRA using Section 1983 analysis). Therefore, it is

---

*Archdiocese of Milwaukee*), No. 13-C-179, 2013 U.S. Dist. LEXIS 106392, at *18, 496 B.R. 905 (E.D. Wis. July 29, 2013). The district court was reversed by the Seventh Circuit.

[12] Parish Opp. at 18-19.

DOCS_SF:103803.8 05066/001

appropriate for this Court to turn to Section 1983 precedent.  Moreover, the Court must be

mindful of the overlap between a governmental actor and someone acting under the color of law

and that courts use these terms interchangeably.  *Listecki,* 780 F.3d at 738; *see Lugar v.*

*Edmondson Oil Co*., 457 U.S. 922, 935 (1982).

In the Tenth Circuit for conduct to be "fairly attributable to the state," when private

parties are involved in a section 1983 action, two conditions must be met.  "First, the

'deprivation must be caused by the exercise of some right or privilege created by the State or by

a rule of conduct imposed by the State or by a person for whom the state is responsible.'

Second, the private party must have 'acted together with or . . . obtained significant aid from

state officials or engaged in conduct otherwise attributable to the State.'"  *Pino v. Higgs*, 75 F.3d

1461, 1465 (10th Cir.1996) (quoting *Wyatt V. Cole* , 504 U.S. 158, 162); *see also*, *Gallagher v.*

*Neil Young Freedom Concert*, 49 F.3d 1442 (10th Cir. 1995) (delineating four tests to determine

whether private parties should be deemed state actors when conducting a state action analysis:

(1) the public function test, (2) the nexus test, (3) the symbiotic relationship test, and (4) the joint

action test).

In *Listecki,* the Seventh Circuit based its holding that the Committee was not acting under

color of law on essentially the same test.

> The Supreme Court has set forth various tests to use when deciding
> whether someone is a governmental actor, including the
> "symbiotic relationship test, the state command and
> encouragement test, the joint participation doctrine, and the public
> function test."  (citations omitted).  *Rodriguez v. Plymouth*
> *Ambulance Serv.*, 577 F.3d 816, 823-24 (7th Cir. 2009).  But "[a]t
> its most basic level, the state action doctrine requires that a court
> find such a 'close nexus between the State and the challenged

26

action' that the challenged action 'may be fairly treated as that of the State itself.'"  *Id*. at 823 (quoting *Jackson v. Metro Edison Co*., 419 U.S. 345, 351, 95 S. Ct. 449, 42 L. Ed. 2d 477 (1974)).

*Listecki,* 780 F.3d 731, 738.

The Seventh Circuit's explanation of why a creditors' committee cannot be considered to be acting under color of law is instructive:

> First, the Archdiocese argues that the court and the Trustee collectively appoint and monitor a committee's makeup which shows a close nexus to governmental action.  Yet, none of the individuals who make up the Committee are governmental actors.  Each is a private, individual creditor who was sexually abused by the clergy.  Neither is the process of appointing this Committee, nor committees in general, evidence of a close nexus.  A committee is usually made up of the seven largest unsecured creditors.  11 U.S.C. § 1102(b)(1).  They became creditors through their own private transactions with the debtor and choose to be appointed to the committee, and that makes them eligible for appointment. The U.S. Trustee, admittedly a governmental actor, appoints the committee in the first instance, as it did here.  *See* 11 U.S.C. § 1102 (a)(1). Appointing a committee is one of the ways that the Trustee is able to perform its duty and "supervise" the bankruptcy cases.  *Id.*; 28 U.S.C. § 586(a)(3)(E).  But upon the "request of a party in interest and after notice and a hearing, the court may order the United States trustee to change the membership of a committee."  11 U.S.C. § 1102 (a)(4).  So, a committee is a combination of private decisions, Trustee appointment, and court supervision, with the private actions providing the qualifying criteria for appointment.  This is not action that can be "fairly treated as that of the State itself."  Just because the court appoints an entity and supervises some of its actions does not make it a governmental actor.  *See Loyd v. Loyd*, 731 F.2d 393, 398 (7th Cir. 1984) (finding court-appointed administer who sold a piece of property pursuant to the court's approval was not governmental actor).

> Moreover, once a committee is created, it takes on a life of its own. The committee can, with the court's approval, employ one or more attorneys, accountants, or other agents to represent or perform services for the committee.  11 U.S.C. § 1103(a).  Here, the Committee has retained counsel that represents them in this appeal.  Those professionals report to the committee, not the Trustee or the court.  The committee has an attorney-client relationship with the attorney.  Neither the Trustee nor the

27

court is involved. All of a committee's expenses, and the fees and expenses of the professionals that the committee hires, are paid for by the Estate and not the government. The Trustee can weigh in, and the court has input, but the money ultimately comes from the Estate, rather than the public coffers.

* * *

Perhaps most problematic for the Archdiocese's argument is that a committee represents the larger interests of the unsecured private creditors, and it is to them, and not the Trustee, court, or any governmental actor, that the committee owes a fiduciary duty. *Smart World Techs., LLC v. Juno Online Services,* 423 F.3d 166, 175 n.12 (2d Cir. 2005) ("[C]reditors' committee owes a fiduciary duty to the class it represents, but not to the debtor, other classes of creditors, or the estate."); *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1315-16 (1st Cir. 1993) (same). The committee does not have to act in accordance with the Trustee's or court's wishes. In fact, the committee can, and should, oppose the Trustee if it is acting against the best interests of the unsecured creditors. *See In re Bayou Group*, LLC, 564 F.3d 541, 547 (2d Cir. 2009) (noting both the creditors' committee and bankruptcy court disagreed with Trustee's motion to appoint trustee); *In re Columbia Gas Sys., Inc.*, 33 F.3d 294, 295 (3d Cir. 1994) (noting difference between the committee's and Trustee's position on interpretation of statute). It is beholden to no governmental actor.

780 F.3d 738-739.

The Parishes and the Trusts do not, and cannot, allege that the Committee has acted with any state official, willfully participated in joint action with state officials, or is exercising powers traditionally reserved for the state. A committee acts on behalf of the members of its constituent class and has a fiduciary duty to protect the interests of that class.

Courts have held, in other contexts, that creditors' committees are non-government private parties, and that their actions in connection with a bankruptcy cannot be viewed as governmental actions or as part of a government action. *See In re Dow Corning Corp.*, 255 B.R. 445, 524 (E.D. Mich. 2000) (rejecting the argument that an approved joint plan of reorganization

28

proposed by the debtor and the creditors' committee violated a creditor's constitutional rights and noting, "Appellants have cited no authority that a Bankruptcy Court or any court's approval of an order establishes a governmental action. A governmental action is required to state a constitutional claim and a mere approval of or acquiescence in the initiatives of a **private party** is not sufficient to justify holding the government responsible for those initiatives.") (emphasis added); *In Fuel Oil Supply and Terminaling v. Gulf Oil Corp.*, 762 F.2d 1283, 1284-85 (5th Cir.1985) (holding that a creditors' committee did not have an unconditional right to intervene in an adversary proceeding and stating, "Courts have been hesitant to find unconditional statutory rights of intervention . . . . [t]he statutes that do confer an absolute right to intervene generally confer that right upon the United States or a federally regulatory commission; **private parties** are rarely given an unconditional statutory right to intervene.") (Emphasis added).

The proposed Adversary Proceedings are not suits by the government, or by a private actor acting under color of state law or jointly with the government. To allow the Parishes and Trusts to insulate themselves from claims by a non-government actor like the Committee would require the Court to create a defense which is not provided for in the statute. The creation of such new defense is the sole province of Congress. On the basis of the plain language of the statute, the Parishes and the Trusts may not assert a RFRA defense against the Committee.

### B. RFRA May Not Be Applied to Modify or Preempt State Law.

The Parishes and Trusts ask the Court to apply RFRA to modify or preempt state law. Parish Opp. at 19. This cannot be done as a matter of law. In *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Supreme Court held that RFRA, as applied to state law, was a violation of (1) the

inherent limitations of federalism (*Id.* at 534); (2) the separation of powers (*Id.* at 536), and (3) the procedures for constitutional amendment in Article V of the Constitution (*Id.* at 529). At a bare minimum, RFRA is beyond Congress's power to regulate the states and any attempt to modify, preempt, or trump state law through RFRA is unconstitutional.

At issue in both the RE Trust Complaint and the DLF Trust Complaint is whether the funds held in the RE Trust and the DLF Trust are property of the estate and whether transfers of property from ASF to the Trusts are avoidable fraudulent transfers. While Bankruptcy Code section 541 defines what property of the debtor becomes part of the bankruptcy estate, the nature and extent of the debtor's interest in that property is governed by state law. *See Butner v. United States,* 440 U.S. 48, 55 (1979). In order to determine whether funds transferred to the trusts are property of ASF's estate, the Court must determine, for example, whether the real property and funds transferred by ASF to the Trusts were held in express or resulting trust under New Mexico law prior to the time they were transferred to the Trusts as alleged by the Objectors.

Also at issue in the RE Trust Complaint and the DLF Trust Complaint is whether the assets of the Trusts are available to the estate's creditors pursuant to New Mexico Statute 46A-5-505 and 505A(1) because the Trusts are self-settled and ASF is a beneficiary and whether ASF's fiduciary duties to its creditors under New Mexico law require it to revoke the Trusts pursuant to New Mexico Statute 46A-6-603. RFRA cannot apply to determine the status of property, which is governed by state law. *In re Roman Catholic Archbishop of Portland in Oregon,* 335 B.R. 842, 860 (Bankr. D. Or. 2005) ("Portland") ("I question whether RFRA applies at all to a determination of what is property of the estate under section 541. Section 541 merely defines

30

what property is included in a bankruptcy estate; issues such as ownership of property are determined by application of state law. It is not clear to me how RFRA applies to a determination of a status, that is, ownership of property that is a result of application of state law.").[13]

The estate's fraudulent transfer claims are asserted under New Mexico state law pursuant to Bankruptcy Code section 544(b). While a federal law (Bankruptcy Code section 544(b))[14] enables the trustee (and here, if the Court permits, the Committee) to stand in the shoes of a creditor who can assert a fraudulent conveyance action under state law, the underlying cause of action for the recovery of the fraudulent transfer itself is brought under state law. Any "substantial" burden that is placed on a transferee's religious practice is imposed on it by the recovery of the transfer itself, which is effectuated under state law, not on the grant of standing to the committee. *Boerne* prohibits the application of RFRA to fraudulent transfer claims under state law. The transferee suffers the same burden irrespective of the application of section 544(b) because outside of bankruptcy any creditor of ASF could sue the Trusts to avoid the transfers from ASF under New Mexico law unimpeded by RFRA. Allowing the Parishes and the Trusts to escape liability as the recipients of fraudulent transfers solely as the result of the ASF's election to file a chapter 11 petition contravenes the clear purpose of the Bankruptcy Code and section 544, which is to expand the estate's rights to recover transfers by a debtor, not contract

---

[13] The bankruptcy court in *Portland* added that even if RFRA were applicable, section 541 does not impose a substantial burden on the free exercise of religion because it requires only a determination of who owns the property under state law. 335 B.R. at 860.

[14] Bankruptcy Code section 544 provides, "(1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502 (e) of this title." 11 U.S.C. § 544(b)(1).

them.[15]  As state law may not be re-interpreted through the lens of RFRA, the claim of the

Parishes and Trusts that the Motion must be denied because RFRA constitutes an absolute

defense must fail.

### C.     The Parishes Reliance on *In re Young* is Misplaced.

The central authority relied upon by the Parishes and Trusts to support their argument

that RFRA constitutes a defense is the Eighth Circuit's decision in *Christians v. Crystal

Evangelical Free Church (In re Young)*, 141 F.3d 854 (8th Cir. 1998), *cert denied*, 525 U.S. 811

(1998).  Parish Opp. at 17 n. 73-75.  In *Young,* the Eighth Circuit found *that* RFRA amended the

Bankruptcy Code and "engrafted the additional clause to section 548(a)(2)(A) that a recovery

that places a substantial burden on a debtor's free exercise will not be allowed unless it is the

least restrictive means to satisfy a compelling governmental interest."  *Id*. at 861.  Although the

court there found that avoiding tithes as fraudulent transfers violated RFRA because protecting

the interests of creditors and allowing a debtor a fresh start were not compelling interests, *Young*

is distinguishable on several grounds and has been rejected by the courts within the Tenth

Circuit.

First, the Committee is suing under state law pursuant to section 544 so not only is *Young*

inapplicable, but, as discussed above, under *Boerne*, RFRA is inapplicable to a state law cause of

action.  Additionally, *Young* was decided prior to Congress's subsequent amendment to the

---

[15] *See Committee of Tort Litigants v. Catholic Diocese of Spokane (In re Catholic Diocese of Spokane)*, 329 B.R.
304, 324 n.5 (Bankr. E.D. Wash. 2005) .  ("If application of a particular Code section would constitute a substantial
burden on religion, the appropriate remedy would be dismissal of the bankruptcy case.  The Code is an integrated
statutory scheme.  Bankruptcy debtors who voluntarily choose to participate in that statutory scheme, even those of a
religious nature, should not be able to pick and choose among Code sections."), *reversed in part*, 364 B.R. 81 (E.D.
Wash. 2006).

DOCS_SF:103803.8 05066/001

Bankruptcy Code under the Religious Liberty and Charitable Donation Protection Act of 1998

("RLCDPA"), which amended numerous Bankruptcy Code sections to limit the ability of a

trustee to recover charitable donations made by a natural person to qualified charitable or

religious organizations. *See* 11 U.S.C. §§ 548(a)(2), 548(d)(3), 544(b)(2).[16] If Congress had

intended RFRA to amend Section 548 or any other section of the Bankruptcy Code, as the *Young*

court claimed, RLCDPA would not have been necessary. Furthermore, tithing cases can be

distinguished from avoidance issues raised by the Adversary Proceedings because in the tithing

cases, the individual debtor had no choice about how to give the money to the church and no

matter how tithing was accomplished, the transfer could be avoided by the trustee. Here, ASF

could have avoided the application of fraudulent transfer law by incorporating its Parishes under

civil law decades ago and requiring them to hold title to the real property and financial assets at

issue, or if ASF insisted on holding legal title, doing so pursuant to an express written trust

agreement under state law. (*See* discussion *infra*, at 40).

Courts within the Tenth Circuit have twice considered *Young* and rejected it both times.

*In re Bloch*,

207 B.R. 944, 948 (D. Colo. 1997); *Morris v. Midway S. Baptist Church (In re Newman)*, 203

B.R. 468, 476-78 (D. Kan. 1996) (section 548 does not impose a substantial burden on religion

and even if it did, the interests furthered by section 548 are compelling; tithes recoverable as

---

[16] Congress passed the RLCDPA, Pub. L. No. 105-183 §§ 2, 3(a), June 19, 1998, 112 Stat. 517 amending section 548 to expressly shield "charitable contribution[s] to a qualified religious or charitable entity" from avoidance, provided that "the amount of that contribution does not exceed 15 percent of the gross annual income of the debtor for the year in which the transfer of the contribution is made" or "was consistent with the practices of the debtor in making charitable contributions."

fraudulent transfers).  *See also*, *Listecki*, 780 F.3d at 745-46 (Bankruptcy Code in general and

sections 541, 544, 547 and 548 constitute compelling governmental interests).

In *Wadsworth v. Word of Life Christian Ctr. (In re McGough)*, 737 F.3d 1268, 1277 n. 8

(10th Cir. 2013), the Tenth Circuit provided a strong indication that it would not find the

application of section 548 violates RFRA even where there is incidental impairment to the free

exercise of religion.  In *Wadsworth*, the Tenth Circuit interpreted the RLCDPA (section

548(a)(2)(A)) and considered the following question: if a debtor transfers more than 15% of his

gross annual income to a qualified religious or charitable organization, can trustee avoid the

entire annual transfer or only the portion exceeding 15%?  The Court held that the entire amount

of the transfer was avoidable and noted in dicta, that this result did not violate RFRA because it

"does not burden, let alone substantially burden, legitimate tithing."  *Id*.

### D.       The Bankruptcy Code Serves a Compelling Government Interest.

Even if RFRA were applicable to the Committee, it would not bar application of sections

541, 542, 544 and 548 of the Bankruptcy Code ("Challenged Provisions") because the Code and

these provisions in particular, serve a compelling interest.  *Listecki* 780 F.3d 731, 746) (extensive

discussion of the scope, nature and Supreme Court precedent leading to the conclusion that the

Bankruptcy Code advances a compelling governmental interest); *See In re Newman*, 183 B.R.

239, 252 (Bankr. D. Kan. 1995) ("The compelling nature of the interest is reflected in the fact

that recovery of fraudulent transfers has been a basic tenet of bankruptcy law for 400 years."),

*aff'd*, 203 B.R. 468 (D. Kan. 1996).  They are also the least restrictive means to serve the fairness

interests at the heart of the fraudulent conveyance provisions.  As the *Newman* court noted:

> Section 548(a)(2) draws a line between proper and improper
> diminution in what would seem to be the only practical way: by
> determining whether the quantifiable economic value received by
> the debtor is reasonably equivalent to that of the property
> transferred.  As stated above, this standard is neutral toward
> religion and can operate to avoid non-religious transfers where no
> economic value is received by the debtor.

*Newman*, 203 B.R. 468, 475, n.4 (Bankr. D. Kan. 1996).  *See also In re Meyer*, 467 B.R. 451,

460-61 (Bankr. E.D. Wis. 2012) (Congress "demonstrated a compelling interest in maintaining

an equitable system for the protection of creditors and for permitting debtors to obtain a fresh

start from overwhelming debt."); *In re Navarro*, 83 B.R. 348, 353 (Bankr. E.D. Pa. 1988) (pre-

RFRA; administration of bankruptcy system and protection of legitimate interests of creditors are

compelling governmental interests); *In re Turner*, 193 B.R. 548, 555-56 (Bankr. N.D. Cal. 1996)

(upholding against RFRA challenge § 110(c) of Bankruptcy Code requiring petition preparers to

place social security numbers on documents for filing, while noting compelling governmental

interest in preventing widespread fraud and abuse at expense of poor and unsophisticated).

Accordingly, the application of the Challenged Provisions violates no rights under RFRA.

**E.      Even if RFRA Is Applicable to the Committee, Whether the Adversary
         Proceedings Impose a Substantial Burden, Is a Factual Issue That Can Only
         Be Resolved in Litigation After Discovery.**

The Parishes and Trusts bear the burden of establishing a prima facie claim or defense

under RFRA by showing that the government substantially burdens a sincere religious exercise.

*Kikumura v. Hurley*, 242 F.3d 950, 960 (10th Cir. 2001).  The burden then shifts to the

government to show that the "compelling interest test is satisfied through application of the

challenged law 'to the person'—the particular claimant whose sincere exercise of religion is

35

DOCS_SF:103803.8 05066/001

being substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31, 126 S. Ct. 1211 (2006).

Even assuming arguendo, that the prosecution of the Adversary Proceedings by the Committee could be viewed as an action by "government," clearly the mere prosecution of the claims does not constitute a substantial burden on the free exercise of religion by either the Parishes or the Trusts. Nor have they shown that applying sections 541, 544 and 548 of the Bankruptcy Code would substantially burden their free exercise of religion. *See Portland,* 335 B.R. at 860 (substantial burden is a question of fact not resolvable on summary judgment).

III. **THE ADVERSARY PROCEEDINGS ARE NOT BARRED BY THE FIRST AMENDMENT FREE EXERCISE CLAUSE.**

A. **The Religious Autonomy Doctrine Does Not Apply to Secular Disputes.**

ASF argues that under the religious autonomy doctrine, the First Amendment[17] requires this Court to apply internal church law and religious doctrine (*i.e.*, canon law) to determine the relationship between ASF and its Parishes with respect the secular world, and excuse any requirement to follow the formalities of New Mexico corporate, property or trust law, to determine what is property of the estate. ASF Opp. at 33-41. This is an indefensible argument. No reported decision has held that secular claimants of a religious entity are bound by the internal laws of the religious organization. Indeed, the seminal case articulating the so-called religious autonomy doctrine, and the cornerstone authority in ASF's brief on this issue, makes

---

[17] Even where, as here, RFRA does not apply, the Free Exercise Clause may. *Listecki* ,780 F.3d 731, 741. However, it does not prevent the application of the avoidance and turnover provisions of the Bankruptcy Code, or applicable New Mexico law, as discussed herein.

36

clear the doctrine only applies to internal church disputes and not to a religious organization's relationship to the secular world:

> **In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all.** The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary, religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. **All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it.**

*Watson v. Jones,* 80 U.S. 679, 728-29, 20 L. Ed. 666 (1872) (emphasis added).

ASF asks the Court to rewrite the Supreme Court's quote to add: *and everybody else in the world that comes into contact with or has claims for damages against the religious organization is also bound to submit to it.* ASF Opp. at 34-38. ASF purports to rely on a long line of Supreme Court cases that address resolution of internal property disputes among members, or former members, of religious organizations. None of the cases cited by ASF involve a secular dispute. *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church,* 344 U.S. 94, 73 S. Ct. 143 (1952) (state statute changing who within a church would control a cathedral unconstitutional)); *Kreshik v. Saint Nicholas Cathedral of Russian Orthodox Church,* 363 U.S. 190, 80 S. Ct. 1037, 1037-38 (1960) (same with respect to judicial action); *Presbyterian Church in United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,* 393 U.S. 440, 89 S. Ct. 601 (1969) (dispute between two local churches that had withdrawn from general church organization, and general church, to use of church property, based on whether the

37

general church had abandoned tenets of faith and practice held at time the local churches had affiliated with the general church).

ASF has mischaracterized *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648 (10th Cir. 2002), as recognizing "that the religious autonomy doctrine applies to claims of third parties unaffiliated with the religious organization." ASF Opp. at 37. In *Bryce*, the Tenth Circuit precluded application of Title VII to the wrongful termination and sexual harassment claims of Bryce, ***a female youth minister*** who was openly gay. Although Bryce's partner, Smith, was a co-plaintiff, ASF's omission of the fact that a church youth minister was the primary plaintiff and its attempt to characterize the decision as applicable to persons with no affiliation to the church is disingenuous and misleading.[18] In fact, the decision is based on the well-settled principal that the First Amendment protects from state interference the right of churches to select its clergy, and that this principal prevents the adjudication of Title VII employment discrimination cases brought by ministers against churches. *Id*. at 656. The opinion expressly recognized that the doctrine "does not apply to purely secular decisions, even when made by churches." *Id.* at 657. Additionally, the Court reaffirmed the obvious: the religious autonomy doctrine ***does not*** mean churches are above the law and does not protect them from liability for their torts or liability upon their contracts. *Id*. at 657. The Court stated that employment decisions of churches may be subject to Title VII scrutiny, "where the decision does not involve the church's spiritual functions." *Id.* In *Bryce*, the court ultimately held that Title

_____

[18] The Tenth Circuit observed that even though Smith had no relationship with the church, her Title VII claim was barred as well because the church's right to engage freely in ecclesiastical discussions with members and non-members alike was protected by the church autonomy doctrine. 289 F.3d. at 658.

38

DOCS_SF:103803.8 05066/001

VII could not be applied to the treatment of plaintiff Bryce as her continued employment, given her sexual preference, was a matter of internal church governance and doctrine, relating as it did to ecclesiastical discussion of church policy. *Id*. at 658.

ASF's contention that secular controversies involving the Catholic Church must be adjudicated according to canon law has been rejected by every court that has considered it in diocesan bankruptcy cases. In *Portland,* the archdiocese had been incorporated as a corporation sole under Oregon law.[19] Only one of the 124 parishes within the archdiocese had been separately incorporated.[20] In the chapter 11 case, the archbishop claimed that the bulk of the archdiocese's assets were held in trust for the benefit of the unincorporated parishes and other juridic persons within the diocese.[21] The archdiocese argued that the bankruptcy court was compelled by the First Amendment and RFRA to apply canon law to define the relationship between the Archdiocese and its unincorporated parishes in adjudicating whether property titled to the Archdiocese was property of the unincorporated parishes or held in trust for them.

The *Portland* bankruptcy court first held that the religion clauses of the First Amendment did not deprive the court of jurisdiction over the question of whether the assets purportedly held in trust were properly part of the bankruptcy estate and thus subject to the claims of the Archdiocese's creditors.[22] The court then held that those same clauses did not require the court to defer to canon law in determining the ownership of the assets in question.[23] Next, the court

---

[19] *Portland*, 335 B.R. at 849.

[20] *Id*.

[21] *Id.* at 848.

[22] *Id.* at 851-53.

[23] *Id.* at 854.

DOCS_SF:103803.8 05066/001

held that Oregon state corporation law likewise did not require the court to defer to canon law in determining the ownership of the assets in question.[24]  The court noted that "even debtor's own canon law expert acknowledges that being a separate juridic person under canon law does not give that juridic person a civil law identity."[25]  The court further explained:

> In fact, unincorporated religious associations are not legal persons that may take title to real property in their names.  Because the parishes are not separately incorporated, as they could be under Oregon religious corporations law, they cannot hold title to real property.  They are not separate from, but are merely a part of debtor.

*Id*. at 866 (citation omitted).

The court also rejected the archbishop's argument "that, even if the parishes are not legal entities that can hold title to real property, they have sufficient legal existence to allow them to be beneficiaries of a trust."[26]  In rejecting the debtor's argument that a judicial determination that parish assets were property of the estate would substantially burden the free exercise of religion, the Court observed that civil law did not prevent the archdiocese from holding property in a way that recognizes internal church law concepts of property ownership and that holding a church organization to the consequences of the choices it has made about how to organize its affairs with relation to the secular world, including its choice of how to hold title to property, does not substantially burden the exercise of religion.  In *Portland*, as in this case, the archdiocese had a

---

[24] *Id*. at 855-59.

[25] *Id*. at 865-66.

[26] *Id*. at 867.  ("Those statutes [tax code and state charitable trust code] do not provide support for concluding that parishes are sufficiently separate from debtor to be the beneficiaries of trusts.  If anything, they show that, if an unincorporated religious organization is to have legal status for some purpose, a statute must expressly provide for such status.")

DOCS_SF:103803.8 05066/001

civil law solution to the problem it created; namely, separate incorporation of each juridic

person.  As the *Portland* bankruptcy judge observed:

> Debtor has chosen to organize its operations under a corporation sole.  It
> chose to separately incorporate (or allow the separate incorporation of)
> [only one parish]; it could also have chosen to incorporate the other
> parishes as religious corporations, by which they would gain a civil legal
> status and could exercise the powers granted to such corporations,
> including the power to hold and dispose of property and to sue and be
> sued.  Debtor did not, however, choose to do that, and gives no reason
> why it could not, under state law, have separately incorporated the
> parishes or in some other way organized itself to protect the canonical
> ownership rights, if any, of the schools and parishes.

*Id.*[27]

In the Diocese of Spokane bankruptcy, the bankruptcy court similarly held that it was not

bound by canon law in determining whether the parishes were separate entities and whether

property owned by the diocese was held in trust for the parishes; rather these matters must be

determined under civil law.  *Comm. of Tort Litigants v. Catholic Diocese of Spokane (In re*

*Catholic Bishop of Spokane),* 329 B.R. 304, 333 (Bankr. E.D. Wash. 2005) .  While the decision

was reversed in part, on other grounds, *Comm. of Tort Litigants v. Catholic Diocese of Spokane*

*(In re Catholic Bishop of Spokane)*, 364 B.R. 81, 91 (E.D. Wash. 2006), this aspect of the

decision, remained undisturbed.

Other courts are in accord. *F.E.L. Publications, Ltd. v. Catholic Bishop*, 754 F.2d 216,

221 (7th Cir. 1984) ("[T]he parishes within the Archdiocese are not legal entities separate and

independent from the Catholic Bishop, but are subsumed within the Catholic Bishop."); *E.E.O.C.*

---

[27] Conversely, when the parishes have been incorporated under state law, and hold legal title to real or personal
property, absent substantive consolidation or application of the alter ego doctrine, their assets are not property of the
estate.  *In re Archdiocese of Milwaukee*, 483 B.R. 693, 699 (Bankr. E.D. Wis. 2012).

*v. St. Francis Xavier Parochial Sch.*, 77 F. Supp. 2d 71, 75-76 (D.D.C. 1999) (finding school and parish were part of larger archdiocese; "Because neither defendant is separately incorporated, defendants are in fact unincorporated divisions of a corporation. As such, their presence in this case triggers a line of precedent holding that unincorporated divisions of a corporation lack legal capacity to be sued."); *Akoury v. Roman Catholic Archbishop*, 2004 Mass. Super. LEXIS 349 at *6-7 (Mass. Super. Sept. 14, 2004) ("Saint Albert the Great's Church and Parish (including its real estate and its personalty) is an unincorporated subdivision of the Archdiocese of Boston.").

The Adversary Proceedings do no implicate an internal church dispute. In fact, the Parishes, ASF, and the Trusts all appear to be in agreement arguing that this Court must apply canon law to determine property of the estate. They all purport to agree that, under canon law, the Parishes were juridic entities even though they had no separate existence under civil law; and that the assets transferred by ASF to the Trusts, without consideration, were subject to the beneficial interests of the unincorporated Parishes prior to the transfers. The disputes that will be resolved by the Adversary Proceedings are purely secular between creditors on the one hand, and a bankruptcy debtor, the Trusts it created and transferred its assets to, and the Parishes, on the other hand.

## IV.    PRIOR TO THE RESTRUCTURING, THE PARISHES COULD NOT BE TRUST BENEFICIARIES BECAUSE THEY HAD NO SEPARATE LEGAL EXISTENCE.

As a matter of law, prior to ASF's transfer of its assets to the Trusts, the Parishes were not capable of being trust beneficiaries.[28]  Because the Parishes failed to fulfill the statutory

---

[28] While this legal issue can be determined by the Court in ruling on the Motion, it is not a gating issue. This is because even if the Court accepts the Objectors' arguments that New Mexico's statute regarding unincorporated associations is not mandatory or is inapplicable to a religious organization, the issue of whether preexisting express

requirement to be treated as unincorporated associations, they could not be recognized as legal entities under civil law and were not legally capable of holding a beneficial interest in property separate from ASF; pre-existing trusts in favor of the Parishes could not have existed prior to the Restructuring and incorporation of the Parishes. Accordingly, ASF made avoidable transfers when it transferred its assets to the Trusts because ASF held both legal title to, and the beneficial interests in, the transferred assets.

The Objectors fail to address (or even acknowledge) the decisions in prior diocesan bankruptcy cases holding that unincorporated parishes could not be trust beneficiaries because they had no separate existence from the diocese under civil law, *Portland* in particular. The baseless argument that this Court is required to recognize the Parishes as separate legal entities because they are treated as juridic entities under canon law (ASF Opp. at 34, 40; Parish Opp. at 6-8) is addressed in the Motion at 27-28 and above at pp. 36-42.

### A.    New Mexico's Statutory Filing Requirement for Unincorporated Associations Is Mandatory.

The Objectors argue that even if this Court concludes (as it must) that civil law rather than canon law must be applied to determine if the unincorporated Parishes were separate legal entities at the time of the challenged transfers, the Parishes were nevertheless unincorporated associations under New Mexico law capable of being trust beneficiaries. However, under New Mexico law, they clearly were not. In New Mexico, unincorporated associations are not

---

or resulting trusts existed for the benefit of the Parishes prior to the challenged transfers by ASF to the Trusts is a factual issue that can only be resolved in discovery after the Committee initiates the underlying litigation.

DOCS_SF:103803.8 05066/001

recognized as legal entities capable of holding property interest unless a written statement is filed with the county clerk. The Objectors concede that the Parishes did not file such statements.[29]

### 1. New Mexico Statute Sections 53-10-1 et *seq.,* Apply to the Parishes.

The Objectors argue, without authority, that New Mexico's statute governing unincorporated associations is "clearly inapplicable" to the Parishes. ASF Opp. at 42; Parish Opp. at 13. New Mexico Statute section 53-10-1, authorizing the formation of unincorporated associations, states:

> [Purposes of organization; filing statement, articles of association and rules and regulations with county clerk.]
>
> **Whenever two or more persons shall desire to form an association for the promotion of their mutual pleasure** or recreation of any hunting, fishing, camping, golf, country club, or association for a similar purpose**, or an association not for the individual profit of the members thereof,** and without incorporating the same as a corporation, or maintaining title of its property in trust . . .[, t]he said persons or members desiring to form such an association . . . may file in the office of the county clerk . . . a statement containing the name of such association, its objects and purposes, the names and residences of the persons forming such association, together with a copy of its articles of association and any rules and/or regulations governing the transactions of its objects and purposes and prescribing the terms by which its members may maintain or cease their membership therein.

N.M. Stat. Ann. ("NMSA") § 53-10-1 (emphasis added).

---

[29] There is no dispute that the Parishes did not file required statements under NMSA § 53-10-1. Motion at 29. To the extent that ASF and the RE Trust filed certain "Certifications of Trust" in counties throughout New Mexico after the RE Trust was formed as part of the Restructure, the documents do not satisfy the plain language of the filing requirement for unincorporated associations as a matter of law because, among other matters, the certifications do not identify any Parishes by name, make no reference to the existence or formation of an unincorporated association or to New Mexico's Unincorporated Associations Act, and make no reference to the purposes of the Parishes or their member parishioners. *See Declaration of Tony Salgado* [Docket No. 420], Exhibit 3 (attaching certifications).

The express terms of NMSA sections 53-10-1 *et seq.* (hereafter, the "Unincorporated Associations Act") apply to "an association not for the individual profit of the members thereof." Prior to the Restructuring, the Parishes are unincorporated non-profit associations. The Objectors argument that the Unincorporated Associations Act is not applicable to religious or charitable organizations is not supported by the plain language of the statute or legal authority. The objecting parties acknowledge that an unrelated chapter, the New Mexico Charitable Solicitations Act (NMSA § 57-22-1 *et seq.*), specifically exempts religious organizations from application of its provisions. ASF Opp. at 44 n. 8; Parish Opp. at 14. Therefore, it is beyond dispute that the New Mexico legislature knows how to exempt religious organizations from statutory requirements when it intends to do so. No such exemption is made with respect to unincorporated associations.

The Parishes and Trusts simultaneously argue that few New Mexico cases treat organizations as unincorporated associations, while submitting that the "absence of more examples . . . does not mean that the difference between a Parish and the organizations meant to be subject to the unincorporated statute are any less clear." Parish Opp. at 14. The absence of reported decisions is irrelevant to the meaning or application of the statute. Statutory construction begins with the plain language of the statute. *See, e.g., Cummings v. X-Ray Assocs. of New Mexico,* 121 N.M. 821, 834 (1996) ("When analyzing a statute from a particular statutory act . . . , we must read the act in its entirety and construe all the provisions together and attempt to view them as a harmonious whole."). NMSA section 53-10-1 makes no exception for religious associations, and reported case law, including *Blue Canyon Well Ass'n v. Jevne,* 2018-

45

DOCS_SF:103803.8 05066/001

Case 18-13027-t11    Doc 457    Filed 08/07/20    Entered 08/07/20 10:35:56 Page 54 of 72

NMCA-004, 410 P. 3d 251 (Ct. App. 2017), discussed below, demonstrates that the Unincorporated Associations Act broadly applies to all non-recreational associations.

ASF alternatively seeks to avoid application of the Unincorporated Associations Act by labeling the Parishes "other legally viable entit[ies]" that did not wish to form unincorporated associations, which ASF argues are exempt from the statute under *Blue Canyon Well Ass'n*. ASF Opp. at 44 (citing *Blue Canyon Well Ass'n,* 410 P. 3d at 254, which states: "[I]t is the right to form an association as opposed to a corporation, trust, or other legally viable entity. . . . For those intending to create an association under Section 53-10-1, the filing of documents is mandatory."). ASF's argument fails because it cannot identify what kind of other legally viable entities the unincorporated Parishes were. Moreover, the "exception" described in *Blue Canyon Well Ass'n* can only be read to mean that the Act governs only formation of an unincorporated association, as distinguished from other legally viable entities such as a corporation, limited liability company, or partnership.

## 2. The Filing Requirement of NMSA Section 53-10-1 *et seq.* Is Mandatory.

The filing of a statement with the county clerk is mandatory, not permissive. *Blue Canyon Well Ass'n,* 410 P. 3d 251. Notwithstanding this unequivocal holding, the Parishes and Trusts argue that the filing requirement is permissive and the case "was simply wrongly decided." Parish Opp. at 13 n. 55.

In *Blue Canyon Well Ass'n,* the court considered identical arguments that the introductory language of section 53-10-1 uses the word "shall" in reference to the desire to form an association and "may" in reference to filing a statement with the county clerk. *Blue Canyon Well*

*Ass'n,* 410 P. 3d at 254-55.  In its reasoned decision, the court concluded that filing documents

with the county clerk is mandatory based on the language of the statute (the information

described at NMSA § 53-10-1 would be rendered surplusage if permissive), and because a

permissive interpretation would conflict with other provisions of the Act (NMSA § 53-10-7

refers to "the statement required to be filed by Section 1").  *Id.*  ("[We decline to follow Blue

Canyon's interpretation, particularly because an interpretation that filing documents is

mandatory gives meaning and effect to each term used in the Act.") (judgment in favor of

unincorporated association reversed based on failure to comply with mandatory statutory filing

requirements).

      Ordinarily, an unincorporated association has no legal existence independent of its

members and cannot hold or acquire property or bring a lawsuit on behalf of its members.  *See,*

*e.g., Moffatt Tunnel League v. U.S.,* 289 U.S. 113, 119 (1933) (unincorporated voluntary

association lacked capacity to sue absent authorization by statute); *Flanagan v. Benvie,* 58 N.M.

525, 529 (1954) (same; unincorporated association lacked capacity to take or hold property).

New Mexico enacted the Unincorporated Associations Act to avoid some of the complexities

associated with the formation of a corporation or trust, while allowing the benefits of acting as a

common association with limitations on liability and the right to hold interests in property,

"*provided* [the unincorporated associations] satisfy its abbreviated requirements."  *Blue Canyon*

*Well Ass'n v. Jevne,* 410 P. 3d at 254 (emphasis added).  *See also Flanagan v. Benvie,* 58 N.M.

at 530 (statute enacted to avoid inconvenience from incapacity of voluntary associations to take

and hold property as an organization).

DOCS_SF:103803.8 05066/001

Under NMSA section 53-10-1 and *Blue Canyon Well Ass'n,* the unincorporated Parishes were required to file a compliant statement with the county clerk to have the legal capacity to hold or acquire property interests as specified in NMSA section 53-10-2 (unincorporated association that meets statutory requirements may hold title to real or personal property). Absent the required filing, the unincorporated Parishes were not entitled to recognition as legally viable entities separate from ASF and were not capable of holding a property interest. To hold otherwise would render the statute meaningless.

       **3.     The Parishes Were Capable of Filing as Unincorporated Associations and Failed to Do So.**

ASF insists that application of the Unincorporated Association Act to the Parishes would be "nonsensical" and filing documents would be "impossible" because the Parishes did not have members prior to incorporation. ASF Opp. at 42-43. However, whether or not the Parishes had members, the parish pastor or the Archbishop (among others) could easily have filed the requisite statement with the county clerk but simply failed to do so.

The filing requirement of NMSA section 53-10-1 is "abbreviated" (*Blue Canyon Well Ass'n,* 410 P. 3d at 254) and far less complex than that of incorporation. The unincorporated association need only file a statement containing: the name of the association and its purpose, the names of the persons forming the association, and a copy of its articles of association and any rules and/or regulations governing its purposes and the terms by which members maintain or cease their membership. NMSA § 53-10-1.

The Objectors have filed numerous declarations by parish pastors that purport to describe, among other matters, the formation, operation, and independence of the Parishes prior

48

to their incorporation. *See, e.g.,* Docket Nos. 417, 433, 441. The requisite statutory statement required far less of the pastors. Each pastor has described a precise number of registered families that comprise the Parish. *See, e.g., Amended Declaration of Rev. Msgr. Lambert Joseph Luna* [Docket No. 441], ¶ 6 (St. Joseph on the Rio Grande comprised of 1,514 registered families); *Declaration of Very Rev. John C. Cannon* [Docket No. 417-1], ¶ 7 (San Isidro parish has 1,002 registered families). Each Parish maintained books and records prior to incorporation and was fully capable of registering as an unincorporated association if it chose to do so, just as the Parishes were capable of and did incorporate as part of the Restructuring and transfer of ASF's assets to the Trusts.

### B. New Mexico's Statutory Filing Requirement Governed the Parishes' Capacity to Hold Real Property and Supplanted Contrary Common Law, If Any.

ASF argues that an unincorporated association that has not complied with statutory requirements of the Unincorporated Associations Act can still be a trust beneficiary under "basic trust law." ASF Opp. at 44-45 (citing provisions of the New Mexico Uniform Trust Code). ASF is wrong; neither common law nor the Uniform Trust Code changes the fact that in New Mexico, legal recognition is not afforded to an unincorporated association unless the mandatory requirements of the statute are met. Prior to incorporation, and in the absence of the mandatory statement necessary to be recognized as unincorporated associations, the Parishes lacked the legal capacity to hold beneficial interests in real and personal property owned by ASF as alleged trust beneficiaries because they were not separate legal entities from ASF.

New Mexico enacted the Unincorporated Associations Act to govern the formation and treatment of unincorporated associations. The Act statutorily enabled the recognition of unincorporated associations in New Mexico, including the right to hold interests in real and personal property if the mandatory filing requirement is met. NMSA § § 53-10-1 and 53-10-2. *See Flanagan v. Benvie,* 58 N.M. at 529-30 ("We recognize that **unincorporated associations, clubs and societies, unless recognized by statute, have no legal existence**.") (citing C.J.S. and Am. Jur. Treatises; emphasis added). Accordingly, in the absence of NMSA sections 53-10-1 *et seq.*—and compliance with its provisions—the Parishes had no separate legal existence prior to incorporation. There is no basis for concluding that the Parishes had a common law capacity to receive and hold property in equity, as alleged trust beneficiaries, if the Parishes had no legal existence and were precluded from receiving or holding property by statute. If accepted by the Court, ASF's interpretation of the Unincorporated Associations Act would render meaningless both the filing requirement and the rights conferred under the statute.

ASF's argument that unincorporated associations that have not satisfied the mandatory requirement of the statute can still be trust beneficiaries is not supported by New Mexico law. First, the Uniform Trust Code's definition of a person or beneficiary as including an "association . . . or any other legal or commercial entity" (NMSA § 46A-1-103(C) and (J)) must be read consistently with the statutory requirements for a legally recognizable unincorporated association under NMSA section 53-10-1. ASF has acknowledged that that the Parishes had no independent legal status prior to their incorporation.[30] Second, ASF's reliance on generalized

---

[30] *See* Brown Decl., Exhibit I at p. 4 (Parish Incorporation Powerpoint: "Parishes today–unincorporated associations. No independent legal status. No recognized identity under *civil* law.") (emphasis in original).

50

DOCS_SF:103803.8 05066/001

language in the Restatement of Trusts that unincorporated associations may be trust beneficiaries is misplaced. The language does not contemplate the filing requirement of NMSA section 53-10-1 or contrary New Mexico authority. *See, e.g., Flanagan, supra* (no legal existence unless recognized by statute).

ASF also relies on two cases applying the law of the state Washington to support its argument that, prior to incorporation, the Parishes could be trust beneficiaries as unincorporated associations without complying with New Mexico's mandatory filing requirement: *Leslie v. Midgate Center, Inc.,* 72 Wash. 2d 977, 436 P. 2d 201 (1967) and *In re Catholic Diocese of Spokane, supra,* 364 B.R. at 91 (citing *Leslie*). ASF Opp. at 45-46. These decisions are inapposite because the state law they were decided under has no filing requirement for unincorporated associations. Washington, unlike New Mexico, has not enacted a statute that governs the recognition of unincorporated associations.

V. **WHETHER ASF'S PROPERTY WAS HELD IN TRUST FOR ITS UNINCORPORATED PARISHES PRIOR TO TRANSFERS TO THE TRUSTS IS A QUESTION OF FACT THAT MUST BE RESOLVED IN THE LITIGATION AFTER DISCOVERY.**

Even if the Court accepts the Objectors' argument that the unincorporated Parishes had legal standing to be the beneficiaries of purported pre-existing trusts, the actual existence of the purported pre-existing trusts is a factual issue which cannot be determined by this Court in the absence of discovery. The existence of factual issues in the litigation is not a basis to deny the Motion. Moreover, based on the current record, the Court would have to conclude that no preexisting trusts existed, at least with respect to ASF's real estate.

Under New Mexico law, an express trust cannot exist without proof of the "manifest intention of the settlor to create it." *Tartaglia v. Hodges,* 129 N.M. 497, 509, 10 P.3d 176, 188 (Ct. App. 2000). An express trust concerning real property is subject to the statute of frauds and "some memorandum manifesting and proving the trust must exist." *Aragon v. Rio Costilla Coop. Livestock Ass'n,* 112 N.M. 152, 155, 812 P.2d 1300, 1303 (1991). "To satisfy the statute of frauds the memorandum must state who are the parties to the contract, either by naming them, or by so designating or describing them that they may be recognized or identified without fair or reasonable doubt or dispute." *Ades v. Supreme Lodge Order of Ahepa*, 51 N.M. 164, 171, 181 P.2d 161, 166 (1947) (quoting 37 C.J.S., Frauds, Statute of, § 193, p. 677). The Objectors have not identified a memorandum that would satisfy this requirement. Therefore, the Objectors' argument that ASF's real estate was held in an unwritten preexisting trust for the Parishes prior to the Restructuring fails under the statute of frauds.

ASF argues that "[u]nder well-established, and very old Canon Law, the relationship between the Archdiocese and the Parishes is one of trustee and beneficiary. Prior to the creation of the RE Trust, the Archdiocese, through the Archbishop, as corporation sole, held bare legal title to the parish property 'in trust for the public juridic persons of the parishes.'" ASF Opp. at 48 (quoting Fox Decl.). ASF does not identify the provisions of canon law that creates this purported trust, instead relying solely on the self-serving declaration of a priest, Joseph Fox. [Dkt. No. 417-3]. Nowhere in his 15-page declaration does this priest identify the particular canon law he relies upon in concluding that ASF held real and personal property in an equitable trust prior to transferring the property to the Trusts. Notably, although Fox refers to the 1951

52

Articles of Incorporation of ASF ("Articles") at paragraph 32 of his declaration, the Objectors have not put the Articles before the Court. The Committee believes this is because the Articles make the following clear: (i) ASF was to be vested with both legal title to, and the beneficial interests in, all Church property within the State of New Mexico; and (ii) there is no reference to canon law or the concept of holding property in trust for Parishes. A true copy of the Articles is attached hereto as **Exhibit A**.

Whether ASF held its assets in preexisting resulting trusts prior to transferring them to the Trusts, is a question of fact:

> A resulting trust arises from a transfer of property under circumstances showing that the transferee was not intended to take the beneficial interest. It has been termed an "intention-enforcing" trust, to distinguish it from the other type of implied trust, the constructive or "fraud-rectifying" trust. The resulting trust carries out the inferred intent of the parties; the constructive trust defeats or prevents the wrongful act of one of them.

*Bassett v. Bassett*, 110 N.M. 559, 566 (1990) (cleaned up). The Objectors have submitted thirteen self-serving declarations (untested by cross-examination) to dispute the facts presented by the Committee concerning the Restructuring and purporting to show the separateness of the Parishes prior to incorporation. Disputed facts have no relevance to the core question of whether the Committee should be granted standing to assert colorable claims for avoidance and recovery of transfers and the determination of property of the estate, which ASF refuses to bring because of its profound and irreconcilable conflict.

## CONCLUSION

The Committee proposes three Complaints to avoid and recover substantial transfers made to the Trusts, and to avoid and recover alleged interests of the Parishes in real property that

DOCS_SF:103803.8 05066/001

were, and are, unrecorded. The Court should grant the Committee standing to pursue these

Complaints under applicable law, which is in no way restricted by RFRA or the First

Amendment.

For the reasons set forth above and in the Motion, the Committee respectfully requests

this Court grant the Motion.

Dated: August 7, 2020

Respectfully submitted,

PACHULSKI STANG ZIEHL & JONES LLP

By    */s/ Kenneth H. Brown*
      James I. Stang
      Kenneth H. Brown
      Gail S. Greenwood
      150 California Street
      San Francisco, CA  94111
      Tel: 415-263-7000
      Fax: 415-263-7010
      jstang@pszjlaw.com
      kbrown@pszjlaw.com
      ggreenwood@pszjlaw.com

      Counsel for the Official Committee of
      Unsecured Creditors

# EXHIBIT A



# OFFICE OF THE
# PUBLIC REGULATION COMMISSION

CERTIFICATE OF COMPARISON

OF

ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF SANTA FE

0283291


The Public Regulation Commission certifies that the attached is a true and complete copy of the ****4**** page document(s) on file in this office.

This Certification is in accordance with Section 53-8-93 NMSA 1978.


DATED: AUGUST 4, 2011


In testimony whereof, the Public Regulation Commission of the state of New Mexico has caused this certificate to be signed by its chairman and the seal of said Commission to be affixed in the City of Santa Fe.

*Patrick H. Lyons*
Chairman

*Stacy Starr-Garcia*
Bureau Chief

**#5903.1**

United States of America

State of New Mexico

It Is Hereby

...tion Commission of the

...day of _____ JUNE

...

...rat : the incorpor...
...ave signed
...d to h ard...
... name ...

Best Available Copy

## ARTICLES OF INCORPORATION of the
## ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE
## OF SANTA FE

RECEIVED
JUN 2 6 1951

(SEAL)   IMPRESSION OF SEAL OF ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF SANTA FE.

KNOW ALL MEN BY THESE PRESENTS:  That I, Edwin V. Byrne, Archbishop of the Roman Catholic Church of the Archdiocese of Santa Fe, under the Provisions of Chapter 183, of the New Mexico Session Laws of 1951, do this day enter into a Corporation Sole, and to that end do hereby adopt, sign and acknowledge the following Articles of Incorporation, to-wit:

1.

The name by which said Corporation shall be known in law is the Roman Catholic Church of the Archdiocese of Santa Fe, and the principal place of business shall be and is the City of Santa Fe, in Santa Fe County, State of New Mexico.

11.

The object of this Corporation shall be the care and administration of the temporal affairs of the Roman Catholic Church of the Archdiocese of Santa Fe, which embraces the State of New Mexico and religious, educational, and charitable ministrations, and maintenance and care of all the property now held, or that may be received, by the said Roman Catholic Church of the Archdiocese of Santa Fe.

Also, to be vested with the title to any and all property held by any predecessor in office, heretofore authorized to receive the same, in behalf of the said Roman Catholic Church of the Archdiocese of Santa Fe.

Also, said Archbishop of the Roman Catholic Church of the Archdiocese of Santa Fe, the subscriber hereto, and his successors in office, to have the power to occupy and possess by donation, gift,

bequests, devise or purchase, and also to hold and maintain, property, real, personal and mixed, and to grant, sell, convey, rent, or otherwise dispose of the same, as may be necessary, to carry on or promote the object of the Corporation. Also, with the full right and authority to borrow money, and to give written declaration therefor, and secure payment thereof by mortgage or other lien on real and personal property, when necessary to promote said objects.

Also, the right to contract and be contracted with, and to sue and be sued, plead and be pleaded in all courts of justice, and to use a corporate seal, by which all deeds and acts of said corporation may be authenticated.

All deeds and other instruments of writing shall be made in the name of the corporation, and signed by the person representing the corporation aforesaid, in the official capacity designated in the Articles, and to be sealed with the seal of the Corporation, an impression of which seal shall be filed with the Articles of Incorporation, in the office of the County Clerk of each county in which said Articles of Incorporation are required to be filed, by the provisions of said Chapter 183, of the New Mexico Session Laws of 1951.

III.

The term of existence of this proposed corporation is perpetual succession.

IV.

The estimated value of the property of the Roman Catholic Church of the Archdiocese of Santa Fe at the time of making these Articles of Incorporation, within the State of New Mexico is Forty Million Dollars ($40,000,000).

V.

The name of the person making these Articles of Incorporation is Most Reverend Edwin V. Byrne, Archbishop of the Roman Catholic Church

of the Archdiocese of Santa Fe, whose residence is 219 Cathedral Place

in the City of Santa Fe, and in whom is vested, and in his successors

in office is vested, the full powers and privileges of this Corporation.

IN WITNESS WHEREOF I have hereunto set my hand and seal as

Archbishop of the Roman Catholic Church of the Archdiocese of Santa Fe,

this  23ᵈ  day of  June  , A. D., 1951.

_Edwin V. Byrne_

Edwin V. Byrne
Archbishop of the Roman Catholic Church of
the Archdiocese of Santa Fe

STATE OF NEW MEXICO

COUNTY OF SANTA FE........ss

Before me, a notary public in and for the County of Santa Fe,
State of New Mexico, on this day personally appeared Most Reverend Edwin
V. Byrne, Archbishop of the Roman Catholic Church of the Archdiocese
of Santa Fe, known to me to be the person whose name is subscribed to
the foregoing Articles of Incorporation, and he acknowledged to me
that on, and for and in behalf of the said Roman Catholic Church of the
Archdiocese of Santa Fe, as Archbishop thereof, he executed the fore-
going Articles of Incorporation, for the purposes and consideration
therein expressed, as the free will and act of said Corporation.

Given under my hand and seal of office, this  23ᵈ  day of
June  , A. D., 1951.

_Rev. C. Blanchard_

Notary public

My commission expires Jan. ...

My commission expires:

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

150 California Street, 15th Floor, San Francisco, CA  94111

A true and correct copy of the foregoing document entitled (*specify*):

**CONSOLIDATED REPLY TO OPPOSITIONS FILED BY THE DEBTOR, PARISHES, RE TRUST, AND DLF TRUST TO MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS: (I) FOR EXCLUSIVE AND IRREVOCABLE AUTHORITY TO COMMENCE, PROSECUTE, AND SETTLE ADVERSARY PROCEEDINGS ON BEHALF OF BANKRUPTCY ESTATE AGAINST CERTAIN DIOCESE-RELATED ENTITIES; AND (II) TO COMPEL THE DEBTOR TO PRODUCE INFORMATION REVEALING THE TEN PARISHES WITH THE LARGEST PURPORTED INTERESTS IN THE DEPOSIT AND LOAN FUND**

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **August 7, 2020**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) **_____**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 7, 2020 | Hung Phan | */s/ Hung Phan* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

1. **Served by Court Electronic Filing (ECF)**

- Jonathan B. Alter    jalter@travelers.com
- Bruce Anderson    baafiling@eaidaho.com, brucea@eaidaho.com
- Dennis A Banning    nmfl@nmfinanciallaw.com,
  banninglaw@yahoo.com;dab@nmfinanciallaw.com;banningdr54167@notify.bestcase.co
  m;dfh@nmfinanciallaw.com
- Jamison Barkley    jamison@jamisonbarkley.com
- Merit Bennett    tblgexternalmail@gmail.com,
  mb@thebennettlawgroup.com;tk@thebennettlawgroup.com;ag@thebennettlawgroup.co
  m;dv@thebennettlawgroup.com
- Joseph A. Blumel    joseph@blumellaw.com
- Aaron J. Boland    aaron@aaronbolandlaw.com
- Kenneth Harris Brown    kbrown@pszjlaw.com
- Martha G Brown    mgb@modrall.com, sandih@modrall.com
- Laura R Callanan    laura@curtislawfirm.org,
  lisa@curtislawfirm.org;amalia@curtislawfirm.org;filing@curtislawfirm.org
- Robert M. Charles    RCharles@LRRC.com, BankruptcyNotices@LRRC.com,robert-
  charles-1072@ecf.pacerpro.com
- Annie Coogan    annie@cooganlawnm.com
- Lisa K. Curtis    lisa@curtislawfirm.org,
  steven@curtislawfirm.org;pauline@curtislawfirm.org;filing@curtislawfirm.org
- Everett J. Cygal    ecygal@schiffhardin.com
- Hannah Dolski    hdolski@lrrc.com
- Ford Elsaesser    ford@eaidaho.com
- Daymon Brandeis Ely    daymon@daymonely.com, darlene@daymonely.com
- Sam L. Fadduol    sfadduol@fchclaw.com
- Daniel Fasy    dan@fasylaw.com
- Benjamin Feuchter    bfeuchter@hinklelawfirm.com, aatkinson@hinklelawfirm.com
- Paul M Fish    pmfish@modrall.com, nikkim@modrall.com;nikkim@ecf.courtdrive.com
- Joseph Mark Fisher    mfisher@schiffhardin.com
- Charles S Glidewell    charles.glidewell@usdoj.gov
- Clifford C Gramer    cliffordgramerlaw@gmail.com, amyccglaw@gmail.com
- Jack Hardwick    jhardwick@SommerUdall.com, lag@SommerUdall.com
- Don F Harris    nmfl@nmfinanciallaw.com,
  briefwriter@comcast.net;donharrislawfirm@gmail.com;nmflcmecf@gmail.com;r54167
  @notify.bestcase.com;dab@nmfinanciallaw.com
- Paul Russell Harris    pharris@ulmer.com
- Manuel Hernandez    mhernandez@fchclaw.com
- Andrew Berne Indahl    andy@alturalawfirm.com
- James C Jacobsen    jjacobsen@nmag.gov, jotero@nmag.gov
- Michele Backus Konigsberg    mbackus@goodwin.com
- Pierre Levy    pierre@ofrielandlevy.com
- Paul M Linnenburger    plinnenburger@rothsteinlaw.com,
  melopez@rothsteinlaw.com;psanchez@rothsteinlaw.com;nrivera@rothsteinlaw.com;dch
  alan@rothsteinlaw.com;ldelgado@rothsteinlaw.com;bjtrujillo@rothsteinlaw.com

- Alicia C. Lopez    alopez@rothsteinlaw.com,
  melopez@rothsteinlaw.com;psanchez@rothsteinlaw.com;nrivera@rothsteinlaw.com;dch
  alan@rothsteinlaw.com;ldelgado@rothsteinlaw.com;bjtrujillo@rothsteinlaw.com
- Caroline Manierre    cmanierre@rothsteinlaw.com,
  melopez@rothsteinlaw.com;psanchez@rothsteinlaw.com;nrivera@rothsteinlaw.com;dch
  alan@rothsteinlaw.com;ldelgado@rothsteinlaw.com;bjtrujillo@rothsteinlaw.com
- Leslie D. Maxwell    lmaxwell@maxwelllawpc.com,
  9786701420@filings.docketbird.com;aburnside@maxwelllawpc.com;
- John F. McIntyre    jmcintyre@montand.com
- James Moffitt    james.moffitt@clydeco.us
- Levi A Monagle    levi@hallmonagle.com
- Carolyn M Nichols    cmnichols@rothsteinlaw.com,
  melopez@rothsteinlaw.com;psanchez@rothsteinlaw.com;nrivera@rothsteinlaw.com;dch
  alan@rothsteinlaw.com;ldelgado@rothsteinlaw.com;bjtrujillo@rothsteinlaw.com
- Christopher Pattock    Christopher.J.Pattock@usdoj.gov
- Jaime A. Pena    jaime.a.pena@usdoj.gov
- Chris W Pierce    cpierce@walkerlawpc.com,
  piercelawfirm@gmail.com;WalkerLawPC14@gmail.com;cramirez@walkerlawpc.com
- Samuel I. Roybal    sroybal@walkerlawpc.com,
  WalkerLawPC14@gmail.com,mlara@walkerlawpc.com
- Stephanie L Schaeffer    bknotice@mccarthyholthus.com,
  sschaeffer@mccarthyholthus.com;sschaeffer@ecf.courtdrive.com
- Daniel J. Schufreider    dschufreider@schiffhardin.com
- Carlos Sedillo    csedillo@fchclaw.com
- Sharon T. Shaheen    sshaheen@montand.com, ltalley@montand.com
- John D. Sloan    pfoster@sloanfirm.com
- Bryan G. Smith    bsmith@tamakilaw.com
- David M. Spector    dspector@schiffhardin.com
- James I. Stang    jstang@pszjlaw.com
- Catalina Sugayan    catalina.sugayan@clydeco.us, Nancy.Lima@clydeco.us
- United States Trustee    ustpregion20.aq.ecf@usdoj.gov
- Douglas R Vadnais    drv@modrall.com,
  doloress@modrall.com,doloress@ecf.courtdrive.com
- Kevin VanLandingham    kevin.p.vanlandingham@usdoj.gov
- Thomas D Walker    twalker@walkerlawpc.com,
  mlara@walkerlawpc.com;sroybal@walkerlawpc.com;WalkerLawPC14@gmail.com;spat
  teson@walkerlawpc.com;mdevine@walkerlawpc.com
- Joshua D Weinberg    jweinberg@goodwin.com
- Christopher P. Winters    cwinters@fchclaw.com
- Vito Ray de la Cruz    vito@tamakilaw.com