UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

ROMAN CATHOLIC CHURCH OF　　　　　　　　　　　　　　Case no. 18-13027-t11
THE ARCHDIOCESE OF SANTA FE,

　　　　Debtor.

# OPINION

Before the Court is the Unsecured Creditors' Committee's (UCC's) motion for authority to bring fraudulent transfer and turnover claims against certain trusts and parishes. The motion has been extensively briefed and argued. Being sufficiently advised, the Court concludes that the motion is well taken and should be granted.

A.　　Facts.

For the sole purpose of ruling on the motion, the Court finds:[1]

Debtor was formally recognized by Pope Pius IX as an archdiocese in 1875. It was incorporated under the laws of the state of New Mexico in 1951. Today the archdiocese includes more than 90 parishes in the northern and northeastern portions of New Mexico. Several of the parishes predate the archdiocese by many decades or even centuries. Since 2015, Debtor has been led by Archbishop John C. Wester, 12th archbishop of the archdiocese.

Each parish operates under the supervision of a pastor appointed by the archbishop. Parishes support themselves with donations from parishioners and others. Each parish hires and

---

[1] The Court takes judicial notice of its docket in this case. *See Gee v. Pacheco*, 627 F.3d 1178, 1191 (10th Cir. 2010) ("We take judicial notice of court records in the underlying proceedings."); *United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007) ("[W]e may exercise our discretion to take judicial notice of publicly-filed records in our court and certain other courts concerning matters that bear directly upon the disposition of the case at hand.")

pays employees, provides (through joint archdiocese programs) employee benefits and worker compensation insurance, insures (through joint archdiocese policies) and maintains its properties, pays its bills, has its own bank accounts, and maintains a separate tax identification number. Parishes have also kept accounts with the Archdiocese Deposit and Loan Fund ("DLF"), which loans funds to parishes for large construction projects. Parishes have appeared as litigants in New Mexico courts. Each parish contributes a share of its collections to the archdiocese.

In late 2007, Debtor and the parishes began to consider a restructuring that involved incorporating the parishes, forming a real estate trust and a financial assets trust, and transferring real estate and financial assets to the trusts. According to Debtor, one of the purposes of the restructuring was to align Debtor's organization under canon law with civil law.

The restructuring began in late 2012, when Debtor created the Archdiocese of Santa Fe Real Estate Corporation ("RE Corp."), a New Mexico nonprofit corporation. Effective January 1, 2013, Debtor created the real estate trust. RE Corp. is the sole trustee of the real estate trust.

The archbishop is the sole member of RE Corp. The archbishop appoints and removes RE Corp.'s directors and controls the actions of RE Corp. as trustee, including the purchase, sale, lease, or improvement of any real estate held or used by the real estate trust.

Debtor is a beneficiary of the real estate trust, which is revocable by Debtor. The stated purpose of the real estate trust is to "support the religious, charitable and educational purposes" of Debtor, the parishes, and other affiliated entities.

More than two years prepetition,[2] Debtor transferred parcels of real property to the real estate trust valued at more than $34.2 million. The transfers typically were made by special warranty deed from Debtor to RE Corp. as trustee for the benefit of a named parish.

Also effective January 1, 2013, Debtor created a financial assets trust for the purpose of receiving financial assets. Under the financial assets trust bylaws, the archbishop appoints trustees of the trust. Debtor is a "Participant" of the financial assets trust, which is revocable by Debtor. The stated purpose of the financial assets trust is to "support the religious, charitable and educational purposes" of Debtor, the parishes, and other affiliated entities.

On the effective date, Debtor transferred financial assets worth about $25.5 million to the trust, including the res of the DLF. Debtor reported the transferred assets as held for the parishes and other church-related organizations.

Parishes have made additional contributions of cash and assets to the financial assets trust. The trust held about $36.7 million on the petition date.

Debtor still holds legal title to real estate worth about $57.4 million. Debtor and the parishes contend that much of this real estate is held for the benefit of the parishes.

Debtor filed this case on December 3, 2018, and operates as a debtor in possession.

The UCC proposes to file three complaints: one to avoid transfers to the real estate trust, one to avoid transfers to the financial assets trust, and one to avoid the parishes' claimed interests in the property titled in Debtor's name. The challenged transfers total more than $150,000,000.

B.     <u>Derivative Standing</u>.

---

[2] This period is relevant to 11 U.S.C. § 548, the Bankruptcy Code's fraudulent transfer avoidance section. The Court does not know if some of the transfers were within the state law "lookback" period (four years). The debtor in possession can use the state statute pursuant to 11 U.S.C. § 544(b).

In chapter 11 cases, there is no question that avoidance claims typically are controlled and brought by the debtor in possession. *See* §§ 544(b), 548, and 1107(a).[3] If a debtor in possession declines to assert a claim, can a bankruptcy court confer derivative standing on a committee to assert it?[4] Relying primarily on two cases, Debtor says no. Debtor's main authority is *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1 (2000). In *Hartford*, the Supreme Court addressed whether a creditor had standing to surcharge collateral under § 506(c), which provides:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

The Supreme Court held:

> The question thus becomes whether it is a proper inference that the trustee is the only party empowered to invoke the provisions. [fn 3: Debtors-in-possession may also use the section, as they are expressly given the rights and powers of a trustee by 11 U.S.C. § 1107] We have little difficulty answering yes.

530 U.S. at 6. While the Supreme Court ruled that a creditor lacks independent standing to assert a § 506(c) surcharge claim, it noted:

> We do not address whether a bankruptcy court can allow other interested parties to act in the trustee's stead in pursuing recovery under § 506(c). *Amici* American Insurance Association and National Union Fire Insurance Co. draw our attention to the practice of some courts of allowing creditors or creditors' committees a derivative right to bring avoidance actions when the trustee refuses to do so, even though the applicable Code provisions, see 11 U.S.C. §§ 544, 545, 547(b), 548(a), 549(a), mention only the trustee. See, *e.g., In re Gibson Group, Inc.,* 66 F.3d 1436, 1438 (C.A.6 1995). Whatever the validity of that practice, it has no analogous application here, since petitioner did not ask the trustee to pursue payment under § 506(c) and did not seek permission from the Bankruptcy Court to take such action in the trustee's stead. Petitioner asserted an independent right to use § 506(c), which is what we reject today. Cf. *In re Xonics Photochemical, Inc.,* 841 F.2d 198, 202–

---

[3] All statutory references are to 11 U.S.C. unless otherwise indicated.

[4] For a general discussion of derivative standing in corporate litigation, *see* Ann M. Scarlett, *Shareholder Derivative Litigation's Historical and Normative Foundations*, 61 Buffalo L. Rev. 837 (2013); Bert S. Prunty, Jr., *The Shareholders' Derivative Suit: Notes on Its Derivation*, 32 N.Y.U. L. Rev. 980 (1957).

203 (C.A.7 1988) (holding that creditor had no right to bring avoidance action independently, but noting that it might have been able to seek to bring derivative suit).

530 U.S. at 13 n.5.

The second case Debtor relies on is *In re Fox,* 305 B.R. 912 (10th Cir. BAP 2004). Addressing the issue left unresolved by *Hartford*, the Tenth Circuit Bankruptcy Appellate Panel (BAP) ruled in *Fox* that a bankruptcy court cannot confer standing on a creditor to pursue a § 548 fraudulent transfer claim (§ 548 has the same "the trustee may" language as § 506(c)). Reasoning that "the statute is absolute and allows us no discretion to vary from what it says," the BAP ruled that under *Hartford* and the plain language of § 548(a), only the trustee can bring avoidance claims; derivative actions are prohibited. *Id.* at 916. The BAP also held: "The language used by the Court in *Hartford* is so clear and compelling, however, that we are convinced it would apply the same reasoning to this case and reach the same conclusion." *Id.* at 915.[5]

*Fox* is in a tiny minority. Every circuit court that has ruled on the question of derivative standing after *Hartford* has allowed it. *See In re Smart World Techs., LLC*, 423 F.3d 166, 176 (2d Cir. 2005); *In re Cybergenics Corp.*, 330 F.3d 548, 553 (3d Cir. 2003); *In re SI Restructuring Inc.*, 714 F.3d 860, 863 (5th Cir. 2013); *In re Trailer Source, Inc.*, 555 F.3d 231, 242-43 (6th Cir. 2009); *In re Consolidated Industries Corp.*, 360 F.3d 712, 716-17 (7th Cir. 2004); *In re Racing Servs., Inc.*, 540 F.3d 892, 898 (8th Cir. 2008); and *In re Jones*, 178 Fed. App'x 662, 664 (9th Cir. 2006). Almost all bankruptcy courts, BAPs, and district courts have ruled the same way.[6] In *In re*

---

[5] For further support for this view, *see In re Cooper*, 405 B.R. 801 (Bankr. N.D. Tex. 2009); *Surf N Sun Apartments, Inc. v. Dempsey*, 253 BR. 490, 491 (M.D. Fla. 1999); *see also* Keith Sharfman, *Derivative Suits in Bankruptcy*, 10 Stan. J.L. Bus. & Fin. 1 (2004) (opposing derivative standing).
[6] *See, e.g., Jefferson County Board of County Commissioners v. Voinovich (In re The V Companies),* 292 B.R. 290 (6th Cir. BAP 2003); *Liberty Mutual Insurance Co. v. Official Unsecured Creditors' Committee of Spaulding Composites Co. (In re Spaulding Composites Co.,*

*Adelphia Comm. Corp.*, 330 B.R. 364, 373 (Bankr. S.D.N.Y. 2005), the bankruptcy court (Judge Gerber) described the practice of conferring derivative standing as "longstanding, and nearly universally recognized."[7] For a good discussion of this majority view, see *Cybergenics* and Lepene and Gordon, *The Case for Derivative Standing in Chapter 11: "It's the Plain Meaning, Stupid,"* 11 A.B.I. L. Rev. 313 (2003).

Courts recognize derivative standing for a variety of textual, historical, and practical reasons.

--<u>Section 503(b)(3)(B)</u>: "After notice and a hearing, there shall be allowed administrative expenses . . . including . . . the actual, necessary expenses . . . incurred by . . . a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor . . . ." This section is often cited as authorizing some sort of derivative action by a creditor. *See, e.g., Cybergenics*, 330 F.3d at 563-66; *Trailer Source*, 555 F.3d at 241; *In re Pursuit Capital Management*, 595 B.R. 631, 658-59 (Bankr. D. Del. 2018).

--<u>Section 1103(c)(5)</u>: "A committee appointed under section 1102 of this title may . . . perform such other services as are in the interest of those represented." This has been read to allow derivative standing. *See, e.g., Smart World Technologies*, 423 F.3d at 183 n. 27; *Cybergenics*, 330 F.3d at 566.

--<u>Section 1107(a)</u>: "Subject to . . . such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights . . . and powers, and shall perform all the functions and duties . . . of a trustee serving in a case under this chapter." In *The V Companies*,

---

*Inc.),* 207 B.R. 899 (9th Cir. BAP 1997); *In re Roman Catholic Bishop of Great Falls, Montana*, 584 B.R. 335 (Bankr. D. Mont. 2018).

[7] According to Judge Gerber, *Fox* is the only appellate court to rule against derivative standing. *Id.* at 373 n.16.

292 B.R. at 295, the court noted § 1107(a) as a potential source of the bankruptcy court's ability to confer derivative standing.

--Section 1109(b): "A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." Again, a number of courts have relied on this section to conclude that they may confer derivative standing in appropriate circumstances. *See, e.g., Cybergenics*, 330 F.3d at 566; *In re STN Enterprises*, 779 F.2d 901, 904 (2d. Cir. 1985); *In re Together Development Corp.*, 262 B.R. 586, 589 (Bankr. D. Mass. 2001).

--Derivative standing was allowed under the Bankruptcy Act. Courts also point to the fact that derivative standing was conferred by bankruptcy referees under the Bankruptcy Act of 1898. *See, e.g., Chatfield v. O'Dwyer*, 101 F. 797, 800 (8th Cir. 1900) (court may grant a creditor the right to pursue an appeal of a claim allowance if the trustee refuses to do so); *Ohio Valley Bank Co. v. Mack*, 163 F. 155, 156 (6th Cir. 1906) (same). Courts reason that the Bankruptcy Code was intended to expand the powers of the bankruptcy court, not contract them, so Congress could not have intended to take away the right to confer derivative standing. *See, e.g., Trailer Source*, 555 F.3d at 241 ("We believe that the well-established practice of derivative standing, unlike the practice as issue in *Hartford Underwriters*, is the type of rule . . . Congress was aware of when enacting the Code") (internal quotations omitted).

--Derivative standing is a better remedy than appointing a trustee. If a debtor in possession unreasonably refuses to bring an avoidance claim, conferring standing on a committee to bring the claim is typically viewed as a better remedy than appointing a trustee. *See, e.g., Cybergenics*, 330 F.3d at 577 ("disallowing derivative suits and forcing creditors' committees to

move to appoint a trustee would amount to replac[ing] the scalpel of derivative suit with a chainsaw") (internal quotations omitted).

--DIPs often have conflicts of interest. Lepene and Gordon note:

> A DIP, unlike a trustee . . . may be subject to conflicts of interest which could affect its decision to initiate avoidance actions. Under these circumstances, and in light of the well-established pre-Code practice recognizing the doctrine of derivative standing, it is entirely *implausible* that Congress intended to provide the power to commence avoidance actions solely to a DIP in a chapter 11 case and not to others in appropriate circumstances.

11 A.B.I. L. Rev. at 334 (footnotes omitted). Also,

> [c]onsidering the objectives of chapter 11, the general reluctance of DIPs to commence litigation against their own insiders, and the contextual features of sections 1107(a), 1109(b), and 503(b)(3)(B), it should be clear that the avoidance provisions of the Bankruptcy Code, unlike section 506(c) in a chapter 7 case, can be "sensibly read" to extend to creditors and committees in a chapter 11 case.

*Id.* at 336 (footnotes omitted).

The Tenth Circuit has not ruled on derivative standing in chapter 11 cases.[8] In *In re MS55, Inc.*, 477 F.3d 1131 (10th Cir. 2007), Judge Tymkovich noted the issue without deciding it, although he did observe that other circuits have continued to allow derivative standing after *Hartford*. *Id.* at 1139, n.9. Lower courts in the Tenth Circuit have approved derivative standing. *See, e.g., In re Ellicott Springs Res., LLC*, 485 B.R. 626, 640 (Bankr. D. Colo. 2013) ("Several circuit level courts have found an implied but qualified right under certain circumstances for creditors, through derivative standing, to pursue ... claims that otherwise belong exclusively to the trustee") (internal quotations omitted); *In re Terra Bentley II, LLC*, 2011 WL 808190, at *4 (Bankr. D. Kan. 2011) ("the Court sees no reason to believe the Tenth Circuit would disagree with the

---

[8] Debtor argues that *Fox* is binding precedent on this Court. As set forth in *In re McGrath and Rogers*, 2020 WL 5884508, at **3–4 (Bankr. D.N.M.), the Court concludes that BAP opinions are persuasive authority but not binding precedent.

unanimous view of the Circuits that have decided the question," i.e., that derivative standing is permissible).

The Court agrees with and adopts the majority view. The *Fox* court interpreted *Hartford* as resolving an important issue (derivative standing) that the Supreme Court said it did *not* decide. Such an interpretation is unfounded. Rather, the Supreme Court should be taken at its word that *Hartford* leaves open the possibility of derivative standing. Seven circuit courts and myriad lower courts have understood the case that way. Examining the question left open by *Hartford*, they considered the entire Bankruptcy Code and prior bankruptcy law and concluded that "the trustee may" language in §§ 544-548 leaves room for bankruptcy courts to confer derivative standing.[9]

C. <u>The Showing Required to Qualify for Derivative Standing</u>.

A court may grant derivative standing to a committee on a showing that the committee made demand on the debtor to bring a claim; the demand was unjustifiably refused; the claim is colorable;[10] and the committee seeks court permission to bring the claim. *Bentley II*, 2011 WL 808190, at *4 (citing *Racing Servs.,* 540 F.3d at 900); *see also Pursuit Capital Management*, 595 B.R. at 664 (the test in the Third Circuit is whether the trustee has unjustifiably refused to pursue

---

[9] There are two schools of thought about the source of a bankruptcy court's authority to confer derivative standing on a creditor or committee. Most courts hold that § 105(a) gives bankruptcy courts the power to confer derivative standing. In *Cybergenics*, for example, the Third Circuit held:
> The concept of derivative standing arose when, despite a lack of express statutory authorization, courts of equity allowed shareholders to pursue valuable actions when the nominal plaintiff (the corporation) unreasonably refused to do so. . . . We believe that the ability to confer derivative standing upon creditors' committees is a straightforward application of bankruptcy courts' equitable powers.

330 F.3d at 568; *see also Trailer Source,* 555 F.3d at 242 (quoting *Cybergenics*); *Racing World*, 540 F.3d at 901 (citing *Cybergenics*). *STN Enterprises*, 770 F.2d at 904 pointed to §§ 1103(c)(5) and 1109(b) as the source of the court's power, while Lepene and Gordon argue that §§1107(a) are 1109(b) the sources. Regardless of the source, it is clear that the Court has the authority to confer derivative standing.

[10] A colorable claim is "A claim that is legitimate and that may reasonably be asserted, given the facts presented and the current law . . ." Black's Law Dictionary (10th ed.)

the claim, whether the claim is colorable, and whether the moving party has leave to sue from the bankruptcy court).

Here, the UCC made demand on Debtor to bring the proposed claims and has sought permission from this Court. The remaining issue is whether the claims are colorable. If they are, then Debtor's refusal to pursue them could be considered unjustifiable. Debtor and the parishes argue that the claims are not colorable for a number of reasons.

D. <u>The First Amendment</u>.[11]

The First Amendment to the Constitution states in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof" (the "Establishment" and "Free Exercise" clauses, respectively). Courts have interpreted these proscriptions to apply government action generally. *See, e.g.*, *Serbian Eastern Orthodox Diocese for United States and Canada v. Milivojevich*, 426 U.S. 696 (1976) (state courts adjudicating church dispute); *Van Orden v. Perry*, 545 U.S. 677 (2005) (display of Ten Commandments on state property). The claims the UCC wishes to pursue are based on the Bankruptcy Code. Consequently, Debtor and the parishes could argue that prosecution of the avoidance actions, or the adjudication of the actions by this Court, prohibits the free exercise of their religion or effects a disestablishment.

In 1963, the Supreme Court applied the Free Exercise Clause to a South Carolina unemployment benefits law. *Sherbert v. Verner*, 374 U.S. 398 (1963). Sherbert was denied unemployment benefits because she would not work on Saturdays, the day of rest in her religion.

---

[11] The parties did not address in any detail the First Amendment, focusing instead on the religious autonomy doctrine and The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq. ("RFRA"), considered *infra*. Both build on the amendment, so the Court thinks it appropriate to discuss it.

*Id.* at 399–401. The Supreme Court found that the unemployment benefit law burdened the free exercise of Sherbert's faith, *id.* at 403–04, and that the state had no compelling interest to maintain the law. *Id.* at 406–07.[12] The court ruled that Sherbert was entitled to unemployment benefits.

In 1990, however, the Supreme Court came up with a new test. In *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), Smith was denied unemployment benefits because of his use of peyote in religious ceremonies. Smith's previous employer had fired Smith because of that use. Smith argued that Oregon's denial of unemployment benefits violated his first amendment rights. The Supreme Court held:

> We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate….[T]he right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).

*Id.* at 878–79 (internal quotations omitted). Courts have applied *Smith's* "neutral law of general applicability" standard broadly. *See, e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993):

> [O]ur cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice….A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest.

*Id.* at 531–32. The Bankruptcy Code's fraudulent transfer sections are neutral and of general applicability, so it may be difficult to challenge them as violating the Free Exercise Clause of the First Amendment.

---

[12] Additionally, if a compelling interest did exist, "it would plainly be incumbent upon the appellees to demonstrate that no alternative forms of regulation would combat such abuses without infringing First Amendment rights." *Id.* at 407.

The Supreme Court has stated several tests for evaluating Establishment Clause challenges, the most protective of which is found in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). "Under the *Lemon* test, a court must ask whether a challenged government action (1) has a secular purpose; (2) has a principal or primary effect that neither advances nor inhibits religion; and (3) does not foster an excessive government entanglement with religion." *American Legion v. American Humanist Assoc.*, 139 S. Ct. 2067, 2078–79 (2019) (quoting *Lemon*, 403 U.S. at 612–13) (internal quotations omitted). The Bankruptcy Code, on its face, meets the first two prongs of the test. The possibility of excessive entanglement appears to be a fact issue.

E.  The Religious Freedom Restoration Act.

In response to *Smith*, Congress passed RFRA, which provides in part:

(a) In general. Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).
(b) Exception. Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--
   (1) is in furtherance of a compelling governmental interest; and
   (2) is the least restrictive means of furthering that compelling governmental interest.
(c) Judicial relief. A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

RFRA generally is understood to reinstate by statute the constitutional free exercise protections articulated in *Sherbert*. Debtor and the parishes argue that RFRA shields it from the UCC's claims. The Seventh Circuit addressed a similar argument in *Listecki v. Comm. Of Unsecured Creditors*, 780 F.3d 731 (7th Cir. 2015). In *Listecki*, the unsecured creditors' committee in the Milwaukee Archdiocese bankruptcy case sought to recover the pre-petition transfer of $55 million to a newly formed trust to operate and maintain eight Catholic cemeteries. The debtor

Case 18-13027-t11    Doc 514    Filed 10/09/20    Entered 10/09/20 15:49:57 Page 12 of 18

argued that the avoidance action was an improper "substantial burden" on the exercise of religion, in violation of RFRA. The Seventh Circuit overruled the argument, holding that RFRA "is not applicable in cases where the government is not a party" to the suit. 780 F.3d at 736. Two other circuits have reached the same conclusion. *See Gen. Conference Corp. of Seventh–Day Adventists v. McGill*, 617 F.3d 402 (6th Cir. 2010); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826 (9th Cir. 1999); *see also Rweyemamu v. Cote*, 520 F.3d 198, 203 n.2 (2d Cir. 2008) ("we do not understand how [RFRA] can apply to a suit between private parties"); *Mathis v. Christian Heating and Air Conditioning, Inc.*, 158 F. Supp. 3d 317, 326 (E.D. Pa. 2016) (to same effect); *Van Stry v. McCrea*, 2020 WL 1812586, at *7 (E.D. Tex.) (same).

The *Listecki* court also found that the committee was not acting under "color of law" and therefore could not be viewed as a government actor. 780 F.3d at 737-41; *accord Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*, 531 B.R. 439 (Bankr. S.D.N.Y. 2015) (a bankruptcy trustee is not a government actor).

To prevail on a RFRA defense, Debtor and the parishes would have to show the Court that *Listecki*, *et al.*, were not correctly decided.

F.  The Religious Autonomy Doctrine.

Debtor and the parishes also argue that pursuit of the claims would violate the "religious autonomy" doctrine. The doctrine protects the right of hierarchical religious institutions, like the Roman Catholic Church, to organize themselves as they see fit. If disputes over church structure arise, the doctrine suggests they should be handled in ecclesiastical rather than civil courts. The doctrine, an outgrowth of the First Amendment, traces its origins to *Watson v. Jones*, 80 U.S. 679 (1871). Discussing disputes about property acquired for the use of a religious congregation, the *Wagner* court held:

> whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest . . . church judicator[y] to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.

80 U.S. at 726-27. Although *Watson* did not refer to the First Amendment, later cases that rely on *Watson* do. In *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952), for example, the Supreme Court, citing *Watson*, held that the First Amendment, made applicable to state law by the Fourteenth Amendment, allowed churches to "decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." Similarly, in *Jones v. Wolf,* 443 U.S. 595, 602 (1979), the Supreme Court held that "the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice." Finally, in *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,* 393 U.S. 440 (1969), the Supreme Court held:

> [T]he First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice.

*Id.* at 449.

Some cases discussing the religious autonomy doctrine, such as *Kedroff*, couch the issue in terms of free exercise. Others consider religious autonomy to implicate the Establishment clause. *See Milivojevich*, 426 U.S. at 709 (expressing concern that the state might "become entangled in essentially religious controversies"); *McRaney v. North American Mission Board of the Southern Baptist Convention, Inc.*, 966 F.3d 346, 348 (5th Cir. 2020) ("The ecclesiastical

-14-
Case 18-13027-t11    Doc 514    Filed 10/09/20    Entered 10/09/20 15:49:57 Page 14 of 18

abstention doctrine recognizes that the Establishment Clause of the First Amendment precludes judicial review of claims that require resolution of 'strictly and purely ecclesiastical' questions.").

A claim to recover an alleged fraudulent transfer does not appear to be the kind of intra-church dispute that the religious autonomy doctrine typically protects from court interference. *See, e.g., Listecki*, 780 F.3d at 742 ("Here, we have what was alleged to be a fraudulent or otherwise avoidable transfer, and the court need not interpret any religious law or principles to make that determination, nor must it examine a decision of a religious organization or 'tribunal' on whether or not the transfer was fraudulent….So, there is no intrachurch dispute at issue"). *See also Tort Claimants v. Roman Catholic Archbishop of Portland*, 335 B.R. 842 (Bankr. D. Ore. 2005) (overruling the archdiocese's religious autonomy doctrine defense).

G. <u>Whether Debtor Holds/Held Parish Property In Trust</u>.

Debtor and the parishes contend that most of the assets at issue, whether titled in Debtor's name on the petition date or transferred prepetition to the real estate and finance trusts, never "belonged" to Debtor but were held in trust for the benefit of the parishes. If true, this would seriously weaken the UCC's proposed fraudulent transfer claims. The UCC counters that the property could not have been held in trust because, before they incorporated in 2013, the parishes were legal nonentities, incapable of being trust beneficiaries. *See* N.M.S.A. § 53-10-1 et seq.; *see also Blue Canyon Well Assoc. v. Jevne*, 410 P.3d 251, 254-55 (N.M. App. 2017) ("For those intending to create an association under Section 53-10-1, the filing of statutory documents is mandatory").

This is a difficult issue. On the one hand, it appears that much of the real estate and money at issue was acquired when the parishes were unincorporated and were not qualified under New Mexico law as unincorporated associations, leaving them vulnerable to the charge that they were

Case 18-13027-t11    Doc 514    Filed 10/09/20    Entered 10/09/20 15:49:57 Page 15 of 18

incapable of owning assets or being trust beneficiaries. If that argument prevails, the UCC's fraudulent transfer claims appear strong.

On the other hand, if the evidence shows that the parishes and their parishioners functioned independently for decades, sometimes centuries; had their own bank accounts and employees; thought of themselves as separate from the archdiocese; and bought their churches, schools, and other property with their own money, intending to own the acquired property in some form or fashion; then they could have a meritorious constructive trust or similar defense. *See, e.g., Committee of Tort Litigants v. Catholic Diocese of Spokane*, 364 B.R. 81 (E.D. Wash. 2006). Most trial courts are willing to consider legal theories that could place the beneficial interest of valuable assets in the hands of the intended and rightful owners. *See, e.g., In re Horton*, 618 B.R. 22, 26–27 (Bankr. D.N.M. 2020) (discussion of constructive trusts in bankruptcy); *see generally Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 135-36 (1962) ("The Bankruptcy Act simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors.").[13]

Clearly there are many fact issues related to this defense.

H.  Statute of limitations.

The alleged transfers occurred some years prepetition, raising potentially difficult statute of limitations issues. The Court does not have enough information to assess the likelihood that the proposed UCC claims might run afoul of an applicable statute of limitations.

I.  The UCC's Proposed Claims are Colorable.

---

[13] If the parishes prevail in their trust argument, query whether the alleged abuse victims could sue the parishes that employed the alleged abusers. In such an event, the parishes would have assets available to compensate abuse victims and may have a sufficient legal existence to be defendants. The fact that the assets of those parishes could be available to pay claims regardless of the outcome of the litigation may reduce the value and/or necessity of adjudicating the proposed claims.

Giving due consideration to the defenses discussed above, the Court concludes that the proposed claims are colorable. Debtor and the parishes have asserted a number of defenses, none of which are frivolous and one or more of which may ultimately be proven meritorious in whole or in part. The Court does not think it prudent, with so much at stake, to rule on the merits of any potential claim or defense at this time. It is enough to find that the claims have sufficient merit to be brought.

## Conclusion

The proposed claims are large, potentially the largest estate assets. While there may be weaknesses in the claims, some of which could prove fatal, the claims are colorable. Debtor declines to pursue the claims because it believes strongly that they lack merit. The Court's authority to confer derivative standing under these circumstances likely is available in the Tenth Circuit, as elsewhere. The UCC has shown that it should be permitted to bring the proposed claims on behalf of the estate. All things considered, the UCC's motion should be granted.

If one or more of Debtor's and/or the parishes defenses has merit, the UCC's claims will fail. If none has merit, the UCC will recover many millions of dollars for the estate. Either way, the proposed litigation will be very expensive and time-consuming. Unless settled, the proceedings may have to be completed by successors to the party representatives, the judge, and counsel, after years of motion practice, discovery, discovery disputes, trials, appeals, remands, and retrials. Millions of dollars would have been spent on attorney fees and costs that could have paid valid abuse claims.

More clarity about the rights of the parties and what is estate property could help the ongoing efforts to reach a global settlement in this case. For that reason, some litigation of the UCC's proposed claims may be needed. There will be a point, however, that the cost of continued

litigation likely will outweigh the benefit. If the proceedings are not settled before then, Debtor, the parishes, and the abuse victims will be the poorer for it.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: October 9, 2020
Copies to: recipients of electronic notice