UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:

ROMAN CATHOLIC CHURCH OF  　　　　　　　　　　　Case no. 18-13027-t11
THE ARCHDIOCESE OF SANTA FE,

　　　Debtor.

# OPINION

　　　Rudy Blea's name is on a list published by Debtor identifying "Priests, Deacons, and Religious Accused of Sexual Abuse of Children." He maintains Debtor put him on the list in error and refuses to remove him, causing him personal and professional harm. Before the Court is Blea's motion for relief from the automatic stay so he can pursue equitable relief to correct the alleged wrong. The Court held a final hearing on the motion on August 19, 2021. Being sufficiently advised, the Court concludes that the motion is not well taken and should be denied.

A.　　Facts.

　　　The Court finds:[1]

　　　Blea, 70, lives in Santa Fe, New Mexico. He works for the New Mexico Department of Health as director of the office of oral health.

　　　Blea was born and raised in Santa Fe. He attended Catholic schools, graduating from high school in 1969. He then went to New Mexico Highlands University for a year, where he performed poorly. He transferred to the College of Santa Fe in 1970, simultaneously enrolling in the Immaculate Heart of Mary Seminary ("IHM"), also in Santa Fe.

---

[1] The Court takes judicial notice of its docket and of the docket in the state court action involving the Archdiocese and Blea, No. D-101-CV-2018-00893. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may sua sponte take judicial notice of its docket and of facts that are part of public records).

In the summer of 1970, before starting at IHM, Blea was a leader of some kind in Debtor's "SEARCH" program. The program was designed to develop leadership and Christian ideals among young Catholics. The program included retreats and get-togethers. At one of these activities Blea, 19, met Gary House, 17, a program participant. During the summer they had a sexual encounter. Blea and House had no contact thereafter.

Blea completed his seminary training at IHM in 1974 and applied to the St. Thomas Seminary in Denver, Colorado. His application omitted his year at New Mexico Highlands, instead representing that he enrolled in IHM in 1969. Blea was accepted to St. Thomas and studied there two and a half years. He then left the seminary, taking a job in Sacramento, California with the California Department of Health. Blea was never ordained as a priest or deacon, nor was he ever employed by Debtor or any other Catholic Church. Nevertheless, Blea was involved with the Catholic Church in California and New Mexico as a lay minister for at least 39 years.

In June 1994, 24 years after his encounter with Blea, House sued Blea, Debtor, the Pecos Benedictine Monastery, the Benedictine Monks, and Archbishop Sanchez, seeking damages for sexual assault. Blea was not served with process until July 1995.

In February 1995, Counsel for Debtor and other defendants (except Blea) took House's deposition. House testified that Blea took advantage of him in 1970 when he was vulnerable and looking for spiritual guidance. House testified that Blea raped him in a room at the Benedictine Monastery in Pecos, New Mexico.

After being served with process in California, Blea traveled to Santa Fe and retained counsel. His lawyer advised him to settle the matter. Blea wrote a check to his counsel for $5,000

-2-
Case 18-13027-t11    Doc 819    Filed 09/17/21    Entered 09/17/21 10:54:23 Page 2 of 17

and eventually (in May 1997) he was dismissed from the action with prejudice.[2] The other defendants were dismissed at about that time. Nothing in the record indicates how much, if anything, the other defendants paid House to settle his claims.

Blea never got the chance to cross-examine House.[3] He strongly disputes House's testimony and testified at the stay relief hearing that the sexual encounter was consensual.

The lawsuit did not result in any adverse action by the Catholic Church against Blea—he was still allowed to work as a lay minister in California and New Mexico. Similarly, no adverse action was taken by the State of California, Blea's employer at the time. There is no evidence that anyone else has ever accused Blea of sexual abuse.

Blea worked and lived in Sacramento, California between 1976 and 2002. At some point before 2017 he returned to Santa Fe.

On September 12, 2017, as part of its attempt to deal with the priest sex abuse scandal, Debtor issued a news release that included a "Letter from Archbishop John C. Wester to introduce List of Accused Priests, Deacons & Religious." Among other things, the letter addressed the measures Debtor was taking to prevent sexual abuse of children and its efforts to help victims of past abuse. The letter stated in part:

> Here at the archdiocese, we have been continually working to identify additional ways that we may aid in the healing process. Not long after I became your archbishop, I concluded that a critical step is for the archdiocese to publicly acknowledge and identify those clergy and religious who have been accused of perpetrating child sexual abuse within our archdiocese. . . . While many of the accused names have already been made public or have been identified elsewhere, this is the first time the archdiocese has published such a list.
> . . . .

---

[2] Blea is unclear about exactly how his settlement occurred. He knows he wrote a check to his lawyer for $5,000 but does not know if the amount included payment of attorney fees. He does not have a copy of a settlement agreement. His former counsel does not, according to Blea, have any records pertaining to the representation.

[3] House is now deceased.

The Archdiocese of Santa Fe's list of accused clergy and religious includes the following:

- The names of all accused clergy and religious who worked within the bounds of the Archdiocese of Santa Fe who have been found guilty of sexually abusing a child, either by the Church (canon law), the State (criminal law), or both. . . .
- The names of all clergy and religious who worked within the boundaries of the Archdiocese of Santa Fe who have been laicized after having been accused of sexually abusing a minor.
- The names of all clergy and religious who worked within the boundaries of the Archdiocese of Santa Fe who have been publicly accused of sexually abusing a child, but who had already been laicized and therefore were no longer in active ministry by the time the accusations were received.
- The names of those deceased clergy and religious who worked within the boundaries of the Archdiocese who have been publicly accused of sexually abusing a child, but where criminal or canonical proceedings were not completed. In most cases, the accused priest had died before the allegations were received.

The news release included a "List of Priests, Deacons, and Religious Accused of Sexual Abuse of Children" (as amended, the "List"). Blea is on the List, identified as a Benedictine brother. The letter and the List were published by local and national media, including newspapers in Santa Fe and USA Today. The List also was published on BishopAccountability.org, which has a database of publicly accused U.S. priests, deacons, etc.. The site was created by the United States Catholic Bishops.

The archbishop decided who to put on the List. Before potential names were submitted to him for consideration, however, an Independent Review Board (IRB)[4] investigated each person and made a recommendation.

---

[4] The IRB was created by Archbishop Sheehan as required by the Charter for the Protection of Children and Young People (the "Charter"), adopted by the United States Conference of Catholic Bishops in 2002. Among other things, the Charter requires each diocese to have a written policy on the sexual abuse of minors by priests, deacons, and "other church personnel" and to have review board that functions as a confidential consultative body to the bishop in discharging his responsibilities under the Charter.

After the List was published, Debtor dismissed Blea from his lay ministries and the State of New Mexico prohibited Blea from participating in activities or programs involving children. There were no other adverse consequences, such as job termination, reduced salary, or demotion.

Blea wrote letters to Debtor's archbishop and Vicar General in November 2017, asserting that he was never ordained, was not a deacon, brother, or priest, and was never part of the Benedictine Order. He asked to be removed from the List.

In March 2018, the Vicar General wrote a letter to Blea, informing him that the IRB had met to consider his request to have his name removed from the List. The letter stated in part:

> To recap the issue that you brought to the Board to reconsider was your status when the alleged action took place, not whether the allegation was credible or not. Your contention is that you were never a Priest, Deacon or Religious, therefore should not be on the list.
>
> The [IRB] reviewed your request and has concluded that insufficient grounds exist for removing your name from the list. In the time frame that the alleged incident took place, you had a relationship with the Benedictine Pecos Monastery and with the Archdiocese of Santa Fe. The type of relationship you had with the Benedictine Pecos Monastery would be classified as a stage of inquiry/formation. The relationship with the Archdiocese of Santa Fe is one in which you were a Seminarian, in formation preparing for ordination to the priesthood. The Board does recommend that a footnote be added to the [L]ist acknowledging your situation at the time. The Archdiocese will follow that recommendation.

In the List, the description of Blea's affiliation was changed from "Benedictine OSB" to "In formation for the Archdiocese of Santa Fe 1969 to 1976." The List's title was changed to include "Seminarians." Blea did not appeal the IRB's/Debtor's decision within the church.[5]

On March 21, 2018, Blea filed a lawsuit in state court against Debtor, asserting claims for defamation, false light invasion of privacy, intentional infliction of emotional distress, and prima

---

[5] The Catholic Church has tribunals through which Blea could appeal the Archbishop's decision. Blea could file a petition or a complaint to initiate a formal process. His complaint would be heard by one or more judicial vicars. The appeals process would be final only after the matter was adjudicated by the Roman Rota, the highest appellate tribunal of the Catholic Church.

facie tort. He asks for compensatory and punitive damages. Debtor answered the complaint on May 18, 2018. Litigation was stayed by the filing of this case on December 3, 2018.

On May 30, 2019, Blea filed a proof of claim for $200,000. Attached to his proof of claim is a copy of his state court complaint.

In his stay motion, Blea seeks relief to "to amend his state court complaint to include a request for injunctive and Equitable Relief or to file an adversary proceeding requesting the same relief." The equitable relief Blea ultimately hopes to get is:

1. A statement to the national website Bishops Accountability.org that Blea was not a priest, deacon, religious, brother or seminarian or any other conferred religious persona at the time of the alleged sexual contact with House.
2. Acknowledgement to those questioning removal of Blea's name from various lists that Blea was never allowed to give a deposition or statement or present any evidence to counsel or any committee for the Archdiocese at any time regarding the circumstances of his relationship while a 19-year-old college student with the alleged 17-year-old victim prior to his name being put on the list.
3. A statement to those who have published his name on various 'Lists' that prior to the inclusion of Creditor Blea's name on the 'Lists' there was no review or investigation of whether Blea was a Benedictine Brother, religious or priest who should be included on the 'Lists.'
4. Letters and publication to the platforms involved (including websites and newspapers) that Blea's name was erroneously placed on the 'lists' of Credibly Accused Child Sexual Offenders.
5. A statement to Roman Catholic parishes within Debtor Archdiocese that Creditor Blea is a Catholic in good standing who should be allowed to practice his faith which is includes [sic] but is not limited to: allowing him to participate and lead volunteer activities, serve on boards and participate in various ministries of the liturgies.

Blea does not say whether he would seek the requested relief as part of his defamation claim or another cause of action.

B.   <u>Relief From the Automatic Stay for Cause</u>.

Bankruptcy courts may grant relief from the automatic stay for "cause." § 362(d)(1). "Because there is no clear definition of what constitutes 'cause,' discretionary relief from the stay

must be determined on a case by case basis." *Chizzali v. Gindi (In re Gindi)*, 642 F.3d 865, 872 (10th Cir. 2011), overruled on other grounds, *TW Telecom Holdings Inc. v. Carolina Internet Ltd.*, 661 F.3d 495 (10th Cir. 2011), quoting *Pursifull v. Eakin*, 814 F.2d 1501, 1504 (10th Cir. 1987).

Debtor opposes stay relief, arguing that the Court lacks jurisdiction over the dispute because it involves an internal, religious matter. Debtor also argues that there is insufficient "cause" to grant stay relief.

C.  Jurisdiction and the Ecclesiastical Abstention Doctrine.

It is well established that secular courts do not have jurisdiction over matters that are "strictly and purely ecclesiastical." *Watson v. Jones*, 80 U.S. 679, 733 (1871). "This principle, which is rooted in the fundamental right of religious freedom, acknowledges that by voluntarily joining a religious association which is engaged in the expression and dissemination of any religious doctrine, a person impliedly consents to be governed, in ecclesiastical matters, by the religious organization's "organic laws, their books of discipline, ... their collections of precedents, ... [and] their usage and customs[.]" *Hubbard v. J Message Grp. Corp.*, 325 F. Supp. 3d 1198, 1207 (D.N.M. 2018); citing *Watson*, 80 U.S. at 729. "[O]riginally a product of common law, the 'ecclesiastical abstention doctrine'" (also known as the "church autonomy doctrine") "has long been tied to the religion clauses of the First Amendment, which prohibits Congress from making any 'law respecting an establishment of religion, or prohibiting the free exercise thereof.'" *Hubbard*, 325 F. Supp. 3d at 1207-08 & n.5; *see also Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952) (*Watson* stands for the proposition that churches may decide for themselves matters of church government, faith, and doctrine). The ecclesiastical abstention doctrine bars courts from deciding "religious controversies" and "matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Serbian E.*

*Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 713 (1976); *see also Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 655 (10th Cir. 2002) (to the same effect).

Some civil disputes involving religious organizations can be resolved without delving into ecclesiastical questions. *See, e.g., Presby. Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presby. Church*, 393 U.S. 440, 449 (1969) (dispute regarding ownership of property may be adjudicated unless the outcome turns on the resolution of controversies over religious doctrine). If a dispute involving a religious organization can be resolved by the application of "neutral principles of law," the ecclesiastical abstention doctrine does not apply. *Id.*; *Jones v. Wolf*, 443 U.S. 595, 602-03 (1979) (the "neutral-principles approach" is "completely secular in operation"); *Milivojevich*, 426 U.S. at 710 (if civil courts adjudicate disputes involving a religious organization, it must be done without resolving underlying religious controversies).

In particular, defamation claims against religious figures and organizations have been allowed to proceed if the claims do not require courts to delve into religious matters. *See, e.g., Hayden v. Schulte*, 701 So. 2d 1354, 1356-57 (La. App. 1997) (the court had subject matter jurisdiction to hear a priest's defamation claim against an archbishop and an archdiocese based upon the priest's unrefuted allegations that the defendants had disseminated defamatory information—unfounded allegations of child sexual abuse—about him through the media); *Lipscombe v. Crudup*, 888 A.2d 1171, 1172-73 (D.C. 2005) (the court had subject matter jurisdiction over a defamation claim against a pastor based on allegations that the pastor "falsely declared at a public gathering that a sexual harassment suit had been brought against" the plaintiff, knowing that the statement was false); *Kliebenstein v. Iowa Conf. of United Methodist Church*, 663 N.W.2d 404, 407-08 (Iowa 2003) (reversing the summary dismissal of plaintiff's defamation

claim against a minister who publicly communicated that the plaintiff embodied "the spirit of Satan" because the phrase has a secular meaning so the court would not have to delve into religious doctrine); *Ausley v. Shaw*, 193 S.W.3d 892, 895-96 (Tenn. App. 2005) (subject matter jurisdiction existed to hear plaintiff's defamation claim against church members and church officials who publicly called plaintiff "a witch doctor" and "a dog" because the alleged defamatory comments were not made in the course of an "ecclesiastical undertaking"); *see generally In re Diocese of Lubbock*, 624 S.W.3d 506, 531-35 (Tex. 2021) (Boyd, J., dissenting) (collecting cases that support the proposition that "the First Amendment does not bar a defamation claim, even if it arises from a religious context, when courts can resolve the claim by applying non-religious neutral principles").

The case law cited above, including the dissent in *Diocese of Lubbock*, is persuasive. The Court concludes that the ecclesiastical abstention doctrine is not a complete bar to Blea's defamation action against Debtor. If Blea wishes to pursue equitable relief as part of a defamation claim, the ecclesiastical abstention doctrine does not prevent him from doing so.[6] The doctrine does, however, limit Blea to using non-religious neutral principles of law to prove his claim. Similarly, equitable relief could not interfere with the church's operations, rules, or procedures.

D.  Defamation in New Mexico.

"Defamation is a wrongful [and unprivileged] injury to [a person's] reputation." NM UJI 13-1001. In New Mexico, to prevail in a defamation claim, a plaintiff must prove: 1. the defendant published a defamatory communication; 2. the communication contained a false statement of fact; 3. the communication concerned the plaintiff; and 4. the communication proximately caused injury

---

[6] As mentioned above, Blea never makes clear that the equitable relief he wants would be a defamation remedy. However, Blea cites a number of defamation cases in his supporting brief, so it is logical to conclude that the relevant claim is defamation.

to the plaintiff's reputation. *Schuler v. McGraw-Hill Companies, Inc.*, 989 F. Supp. 1377, 1383 (D.N.M. 1997), aff'd, 145 F.3d 1346 (10th Cir. 1998); *accord* N.M. UJI 13–1002 (stating the elements of a defamation claim). Based on the evidence before the Court, it appears likely that Blea could satisfy elements 1 (publication of a defamatory statement);[7] 3 (concerning the plaintiff), and 4 (injury).

It would be difficult, however, for Blea to prove that the defamatory statement (i.e., that he has been accused of sexual abuse of children)[8] is false. In 1995, House filed a complaint accusing Blea of sexually abusing him while he was a "minor child."[9] House alleged throughout his complaint that Blea was a pedophile and/or "molester of children." House alleges that Blea raped him when he was a child. Because Blea settled that lawsuit, House's accusations were never determined to be untrue. Thus, Debtor's statement that Blea was "accused of sexual abuse of children" appears to be a true statement of fact.

E.      Availability of Injunctive Relief in Defamation Actions.

Historically, injunctive relief was not a remedy for defamation. *See generally* Erwin Chemerinsky, Injunctions in Defamation Cases, 57 Syracuse L. Rev. 157, 167 (2007); Rodney Smolla, *2 Law of Defamation* § 9:85; David Elder, *Injunctive Relief, Defamation: A Lawyer's Guide*, § 9:9. In this district, however, and in the State of New Mexico, courts follow a "modern"

---

[7] *See, e.g., Andrews v. Stallings*, 892 P.2d 611, 615 (N.M. App. 1995), citing *Bookout v. Griffin*, 639 P.2d 1190, 1193 (N.M. 1982). ("[A] statement is considered defamatory if it has a tendency to render the party about whom it is published contemptible or ridiculous in public estimation, or expose him to public hatred or contempt, or hinder virtuous men from associating with him."); *In re Lipsky*, 460 S.W.3d 579, 596 (Tex. 2015) ("Accusing someone of a crime, of having a foul or loathsome disease, or of engaging in serious sexual misconduct are examples of defamation per se." Restatement (Second) of Torts § 570 (same). Blea does not allege that calling him a "Benedictine brother" or "in formation" was defamatory, merely inaccurate.
[8] Blea does not argue that describing him as a Benedictine was defamatory, only erroneous.
[9] *See* New Mexico Laws of 1971, Chapter 213, An Act Lowering the Age of Majority (lowering the age of majority from 21 to 18).

approach, i.e., that speech that has been judicially determined to be defamatory may be enjoined. *See Wagner Equip. Co. v. Wood*, 893 F. Supp. 2d 1157, 1160 (D.N.M. 2012) (discussing and adopting the modern approach and concluding that it is in accord with New Mexico jurisprudence); *Kimbrell v. Kimbrell*, 306 P.3d 495, 507-08 (N.M. App. 2013), rev'd on other grounds, 331 P.3d 915 (N.M. 2014) (recognizing that a court may enjoin someone from publishing material that has been adjudicated defamatory).

Nevertheless, there is a strong presumption that money damages are sufficient. *See, e.g., Sindi v. El-Moslimany*, 896 F.3d 1, 35 n.15 (1st Cir. 2018); *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emp. and Rest. Emp. Int'l Union*, 239 F.3d 172, 177 (2d Cir. 2001); *Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102, 117 n. 67, 119 (Del. Ch. 2017) (discussing the difficulty of getting injunctive relief in defamation actions). Where, as here, there has been no showing that money damages would be inadequate, it seems unlikely that Blea could obtain injunctive relief in connection with his defamation claim. Furthermore, in such an unlikely event the relief would be limited to enjoining further publication of the defamatory statement. *See, e.g., Sindi*, 896 F.3d at 12; *Organovo Holdings*, 162 A.3d at 123.

F.  Blea's Requested Relief.

Blea seeks stay modification to pursue the following relief.

> 1. A statement to the national website Bishops Accountability.org that Blea was not a priest, deacon, religious, brother or seminarian or any other conferred religious persona at the time of the alleged sexual contact with House.

This request goes beyond a typical defamation injunction (i.e., don't publish it again), and most likely would not be available. Further, it asks the Court to find that Blea was not a "religious," "seminarian," or "other conferred religious persona." Those descriptors are matters of ecclesiastical custom and law, the interpretation of which is within the exclusive jurisdiction of

the church. *See In re Lubbock*, 624 S.W.3d at 513 ("Autonomy extends to the rights of hierarchical religious bodies to establish their own internal rules and regulations and to create tribunals for adjudicating disputes over religious matters."). The ecclesiastical abstention doctrine prevents the Court from interpreting religious doctrine and definitions in the manner Blea requests.

> 2. Acknowledgement to those questioning removal of Blea's name from various lists that Blea was never allowed to give a deposition or statement or present any evidence to counsel or any committee for the Archdiocese at any time regarding the circumstances of his relationship while a 19-year-old college student with the alleged 17-year-old victim prior to his name being put on the list.

This request has the same problems as #1: it goes beyond normal injunctive relief for defamation and it delves into Debtor's rules and procedures. If Blea believes he should have been allowed to give a deposition or statement, or present any evidence to Debtor, he should pursue the matter through the church's appellate procedures. The Court cannot police the church's tribunals to assure that members' rights under canon law are protected. *See, e.g., Milivojevich*, 426 U.S. at 718-720 (court review of church tribunal's decision is impermissible); *Watson*, 80 U.S. at 732 (civil courts should not attempt to "supervise [the] judgments" of ecclesiastical courts); *Connitt v. Reformed Protestant Dutch Church of New Prospect*, 54 N.Y. 551, 562 (1874) (court of law cannot inquire whether the church judicatories "proceeded according to the laws and usages of their church, nor whether they have decided the matter correctly").

> 3. A statement to those who have published his name on various 'Lists' that prior to the inclusion of Creditor Blea's name on the 'Lists' there was no review or investigation of whether Blea was a Benedictine Brother, religious or priest who should be included on the 'Lists.'

Again, this is not a type of injunctive relief available for a defamation claim and it asks the Court to interpret Debtor's rules and overrule the archbishop's/IRB's decision to keep Blea on the List. The Court cannot do that.

> 4. Letters and publication to the platforms involved (including websites and newspapers) that Blea's name was erroneously placed on the 'lists' of Credibly Accused Child Sexual Offenders.

The request shows that Blea's real complaint is not that Debtor defamed him but that he should never have been put on the List because was not a priest, deacon, or religious. Blea's position certainly is defensible, although Debtor's counterarguments have equal force. The dispute has nothing to do with defamation, however, so injunctive relief would not be available. Further, the Court cannot interfere with Debtor's decision to leave Blea on the List.

> 5. A statement to Roman Catholic parishes within Debtor Archdiocese that Creditor Blea is a Catholic in good standing who should be allowed to practice his faith which is includes [sic] but is not limited to: allowing him to participate and lead volunteer activities, serve on boards and participate in various ministries of the liturgies.

The requested relief clearly is outside the scope of a defamation injunction and within the exclusive jurisdiction of the church. *See, e.g., Milivojevich*, 426 U.S. at 718 (church tribunal's decision to suspend or defrock a bishop may not be reviewed or reversed by a civil court); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188 (2012) ("Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so . . . interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs."); *Bollard v. California Province of the Soc'y of Jesus*, 196 F.3d 940, 946 (9th Cir. 1999) ("A church's selection of its own clergy is one such core matter of ecclesiastical self-governance with which the state may not constitutionally interfere."); *Kral v. Sisters of the Third Order Regular of St. Francis of Congregation of Our Lady of Lourdes*, 746 F.2d 450, 451 (8th Cir. 1984) (church tribunal's decision to expel someone from membership is not reviewable in a civil court).

G.  Collateral Attack.

Blea's requested relief shows that his goal is to overturn Debtor's decision to keep him on the List. Not only is this prohibited by the ecclesiastical abstention doctrine, it also is a collateral attack on Debtor's decision. As a general matter, collateral attacks of the decisions of other courts or tribunals are impermissible, especially if the attacking party had, but did not use, avenues of appeal from the decision. *See, e.g., In re Gollehon*, 2015 WL 1746496, at *7 (10th Cir. BAP) (debtor may not "opportunistically relitigate matters already concluded" in state court judgment), citing *In re Owenby*, 42 F. App'x 59 (9th Cir. 2002); *Wermy v. Norwest Financial Washington, Inc.*, 72 F.3d 139, at *2 (10th Cir. 1995) (unpublished) (affirming district court's dismissal of a lawsuit as an impermissible collateral attach on a state court judgment); *Greenpeace, Inc. v. Waste Tech. Indus.*, 9 F.3d 1174, 1182 (6th Cir. 1993) (plaintiff's lawsuit to enjoin defendant was an impermissible collateral attack on EPA's decision to issue defendant a permit). As Blea disagreed with the IRB's/Debtor's decision to keep him on the List, he should have appealed the decision through the church's appellate channels.

H.  Cause and the *Curtis/Crespin* Factors.

If a movant seeks to modify the automatic stay to pursue litigation in another forum, the Court considers a number of factors—i.e., the "*Curtis*" and "*Crespin*" factors, to assist the Court's "cause" determination. *See In re Kearney,* 2018 WL 4502076, at *4-6 (Bankr. D.N.M.). The *Curtis* factors are: 1. Whether the relief will result in a partial or complete resolution of the issues; 2. The lack of any connection with or interference with the bankruptcy case; 3. Whether the foreign proceeding involves Debtor as a fiduciary; 4. Whether a specialized tribunal has been established to hear the particular cause of action and that tribunal has the expertise to hear such cases; 5. Whether Debtor's insurance carrier has assumed full financial responsibility for defending the litigation; 6. Whether the action essentially involves third parties, and Debtor functions only as a

bailee or conduit for the goods or proceeds in question; 7. Whether litigation in another forum would prejudice the interests of other creditors, the creditors' committee and other interested parties; 8. Whether the judgment claim arising from the foreign action is subject to equitable subordination under Section 510(c); 9. Whether movant's success in the foreign proceeding would result in a judicial lien avoidable by Debtor under Section 522(f); 10. The interest of judicial economy and the expeditious and economical determination of litigation for the parties; 11. Whether the foreign proceedings have progressed to the point where the parties are prepared for trial; and 12. The impact of the stay on the parties and the 'balance of hurt.' *In re Curtis*, 40, B.R. 795, 799-800 (Bankr. D. Utah 1984).

The *Crespin* factors are: 1. Whether a specialized tribunal should hear the matter; 2. Whether stay relief would have an adverse effect on estate administration; 3. Whether stay relief would be compatible with the claims allowance process; 4. Whether stay relief would promote judicial economy; 5. Whether stay relief would reduce litigation expense; 6. Whether creditors would be prejudiced by stay relief; 7. How likely it is that the movant would prevail on his claim; and 8. Whether stay relief would harm one party more than it would help the other. *In re Crespin*, 581 B.R. 904, 908-09 (Bankr. D.N.M. 2018).

The Court weighs the factors as follows:

| *Crespin* Factors | Discussion |
|---|---|
| 1. Specialized Tribunal | Blea's defamation claim does not need a specialized tribunal. On the other hand, Blea's more fundamental grievance, i.e., that Debtor should have removed his name from the List but did not, must be heard by a Church appellate tribunal, not this Court. |
| 2. Estate Administration | Trial of Blea's defamation claim would burden the estate. Furthermore, if Blea's proposed adversary proceeding were limited to equitable relief, there would be duplication of effort when Debtor's anticipated objection to Blea's proof of claim is heard. |
| 3. Claims Allowance Process | While Blea's motion is not directly related to his proof of claim because he seeks non-monetary relief, the underlying facts are identical. Thus, as a practical matter the Court would have to hear |

|  | Debtor's objection to Blea's claim at the same time. Because Debtor is not yet ready to begin the claims administration process, this factor weighs against stay relief. |
|---|---|
| 4. Judicial Economy | As the action could be filed in this Court, the factor does not apply or else weighs in Blea's favor. |
| 5. Litigation Expense | It would be more efficient to hear Blea's damages and equitable relief claims at the same time. Were the Court to grant stay relief, it would hear both. However, given all of the problems with Blea's requested equitable relief, this factor weighs in favor of keeping the stay in place. |
| 6. Prejudice to other creditors | Because it is not practicable to limit Blea's adversary proceeding to equitable relief, the Court would have to try Blea's claim ahead of the others. That would not necessarily prejudice other creditors, however, as any allowed claim would not be paid ahead of them. Thus, the only potential prejudice to creditors would be the litigation expense and possible erosion of insurance coverage. |
| 7. Likelihood of Success | For a number of reasons, Blea is not likely to obtain his requested relief. First, Blea is vague about the cause of action he wants to pursue—is it defamation, declaratory judgment, or something else? Assuming he seeks equitable relief for defamation, Blea would have difficulty proving the claim. Second, Blea probably would not be entitled to injunctive relief even if he did obtain a defamation judgment, Third, the injunctive relief to which he might be entitled is not the relief he wants. Fourth, his request for injunctive relief is an impermissible collateral attack on Debtor's decision to keep his name on the List. Fifth, the ecclesiastical abstention doctrine bars the Court from granting Blea the equitable relief he seeks, as it is not based on "non-religious neutral principles" but on Debtor's interpretation and application of church law and rules about who should be disclosed as possible child molesters. |
| 8. Balance of the Hurt | Denying the stay motion might hurt Blea and help Debtor, but any hurt is mitigated, and perhaps eliminated, by the fact that Blea's equitable relief claims are very unlikely to succeed. |
| *Curtis* factors not discussed above | |
| 1. Whether the relief will result in a partial or complete resolution of the issues. | As a practical matter, granting stay relief would result in the trial of all of Blea's claims against Debtor, as it makes no sense to try Blea's equitable relief claims without hearing testimony about damages. |
| 5. Whether Debtor's insurance carrier has assumed full financial responsibility for defending the litigation. | There is no evidence that Blea's claim is insured or that an insurer has agreed to pay defense costs. However, Debtor's counsel represented to the Court that there is insurance coverage and that any defense costs incurred in a defamation action would reduce funds available to other creditors. |
| Factors 3, 6, 8, 9, and 11. | N/A |

Weighing the *Crespin/Curtis* factors, the Court finds that Blea has not carried his burden of showing that cause exists to modify the automatic stay. Blea has an uphill battle to win his defamation claim and get money damages. His chance of obtaining his desired equitable relief from this Court is vanishingly small, for the reasons outlined above. It makes no sense to allow Blea to tilt at this windmill, nor to force Debtor (and other creditors) to incur the expense of defending the charge.

## Conclusion

The Court has jurisdiction to hear Blea's defamation claim and award money damages if appropriate, applying neutral principles of law. It also has jurisdiction to enjoin further publication of defamatory statements, if defamation is proved. It does not have jurisdiction, however, to order that Blea be removed from the List, nor to adjudicate Blea's challenge to Debtor's decision that he was close enough to the church in 1970 to warrant inclusion on the List.

Blea's stay relief motion will be denied by separate order.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: September 17, 2021
Copies to: counsel of record